

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT;
THE STATE OF ALABAMA;
THE STATE OF ALASKA;
THE STATE OF ARIZONA;
THE STATE OF COLORADO;
THE STATE OF DELAWARE;
THE STATE OF FLORIDA;
THE STATE OF HAWAII;
THE STATE OF IDAHO;
THE STATE OF ILLINOIS;
THE STATE OF INDIANA;
THE STATE OF IOWA;
THE STATE OF KANSAS;
THE COMMONWEALTH OF KENTUCKY;
THE STATE OF LOUISIANA;
THE STATE OF MAINE;
THE STATE OF MARYLAND;
THE COMMONWEALTH OF
    MASSACHUSETTS;
THE STATE OF MICHIGAN;
THE STATE OF MINNESOTA;
THE STATE OF MISSISSIPPI;
THE STATE OF MISSOURI;
THE STATE OF MONTANA;
THE STATE OF NEBRASKA;
THE STATE OF NEVADA;
THE STATE OF NEW JERSEY;
THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK;
THE STATE OF NORTH CAROLINA;
THE STATE OF NORTH DAKOTA;
THE STATE OF OHIO;
THE STATE OF OKLAHOMA;
THE STATE OF OREGON;
THE COMMONWEALTH OF
    PENNSYLVANIA;
THE COMMONWEALTH OF PUERTO RICO;
THE STATE OF RHODE ISLAND;
THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE;
THE STATE OF UTAH;
THE STATE OF VERMONT;
THE COMMONWEALTH OF VIRGINIA;

Civil Action No.

3:19CV710 MPS

May 10, 2019

**COMPLAINT**

**Public Version**

FILED

2019 MAY 10 P 12: 11

US DISTRICT COURT
HARTFORD

THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA;
THE STATE OF WISCONSIN;

v.

TEVA PHARMACEUTICALS USA, INC.;
ACTAVIS HOLDCO US, INC.;
ACTAVIS PHARMA, INC.;
AMNEAL PHARMACEUTICALS, INC.;
APOTEX CORP.;
ARA APRAHAMIAN;
AUROBINDO PHARMA U.S.A., INC.;
DAVID BERTHOLD;
BRECKENRIDGE PHARMACEUTICAL, INC.;
JAMES (JIM) BROWN;
MAUREEN CAVANAUGH;
TRACY SULLIVAN DIVALERIO;
DR. REDDY'S LABORATORIES, INC.;
MARC FALKIN;
GLENMARK PHARMACEUTICALS, INC.,
USA;
JAMES (JIM) GRAUSO;
KEVIN GREEN;
GREENSTONE LLC;
ARMANDO KELLUM;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MYLAN PHARMACEUTICALS INC.;
JILL NAILOR;
JAMES (JIM) NESTA;
PAR PHARMACEUTICAL COMPANIES, INC.;
NISHA PATEL;
PFIZER, INC.;
KONSTANTIN OSTAFICIUK;
DAVID REKENTHALER;
RICHARD (RICK) ROGERSON;
SANDOZ, INC.;
TARO PHARMACEUTICALS USA, INC.
UPSHER-SMITH LABORATORIES, LLC;
WOCKHARDT USA LLC;
ZYDUS PHARMACEUTICALS (USA), INC.

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| I. | SUMMARY OF THE CASE | 2 |
| II. | JURISDICTION AND VENUE | 9 |
| III. | THE PARTIES | 10 |
| IV. | FACTS SUPPORTING THE LEGAL CLAIMS | 18 |
|  | A. Factual Support For The Allegations | 18 |
|  | B. The Generic Drug Market | 20 |
|  |    1. The Hatch-Waxman Act | 20 |
|  |    2. The Importance Of Generic Drugs | 21 |
|  |    3. The Players In The Drug Distribution System | 22 |
|  |       a. *Manufacturers/Suppliers* | 22 |
|  |       b. *Wholesalers/Distributors* | 25 |
|  |       c. *Group Purchasing Organizations (GPOs)* | 26 |
|  |       d. *Pharmacy and supermarket Chains* | 26 |
|  |       e. *Customer Incentives* | 27 |
|  |    4. The Cozy Nature Of The Industry And Opportunities For Collusion | 29 |
|  |       a. *Trade Association and Customer Conferences* | 29 |
|  |       b. *Industry Dinners and Private Meetings* | 30 |
|  |    5. The Overarching Conspiracy Between Generic Drug Manufacturers *Playing Nice In The Sandbox* | 33 |
|  |    6. Generic Drug Price Spikes Since 2013 | 50 |
|  | C. The Illegal Schemes | 51 |
|  |    1. The Overarching Conspiracy In Operation:  Customer And Market Allocation Agreements To Maintain Market Share And Avoid Price Erosion | 51 |
|  |       a. Teva/Mylan | 52 |
|  |          i. Fenofibrate | 52 |
|  |          ii. Clonidine –TTS Patch | 55 |
|  |          iii. Tolterodine Extended Release | 60 |
|  |          iv. Capecitabine | 65 |

i

b.  Teva/Sandoz ................................................................ 68
    i.    Portia and Jolessa ........................................... 68
    ii.   Temozolomide ................................................ 70
    iii.  Tobramycin ................................................... 74
    iv.   Dexmethylphenidate HCL Extended Release ............... 76

c.  Teva/Lupin ................................................................ 79
    i.    Lamivudine/Zidovudine (generic Combivir) ............. 79
    ii.   Irbesartan ................................................... 83
    iii.  Drospirenone and ethinyl estradiol (Ocella) ........... 84
    iv.   Norethindrone/ethinyl estradiol (Balziva®) ............ 88

d.  Teva/Greenstone ......................................................... 88
    i.    Oxaprozin Tablets ........................................... 89
    ii.   Tolterodine Tartrate ........................................ 92
    iii.  Piroxicam .................................................... 94
    iv.   Cabergoline .................................................. 97

e.  Teva/Actavis ............................................................. 98
    i.    Amphetamine/Dextroamphetamine Extended Release ...... 98
    ii.   Amphetamine/Dextroamphetamine Immediate Release ..... 99
    iii.  Dextroamphetamine Sulfate Extended Release ............ 101
    iv.   Clonidine-TTS ................................................ 101
    v.    Budesonide Inhalation ....................................... 103
    vi.   Celecoxib .................................................... 104

f.  Teva/Par ................................................................. 106
    i.    Omega-3-Acid Ethyl Esters ................................. 106
    ii.   Entecavir .................................................... 108
    iii.  Budesonide DR Capsules ..................................... 110
    iv.   Clonidine-TTS ................................................ 101
    v.    Budesonide Inhalation ....................................... 103

g.  Teva/Taro ................................................................ 112
    i.    Enalapril Maleate ........................................... 112
    ii.   Nortriptyline Hydrochloride ................................ 116

h.  Teva/Zydus ............................................................... 120
    i.    Fenofibrate .................................................. 120
    ii.   Paricalcitol ................................................. 125
    iii.  Niacin ER .................................................... 128
    iv.   Etodolac Extended Release ................................... 131

i.  Teva/Glenmark ............................................................ 133
    i.    Moexipril Hydrochloride Tablets ............................ 134
    ii.   Desogestrel/Ethinyl Estradiol Tables (Kariva) ............. 135
    iii.  Gabapentin Tablets .......................................... 136

|  | iv. | Etodolac Extended Release | 131 |

| j. | Teva/Lannett | 137 |
|  | i. | Baclofen | 138 |

| k. | Teva/Amneal | 140 |
|  | i. | Norethindrone Acetate | 140 |

| l. | Teva/Dr. Reddy's | 141 |
|  | i. | Oxaprozin | 141 |
|  | ii. | Paricalcitol | 143 |

2. Taking The Overarching Conspiracy To A New Level:  Price Fixing (2012 – 2015) .......... 148

| a. | Teva July 31, 2012 Price Increase | 150 |
|  | i. | Nadolol | 151 |
|  | ii. | Labetalol | 154 |
|  | iii. | Nitrofurantoin MAC Capsules | 154 |

b. Increasing Prices Before A New Competitor Enters The Market:  Budesonide Inhalation Suspension (February – April 2013) .......... 155

c. Early 2013:  Teva's Generics Business Struggles .......... 157

d. April 2013:  Teva Hires Defendant Nisha Patel .......... 158

e. Ranking "Quality of Competition" to Identify Price Increase Candidates .......... 162
  i. The "High Quality" Competitor Relationships .......... 163
    a) Mylan (+3) .......... 163
    b) Watson/Actavis (+3) .......... 165
    c) Sandoz (+3) .......... 166
    d) Glenmark (+3) .......... 166
    e) Taro (+3) .......... 167
    f) Lupin (+2) .......... 167

f. May 24, 2013:  The First List of Increase Candidates .......... 168
  i Glenmark .......... 170
  ii. Sandoz .......... 174
  iii. Taro .......... 177

g. July 3, 2013 Price Increases .......... 178
  i. Upsher-Smith .......... 180
  ii. Mylan .......... 182
  iii. Sandoz .......... 186

h.    July 19, 2013 Price Increase (Enalapril Maleate) ..................... 187

i.    August 9, 2013 Price Increases ("Round 2") ........................... 193
      i.      Mylan ................................................................ 198
      ii.     Pravastatin (Glenmark/Apotex/Zydus/Lupin) .............. 201
      iii.    Etodolac and Etodolac ER ................................... 207
      iv.     Impact of Price Increases ................................... 211

j.    Price Increase Hiatus ................................................... 212

k.    March 7, 2014:  Price Increases and Overarching Conspiracy
      Converge (Niacin ER) ................................................... 213

l.    April 4, 2014 Price Increases ........................................ 216
      i.      Lupin (Cephalexin Oral Suspension) ........................... 222
      ii.     Greenstone (Azithromycin Oral Suspension,
              Azithromycin Suspension, and Medroxyprogesterone
              Tablets) ........................................................... 224
      iii.    Actavis (Clarithromycin ER Tablets, Tamoxifen
              Citrate and Estazolam ........................................ 227
      iv.     Multiple Manufacturers (Ketoconazole Cream and
              Tablets) ........................................................... 231
      v.      New Relationships Emerge ................................... 234
              a) Breckenridge ................................................ 234
              b) Rising ......................................................... 236
              c) Versapharm .................................................. 238
      vi.     Impact ............................................................. 239

m.    April 15, 2014 Price Increase (Baclofen) ............................. 239

n.    July 1, 2014 Price Increase (Fluocinonide) .......................... 241

o.    August 28, 2014 Price Increases ...................................... 246
      i.      Mylan ............................................................. 252
      ii.     Taro ............................................................... 256
      iii.    Zydus............................................................. 260
      iv.     Competitors Follow Teva ...................................... 261

p.    January 28, 2015 Price Increases ..................................... 262
      i.      Propranolol ...................................................... 265
      ii.     Ciprofloxacin HCL and Glimepiride ........................... 266
      iii.    Griseofulvin ..................................................... 269

3.    Competitors Become "High Quality" After Successfully Colluding
      With Teva................................................................... 270

      a.    May 2014:  Defendant Patel Updates The Quality Competitor
            Rankings to Reflect New Relationships ................................. 270

iv

|        | i.     | Apotex ................................................... | 270 |
|        | ii.    | Zydus.................................................... | 272 |
|        | iii.   | Heritage ............................................... | 274 |
|        | iv.    | Lupin .................................................... | 275 |
|        | v.     | Par ....................................................... | 276 |
|        | vi.    | Greenstone .......................................... | 278 |
|        | vii.   | Amneal ................................................ | 279 |
|        | viii.  | Rising .................................................. | 281 |
|        | ix.    | Breckenridge ....................................... | 282 |
|        | x.     | Glenmark ............................................. | 283 |

4.    "Quality Competitors" Collude With Each Other As Well (Not Just With Teva) .................................................................................. 284

    a.    One Example:  The Sandoz/Mylan Relationship ..................... 285
        i.    Market Allocation – Valsartan HCTZ ........................... 286
        ii.    Price Increases – Summer 2013 ........................... 289
            a)    Haloperidol and Trifluoperazine HCL............... 290
            b)    Benazepril HCTZ..................................... 293
            c)    Levothyroxine....................................... 295
            d)    Clomipramine HCL ................................. 299
            e)    Tizanidine ............................................ 305

    b.    Individual Defendant Relationships ................................. 307
        i.    Ara Aprahamian.................................... 308
        ii.    David Berthold .................................... 309
        iii.    Jim Brown ........................................ 310
        iv.    Maureen Cavanaugh ............................... 311
        v.    Marc Falkin ...................................... 312
        vi.    Jim Grauso ....................................... 313
        vii.    Kevin Green ...................................... 315
        viii.    Armando Kellum .................................. 317
        ix.    Jill Nailor ......................................... 318
        x.    James Nesta....................................... 319
        xi.    Konstantin Ostaficiuk ............................. 320
        xii.    Nisha Patel ....................................... 321
        xiii.    David Rekenthaler ................................ 323
        xiv.    Rick Rogerson.................................... 324
        xv.    Tracy Sullivan .................................... 325

5.    A Commitment To The Overarching Conspiracy Was Instrumental To The Success Of The Price Fixing Agreements............................. 326

6.    "Quality Competitor" Rankings Relate To Price Increases, But Even "Low Quality" Competitors Comply With The Overarching Conspiracy ............................................................................................ 328

        a.    Example:  Camber Pharmaceuticals, Inc. (and its President, Defendant Ostaficiuk) .................................................................... 328

    7.    Teva Profitability Increases Dramatically As A Result Of Price Increases .................................................................................... 334

    8.    Teva and Its Executives Knowingly Violated The Antitrust Laws ....... 335

    9.    Price Increases Slow Dramatically After Government Investigations Commence ..................................................... 338

  D.   Consciousness Of Guilt ..................................................... 340

    1.    Spoliation of Evidence  ............................................... 341
    2.    Obstruction of Justice ................................................. 342

V.    TRADE AND COMMERCE ............................................... 344

VI.    MARKET EFFECTS ......................................................... 344

VII.    CAUSES OF ACTION

COUNT ONE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT TEVA
AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND
SEVERAL LIABILITY – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND  FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT MARKET EFFECTS ...... 345

COUNT TWO
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
MYLAN AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERALLIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ......................................... 349

COUNT THREE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
SANDOZ AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ......................................... 351

COUNT FOUR
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
ACTAVIS AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE

MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF |THE SHERMAN ACT .......................................... 353

COUNT FIVE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
TARO AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT .......................................... 355

COUNT SIX
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
GLENMARK AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 357

COUNT SEVEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
LUPIN AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 359

COUNT EIGHT
 (BY ALL PLAINTIFF STATES AGAINST DEFENDANT |
AMNEAL AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 360

COUNT NINE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
APOTEX AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 362

COUNT TEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
AUROBINDO AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 363

COUNT ELEVEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT

BRECKENRIDGE AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................... 365

COUNT TWELVE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
DR. REDDY'S AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................... 366

COUNT THIRTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANTS
PFIZER AND GREENSTONE AND ALL OTHER CORPORATE DEFENDANTS
UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY
TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................... 368

COUNT FOURTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
LANNETT AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT
AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................................... 369

COUNT FIFTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
PAR AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND
SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................................... 371

COUNT SIXTEEN
 (BY ALL PLAINTIFF STATES AGAINST DEFENDANT
UPSHER-SMITH AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................... 372

COUNT SEVENTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT
WOCKHARDT AND ALL OTHER CORPORATE DEFENDANTS UNDER
JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ....................... 374

COUNT EIGHTEEN
 (BY ALL PLAINTIFF STATES AGAINST DEFENDANT
ZYDUS AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND
SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT .......................................... 375

COUNT NINETEEN
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT ARA APRAHAMIAN) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 377

COUNT TWENTY
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT DAVID BERTHOLD) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 378

COUNT TWENTY-ONE
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT JAMES (JIM) BROWN) – HORIZONTAL CONSPIRACY
TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 380

COUNT TWENTY-TWO
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT MAUREEN CAVANAUGH) – HORIZONTAL CONSPIRACY
TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 382

COUNT TWENTY-THREE
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT MARC FALKIN) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 386

COUNT TWENTY-FOUR
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT JAMES (JIM) GRAUSO) – HORIZONTAL CONSPIRACY
TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 388

COUNT TWENTY-FIVE
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT KEVIN GREEN) – HORIZONTAL CONSPIRACY TO

ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 389

COUNT TWENTY-SIX
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT ARMANDO KELLUM) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 392

COUNT TWENTY-SEVEN
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT JILL NAILOR) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 394

COUNT TWENTY-EIGHT
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT JAMES NESTA) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 395

COUNT TWENTY-NINE
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT KONSTANTIN OSTAFICIUK) – HORIZONTAL
CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT ....................................................... 398

COUNT THIRTY
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT NISHA PATEL) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 399

COUNT THIRTY-ONE
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT DAVID REKENTHALER) – HORIZONTAL CONSPIRACY
TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 403

COUNT THIRTY-TWO
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT RICHARD (RICK) ROGERSON) – HORIZONTAL
CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT ....................................................... 407

COUNT THIRTY-THREE
(BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT TRACY SULLIVAN) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC
DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ...................... 409

COUNT THIRTY-FOUR
SUPPLEMENTAL STATE LAW CLAIMS............................................................ 410

Connecticut ........................................................................... 410
Alabama ................................................................................ 411
Alaska ................................................................................... 412
Arizona .................................................................................. 412
Colorado ................................................................................ 414
Delaware ............................................................................... 414
Florida ................................................................................... 415
Hawaii ................................................................................... 417
Idaho ..................................................................................... 418
Illinois ................................................................................... 418
Indiana .................................................................................. 419
Iowa ...................................................................................... 420
Kansas ................................................................................... 420
Kentucky ............................................................................... 421
Louisiana ............................................................................... 425
Maine .................................................................................... 425
Maryland ............................................................................... 425
Massachusetts ....................................................................... 426
Michigan ............................................................................... 427
Minnesota .............................................................................. 428
Mississippi ............................................................................ 432
Missouri ................................................................................ 433
Montana ................................................................................ 433
Nebraska ............................................................................... 435
Nevada .................................................................................. 436
New Jersey ............................................................................ 437
New Mexico ........................................................................... 438
New York ............................................................................... 439
North Carolina ....................................................................... 440
North Dakota .......................................................................... 444
Ohio ...................................................................................... 445
Oklahoma .............................................................................. 445
Oregon .................................................................................. 445
Pennsylvania ......................................................................... 446
Puerto Rico ............................................................................ 457
Rhode Island .......................................................................... 457
South Carolina ....................................................................... 458

Tennessee ........................................................................................ 459
Utah ................................................................................................. 461
Vermont ........................................................................................... 461
Virginia ............................................................................................ 462
Washington ...................................................................................... 462
West Virginia ................................................................................... 463
Wisconsin ......................................................................................... 463

PRAYTER FOR RELIEF .................................................................. 465

JURY DEMAND ................................................................................. 467

People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.

- Adam Smith, *The Wealth of Nations*, 1776

Teva said in a statement it would continue to defend itself and that while it does "review prices in the context of market conditions, availability and cost of production," it does not "discuss individual pricing rationale/strategies." It denied that it engaged in anything that would lead to criminal or civil liability.

"Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill obligations to our shareholders," Teva said. "Teva delivers high-quality medicines to patients around the world, and is committed to complying with all applicable competition laws and regulations in doing so. Teva fosters a culture of compliance with these laws and regulations, and is dedicated to conducting business with integrity and fairness. Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of innacurate media stories."

- *Statements by Teva reported in Law360, January 18, 2019*

## COMPLAINT

The States of Connecticut, Alabama, Alaska, Arizona, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, West Virginia, Wisconsin, the Commonwealths of Kentucky, Massachusetts, Pennsylvania, Puerto Rico and Virginia (the "Plaintiff States"), by and through their Attorneys General, bring this civil law enforcement action against Teva Pharmaceuticals USA, Inc. ("Teva"), Actavis Holdco US, Inc., Actavis Pharma, Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Ara Aprahamian, Aurobindo Pharma U.S.A., Inc., David Berthold, Breckenridge Pharmaceutical, Inc., James (Jim) Brown, Maureen Cavanaugh, Tracy Sullivan DiValerio, Dr. Reddy's Laboratories, Inc., Marc Falkin, Glenmark Pharmaceuticals, Inc., USA, James (Jim) Grauso, Kevin Green, Greenstone LLC, Armando Kellum, Lannett

Company, Inc., Lupin Pharmaceuticals, Inc., Mylan Pharmaceuticals Inc., Jill Nailor, James

(Jim) Nesta, Konstantin Ostaficiuk, Par Pharmaceutical Companies, Inc., Nisha Patel, Pfizer,

Inc., David Rekenthaler, Richard (Rick) Rogerson, Sandoz, Inc., Taro Pharmaceuticals USA,

Inc., Upsher-Smith Laboratories, LLC, Wockhardt USA LLC, and Zydus Pharmaceuticals

(USA), Inc. (collectively, the "Defendants") and allege as follows:

## I.     SUMMARY OF THE CASE

1.     For many years, the generic pharmaceutical industry has operated pursuant to an

understanding among generic manufacturers not to compete with each other and to instead settle

for what these competitors refer to as "fair share."  This understanding has permeated every

segment of the industry, and the purpose of the agreement was to avoid competition among

generic manufacturers that would normally result in significant price erosion and great savings to

the ultimate consumer.  Rather than enter a particular generic drug market by competing on price

in order to gain market share, competitors in the generic drug industry would systematically and

routinely communicate with one another directly, divvy up customers to create an artificial

equilibrium in the market, and then maintain anticompetitively high prices.  This "fair share"

understanding was not the result of independent decision making by individual companies to

avoid competing with one another.  Rather, it was a direct result of specific discussion,

negotiation and collusion among industry participants over the course of many years.

2.     By 2012, Teva and other co-conspirators decided to take this understanding to the

next level.  Apparently unsatisfied with the status quo of "fair share" and the mere avoidance of

price erosion, Teva and its co-conspirators embarked on one of the most egregious and damaging

price-fixing conspiracies in the history of the United States.  Teva and its competitors sought to

leverage the collusive nature of the industry to not only maintain their "fair share" of each

2

generic drug market, but also to significantly raise prices on as many drugs as possible.  In order to accomplish that objective, Teva selected a core group of competitors with which it already had very profitable collusive relationships – Teva referred to them as "High Quality" competitors – and targeted drugs where they overlapped.  Teva had understandings with its highest quality competitors to lead and follow each other's price increases, and did so with great frequency and success, resulting in many billions of dollars of harm to the national economy over a period of several years.

3.      At the zenith of this collusive activity involving Teva, during a 19-month period beginning in July 2013 and continuing through January 2015, Teva significantly raised prices on approximately 112 different generic drugs.  Of those 112 different drugs, Teva colluded with its "High Quality" competitors on at least 86 of them (the others were largely in markets where Teva was exclusive).  The size of the price increases varied, but a number of them were well over 1,000%.

4.      In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals.  Over time, the investigation expanded and Connecticut was joined in its efforts by forty-eight (48) additional states and U.S. territories.  The allegations in this Complaint are based on, and supported by, information and evidence gleaned directly from the investigation, including: (1) the review of many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged herein.

3

5.      As a result of the information and evidence developed through that investigation, which is still ongoing, the Plaintiff States allege that Defendant Teva consistently and systematically, over a period of several years, along with the other Defendants named herein and other unnamed co-conspirators, engaged in contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the generic pharmaceutical industry throughout the United States, including but not limited to, the markets for well more than one-hundred (100) different generic drugs, many of which are identified herein. This conduct has resulted in many billions of dollars of overcharges to the Plaintiff States and others, and has had a significant negative impact on our national health and economy.

6.      Plaintiff States also allege that Defendants participated in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry. The overarching conspiracy was effectuated by a series of conspiracies that affected and continue to affect the market for a number of generic drugs identified in this Complaint.

7.      The Plaintiff States focus here on the role of these named Defendants and their participation in and agreement with this overarching conspiracy. The Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy. The Plaintiff States continue to investigate additional conspiracies, involving these and other generic drug manufacturers, regarding the sale of other drugs not identified in this Complaint, and will likely bring additional actions based on those conspiracies at the appropriate time in the future.

8.      Defendants' illegal agreements have raised prices, maintained artificially inflated prices, thwarted Congress's goal to lower the prices of drugs, and thus frustrated the potential of

the industry to deliver great value to Plaintiff States and those they represent.  Generic drugs are pharmaceutically equivalent to the referenced brand name drug in dosage, form, route of administration, strength or concentration, and amount of active ingredient.  Generic drugs can save (and have saved) consumers, other purchasers of drugs, and taxpayers tens of billions of dollars annually because generic drugs are a lower-priced alternative to brand name drugs. When the manufacturer of a branded drug loses the market exclusivity that comes with patent rights, generic drugs offer lower prices and greater access to healthcare for all consumers in the United States through genuine competition.  A consumer with a prescription can fill that prescription not only with the brand name drug, but also with a generic version of that drug, if one is available.  State laws often require pharmacists to fill prescriptions with generic versions of the drug.

9.      Typically, when the first generic manufacturer enters a market for a given drug, the manufacturer prices its product slightly lower than the brand-name manufacturer.  When a second generic manufacturer enters, that reduces the average generic price to nearly half the brand-name price.  As additional generic manufacturers market the product, the prices continue to fall.  For drugs that attract a large number of generic manufacturers, the average generic price falls to 20% or less of the price of the branded drug.

10.      Generic drugs were one of the few "bargains" in the United States healthcare system.  Health care experts believe cost savings from the growing number of generic drugs helped keep the lid on increasing health care costs.  With the Hatch-Waxman Act of 1984, Congress designed the generic drug market to keep costs low, and the market initially operated that way.

11.     At some point, that price dynamic changed for many generic drugs.  Prices for hundreds of generic drugs have risen – while some have skyrocketed, without explanation, sparking outrage from politicians, payers and consumers across the country whose costs have doubled, tripled, or even increased 1,000% or more.   The growing outrage and public reports of unexplained and suspicious price increases caused the State of Connecticut to commence its investigation in July 2014.  Shortly thereafter, Congress opened an inquiry and various companies acknowledged that a criminal grand jury investigation had been convened by the United States Department of Justice Antitrust Division.

12.     Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward – illegal collusion among generic drug manufacturers.  Prices of many generic pharmaceuticals were and remain artificially inflated through collusive bid rigging and market allocation agreements designed to prevent price wars from occurring when key competitive opportunities arise in the marketplace.

13.     Generic drug manufacturers, through their senior leadership and marketing, sales and pricing executives, have routine and direct interaction.  The Defendants exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.  These anticompetitive agreements are further refined and coordinated at regular "industry dinners," "girls' nights out," lunches, parties, golf outings, frequent telephone calls, e-mails and text messages.

14.     The anticompetitive conduct – schemes to fix and maintain prices, allocate markets and otherwise thwart competition – has caused, and continues to cause, significant harm to the United States healthcare system, which is ongoing.  Moreover, executives and others at the highest levels in many of the Defendant companies, including but not limited to Defendants Ara Aprahamian, David Berthold, James (Jim) Brown, Maureen Cavanaugh, Tracy Sullivan DiValerio, Marc Falkin, James (Jim) Grauso, Kevin Green, Armando Kellum, Jill Nailor, James (Jim) Nesta, Konstantin (Kon) Ostaficiuk, Nisha Patel, David Rekenthaler, and Richard (Rick) Rogerson, among others, conceived, directed and ultimately benefited from these schemes.

15.     Defendant Teva is a consistent participant in the conspiracies identified in this Complaint, but the conduct is pervasive and industry-wide.  The schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition.  Through its senior-most executives and account managers, Teva participated in a wide-ranging series of restraints with more than a dozen generic drug manufacturers, all of whom knowingly and willingly participated.  As a result of these conspiracies, Defendants reaped substantial monetary rewards.

16.     Defendants' anticompetitive conduct falls principally into two categories, the overarching goal being to avoid price erosion and maintain inflated pricing within and across their respective broad product portfolios and, at times, increase pricing for targeted products without triggering a "fight to the bottom" among existing competitors.  First, to avoid competing with one another and thus eroding the prices for a myriad of generic drugs, Defendants – either upon their entry into a given generic market or upon the entry of a new competitor into that market – communicated with each other to determine and agree on how much market share and which customers each competitor was entitled to.  They then implemented the agreement by

7

either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful.

17.    Second, and often in conjunction with the market allocation schemes, competitors in a particular market communicated -- either in person, by telephone, or by text message -- and agreed to collectively raise and/or maintain prices for a particular generic drug.

18.    Defendants here understood and acted upon an underlying code of conduct that is widespread in the generics industry: an expectation that any time a competitor is entering a particular generic drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high.  While different drugs may involve different sets of companies, this background understanding remains constant and is an important component of the Defendants' ability to reach agreements for specific drugs.

19.    The Defendants knew their conduct was unlawful.  The conspirators usually chose to communicate in person or by cell phone, in an attempt to avoid creating a written record of their illegal conduct.  The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings.  When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications.

20.    As a result of the conspiracies identified in this Complaint, consumers and payors nationwide, including the Plaintiff States, paid substantially inflated and anticompetitive prices for numerous generic pharmaceutical drugs, and the Defendants illegally profited as a result.

21.    The Plaintiff States seek a finding that the Defendants' actions violated federal and state antitrust and consumer protection laws; a permanent injunction preventing the

Defendants from continuing their illegal conduct and remedying the anticompetitive effects caused by their illegal conduct; disgorgement of the Defendants' ill-gotten gains; damages on behalf of various state and governmental entities and consumers in various Plaintiff States; and civil penalties and other relief as a result of Defendants' violations of law.

## II.   **JURISDICTION AND VENUE**

22.   This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 & 26, and under 28 U.S.C. §§ 1331 and 1337.

23.   In addition to pleading violations of federal law, the Plaintiff States also allege violations of state law, as set forth below, and seek civil penalties, damages and equitable relief under those state laws.  All claims under federal and state law are based on a common nucleus of operative fact, and the entire law enforcement action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.  The Court has jurisdiction over the non-federal claims under 18 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

24.   This Court may exercise personal jurisdiction over all of the Defendants because they either transact business in the District of Connecticut where this action was commenced, or they have engaged in anticompetitive and illegal conduct that has had an impact in the District of Connecticut.  Specifically, the corporate Defendants market and sell generic pharmaceutical drugs in interstate and intrastate commerce to consumers nationwide through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs. The individual Defendants were executives of various Defendants or non-Defendant co-conspirators who engaged in and directed some of the unlawful conduct addressed herein.  The

9

acts complained of have, and will continue to have, substantial effects in the District of Connecticut.

25.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c).  At all times relevant to the Plaintiff States' Complaint, the Defendants resided, transacted business, were found, or had agents in this District, and a portion of the affected interstate trade and commerce described below has been carried out in this District.

III.     **THE PARTIES**

26.     The Attorneys General are the chief legal officers for their respective States. They are granted authority under federal and state antitrust and consumer protection laws to bring actions to protect the economic well-being of the Plaintiff States and obtain injunctive and other relief from the harm that results from the violations of antitrust and consumer protection laws alleged herein.  All Plaintiff States seek equitable and other relief under federal antitrust laws in their sovereign or quasi-sovereign capacities.  To the extent specified in the state claims asserted in the Complaint, certain Attorneys General of the Plaintiff States have and here exercise authority to secure relief, including monetary relief, including for governmental entities and consumers in their states who paid or reimbursed for the generic pharmaceutical drugs that are the subject of the Complaint.  As specified in Count 34, some states also seek damages for state entities or their consumers under state antitrust law, and some states seek additional relief for violations of state consumer protection laws.

27.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090

10

Horsham Road, North Wales, Pennsylvania.  At all times relevant to the Complaint, Teva has marketed and sold generic pharmaceuticals in this District and throughout the United States.

28.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc.  Upon the acquisition, Actavis, Inc. – the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals) – was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others.  Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

29.     Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic pharmaceuticals.  Unless addressed individually, Actavis Holdco and Actavis Pharma, Inc. are collectively referred to herein as "Actavis."  At all times relevant to the Complaint, Actavis has marketed and sold generic pharmaceuticals in this District and throughout the United States.

30.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 400

11

Crossing Boulevard, Bridgewater, New Jersey. At all times relevant to the Complaint, Amneal has marketed and sold generic pharmaceuticals in this District and throughout the United States.

31.     Defendant Apotex Corp. ("Apotex") is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is 2400 North Commerce Parkway, Weston, Florida.  At all times relevant to the Complaint, Apotex has marketed and sold generic pharmaceuticals in this District and throughout the United States.

32.     Defendant Ara Aprahamian ("Aprahamian") is an individual residing at 14 Catalpa Court, Bardonia, New York.  At all times relevant to the Complaint, Aprahamian was the Vice President of Sales and Marketing at Defendant Taro Pharmaceuticals USA, Inc.

33.     Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6 Wheeling Road, Dayton, New Jersey.  At all times relevant to the Complaint, Aurobindo has marketed and sold generic pharmaceuticals in this District and throughout the United States.

34.     Defendant David Berthold ("Berthold") is an individual residing at 21 Hillcrest Road, Towaco, New Jersey.  At all times relevant to the Complaint, Berthold was the Vice President of Sales at Defendant Lupin Pharmaceuticals, Inc.

35.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Avenue, Fairfield, New Jersey.  At all times relevant to the Complaint, Breckenridge has marketed and sold generic pharmaceuticals in this District and throughout the United States.

36.     Defendant James (Jim) Brown ("Brown") is an individual residing at 4521 Christensen Circle, Littleton, Colorado.  At all times relevant to the Complaint, Brown was the Vice President of Sales at Defendant Glenmark Pharmaceuticals, Inc.

37.     Defendant Maureen Cavanaugh ("Cavanaugh") is an individual residing at 529 North York Road, Hatboro, Pennsylvania.  At all times relevant to the Complaint, Cavanaugh was the Senior Vice President, Commercial Officer, North America, for Defendant Teva Pharmaceuticals USA, Inc.

38.     Defendant Tracy Sullivan DiValerio ("Sullivan") is an individual residing at 2 Pierre Court, Marlton, New Jersey.  At all times relevant to the Complaint, Sullivan was a Director of National Accounts at Defendant Lannett Company, Inc.

39.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 107 College Road East, Princeton, New Jersey.  At all times relevant to the Complaint, Dr. Reddy's has marketed and sold generic pharmaceuticals in this District and throughout the United States.

40.     Defendant Marc Falkin ("Falkin") is an individual residing at 2915 Weston Road, Westin, Florida.  At all times relevant to the Complaint, Falkin was the Vice President, Marketing, Pricing and Contracts at Defendant Actavis.

41.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey.  At all times relevant to the Complaint, Glenmark has marketed and sold generic pharmaceuticals in this District and throughout the United States.

13

42.     Defendant James (Jim) Grauso ("Grauso") is an individual residing at 113 Windsor Lane, Ramsey, New Jersey.  Defendant Grauso worked at Defendant Aurobindo as a Senior Vice President, Commercial Operations from December 2011 through January 2014. Since February 2014, Grauso has been employed as the Executive Vice President, N.A. Commercial Operations at Defendant Glenmark.

43.     Defendant Kevin Green ("Green") is an individual residing at 110 Coachlight Circle, Chalfont, Pennsylvania.  Defendant Green worked at Defendant Teva as a Director of National Accounts from January 2006 through October 2013.  Since November 2013, Green has worked at Defendant Zydus Pharmaceuticals (USA) Inc. and is currently the Vice President of Sales.

44.     Defendant Greenstone LLC ("Greenstone") is a limited liability company located at 100 Route 206, North Peapack, New Jersey.  Greenstone is a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President.  Greenstone employees also use Pfizer for financial analysis, human resources and employee benefit purposes, making the two companies essentially indistinguishable.  At all times relevant to the Complaint, Greenstone has – under the direction and control of Pfizer – marketed and sold generic pharmaceuticals in this District and throughout the United States.

45.     Defendant Armando Kellum ("Kellum") is an individual residing at 56 Gravel Hill Road, Huntingdon Valley, Pennsylvania.  At all times relevant to the Complaint, Kellum was the Vice President, Contracting and Business Analytics at Defendant Sandoz, Inc.

46.     Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 9000 State Road, Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett has marketed and sold generic pharmaceuticals in this District and throughout the United States.

47.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland.  Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India.  At all times relevant to the Complaint, Lupin has marketed and sold generic pharmaceuticals in this District and throughout the United States.

48.     Defendant Mylan Pharmaceuticals Inc. ("Mylan") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.  At all times relevant to the Complaint, Mylan has marketed and sold generic pharmaceuticals in this District and throughout the United States.

49.     Defendant Jill Nailor ("Nailor") is an individual residing at 1918 McRae Lane, Mundelein, Illinois.  At all times relevant to the Complaint, Nailor was the Senior Director of Sales and National Accounts at Defendant Greenstone.

50.     Defendant James (Jim) Nesta ("Nesta") is an individual residing at 9715 Devonshire Drive, Huntersville, North Carolina.  At all times relevant to the Complaint, Nesta was the Vice President of Sales at Defendant Mylan.

51.     Defendant Konstantin Ostaficiuk ("Ostaficiuk") is an individual residing at 29 Horizon Drive, Mendham, New Jersey.  At all times relevant to the Complaint, Ostaficiuk was the President of Camber Pharmaceuticals, Inc. ("Camber").

52.     Defendant Par Pharmaceutical Companies, Inc. ("Par") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York.  At all times relevant to the Complaint, Par has marketed and sold generic pharmaceuticals in this District and throughout the United States.

53.     Defendant Nisha Patel ("Patel") is an individual residing at 103 Chinaberry Lane Collegeville, Pennsylvania.  At all times relevant to the Complaint, Patel worked as a Director of Strategic Customer Marketing and as a Director of National Accounts at Defendant Teva.

54.     Defendant Pfizer, Inc. ("Pifizer") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 235 East 42nd Street New York, New York.  Pfizer is a global biopharmaceutical company and is the corporate parent of Defendant Greenstone.  At all times relevant to the Complaint, Pfizer has marketed and sold generic pharmaceuticals in this District and throughout the United States, and has also participated in and directed the business activities of Defendant Greenstone.

55.     Defendant David Rekenthaler ("Rekenthaler") is an individual residing at 2626 Lulworth Lane, Marietta, Georgia.  At all times relevant to the Complaint, Rekenthaler was the Vice President, Sales US Generics at Defendant Teva.

56.     Defendant Richard (Rick) Rogerson ("Rogerson") is an individual residing at 32 Chestnut Trail, Flemington, New Jersey.  At all times relevant to the Complaint, Rogerson was the Executive Director of Pricing and Business Analytics at Defendant Actavis.

57.     Defendant Sandoz, Inc. ("Sandoz") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business at 100 College Road West, Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company

16

based in Basel, Switzerland.  At all times relevant to the Complaint, Sandoz has marketed and sold generic pharmaceuticals in this District and throughout the United States.

58.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 3 Skyline Drive, Hawthorne, New York.  At all times relevant to the Complaint, Taro marketed and sold generic pharmaceutical drugs in this District and throughout the United States.

59.     Defendant Upsher-Smith Laboratories, LLC (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith"), is a Minnesota limited liability company located at 6701 Evenstad Drive, Maple Grove, MN.  Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan.  At all times relevant to the Complaint, Upsher-Smith has marketed and sold generic pharmaceuticals in this District and throughout the United States.

60.     Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company located at 20 Waterview Boulevard, 3rd Floor, Parsippany, New Jersey.  At all times relevant to the Complaint, Wockhardt has marketed and sold generic pharmaceuticals in this District and throughout the United States.

61.     Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 73 Route 31 North, Pennington, New Jersey.  At all times relevant to the Complaint, Zydus has marketed and sold generic pharmaceuticals in this District and throughout the United States.

62.     Whenever any reference is made in any allegation of the Complaint to any representation, act or transaction of Defendants, or any agent, employee or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors,

employees, agents or representatives of Defendants, while acting within the scope of their actual

or apparent authority, whether they were acting on their own behalf or for their own benefit, did

or authorized such representations, acts or transactions on behalf of Defendants, respectively.

## IV.   FACTS SUPPORTING THE LEGAL CLAIMS

### A.   Factual Support For The Allegations

63.   The allegations in this Complaint are supported and corroborated by facts and

evidence obtained from numerous sources, including but not limited to those set forth below.

64.   During the course of the investigation, the Plaintiff States have issued over 30

subpoenas to various generic drug manufacturers, individuals and third parties, and have

compiled over 7 million documents in a shared document review platform.

65.   The Plaintiff States have issued more than 300 subpoenas to various telephone

carriers, and have obtained phone call and text message records for numerous companies and

individuals throughout the generic pharmaceutical industry.  The Plaintiff States have loaded

those call and text records into a software application for communications surveillance,

collection and analysis, designed exclusively for law enforcement.  The Plaintiff States have also

loaded the names and contact information for over 600 sales and pricing individuals throughout

the industry, at every level – giving the Plaintiff States a unique perspective to know who in the

industry was talking to who, and when.

66.   Defendant Teva has, at all times relevant to the Complaint, maintained a live

database that it refers to as Delphi where it has catalogued nearly every decision it has made

regarding the products it sells, including those decisions that were made collusively – which

Teva often referred to as "strategic" decisions.  Although the Plaintiff States have not been

provided with full access to that important database from Teva, they have obtained static images

18

of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports.  Through its review and investigation of some of those reports, in combination with the phone records, the Plaintiff States have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision.  A number of those instances are detailed throughout this Complaint.

67.     During the course of their investigation, the States have also obtained valuable cooperation from a number of individuals.  The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout this Complaint.  Some of those cooperating witnesses include:

(a)     A former pricing executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

(b)     A former sales and marketing executive at Rising Pharmaceuticals, Inc. and Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

(c)     A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

(d)     A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

(e)     A former senior executive at Defendant Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

(f)     Jason Malek ("Malek"), former Vice President of Commercial Operations at Heritage Pharmaceuticals, Inc. ("Heritage")

B.      **The Generic Drug Market**

1.      <u>**The Hatch-Waxman Act**</u>

68.     In 1984, Congress enacted the Drug Price Competition and Patent Term
Restoration Act, commonly known as the "Hatch-Waxman" Act.  Its intention was to balance
two seemingly contradictory interests: encouraging drug innovation, and promoting competition
between brand and generic drugs in order to lower drug prices.  To encourage innovation, Hatch-
Waxman gave branded drug manufacturers longer periods of market exclusivity for newly-
approved products; this increased the financial returns for investment in drug research and
development.

69.     To promote price competition, the law established a new regulatory approval
pathway for generic products to help ensure that generic drugs became available more quickly
following patent expiration.  To gain approval for a new drug, drug manufacturers must submit a
new drug application ("NDA") to the United States Food and Drug Administration ("FDA")
showing that the new drug is safe and effective for its intended use.  Developing a new drug and
obtaining an NDA can take many years and cost tens or hundreds of millions of dollars.

70.     The Hatch-Waxman Act encouraged faster approval for generic versions of
brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs").  These
applications rely on the safety and efficacy evidence previously submitted by the branded drug
manufacturer, permitting generic manufacturers to avoid conducting costly and duplicative
clinical trials.

71.     Hatch-Waxman succeeded in both of its goals.  Since the law was passed in 1984,
generic drugs have moved from being less than 20% of prescriptions filled in the United States to
nearly 90% of prescriptions filled.  A recent study found that, in 2011 alone, generic medicines

20

saved $193 billion for consumers. During the same period, innovation has continued to lead to many new and helpful drugs.

### 2.      The Importance Of Generic Drugs

72.      Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States. In 2015, sales of generic drugs in the United States were estimated at $74.5 billion dollars. Today, the generic pharmaceutical industry accounts for nearly 90% of all prescriptions written in the United States.

73.      A branded drug manufacturer that develops an innovative drug can be rewarded with a patent granting a period of exclusive rights to market and sell the drug. During this period of patent protection, the manufacturer typically markets and sells its drug under a brand name, and the lack of competition can permit the manufacturer to set its prices extremely high.

74.      Once the brand-name drug's exclusivity period ends, additional firms that receive FDA approval are permitted to manufacture and sell "generic" versions of the brand-name drug. As generic drugs enter the market, competition typically leads to dramatic reductions in price. Generic versions of brand name drugs are priced lower than the brand-name versions. Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug must be "dispensed as written."

75.      As additional manufacturers enter a particular drug market, competition pushes the price down much more dramatically. Often, the price of a generic drug will end up as low as 20% of the branded price or even lower. For this reason, generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system. Experts have stated that

the substantial cost savings gained from the growing number of generic drugs have played a major role in keeping health care costs from increasing more dramatically.

76.    Where there is genuine competition, the savings offered by generics drugs over their brand-name equivalents provide tremendous benefits to consumers and health care payors. Patients typically see lower out of pocket expenses, while lower costs for payors and insurers can lead to lower premiums for those who pay for health insurance, and lower costs to government health care programs like Medicare and Medicaid mean greater value for taxpayers.

### 3.  The Players In The Drug Distribution System

77.    The United States prescription drug distribution system includes entities that are involved at various levels before prescription drugs are ultimately delivered to end users.

#### a.    *Manufacturers/Suppliers*

78.    Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain.  Unlike branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic drugs that can be substituted (often automatically under state law) for the branded drug after expiration of the brand's exclusivity. Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments and creams.  A manufacturer seeking to sell a "new drug" in the United States (including generic versions of previously approved drugs) must obtain approval from the FDA, which evaluates many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling and quality control.

79.    Generic drug manufacturers operate manufacturing facilities, and compete with each other to sell the generic drugs they produce to wholesalers, distributors, and in some cases,

directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

80.    Generic drug manufacturers also sell some of their drugs through auctions to different purchasers in the supply chain, e.g., group purchasing organizations, retail pharmacies and supermarket chains with pharmacies.

81.    In marketing their generic drugs, manufacturers often do not attempt to differentiate their products because, primarily, a generic drug is a commodity.  Consequently, competition is dictated by price and supply.  As a result, generic drug manufacturers usually all market the drug under the same name, which is the name of the active ingredient (e.g., Acetazolamide).

82.    Drug suppliers include the manufacturers themselves, as well as other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company.  The corporate Defendants in this action are all drug manufacturers and suppliers who compete with one another for the sale of generic pharmaceutical drugs which are ultimately sold to consumers in the United States.

83.    Drugs sold in the United States may be manufactured either domestically or abroad.  Many manufacturers that produce drugs for the United States market are owned by, or are, foreign companies.  Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively.  Drug manufacturers typically sell their products through supply agreements negotiated with their customers.

84.    Generic manufacturers report certain benchmark or list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition

cost ("WAC"); these sometimes serve as benchmarks, but given the different characteristics of different buyers and the nature of individual negotiations, a manufacturer will frequently supply the same generic drug at several different prices depending on the customer or type of customer.

85.     In addition, generic manufacturers that enter into a Medicaid rebate agreement must report their average manufacturer prices ("AMP") to the federal Centers for Medicare and Medicaid Services on a monthly and quarterly basis.  Pursuant to federal law, AMP is defined as the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

86.     Medicaid reimbursement for certain generic drugs is calculated using a formula that is derived from a manufacturer's AMP for that specific generic drug.  Put another way, a manufacturer's AMP may have a direct impact on how much a state Medicaid program pays for a generic drug dispensed to a Medicaid beneficiary.

87.     The corporate Defendants in this case are among the largest generic pharmaceutical manufacturers in the industry.  Each has a broad portfolio of generic drugs which it sells to distributors, retailers and group purchasing organizations, many of whom have a nationwide presence.  Competitors for particular pharmaceutical products vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market.  At all time relevant to this Complaint, every Defendant's portfolio remained broad, and was marketed to customers in virtually every state across the United States.

88.     The Defendants' customers supply generic pharmaceuticals to a wide swath of consumer populations, including but not limited to Medicaid recipients; private and public sector employees with commercial payor, employer-funded, or self-funded health plans; patients in

non-profit, for-profit, or public hospitals or long-term care facilities; uninsured "cash pay" consumers; and prisons.

89.     The generic pharmaceutical portfolios of the Defendants run the gamut of indications, servicing a wide range of health needs.  These include potentially less common health problems such as human immunodeficiency virus (HIV) treated with Lamivudine/Zidovudine and long-term kidney disease treated by Paricalcitol, as well as more commonplace conditions such as high blood pressure treated with medications including Clonidine-TTS Patch, Irbesartan, Moexipril HCL and Enalapril Maleate, high cholesterol treated with medications such as Fenofibrate, Pravastatin or Niacin ER, and attention deficit hyperactivity disorder (ADHD) treated by Dexmethylphenidate or Amphetamine/Dextroamphetamine.

90.     Taken together, customers purchase a wide range of generic pharmaceutical products, in enormous volumes, in every state.  Defendants' business plans and strategies for their broad portfolios focus on the nationwide supply and demand chain that funnels their products through various purchasers, including state governments, municipalities, and private sector employers, in order to reach consumer populations in every state.  This supply and demand chain is described in more detail below.

### b.     *Wholesalers/Distributors*

91.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, long-term care and other medical facilities.  Some wholesalers sell to a broad range of customers while others specialize in sales of particular products (e.g., biologic products) or sales to a particular type of customer (e.g., nursing homes).

92.     Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers.  Some of the largest wholesalers and distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris & Dickson").

### c.     *Group Purchasing Organizations (GPOs)*

93.     Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group of purchasers.  GPOs leverage their buying power to obtain better prices and terms for their members, and assist buyers in trade relations and contract management with sellers.  GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains.  Some of the GPOs who sell large volumes of Defendants' generic products for distribution nationwide include Vizient (formerly Novation), Premier, Inc. ("Premier"), Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions ("Econdisc").

### d.     *Pharmacy and Supermarket Chains*

94.     Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer.  There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies. If a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers may agree to contract with them directly.  Such retailers can obtain attractive terms by avoiding the markups or fees charged by wholesalers, distributors, and GPOs. Retailers large enough to purchase drugs directly from manufacturers include Rite Aid

Corporation ("Rite Aid"), CVS Health ("CVS"), The Walgreen Company ("Walgreens"), Wal-Mart Stores, Inc. ("Walmart"), Target Corporation, and Publix Super Markets, Inc. ("Publix").

### e. *Customer Incentives*

95.     Some of the largest buyers that purchase from generic manufacturers actually benefit when prices are higher.  For example, in McKesson's 2014 10-K filing, the company reported the following:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby *we benefit when the manufacturers increase their prices* as we sell our existing inventory at the new higher prices. *For these manufacturers, a reduction in the frequency and magnitude of price increases,* as well as restrictions in the amount of inventory available to us, *could have a material adverse impact on our gross profit margin.*

In that same filing, McKesson also reported that "The business' practice is to pass on to customers published price changes from suppliers."

96.     Similarly, in Cardinal's 2014 10-K filing, the company reported that

> Gross margin in our Pharmaceutical segment is impacted by generic and branded pharmaceutical price appreciation and the number and value of generic pharmaceutical launches. In past years, these items have been substantial drivers of Pharmaceutical segment profit.  Prices for generic pharmaceuticals generally decline over time. But at times, *some generic products experience price appreciation, which positively impacts our margins.*

97.     ABC's Annual Summary 2014 and Annual Report 2014 make very similar observations:

> **Our results of operations continue to be subject to the risks and uncertainties of inflation in branded and generic pharmaceutical prices and deflation in generic pharmaceutical prices.**

> Certain distribution service agreements that we have entered into
> with branded and generic pharmaceutical manufacturers continue
> to have an inflation-based compensation component to them.
> Arrangements with a small number of branded manufacturers
> continue to be solely inflation-based. As a result, our gross profit
> from brand-name and generic manufacturers continues to be
> subject to fluctuation based upon the timing and extent of
> manufacturer price increases. *If the frequency or rate of branded
> and generic pharmaceutical price increases slows, our results of
> operations could be adversely affected.* In addition, generic
> pharmaceuticals are also subject to price deflation. *If the frequency
> or rate of generic pharmaceutical price deflation accelerates, our
> results of operations could be adversely affected.*

98.     Other large retail customers have similar contractual provisions in their contracts

with generic manufacturers that allow for potentially greater compensation when prices are

higher.   For example, contracts between Walgreens Boots Alliance Development GmbH, a

GPO, and generic manufacturers contain provisions about Rebates and Administrative fees that

are directly tied to "total contract sales" – a number that increases when prices increase.  In other

words, that GPO (and other larger retail customers with similar contractual terms) may make

more money when generic pharmaceutical prices are higher.

99.     The generic manufacturers are keenly aware that some of their customers benefit

from their price increases.  In fact, many of the generic drug manufacturers regularly tout these

price increases in their discussions with customers.  As just one example, when Teva met with

large customer Red Oak (a joint venture between Cardinal and CVS) in December 2014, it

boasted that during its August 28, 2014 price increase it had been able to increase twenty

different product families, resulting in an estimated $29.0M price increase value to the customer.

4.       **The Cozy Nature Of The Industry And Opportunities For Collusion**

100.    The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

a.       *Trade Association and Customer Conferences*

101.    Many customers of the Defendants, including but not limited to (a) large wholesalers or distributors like ABC, Cardinal, HD Smith, McKesson and Morris & Dickson, (b) GPOs like Premier, MMCAP and Econdisc, and (c) other large drug purchasers like pharmacy or grocery store chains, hold multi-day conferences throughout the year in various locations throughout the United States.  Generic manufacturers from across the United States are invited to attend.

102.    Additionally, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), in a variety of locations throughout the United States.

103.    At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including Defendants, interact with each other and discuss their respective businesses and customers.  Many of these conferences and trade shows include organized recreational and social events such as golf outings, lunches, cocktail parties and dinners that provide additional opportunities to meet with competitors.  Defendants use these opportunities to discuss and share competitively-sensitive information concerning upcoming

29

bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

104.    These trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### b.    *Industry Dinners and Private Meetings*

105.    In addition to these frequent conferences and trade shows, senior executives and sales representatives gather in smaller groups, allowing them to further meet face-to-face with their competitors and discuss competitively sensitive information.

106.    Many generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude.  At least forty-one (41) different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Par, Pfizer, Sandoz, Taro, Teva, Wockhardt and Zydus.

107.    High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners."  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  Executives (including individual Defendants Berthold, Falkin and Ostaficiuk) from Defendants Actavis,

Aurobindo, Breckenridge, Dr. Reddy's and Lannett, among many other generic manufacturers, attended this particular dinner.

108.    At these industry dinners, one company is usually responsible for paying for all of the attendees.  For example, in a group e-mail conversation among the competitors in December 2013, one of the participants -- a high-ranking executive for Defendant Dr. Reddy's -- joked "[y]ou guys are still buying for Mark and I, right?"  The response from another executive: "Well. . . I didn't think the topic would come up so quickly but . . . we go in alphabetical order by company and [a generic drug manufacturer not identified in this Complaint as a conspirator] picked up the last bill. . . . PS. . . . no backing out now!  Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

109.    Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption.  One such annual event was organized by a packaging contractor in Kentucky.  From September 17-19, 2014, for example, high-level executives from Defendants Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus and others were invited to a gathering at a country club in Bowling Green, Kentucky where they would play golf all day and socialize at night.  Defendant Rekenthaler was in attendance with high-level executives from Defendants Lannett, Amneal, Apotex, Wockhardt and other generic manufacturers.  Rekenthaler and a high-level executive from Apotex, J.H., actually stayed together in the home of the owner of the packaging company that sponsored the event.  At the conclusion of the outing, one of the executives – Defendant Ostaficiuk – sent an e-mail to the other attendees, stating: "███████████████████████████████████ ████████████████████████████████████████████████"  As discussed more fully below in Section IV.C.6.a, Defendants Rekenthaler and Ostaficiuk used this golf outing as an

opportunity to negotiate Camber's anticompetitive entry into the market for two different Teva drugs.

110.    Some generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meeting or dinner.  During these events, the sales representatives meet with their competitors and discuss competitively sensitive information.

111.    Many "Women in the Industry" dinners were organized by A.S., a salesperson from non-Defendant Heritage Pharmaceuticals, Inc. who resides in the State of Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area.  However, out-of-town sales representatives were also aware of these dinners and were included when in the area.  For example, in November 2014, Defendant Sullivan of Defendant Lannett sent A.S. a text message asking "[w]hen is your next industry women event?  I'm due for a trip out there and I'd love to plan for it if possible...." A.S. responded:  "There is an XMas [sic] party at Tanya's house on Dec 6th.  Yes that is a Saturday.  We do it about once a quarter and usually it is during the week -- this was an exception."

112.    Sometimes dinners were also planned around visits of out-of-town competitors. As A.S. stated in organizing the dinner:

> Sorry if the meeting/dinner invite is a little short notice, but [K.N., a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together!  So much has been happening in the industry too -- we can recap all our findings from NACDS [trade show] over a martini or glass of wine!  :)  Plus the food is super Yummy!

113.    Several different GNOs were held in 2015, including:  (1) at the ECRM conference in February (involving Defendants Dr. Reddy's, Greenstone, Lannett, Teva, Upsher-

Smith and Zydus, among others – including individual Defendants Nailor and Sullivan); (2) in Baltimore in May (involving Defendants Dr. Reddy's, Lupin and Teva among others); and (3) at the NACDS conference in August (involving Defendant Dr. Reddy's among others).

### 5.  The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice In The Sandbox

114.   As a result of these communications, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans.  This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

115.   The overarching conspiracy among generic manufacturers, however – which ties together all of the agreements on individual drugs identified in this Complaint – is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs.  Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry.  Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business.  The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion and serve as the basis for further supra-competitive price increases.

116.   This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint.  The Plaintiff States focus here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy.  This Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

117.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs.  These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans.  For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person.  These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

118.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications occur with great frequency across the industry, including among Defendants.

119.    For example, from the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions.  Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below.  The following Table (Table 1), which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds some light on the frequency with which Defendants communicated with each other throughout 2013.

34

**Table 1**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

120. Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Defendants Green, Patel and Rekenthaler of Teva speaking with competitors. Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

121. Similarly, from the period of January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below. The following Table (Table 2), which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

|            | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|------------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| Actavis    | 31     | 17     | 47     | 42     | 76     | 9      | 38     | 24     | 36     | 23     | 8      | 14     | 365    |
| Glenmark   | 4      | 11     | 11     | 7      | 7      | 2      | 9      | 6      | 1      | 6      | 3      | 3      | 70     |
| Greenstone | 17     | 3      | 13     | 3      | 1      | 1      | 6      | 1      | 9      | 0      | 0      | 0      | 54     |
| Lupin      | 11     | 5      | 13     | 4      | 0      | 0      | 0      | 0      | 0      | 0      | 0      | 0      | 33     |
| Mylan      | 6      | 1      | 1      | 1      | 7      | 2      | 0      | 10     | 13     | 5      | 2      | 9      | 57     |
| Sandoz     | 5      | 10     | 7      | 10     | 0      | 1      | 28     | 7      | 4      | 1      | 6      | 3      | 82     |
| Taro       | 1      | 1      | 7      | 4      | 17     | 16     | 5      | 2      | 1      | 0      | 0      | 1      | 55     |
| Zydus      | 18     | 36     | 44     | 24     | 37     | 14     | 19     | 15     | 5      | 5      | 4      | 4      | 225    |
| Totals     | 93     | 84     | 143    | 95     | 145    | 45     | 105    | 65     | 69     | 40     | 23     | 34     | 941    |

122.    Of the 941 calls listed in Table 2, 778 of them – or 83% -- involved Defendants Patel and Rekenthaler of Teva speaking with competitors (by this time, Defendant Green no longer worked at Teva).  Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

123.    It was not just Teva personnel speaking to their competitors, however.  All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy.  Because it would be too voluminous to list the total number of calls among all of the Defendants, the following graphic shows the interlocking web of communications and relationships between just some of the individuals employed by Teva and its key competitors.  Each line in the graphic below demonstrates that at least one phone call or text message was sent between those individuals (identified by their initials) while they were competitors.  For many of these individuals, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



124.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationship between Defendant Teva and another conspirator.  However, this convenience should not imply that the Complaint is solely concerned with bilateral relationships involving Teva.

125.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants:  Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole Cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR Capsules.  These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

126.   Referred to sometimes as the ███████████████ for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.   When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

127.   When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.   For example, when Defendant Dr. Reddy's was about to enter the market for a drug in January 2013, the Vice President of Sales and Marketing explained during negotiations with his competitor that "he views it this way.  If they [Dr. Reddy's] are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

128.   Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.   One of the many examples of this occurred in March 2014, when – as discussed more fully below – Defendant Lupin entered the Niacin ER market after Defendant Teva had previously been exclusive.  Defendants Patel of Teva and Berthold of Lupin spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014.  That same day, Defendant Rekenthaler of Teva sent an internal e-mail to Defendant Patel stating: ████████████████████████████████████████████ ██████████████████████████████████████ Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

38

129.   Defendant Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



**[TARO_000224150.]**

130.   Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year.  The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

131.   This common goal was stated succinctly by Defendant Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that

█████████████████████████████████████████████████████████

████████████████████████████████████  As demonstrated throughout the Complaint, Aprahamian's idea of ███████████ meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

132.   This scheme to minimize competition and allocate "fair share" is typically implemented as follows.  First, Defendants allocate the market for an individual drug based on

the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

133.    This "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. In today's generic drug markets, a new competitor will either approach or be approached by the existing competitors. Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

134.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market. For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of Defendant Mylan's products was on back order and asked Taro to bid for the business. Defendant Aprahamian sent an internal e-mail stating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

███████████████████████████████████████████████

135.   These rules about "fair share" apply equally to price increases.  As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules."  Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

136.   For example, in May 2013 after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs.  Defendant Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

████████████████████████████████████████████████

Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

137.   When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox."  For example – as discussed more fully below – in December 2014 Defendant Teva was approached by a large retail customer on behalf of Defendant Greenstone.  The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers.  The customer specifically requested

that Teva give up a large customer to the new entrant, and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

138.    Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, R.T., a senior sales and marketing executive at Defendant Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

139.    Defendant Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a ██████████████████████████ and Defendant Taro as a ████████████████████████

140.    Defendant Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As explored more fully below, Teva had long-standing relationships with these competitors, including several of the corporate Defendants, which affected nearly every overlapping drug they sold. As just one example, Defendant Patel of Teva exchanged seven (7) text messages and had two (2) long phone calls with Defendant Aprahamian of Taro on June 3 and 4, 2014. After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to K.G., a Teva senior marketing executive, stating ████████████████████████████████████████

42

███████████████████████████████████████████████████

████████████████████████████

141.    Adherence to the rules regarding "fair share" is critical in order to maintain high prices.  Indeed, that is the primary purpose of the agreement.  If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices.  In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by other competitors.  For example, in March 2015, Defendant Upsher-Smith learned that Defendant Sandoz had submitted a bid on a product not identified in the Complaint at one of Upsher-Smith's GPO customers.  B.P., a senior account manager at Upsher-Smith, forwarded that information internally stating ████████████

███████████████████████████████████████████████████

██████████████████

142.    "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below.  For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market.  After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Defendant Kellum responded by emphasizing the truly industry-wide nature of the agreement:



143.    Indeed, the concept of "fair share" is so well ingrained in the generic

pharmaceutical industry that even customers are aware of, and at times facilitate, collusion

among generic manufacturers.  For example, in June 2013, Defendant Dr. Reddy's was entering

the market on a product not identified in the Complaint where Defendant Par had previously

been exclusive.  K.N., a senior account executive at Dr. Reddy's, sent an internal e-mail reporting

that

144.    Similarly, in September 2014, a large wholesale customer reached out to several

large generic manufacturers, including Defendant Teva, asking them to submit a

The customer reported to Teva that

145.    Further, in January 2015, Defendant Teva was in discussions with a large retail

customer about the possibility of becoming its supplier for Moexipril HCL HCTZ Tablets.  The

customer stated

146.    Customers at times also facilitate price increases, asking competitors to

████████        a market by raising prices.  For example, in November 2013, S.G., a senior account

executive at Sandoz, sent an internal e-mail stating ███████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████

147.    The "fair share" agreement is not limited to any one market; these principles

constantly inform and guide the market actions that generic drug manufacturers decide to take

(or not take) both within and across product markets.  For example, in November 2013,

Defendant Dr. Reddy's won the "B" slot[1] business at a large wholesale customer on a product not

identified in the Complaint.  Dr. Reddy's had previously won the "A" slot business at that

customer because Defendant Mylan had ██████████ from the business.  J.A., a senior

account executive at Dr. Reddy's, sent an internal e-mail stating ██████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

148.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an

internal e-mail, including to Defendant Kellum, stating that Sandoz had decided not to bid on

two drugs not identified in the Complaint at a large retail customer.  CW-1 explained his

reasoning as follows: ██████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████        Similarly, in June 2014, Sandoz chose not to bid at a customer

on a product not identified in the Complaint out of concern that Defendant Mylan would

---

[1]  Some large customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

retaliate.  As CW-1 explained, ███████████████████████████████████

███████████████████████████████████████████████████████████

As discussed more fully below in Section IV.C.4.a, these decisions were made by Sandoz

executives as a direct result of communications between the competitors, and in the context of an

ongoing understanding between Defendants Sandoz and Mylan to fix prices and avoid

competition on a number of different drugs, including Nadolol and Benazepril HCTZ.

149.   A similar scenario occurred in August 2015, when Defendant Taro declined to bid

on Etodolac Extended Release (ER) Tablets at a large supermarket chain where Defendant Zydus

was the incumbent.  Taro voiced concerns internally that Zydus might retaliate and take share

from them on another product, Warfarin Sodium Tablets.  As C.L., an analyst at Taro, reasoned

in an internal e-mail, Zydus ████████████████████████████████████████

████████████████████████   As discussed more fully below, both Etodolac ER and Warfarin

were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to

fix prices and allocate customers in 2014.  Taro's focus on playing nice in the sandbox was

merely an extension of those already-existing agreements.

150.   As these examples make clear, the interdependence among generic manufacturers

transcends product markets as these companies make decisions not only based on what impact

their actions will have in a given product market, but also on how those actions will impact other

product markets where the competitors overlap, and any future markets where they might

eventually compete.

151.   In fact, as explained in more detail below, certain Defendants had long-standing

agreements with some of their competitors to limit competition on any products on which the

companies overlapped.  For instance, shortly after Defendant Patel was hired by Teva in 2013,

she reached out to CW-1 and asked how Sandoz handled price increases.  Patel explained that

she had been hired by Teva to identify products where Teva could increase prices.  CW-1 told

Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach

Teva's customers after Teva increased price.  CW-1 reiterated his conversation to Defendant

Kellum, who understood and approved.

152.    Indeed, generic manufacturers often communicated about, and colluded on,

multiple drugs at any given time.  As just one example, in July 2013, Defendant Teva increased

pricing on a list of 21 different products.  There was a great deal of internal pressure from

management at Sandoz – including from Defendant Kellum and CW-1 – to obtain a copy of the

Teva price increase list.  As a result, CW-2 (then a Sandoz employee) reached out to his former

colleague, Defendant Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the

full Teva price increase list.  Defendant Rekenthaler forwarded the list to his own personal e-

mail address before then forwarding it to CW-2's personal e-mail address.  Upon receiving the

list, CW-2 read it to his supervisor – CW-1 – over the phone.  Notably, the Teva list included a

number of products that Defendant Sandoz did not even sell.

153.    It was not uncommon for generic manufacturers to communicate with each other

about products that they did not sell.  In another example, Defendants Teva, Wockhardt, and

Mylan collusively raised pricing on Enalapril in July 2013 (discussed more fully below).  After a

lengthy conversation with Defendant Patel in the midst of the price increases, Defendant

Aprahamian of Taro (not in the market for Enalapril at that time) sent an internal e-mail,

including to M.P., a senior Taro executive, stating ██████████████████████████

████████████████████████████████████████████████████████

And Taro did move fast.  By December 2013, Aprahamian spoke again with Defendant Patel,

M.A., an account manager at Defendant Mylan, and M.C., a senior sales and marketing executive at Defendant Wockhardt. Taro then re-entered the Enalapril market and matched competitor pricing.

154.   In another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items – Defendant Green of Teva spoke five (5) times with Defendant Nesta of Mylan. The next day, Defendant Green spoke with Defendant Kellum of Sandoz. Defendant Kellum then sent an internal e-mail to the Sandoz team stating ████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

155.   Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Defendant Sandoz was looking to implement a ███████████ that involved temporarily delisting ten products that they overlapped on with Defendant Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

156.   This interdependence between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course. The Plaintiff States have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and

48

pricing strategy. This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

157. Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers. For instance, in December 2013, Defendant Teva was negotiating new price increase language in its customer contracts, and wanted some comfort that its competitors had similar language. On December 23, 2013, Defendant Rekenthaler spoke with Defendant Nesta of Mylan three times, including a thirteen (13) minute call. Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:



158. Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on a product not identified in the Complaint and gave Taro an opportunity to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal e-mail stating ███████████████████████████ ████████████████████████████ Defendant Aprahamian replied:

███████████████████████████

Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: ████████████████

████████████████████████

159.    To avoid creating a potentially incriminating paper trail, Defendant Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

160.    It bears noting that the examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.  Indeed, to date, many of the Defendants have made no document productions in connection with the Plaintiff States' investigation, including Defendants Amneal, Apotex, Breckenridge, Glenmark, Lupin, and Zydus, and several other Defendants have made only limited productions focused on particular drugs or custodians, including Actavis, Mylan, Par, and Wockhardt.  Even Teva, the central figure in this Complaint, has to date only produced documents from two custodians to the Plaintiff States.

### 6.    <u>Generic Drug Price Spikes Since 2013</u>

161.    Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014.  According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."  A separate analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 ███████████████ (increases

of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

162.    These increases in 2013 and 2014 were staggering compared to prior years.  The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:



163.    A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

164.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

    C.    **The Illegal Schemes**

        1.    **The Overarching Conspiracy In Operation:  Customer And Market Allocation Agreements To Maintain Market Share And Avoid Price Erosion**

165.    When entering a generic drug market, Teva and the other Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of

artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

166.   Some illustrative examples of these agreements are set forth below, organized by company relationship and describing specific examples relating to specific drugs over time.

### a.   Teva/Mylan

### i.   Fenofibrate

167.   Fenofibrate—also known by brand names such as Tricor—is a medication used to treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and triglycerides) and raising "good" cholesterol (HDL) in the blood.

168.   As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

169.   On February 27, 2013, K.G., a senior marketing executive at Teva, e-mailed multiple Teva colleagues asking them to provide ███████████████████████ ██████████████████████████████████ Specifically, K.G. was seeking ████████████████ on Mylan's potential entry to the market.  In order to get this information, Defendant Green called Mylan's Vice President of National Accounts, Defendant Jim Nesta.  Over the course of that day, Green and Nesta spoke at least four (4) different times.  That same day, Green reported back to K.G. and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

170.   A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate.  On May 8, 2013, Defendant Green e-mailed his colleagues at Teva that

████████████████████████████████████████████ To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the ████████████████ This request for information was reiterated—and its purpose made clear—the following day when K.G. sent an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets ███████████████ and that he needed Teva's Fenofibrate sales and profitability information ███████████████████████████ to Mylan.

171.    Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone.  These calls include at least those listed below. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

172.    In one striking example of the coordination between the three companies, Defendant Nesta called Defendant Green at 2:42pm on May 7 and they spoke for more than

eleven (11) minutes. Immediately after hanging up the phone – at 2:54pm – Nesta called

Defendant Berthold and spoke for nearly three (3) minutes.

173.    On May 10, 2013, K.G. received the Teva sales and profitability information he

requested. After having the information for barely a half hour, and before there was even a

formal price challenge by Mylan at any of Teva's customers, K.G. concluded that ███████

███████████████████████████████████████████████████ By

conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms

of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross

profit) for the 145mg tablets. Defendant Patel, who had been at Teva for only two weeks at that

point, said she ██████████████████████████████████ The

logic, of course, was to allocate a customer of sufficient size to Mylan so that Mylan would be

comfortable with its "fair share" and not need to compete on price to acquire market share.

174.    Teva executives immediately reached out to executives at Mylan and Lupin

through a series of phone calls. These calls include at least those listed below. On these calls,

executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

175.    Teva made good on its agreement to concede Econdisc to Mylan. On May 15,

2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for

Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's

business. Less than an hour after receiving the notice of the price challenge, Defendant Green

recommended conceding Econdisc based on ████████████████   K.G. later agreed: ████████

████████████████████████████

176.   Following Teva's internal confirmation of the market allocation scheme, Teva

executives spoke with executives at Mylan and Lupin numerous times.  These calls include at

least those listed below.  On these calls, executives of Teva, Mylan, and Lupin confirmed that

Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

**ii.    Clonidine-TTS Patch**

177.   Clonidine-TTS Patch—also known by the brand name Catapres-TTS —is a

medication in the form of a transdermal patch that is used to treat high blood pressure.

178.   As of September 2011, Mylan and Teva were at rough parity in the market for

generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having

approximately 44.4% market share.  At the end of 2011 and beginning of 2012, however, Teva

began to take more than its "fair share."

179.    In November 2011, Teva took over Mylan's business for Clonidine-TTS at Walgreens after Walgreens solicited Teva to provide a bid.  Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term ███████ ████████ that Mylan was experiencing.  A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine-TTS.  Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.

180.    On February 10, 2012, the move of Cardinal's business to Teva prompted K.G. of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues.  That same day, Defendant Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain the information and they spoke for six (6) minutes.  Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, ███████████ ███████ and cautioned that Teva should ███████████  Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan.  With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine-TTS.

181.    To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson.  To de-escalate the situation, Teva ████████████████████████████ ███████  Then, in April 2012, Mylan aggressively challenged Teva's Clonidine-TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business.  Internally, Teva lamented that Mylan was ██████████████████ █████████████  Ultimately, Teva █████████████████████████

56

182.    Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin.  At the time, Mylan was the primary supplier for Doxazosin at Cardinal.  Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva.  Rather than take this business, K.G. cautioned his colleagues that Teva ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████

183.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e-mail to Teva's national account managers that the ██████████████████████████ ██████████████████████ Teva learned of this ███████ directly from Mylan over the course of at least two calls between Defendants Green and Nesta on July 17 and the morning of July 18, 2012.  Those calls lasted three (3) minutes and five (5) minutes, respectively.

184.    On the morning of September 28, 2012, Defendants Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes.  On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.  As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

185.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.  For example, in April 2012, before Mylan had challenged Teva's Clonidine-TTS

business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine-TTS was $22.13, $37.81, and $54.41, respectively.  Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

186.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS.  For example, Teva submitted bids to CVS and Wal-Mart—which were ultimately accepted by those companies—on October 4, 2012 and October 5, 2012, respectively.  In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

187.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding.  For example, on October 10, 2012, Defendants Green and Nesta spoke for ten (10) minutes.  That same day, E.G. of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should ███████████████████████████

188.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share.  In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc.  Rather than competitively bid for the business, Teva's internal documents state that

they chose to █████████ Econdisc back to Mylan.  By April 2013 Teva also ██████████████ and ███████████ McKesson to Mylan.

189.    In a stark admission of Teva's willingness to help Mylan regain market share without competition, Defendant Rekenthaler acknowledged in an internal e-mail dated February 28, 2013 that Teva was ██████████████████████████████ to Mylan.  Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's ███████████████████████████ For its part, Teva was ███████████████████████████████████████████████ ███████████ if CVS brought Mylan's price challenge to Teva's attention.  CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so.  Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS was not competitive—but rather an effort to allocate the market without eroding price— Teva was able to maintain artificially higher prices at CVS.

190.    To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

191.    By April 2013, Teva had ███████████████████████████████████ Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine-TTS.  On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Defendant Rekenthaler, that Mylan had agreed to raise prices:



**[TUS000381907.]**  Defendant Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Defendant Nesta (Mylan), with one lasting one (1) minute and the other lasting eight (8) minutes.  In a follow up call the following day between Defendants Green and Nesta lasting eleven (11) minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

### iii.      Tolterodine Extended Release

192.    Tolterodine Extended Release ("Tolterodine ER")—also known by the brand name Detrol LA—is a medication used for the treatment of an overactive bladder.

193.    Pfizer is the branded drug manufacturer for Detrol LA.  To resolve patent infringement claims against Teva by Pfizer related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER.  To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its generic version Tolterodine ER.  On October 31, 2013,

Mylan's ANDA for Tolterodine ER was approved.  Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

194.    Teva planned to launch on January 2, 2014.  During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.  On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Defendant Rekenthaler, K.G., and several other Teva colleagues stating ████████████████████████████████ ████████████████████████████ To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

195.    Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date.  Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER.  Specifically, Teva expected that on January 1, 2014, Pfizer would raise the price of branded Detrol LA.  This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

196.    At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2, 2014.  D.H.

61

further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan is

 and that Teva ████████████████

197.    Figure it out they did.  T.C. informed her Teva colleagues of Mylan's plans.  K.G.

of Teva then worked over the weekend to turn this information into initial pricing for all of

Teva's potential customers and then shared it internally.  In a telling admission that Teva had no

intention to bid competitively for all accounts, K.G. noted that the next step was ███████████

████████ bids.  The goal in ████████████████ bids was to ensure that both

Mylan and Teva received their previously stated market share goals:  Teva wanted ████████

█████ while Mylan was only ████████████████████

198.    On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several

others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the

Tolterodine ER launch strategy.  Just minutes before the meeting was to start, Rekenthaler tried

calling Defendant Nesta at Mylan.  Nesta returned Rekenthaler's call at 8:15am, which was

during Teva's scheduled Tolterodine ER phone conference.  Rekenthaler nonetheless answered

Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds.  Immediately after

Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more

times.  At 10:22am, Nesta returned Rekenthaler's calls and the pair spoke for an additional 12

minutes, 2 seconds.  During these calls, Defendants Rekenthaler and Nesta exchanged the details

about their offers to various customers, including the specific contractual language used in their

offers.

199.    +For example, at 10:33am—while Rekenthaler was still on the phone with Nesta,

K.G. sent an e-mail to Rekenthaler and others asking about the appropriate contractual language

to use in offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:



Most importantly though, during these calls between Defendants Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

200.    At 12:12pm on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share:



[TUS000654798.]

201.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised

63

pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX Prime Therapuetics, and Kaiser. The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Defendant Rekenthaler spoke with Defendant Nesta on December 23, 2013:

| Dosages | Initial Pricing Plan | Price after Dave Rekenthaler Speaks with Jim Nesta |
|---------|---------------------|----------------------------------------------------|
| | | |
| | | |
| | | |
| | | |
| | | |

64



202.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX Prime Therapuetics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

203.    The following day, on December 24, 2013, Defendants Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

### iv.    Capecitabine

204.    Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

205.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

206.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Defendant Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that ▆▆▆▆▆

████████████████████████████████████ Teva incorporated this data it received

from Mylan into its own launch plan for Capecitabine.

207.    On February 26, 2014, Defendant Nesta of Mylan called Defendant Rekenthaler

of Teva and the two spoke for sixteen (16) minutes.  Nesta informed Rekenthaler that Mylan

would not be able to launch on time with Teva.  Rekenthaler immediately reported this news

internally at Teva.

208.    In early March 2014, Teva launched as the exclusive generic Capecitabine

manufacturer.  Teva remained the exclusive generic Capecitabine manufacturer until Mylan

entered in August 2014.

209.    On August 4, 2014, Defendants Nesta and Rekenthaler spoke by phone three

times.  On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine

market and the pair discussed how to allocate the market.

210.    For example, at 12:46pm that day, Nesta called Rekenthaler and they spoke for a

little more than five (5) minutes.  Immediately after hanging up the phone, Rekenthaler sent the

following e-mail:



Defendant Cavanaugh responded that she would be in the office the next day and wanted to

discuss it with Rekenthaler in person.

211.    Less than an hour later, Rekenthaler sent another e-mail, just to Defendant Patel,

asking her to run a customer report and indicating that Mylan will ████████████████

███████████████████████████████████████████ Mylan
did seek the business for each of these three companies and Teva conceded each of them,
pursuant to the agreement Rekenthaler had reached with Nesta.

212.    On August 7, 2014, McKesson informed Teva that it received a bid for
Capecitabine and gave Teva the opportunity to bid to retain the business. Defendant Patel then
sent an e-mail to K.G., Defendant Rekenthaler, and C.B. at Teva to ask if they had ████████
████████████████████ C.B., a senior operations executive at Teva, replied that Teva
did ███████ but C.B. did not want to put the plan in writing.  Instead C.B. told Patel she
████████ to discuss it.  K.G., separately, questioned whether the competitive bid was coming
from Mylan, and asked Defendant Rekenthaler whether he had any additional information.
Defendant Rekenthaler also did not want to put that █████████████ in writing, so he
responded: ██████████████

213.    The █████ was the market allocation scheme previously agreed to by Defendants
Nesta and Rekenthaler on behalf of Mylan and Teva.  The same day that Mylan put a bid in to
McKesson – August 7, 2014 – Defendants Nesta and Rekenthaler spoke by phone for nearly
thirteen (13) minutes.  On that call, Defendants Rekenthaler and Nesta discussed Mylan's bid to
McKesson and reconfirmed their market allocation scheme.

214.    This market allocation █████ was highlighted in other e-mails as well.  On
August 10, 2014, C.B. e-mailed Defendant Rekenthaler, Defendant Patel, and K.G. about the
plan.  C.B. stated that C.B.'s ██████████████████████████████
█████████████████████ but that C.B. wanted to confirm.  Defendant Rekenthaler
corrected C.B., stating that Mylan is ██████████████████████ but that
Teva ████████████████ Rekenthaler knew Mylan was targeting Econdisc,

even though Econdisc had not contacted Teva, because he and Defendant Nesta had previously discussed it.

215.    The next morning, at 8:30am on August 11, 2014, Defendant Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was ████████████████████ Five minutes later, Rekenthaler received a call from Defendant Nesta. After exchanging voicemails, the two spoke at 8:52am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02am, Rekenthaler e-mailed K.G., Defendant Patel and others at Teva to confirm that Mylan's ████████████ ████████████ He added that Teva ██████████████████████ and that he ██████████████████ 

216.    In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

217.    Teva also conceded some of the ████████ as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, K.G. circulated an internal e-mail confirming that Teva ██████████████ ████████ at Cigna.

      **b.**    **Teva/Sandoz**

         **i.**    **Portia and Jolessa**

218.    Ethinyl estradiol and levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy. During the relevant time period, both Teva and Sandoz

marketed ethinyl estradiol and levonorgestrel under multiple names – including both Portia and Jolessa.

219.    In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

220.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa.  T.C., a senior sales executive at Teva, responded, ███████████████████ ███████████████████████████████  The customer responded that it was Sandoz.  T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, ███████████████████████████████████████ ███████████████████████████

221.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer.  The night before this change in plans, on May 22, Defendant Green of Teva spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa.  The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa.  Teva discussed the decision internally and explained that the reason for the ███████████████ was that Teva was ███████████████ ███████████████

222.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa.  On July 2, 2013, another key customer contacted Teva

stating it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its ▮▮▮▮▮▮  On July 9, 2013, CW-1 of Sandoz called Defendant Patel and left a voicemail.  Shortly thereafter, they connected for a sixteen (16) minute call.  On July 10, Teva learned that the challenger was Sandoz.  At 12:16pm, Defendant Rekenthaler forwarded an e-mail to Defendant Patel and posed the question, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Defendant Rekenthaler.

223.    Defendant Rekenthaler then called CW-2 at Sandoz at 1:26pm that same day and they spoke for two (2) minutes.  CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes.  CW-2 and Rekenthaler would speak once more later that day, at 4:48pm, for seven (7) minutes.  Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as ▮▮▮▮▮▮▮▮▮▮ for their primary supply.  Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

### ii.    Temozolomide

224.    Temozolomide, also known by the brand name Temodar, is used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

225.    The patent on Temodar was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration.  Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

226.    On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see

what Teva was going to do before submitting their own bid.  That same day, CW-1 received a telephone call from Defendant Patel.  Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.  Nothing was agreed to on that call.

227.   On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to The Pharmacy: ███████████████████████████

███   The next morning, S.G., a national accounts executive at Sandoz, spoke with The Pharmacy and asked The Pharmacy to find out Teva's plans.  S.G. summarized his call with The Pharmacy to his team: ████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████

228.   At the same time, CW-1 was reaching out to Teva directly to get more information.  CW-1 called Defendant Patel at approximately 1:45pm on July 23, 2013.  After exchanging voicemails, they spoke for over fourteen (14) minutes that same afternoon.

229.   Also on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide:



230.    By using The Pharmacy as its intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide.  Sandoz understood the implications of the communication, and understood that ███████████████████████ One Sandoz executive responded internally and exclaimed that this was ██████████████

231.    On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide.  T.C., a senior sales executive at Teva, discussed the matter internally and asked her boss, Defendant Rekenthaler, ████████████████ Rekenthaler responded by alluding to the deal that had already been struck with Sandoz: ████████
███████████████████████████████
████████████████████████ Rekenthaler most likely got his information from Defendant Patel.  Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

72

232.   Teva and Sandoz were also coordinating through other channels.  After receiving the RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive at Teva, on a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July 31, 2013.  After those calls, S.G. suggested in an internal e-mail on July 31 that Sandoz cede the business and instead submit a cover bid:

233.   Similarly, on July 29, 2013, Defendant Green spoke to CW-2 of Sandoz two (2) times.  The two spoke again on July 31, 2013 for six (6) minutes.  During those calls, Green told CW-2 about Teva's launch plans and that Teva wanted the The Pharmacy's business.  The next day, August 1, 2013, D.P., another Sandoz executive, e-mailed Defendant Kellum, conveying the message from Green:



234.   Teva and Sandoz communicated their future plans with each other for other accounts in addition to The Pharmacy and CVS.  On July 31, 2013, D.P. of Sandoz e-mailed an update on Temozolomide to his coworker, stating:

235.    Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide.   On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Defendant Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.   There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

236.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength.   In an internal e-mail dated August 16, 2013, a Teva employee confirmed the plan: ███████████

█████████████████████████████████████████████████████████

███████████

237.    CW-1 spoke to Defendant Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

### iii.    Tobramycin

238.    Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

239.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period.   These plans included going after Sandoz's "fair share," but depended on Teva being ██████ A.S., a Sandoz executive responsible for product launches, wrote in an internal e-mail in October 2013: ████████████████████

███████████████████████████████████████████████

██████████████

240.    As expected, Teva was ██████████ when it came time to give up share to Sandoz.

Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began

sharing information and coordinating to divide up the market for Tobramycin. Defendant Patel

exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch

plans and how to divide up the market for Tobramycin. Defendant Patel conveyed some of this

information in an internal Teva e-mail the same day, writing, ████████████████████

██████████████████████████████████████████████████

████████████████████████████ The next day, Teva made the decision to

concede two different accounts for Tobramycin to Sandoz.

241.    On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting

eleven (11) minutes. On these calls, CW-1 and Patel discussed how to divide up the market for

Tobramycin, including specific accounts that each would maintain or concede to the other. Patel

then memorialized the agreement in an e-mail two days later. The result: Teva would take

Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna,

Prime Therapeutics, Kinney Drugs, and OptumRx. Teva also planned to concede the Cardinal

business to Sandoz.

242.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This

was significant because Tobramycin was a very expensive product, and Sandoz was able to

acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

243.    According to plan, Teva conceded the CVS business to Sandoz after CVS

contacted Teva and requested that Teva submit a lower price to retain the business. Defendant

Rekenthaler wrote in an internal e-mail, ███████████████████████

█████████████████████████████████████████ Teva also went

through with its plan to concede Cardinal to Sandoz.

244.    CW-1, in turn, told Defendant Patel that Sandoz would not pursue business from

ABC and Walgreens.  CW-1 spoke with Defendant Kellum about his conversations with

Defendant Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed

with the plan.  Pursuant to that agreement, Sandoz made no effort to contact those two large

customers when it entered the market.

245.    CW-1 and Patel also discussed Sandoz's target market share.  CW-1 informed

Patel that Sandoz was seeking a 50% share, but Patel thought that was ████████████████

█████████████████ After discussing Sandoz's share goal with Defendant Rekenthaler,

Patel went back to CW-1 and informed him ██████████████████████ Sandoz

appeared to comply with that, as Patel observed that Sandoz ████████████████████

███████

246.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached

Teva asking for a lower price on Tobramycin.  A Teva analyst stated in an internal e-mail, █████

████████████████████████████████████ A Teva national accounts

director was confused by this decision and responded, ████████████████████████

███████████ The analyst responded and said, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Defendant Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014

and left him a voicemail.  CW-1 then returned her call the same day and the two spoke for four (4) minutes.

### iv.    Dexmethylphenidate HCL Extended Release

247.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD).

248.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Defendant Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.  On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg.  Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes.  On February 18, Patel left a voicemail for CW-1.  That same day, Teva conceded the Rite Aid account to Sandoz.  Patel and CW-1 then spoke again by phone on February 20, 2014.

249.    Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER.  After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business.  In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:



One of the Teva national account managers on the e-mail responded by confirming that the approach ███████████

250.    On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

251.    Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug).  Patel spoke to CW-1 the same day for almost twenty-one (21) minutes.  The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating: ██████████████████████████████
████████████████████████████████████████
████████████████

252.    Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was ████ ████████ for ████████████████████████████████ Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

253.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.  In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.

254.    Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.  The agreement was also carried out by other manufacturers allowing Sandoz to

take share from them.  In February 2014, for example, as Sandoz was seeking share on the 15mg

dosage strength of Dexmeth ER, Par ███████████████████████████████  As

Sandoz was entering the market, Defendant Rekenthaler of Teva was speaking to M.B., a senior

national account executive at Par, right around the same times that Patel had been speaking to

CW-1 – including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2

and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

255.    The market allocation scheme between Teva and Sandoz on Dexmeth ER

continued through at least mid-2015.  On May 6, 2015, for example, Teva declined to submit a

bid to Walgreens for Dexmeth ER 5mg on the basis that ██████████████████████

████████████  Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed

Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already

had 57% market share – greater than its sole competitor on this dosage strength, Teva.  When a

Sandoz national account representative communicated this decision to the customer, he lied and

explained that the decision not to bid was based on limited supply.

        **c.    Teva/Lupin**

            **i.    Lamivudine/Zidovudine (generic Combivir)**

256.    Lamivudine/Zidovudine, also known by the brand name Combivir, is a

combination of medications used in the treatment of human immunodeficiency virus (HIV)

infection.  This combination of drugs is often prescribed to decrease the chances that an HIV-

positive patient will develop acquired immunodeficiency syndrome (AIDS) or other related

illnesses.

257.    Teva launched its generic Combivir product in December 2011.

258.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

259.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Defendant Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Defendant Green was speaking to Defendant Berthold of Lupin and Defendant Grauso of Aurobindo.

260.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Defendant Rekenthaler responded immediately that Aurobindo was entering. When T.C. questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:



That             was Aurobindo's R.C., who had previously worked with both T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would evidence conspiratorial communications between the two competitors. To confirm this information, Defendant Green also called and spoke to Defendant Grauso of Aurobindo that same day for twelve (12) minutes and Defendant Berthold of Lupin for four (4) minutes.

261.    After speaking with Berthold, Defendant Green responded separately to T.C., providing specific information regarding Lupin's entry plans, including commercially sensitive

intelligence about Lupin's anticipated bid at a large wholesaler.  Green and Berthold then spoke again the next day, April 25, 2012, for seven (7) minutes.

262.    In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably.  Over the four-day period from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Incoming | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

263.    During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and

Aurobindo's entry into the generic Combivir market as seamless as possible. The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

264.    On May 10, 2012, at the conclusion of this four-day period of intensive communications, K.G. of Teva informed his colleagues of the results. He confirmed that ███████ ████████████████████████████████████ Importantly, he went on to list the specific accounts that Teva had negotiated to retain in order to hold on to a 40% market share in generic Combivir. K.G. also identified the specific accounts that Teva would concede to its competitors Aurobindo and Lupin.

265.    Even before the negotiations with Aurobindo and Lupin were finalized, K.G. made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market. On May 9, 2012, when a major customer was pressing Teva for a bid, K.G. instructed T.C. that Teva did not plan to keep that customer. When T.C. asked if she should provide any bid at all, K.G. directed her to provide a sham bid, saying:



266.    Three days later, when preparing the bid for that customer, T.C. pushed back on K.G.'s directive on price, asking: ████████████████████████████████████

▬▬▬▬ But K.G. refused, responding that they could not go any lower or else Teva might risk actually winning the business.  He concluded: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬

267.    In a separate e-mail exchange with T.C. on that same day, May 11, 2012, K.G. told T.C. that another of her major customers was not on the list for Teva to retain with respect to generic Combivir.  He reminded her of the goal of the overarching conspiracy, stating that Teva should concede that customer ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ K.G. pointed out that such a move would give Teva its fair share as the first entrant: ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬ T.C. then informed that customer that Teva would not compete for its business because ▬▬▬▬▬▬▬▬▬▬

268.    Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

ii.    **Irbesartan**

269.    Irbesartan is a drug used in the treatment of hypertension.  It prevents the narrowing of blood vessels, thus lowering the patient's blood pressure.  Irbesartan is also known by the brand name Avapro®.

270.    Teva received approval to manufacture generic Irbesartan in March 2012.

271.    On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

272.    At 11:27am, J.P., an account manager at Teva responded: ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ Less than twenty minutes later, Defendant Green placed a call to Defendant

Berthold at Lupin.  They talked for seventeen (17) minutes.  Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:



273.    That same day, Defendant Rekenthaler informed the group that he still had not received ██████████████████████████████████ He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:



274.    At 10:54am the next day, Green called Berthold again.  They spoke for nearly seven (7) minutes.  At 12:20pm, K.G. of Teva shared with the sales team the competitively sensitive information Defendant Green had obtained.  Included were the details Berthold had shared with Green about which competitors were launching/not launching the drug, and the identity of the customers that received offers.  K.G. stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan on March 30, 2012.

### iii.    Drospirenone and ethinyl estradiol (Ocella)

275.    Drospirenone and ethinyl estradiol, commonly known by the brand name Ocella®, is a pair of drugs used in combination as an oral contraceptive.  This drug is also marketed under the brand names Yaz®, Yasmin® and Gianvi®.

276.     Barr Pharmaceuticals received approval to market generic Ocella in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

277.     In late 2012, Lupin received approval to market a generic Ocella product.

278.     By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves.  On April 24, 2013, Defendant Berthold of Lupin called Defendant Green at Teva.  The two spoke for over three (3) minutes.  Berthold called Green two more times the following day.

279.     The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis.   In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers.   The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

280.     The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Defendant Rekenthaler of Teva spoke twice by phone.  That same day, Defendant Patel of Teva also called A.B.  On May 1, Patel sent A.B. four (4) text messages.

281.     The competitors' communications continued into early May.  On May 6, Defendants Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes.  Defendants Green and Berthold also spoke that same day.  On May 7, Defendants Patel and Berthold had yet another call, this one lasting over ten (10) minutes.  Patel also placed a call to Defendant Rogerson at Actavis, which lasted thirty-nine seconds.

282.     Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share.  Patel called

Defendant Rogerson on May 8, and they spoke for nineteen (19) minutes.  On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

283.    The following day, Teva's L.R. complied with Defendant Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin.  Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes.  Patel also called Defendant Rogerson at Actavis and the two spoke for more than five (5) minutes.

284.    On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis.  Rekenthaler replied simply:  ███████

285.    On July 10, 2013, Defendant Green spoke to Defendant Berthold twice (for more than eight (8) minutes and more than two (2) minutes).  After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:



Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold.  During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.  Patel called Berthold shortly after and the two spoke for more than four (4) minutes.  They spoke again first thing the next morning, for nearly one (1) minute.

286.    The next day, Patel e-mailed Green, saying: ████████████ Green,

confused by the e-mail, responded: ████████████████████████████

████████████████████████████

287.    Discussions between Teva and Lupin continued on July 17, 2013 with a call

between Defendants Green and Berthold that lasted twenty (20) minutes.

288.    On July 29, 2013, Defendant Green announced to his colleagues: ████████

████████████████

289.    The lines of communication between competitors Teva and Lupin remained open

and active over the next few months as they worked on the details of which company would take

which generic Ocella accounts.  On September 5, 2013, for example, Defendant Rekenthaler

conveyed to a colleague the importance of retaining a particular customer's account, along with

his understanding of Green's discussions with Berthold about Lupin's desired market share.

Green spoke to Berthold by phone twice the following day to confirm the understanding between

the two companies.

290.    On September 9, 2013, K.G. of Teva sent an internal e-mail to his colleagues

conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella

business.  He informed them that because Teva had secured two other significant customers, ████

████████████████████████████████████████████

291.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts

between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of

the furtive arrangement.  He told her to be careful before conceding large customers on a ████

████ rather than drug-by-drug in order to ████████████████████████████

████████████████████

#### iv.    Norethindrone/ethinyl estradiol (Balziva®)

292.    Norethindrone/ethinyl estradiol, also known by the brand name Ovcon®35, is a combination of medications used as an oral contraceptive.  Teva markets its generic version of this combination medication under the name Balziva®.

293.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business.  Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its generic of Ovcon®35.

294.    Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that ███████████████████████████████ ████████████████

295.    The discussions about how to share the market with the recent entrant were not limited to internal communications, however.  On January 24, 2014, Defendant Patel spoke to Defendant Berthold at Lupin twice by phone.

296.    Five days later, on January 29, Patel informed Defendant Rekenthaler of her recommendation based on her communications with Defendant Berthold, to take a cooperative stance towards this competitor, saying: ██████████████████████████████████ ████████████████████████

297.    On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin.  That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

#### d.    Teva/Greenstone

### i.      Oxaprozin Tablets

298.    Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID). It is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

299.    Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva.  In the days and weeks leading up to Greenstone's entry into the market, Defendant Green of Teva and R.H., an account executive at Greenstone, were in frequent communication by phone and text to coordinate the entry, as set forth in more detail below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

300.    Part of the understanding between the companies was that Teva would concede at least two large customers – CVS and Cardinal – to Greenstone, and that Teva would retain Walmart as a customer.  On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

301.    On March 27, 2013, T.C. of Teva forwarded an e-mail that T.C. had received from Walmart to Defendants Green and Rekenthaler. The e-mail from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor (Greenstone).

302.    Defendant Rekenthaler's immediate reaction to T.C.'s e-mail was ███████████ ██████████████ In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with Greenstone, █████████████████ ███████████ Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal *and* CVS to Greenstone.  Rekenthaler remarked that ██████████████████████████ ████████████████ In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone:



303.    Teva took immediate steps to address the situation.  That same day – March 27, 2013 – Defendant Green called R.H. at Greenstone at 5:25pm but she did not answer.  The next morning, at 8:06am, T.C. sent an e-mail to Walmart stating: ██████████████████ Less than a half hour later, T.C. sent an e-mail to Defendant Green, stating: ██████████████ ███████████████████

304.    After Green spoke to T.C., he immediately called R.H. at Greenstone.  R.H. relayed the information from Green to her boss, Defendant Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

305.    At 1:22pm that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer:



T.C. forwarded the e-mail to Defendant Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin:

306.    Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry.  A couple of months later, as Defendant Dr. Reddy's was preparing to enter the market for Oxaprozin (discussed more fully below), a Dr. Reddy's representative commented positively that                     on Oxaprozin.  That same representative had also talked to wholesaler Cardinal about the drug, and conveyed that

### ii.     Tolterodine Tartrate

307.    Tolterodine Tartrate, also known by the brand name Detrol, is in the

antispasmodics class of medications.  It is used to treat overactive bladder by improving the

ability to control urination.

308.    Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets

("Tolterodine") on January 23, 2014 with the exact same WAC prices as Teva for all

formulations.  In the days leading up to Greenstone's entry, R.H. and Defendant Nailor of

Greenstone were speaking frequently to Defendants Patel and Rekenthaler of Teva to coordinate

Greenstone's entry into the market.  Those calls and text messages include at least those set forth

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

During these calls and text messages, Teva and Greenstone agreed that Teva would concede

business to Greenstone in order to avoid significant price erosion in the market.

309.    The day after Greenstone's entry – January 24, 2014 – in a message to Teva

national account managers about how important it was for them to determine and document

which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not) Defendant Patel stated: ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

310.    On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. K.G. of Teva immediately asked: ▮▮▮▮▮

▮▮▮▮▮▮▮▮ Defendant Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:



The next day, Defendant Patel and R.H. of Greenstone tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

311.    On Monday, February 3, 2014, Defendant Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Defendant Rekenthaler responded – again not wanting to put the details into writing:

The next day, Defendant Patel called R.H. at Greenstone and the two spoke for nearly sixteen (16) minutes.

312.   After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to Greenstone. CVS represented more than 20% of Teva's business on Tolterodine.

### iii.   Piroxicam

313.   Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID). Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

314.   On March 3, 2014, Greenstone received FDA approval to market Piroxicam Capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

315.   Greenstone immediately began seeking potential customers. At 10:07am on March 5, 2014, J.L. of Teva sent an e-mail to Defendant Patel informing her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. J.L. asked Patel:

316.   Before responding to that e-mail, Defendant Patel sought to negotiate strategy with Greenstone. Patel called R.H. at Greenstone at 10:55am and they spoke briefly. Shortly after that call, Patel also called R.H.'s boss, Defendant Nailor. At 2:14pm that afternoon, Defendants Patel and Nailor spoke briefly.

Immediately after hanging up with Defendant Nailor, Patel responded to J.L.'s e-mail:



317.   Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market.  On March 6, 2014, Defendant Patel requested a customer profitability and share analysis.  During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a ███████████████████ (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

318.   That same day, Defendant Patel had multiple calls with Defendant Nailor and R.H. at Greenstone to discuss their plans for dividing the Piroxicam market.  At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

319.   The next day – March 7, 2014 – after the flurry of phone calls detailed above, Defendant Patel sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to concede to Greenstone.  Based on her several conversations with

Greenstone, and her understanding of the concept of fair share, Patel also noted: ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

320.    Additional challenges did come.  On March 12, 2014, Defendant Patel learned

that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam.  Teva

refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market

share for that drug.  Teva lowered its price by 20%, and the next morning CVS notified Teva that

it would retain the account.  The same day, after hearing that Teva was not going to back down

on the CVS challenge, R.H. of Greenstone called Defendant Patel at 1:41pm and they spoke

briefly.

321.    Teva and Greenstone continued to coordinate their allocation over the coming

days and weeks.  On March 17, 2014, Defendant Patel called R.H. and they spoke briefly.  R.H.

called Patel back at 11:35pm that same day and they spoke for fifteen (15) minutes.  Immediately

after speaking to Patel, R.H. called Defendant Nailor and they spoke for ten (10) minutes.  Teva

retained the CVS account but conceded other customers (representing less market share) to

Greenstone through March and April.

322.    For example, on March 25, 2014 Teva learned of a challenge from Greenstone at

Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that

it still had more than its fair share of the market.  Pursuant to the understanding among generic

manufacturers alleged above, Teva determined that it would be prudent to concede the Anda

business to Greenstone on Piroxicam, in order to alleviate any future challenges from

Greenstone.  Defendant Patel agreed with the decision to concede on April 1, 2014.

iv.        **Cabergoline**

323.    Cabergoline, also known by the brand name Dostinex, is used to treat medical problems that occur when too much of the hormone prolactin is produced.  It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

324.    In December 2014, as Greenstone was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("The Pharmacy") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. of Teva on Greenstone's behalf.  In a December 9, 2014 e-mail, F.H. directly sought to facilitate a customer allocation between Greenstone and Teva:



The Wholesaler represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

325.    T.C. of Teva did not respond immediately, asking for a little extra time ▮▮▮ ▮▮▮▮▮▮▮▮▮▮  F.H. responded: ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

326.    The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation: ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

327.    Pursuant to this agreement, Greenstone was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business.  In exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

         **e.**      **Teva/Actavis**

         **i.**      **Amphetamine/Dextroamphetamine Extended Release**

328.    Amphetamine/Dextroamphetamine Extended Release, also known by the brand name Adderall XR®, is a medication used in the treatment of attention deficit hyperactivity disorder (ADHD).  The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS."

329.    Teva began marketing generic Amphetamine/Dextroamphetamine Extended Release ("MAS-XR"), after the expiration of brand manufacturer Shire's patent on Adderall XR®.

330.    On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in ████████ of its MAS-XR business.  A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be.  The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

331.    Teva deferred its decision on pricing until Actavis was in a position to ship the product.

332.    Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012.  At 9:58pm that same evening, Defendant Rekenthaler instructed Teva employees to find out Actavis's plans regarding its newly-approved generic, including shipping

details and inventory levels.  At 8:32am the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:



The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

333.   Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky.  She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be ▮▮▮▮▮ that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

334.   One year later, Teva's customer renewed its request for a price reduction on MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug.  On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business.  T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor.  She stated: ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

### ii.        Amphetamine/Dextroamphetamine Immediate Release

335.   Amphetamine/Dextroamphetamine Immediate Release, also known by the brand name Adderall IR®, is a medication used in the treatment of attention deficit hyperactivity

disorder (ADHD).  The drug is an immediate release formulation comprised of a combination of

dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed

Amphetamine Salts" or "MAS-IR."

336.    In March 2014, Aurobindo was making plans to enter the market with its MAS-IR

product.  On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market

share target for the impending launch was 10%.  Teva's senior marketing operations executive,

K.G., indicated that Teva was aware that both Aurobindo and Actavis were launching.

337.    A flurry of telephone communications between Teva and these two competitors

took place on the days surrounding the foregoing e-mail.  The day before, on March 17, 2014,

Defendant Patel had spoken to Actavis's Director of Pricing, Defendant Rick Rogerson, three (3)

times.  Defendants Rekenthaler and Falkin of Actavis also spoke once on that day.  On March

18, 2014, the day of the e-mail, Rekenthaler and R.C., a senior-most executive at Aurobindo, had

a thirty (30) minute telephone conversation.  Rekenthaler and Falkin spoke again seven (7) times

on March 20, 2014.

338.    On April 16, 2014, Teva received word from a customer that a new competitor in

the market had offered a lower price than Teva's current price for MAS-IR.  Defendant Patel

informed K.G. that the challenge was coming from Actavis, and recommended that Teva

concede that customer's account.  At 1:43pm, she communicated to another colleague that the

decision had been made to concede.  Apparently closing the loop, she called Defendant Rogerson

at Actavis at 1:55pm.  They spoke for just over four (4) minutes.

### iii.        Dextroamphetamine Sulfate Extended Release

339.    Dextroamphetamine Sulfate Extended Release, also known by the brand name

Dexedrine® and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate

the central nervous system in the treatment of hyperactivity and impulse control.

340.    On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR,

Defendant Patel reviewed a profitability analysis for that drug and asked Defendant Rekenthaler

what share of the market Actavis was targeting.  Rekenthaler responded: ▮▮▮▮▮  Rekenthaler

knew Actavis's market share goals because he and Defendant Falkin of Actavis had spoken twice

by phone that morning – once for more than eleven (11) minutes and again for more than nine

(9) minutes.

341.    Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues

in an e-mail that Actavis had entered the market for Dex Sulfate XR. She remarked that Teva had

a 72.2% share of this ▮▮▮▮▮▮ and thus recommended giving up a large customer to

Actavis and reducing Teva's market share to 58.3% – in accordance with the industry

understanding to allocate the market, and Teva's ongoing agreement with Actavis.  Later internal

e-mails confirmed Teva's decision to concede that customer to Actavis because ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

### iv.        Clonidine-TTS

342.    Clonidine-TTS Patch—also known by the brand name Catapres-TTS —is a

medication in the form of a transdermal patch that is used to treat high blood pressure.

343.    Teva began marketing Clonidine-TTS in 2010 after the expiration of brand

manufacturer Boehringer Ingelheim's patent on Catapres-TTS®.

344.   On May 6, 2014, Actavis was granted approval to market Clonidine-TTS.  Teva and Actavis immediately commenced an extensive negotiation over price and market share. Defendants Rekenthaler and Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

345.   The next day, Rekenthaler announced to his colleagues that Actavis was entering the market.  K.G. of Teva responded by requesting that Defendant Patel come up with a recommendation as to which customers Teva should concede to Actavis.  At the same time, Teva employees bemoaned Actavis's ▮▮▮▮▮▮ low pricing for a new entrant, saying that price ▮▮ ▮▮▮▮▮▮▮▮▮

346.   On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls.  On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls).  Patel spoke to Defendant Rogerson at Actavis four times, the last call coming at 9:54am.  At 10:02am, she informed her colleagues of the results of the negotiations, instructing them:  ▮▮▮▮▮▮▮▮▮▮▮

347.   The following day, May 9, 2014, Defendant Patel learned from yet another customer of a ▮▮▮▮▮▮▮▮▮ on this drug.  Suspecting the source of the challenge was Actavis, Patel called Rogerson three times.  Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market.  She also stated that Actavis would likely want 10%-15% of that share from Teva.  During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that ▮▮▮▮▮▮▮▮▮▮▮▮

102

████████  Shortly after that, Patel also learned that Actavis had ████████████████

████████████████████

348.   Rekenthaler described to his colleagues the agreement he was willing to strike

with Actavis over market share, saying: ██████████████████████████████████

██████████████████████████████████████████████

████████  Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a

cooperative stance towards this competitor, saying: ████████████████████████████

████████████████████████████████████████████

349.   The market share give-and-take between Teva and Actavis continued over the

coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to

achieve its fair share of the market for Clonidine-TTS.  On May 14, 2014, for example,

Defendant Patel told colleagues that Teva must be ████████████  and concede a particular

wholesaler's account to Actavis.  On May 17, 2014, Teva conceded a large retailer account to

Actavis.  On May 20, 2014, Patel again declined to bid at another customer due to the new

entrant Actavis, stating: ████████████████████████

350.   When L.R., Teva's analytics manager, recommended giving up yet another

Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between

Defendants Patel and Rogerson the prior day, K.G. of Teva reluctantly approved, saying:

████████████████████████████████████████████████

v.      **Budesonide Inhalation**

351.   Budesonide Inhalation, also known by the brand name Pulmicort Respules®, is an

anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent

asthma attacks.

352.    Teva obtained approval to market Budesonide Inhalation in November 2008.
Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide
Inhalation, with other competitors having less than 1% market share.

353.    On February 13, 2015, Defendant Rekenthaler informed other Teva employees of
Actavis's plans to enter the market, saying: ███████████████████████████████
Budesonide Inhalation.  Rekenthaler and Defendant Falkin of Actavis had spoken by phone three
days earlier on February 10, 2015.

354.    On February 16, 2015, Defendants Rekenthaler and Falkin had another lengthy
telephone conversation lasting twenty-three (23) minutes.  The following morning, Teva's T.C.
confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two
major customers to Actavis.  She explained that Actavis's sense of urgency to obtain the
accounts was due to concerns about getting its product into market before it faced legal action
from the brand manufacturer.  Thus, she explained, she was working with the customers on an
████████████ to get Teva's product out of the supply channel, so as to streamline Actavis's
entry into the market.

### vi.    Celecoxib

355.    Celecoxib, also known by the brand name Celebrex®, is a nonsteroidal anti-
inflammatory medication used in the treatment of pain and inflammation associated with
arthritis, juvenile rheumatoid arthritis, and other disorders.

356.    Teva received approval to market generic Celecoxib in May 2014.

357.    On November 20, 2014, as Teva was preparing to launch its generic Celecoxib
capsules, a customer informed Teva that Actavis was vying for some of the customer's
Celecoxib business.  The customer indicated that Actavis was preparing for a launch of its own

104

and had advocated its position by pointing out that it was just trying to ████████ in light of the fact that Teva had already secured over 30% of the market.

358.   Defendant Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: ██████████████████████

359.   By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided.  Another customer, a large retail pharmacy chain ("The Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch.  Actavis reportedly sought 25% of The Pharmacy's Celecoxib business.  A representative of The Pharmacy told Teva's T.C. that ██████████████████████ and that he did not have an issue with sending Actavis ████████

360.   Rekenthaler's response was consistent with the "fair share" understanding, saying ██████████████████████████████

361.   In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis.  Defendant Rekenthaler had a six (6) minute call with Defendant Falkin at Actavis on November 25.  The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute. Defendant Patel spoke to A.B., a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8.  Defendants Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one (1) minute phone call.  On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

f.      **Teva/Par**

i.      **Omega-3-Acid Ethyl Esters**

362.    Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid-regulating agent used to lower levels of triglycerides.

363.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014.  During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

364.    On the morning of June 26, 2014, Defendant Patel e-mailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters.  C.B. responded by asking if Par had started shipping that product. Patel replied at 10:24am that she had not heard anything yet, but promised to ▮▮▮▮▮▮▮▮

365.    Patel had indeed already started ▮▮▮▮▮▮▮  At 9:46am, she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:



T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June

26. That night, Patel followed up with C.B., informing her that the only thing Patel knew at that

point was that Par was limited on supply, but that she was ███████████████████

366.    The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes.

That was the first and only voice call ever between the two according to the phone records.  That

same morning, Patel informed C.B. that she now had ████████████ on Par's launch of

Omega-3-Acid Ethyl Esters and would ████████████ Patel also communicated

this information to Defendant Rekenthaler.  At 11:27am that same morning, Rekenthaler sent an

e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's

bidding and pricing plans:



367.    Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June

30, 2014.

368.    After the discussions between Patel and T.P. at Par, Teva proceeded to concede

business to Par to ensure Par's smooth entry into the market.  As of July 11, 2014, Teva's share

of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the

total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

369.    As new competitors entered the market, Teva coordinated with them to avoid

competition and keep prices high.  For example, in an internal e-mail on October 2, 2014, Teva's

K.G. stated that ████████████████████████

███████ Defendant Rekenthaler had obtained this information through phone calls with J.H., a

senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

370.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014.  On November 10, 2014, Patel and T.P. exchanged five (5) text messages.  On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters.  T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating ███████████████  Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

371.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing.  During this time, Defendant Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

372.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop.  By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%.  Defendant Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

### ii.    Entecavir

373.    Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B.

374.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir ▉▉▉▉▉ depending on when the FDA approved the drug. T.C. further noted: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉

375.    On August 28, 2014, Defendant Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉ Defendant Rekenthaler also noted that Teva would be pricing as if they were ▉▉▉▉▉ in the market, and expressed concern that customers might react negatively to the launch of this drug ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

376.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par.  The two spoke two (2) more times the next day, August 29, 2014.

377.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva.  The employee inquired whether Teva might consider reducing its price as well.  Defendant Rekenthaler, after speaking with M.B. at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

109

378.    Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback from CVS on Entecavir.  T.C. replied that she had not, and followed up later saying that ABC had indicated that it would sign Teva's offer letter.  Defendant Rekenthaler replied:

███████████████████████████████████████████████████████████████████

████  T.C. dismissed that concern:  ███████████████████████████████████

███████████████████████████████

379.    Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

380.    Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

381.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to ████████████████████████████████ Teva declined to do so, citing that the ████████████████████████████ Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

382.    The two-player market for Entecavir remained stable over time.  By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

### iii.    Budesonide DR Capsules

383.    Budesonide DR Capsules, also known by the brand name Entocort EC, is a steroid used to treat Crohn's disease and ulcerative colitis when taken orally.

384.    Teva was preparing to enter the market for Budesonide DR in or about March 2014.  At that time, it was a 2-player market:  Par had 70% market share and Mylan had the remaining 30%.

385.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug.  On April 1, 2014, M.B., a senior national account executive at Par, called Defendant Rekenthaler at Teva.  The two executives spoke for twenty-six (26) minutes.  The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

386.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: ████████████████████████████████████ ████████████████████████████████████████

387.    Par and Mylan were also communicating at this time.  On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

388.    On April 4, 2014, Defendant Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so.  Nonetheless, Rekenthaler spoke to both Defendant Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

389.   Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### g.   Teva/Taro

#### i.   Enalapril Maleate

390.   Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec®, is a drug used in the treatment of high blood pressure and congestive heart failure.

391.   In 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the market.  It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

392.   By mid-2013, the Enalapril market was shared by three players:  Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%.  As discussed more fully below in Section IV.C.2.h, those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

393.   Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Defendant Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

394.   In the midst of that coordinated price increase, however, Aprahamian was communicating with both Defendant Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril.  As a result of those conversations, Taro's plans changed.

395.     On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Defendant Patel called Defendant Aprahamian and left a message.  He returned the call and the two spoke for almost fourteen (14) minutes.  Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril became effective – Defendant Aprahamian called M.C. at Wockhardt on his office phone and left a message.  He then immediately called M.C.'s cell phone, which M.C. answered.  They spoke for nearly eleven (11) minutes.

396.     On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:



Aprahamian followed up with another e-mail shortly after, adding that Taro

397.     In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

398.     On July 31, 2013, for example, Defendant Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets.  Enalapril was one of the drugs

where, according to Defendant Patel, Teva was ████████████ so she authorized the

submission of a bid.  Prior to sending that e-mail, Patel had spoken to Defendant Aprahamian on

July 30 (11 minute call) and July 31, 2013 (4 minute call).  Based on the agreement between the

two companies, and in accordance with the industry's "fair share" code of conduct, Taro

understood that it would not take significant share from Teva upon its launch because Teva had a

relatively low market share compared to others in the market.

399.   Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian

emphasized to his colleagues that Taro's final prices would be set largely based on ████████

████████████████████████

400.   In early December 2013, Taro was fully ready to re-enter the Enalapril market.

On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account

executive, M.A., during conversations of two (2) and eleven (11) minutes.

401.   On December 4, 2013, one customer that had recently switched from Wockhardt

to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg,

and 20mg strengths.  At 4:30pm that afternoon, Defendant Aprahamian instructed a colleague to

prepare a price proposal for that customer for all four products.

402.   Before sending the proposal to the customer, however, Defendant Aprahamian

sought the input of his competitor, Teva.  On December 5, 2013, he and Defendant Patel spoke

by phone for nearly five (5) minutes.

403.   Taro's fact sheet for the Enalapril re-launch generated on the day of

Aprahamian's call with Teva showed a ████████████████ of 15%, with pricing

identical to Teva's and nearly identical to Wockhardt's and Mylan's.

114

404.    Taro began submitting offers on Enalapril the following day, December 6, 2013. But even with the bidding process underway, Defendant Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

405.    Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market. Defendant Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

406.    Thereafter, and with the likely consent of Mylan, Defendant Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

407.    Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. of Wockhardt to call Defendant Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an e-mail on January 2, 2014, S.K. of Wockhardt conveyed the details to his colleagues:



408.    By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies. As Teva was considering whether to bid on

specific drugs for an RFP sent out by a large wholesaler customer, Defendant Patel provided the following caution with regard to Enalapril: ████████████████████████████

████████████████ The same day she sent that e-mail -- May 14, 2014 -- Patel spoke to Defendant Aprahamian for more than four (4) minutes, and exchanged eight (8) text messages with him.

409.   By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player market.  Mylan and Teva each had approximately 28% market share.

ii.   **Nortriptyline Hydrochloride**

410.   Nortriptyline Hydrochloride ("Nortriptyline"), also known by the brand name Pamelor, is a drug used to treat depression.

411.   While Taro was approved in May 2000 to market generic Nortriptyline, it subsequently withdrew from the market.  As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

412.   By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that ████████████████████████████████ ████████████████████

413.   In early November, Taro was formulating re-launch plans, including a ███████ ████████████ for Nortriptyline of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

414.   On November 6, 2013, Defendant Aprahamian pressed his team to ███████████ ████████████████████████ He emphasized the need to find out who currently supplied two particular large customers so that Taro could ████████████████████████████

116

415.   Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

416.   Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market.  For example, Defendant Rekenthaler of Teva and Defendant Falkin of Actavis spoke twice by phone on November 10, 2013.

417.   Then, on November 12, 2013, Taro's Aprahamian called Defendant Patel at Teva.  Their conversation lasted almost eleven (11) minutes.  That same day, Defendant Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: ██████████████████  Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

418.   The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however.  Defendants Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18.  Falkin also exchanged two text messages with Defendant Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

419.   Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis.  On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: ████████████████████████████████████████████████

420.   The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue.  Armed with this new information, Defendant Aprahamian wasted no time in seeking Actavis's permission, placing a call to M.D., a senior

117

national account executive at Actavis, less than four hours later.  They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

421.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro.  On November 21, 2013, Teva informed its customer that ██████████████████████████████████████████

422.    The competitors continued consulting with each other over the coming months on Nortriptyline.  On December 6, 2013, for example, Defendant Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes.  On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

423.    Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

424.    Defendant Aprahamian also continued to coordinate with Teva.  He called Defendant Patel on January 28, 2014, but she did not pick up.  The dialogue continued on February 4, 2014 when Patel called Aprahamian back.  The two talked for nearly twenty-four (24) minutes.

425.    Two days later, on February 6, a potential customer solicited Taro to bid on its business.  When a colleague informed Defendant Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:



426.    Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

427.    At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline.  Prior to this time – particularly in early 2014 – Nortriptyline had been listed by Teva as a potential candidate for a price increase.  On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Defendant Aprahamian for more than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry.  The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks.

119

With respect to a possible Nortriptyline price increase, it stated: ██████████████████

████████   As discussed more fully below, Teva subsequently raised the price of Nortriptyline on

January 28, 2015 – in coordination with both Taro and Actavis.

### h.   Teva/Zydus

428.   Defendant Green left Teva in November 2013 and moved to Zydus where he took

a position as an Associate Vice President of National Accounts.  Once at Zydus, Green

capitalized on the relationships he had forged with his former Teva colleagues to collude with

Teva (and other competitors) on several Teva/Zydus overlap drugs.

429.   In the spring/early summer of 2014 in particular, Zydus was entering four

different product markets that overlapped with Teva.  During that time period, Defendant Green

was in frequent contact with Defendants Patel and Rekenthaler, and others, to discuss pricing and

the allocation of customers to his new employer, Zydus.  Indeed, given the close timing of entry

on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at

any given time.

### i.   Fenofibrate

430.   Fenofibrate, also known by brand names such as Tricor, is a medication used to

treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and

triglycerides) and raising "good" cholesterol (HDL) in the blood.

431.   As discussed in detail in Section IV.C.1.a.i above, Defendant Teva colluded with

Defendants Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May

2013.  To effectuate that agreement, Defendant Green was in frequent contact with Defendant

Nesta of Mylan and Defendant Berthold of Lupin.

432.     In February 2014, Zydus was preparing to launch into the Fenofibrate market. Defendant Green, now at Zydus, colluded with Defendants Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

433.     On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss ███ ████████████████████ on February 24, 2014.  One discussion item was Zydus's anticipated entry into the Fenofibrate market.  Notably, Defendant Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

434.     In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

435.     On or about March 7, 2014, Defendant Zydus entered the Fenofibrate market at WAC pricing that matched Defendants Teva, Mylan, and Lupin.  In the days leading up to the launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Indeed, between March 3 and March 7, these competitors exchanged at least 26 calls with each other.  These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, **David** (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, **David** (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | **Voice** | **Nesta, Jim (Mylan)** | **Incoming** | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | **Voice** | **Patel, Nisha (Teva)** | **Outgoing** | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | **Voice** | **Patel, Nisha (Teva)** | **Outgoing** | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | **Voice** | **Nesta, Jim (Mylan)** | **Outgoing** | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | **Voice** | **Nesta, Jim (Mylan)** | **Incoming** | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | **Voice** | **Nesta, Jim (Mylan)** | **Outgoing** | Rekenthaler, **David** (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | **Voice** | **Patel, Nisha (Teva)** | **Outgoing** | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | **Voice** | **Berthold, David (Lupin)** | **Incoming** | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | **Voice** | **Nesta, Jim (Mylan)** | **Outgoing** | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | **Voice** | **Green, Kevin (Zydus)** | **Outgoing** | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | **Voice** | **Green, Kevin (Zydus)** | **Incoming** | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | **Voice** | **Green, Kevin (Zydus)** | **Outgoing** | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

436.    During the morning of March 17, 2014, Defendants Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.  A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying ▮▮▮▮▮▮▮▮▮▮ for several products on which Teva overlapped with Defendant Zydus – including Fenofibrate.  With respect to Fenofibrate, Patel recommended ▮▮▮▮▮▮▮▮▮▮  Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

437.    In the months that followed, Teva ▮▮▮▮▮▮▮ several customers to Zydus in accordance with the agreement they had reached.

122

438.    For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Defendants Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource.  Patel responded that Teva was ████████████████████████

439.    That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss ███████████████████████ One item on the agenda was ████████████████████████████████

440.    The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva ██████ OptiSource and Humana to Zydus.  Patel further stated that Teva provided a ████████████ to a third customer, NC Mutual, but stated that Teva should █████████ ███████████████████ That same day, Patel called Green and they spoke for more than fourteen (14) minutes.  She also spoke with Defendant Berthold of Lupin for nearly twelve (12) minutes.

441.    In the meantime, Zydus bid at another Teva customer, Ahold.  On March 25, 2014, Patel e-mailed Rekenthaler stating ███████████████████████████ ███████████████████████ Patel then sent an internal e-mail directing that Teva ████████ the Ahold business.  Later that day, Patel called Green.  He returned the call and they spoke for nearly eight (8) minutes.  Patel also called Defendant Berthold of Lupin and they spoke for five (5) minutes.

442.    On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer.  The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and explained ███████████████████████████████████████ ██████████████████████████████████████████

123

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

443.    K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens, but explained that ███████████████ ███████████████████████████████████████████████████████ Patel emphasized that we ██████████████████████████████████████████████████ ████████ Later that day, Green called Patel and they spoke for twenty (20) minutes.

444.    On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes. He also called Rekenthaler, and they spoke for two (2) minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

445.    On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating ██████████████████████████████████ ████████████████ T.S. forwarded the e-mail to K.G., copying Defendants Patel and Rekenthaler, asking to ████████████████████████ because ██████████████ ██████████████████████████████ Rekenthaler responded, █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

124

446.    The next day, on June 11, 2014, Defendant Green called Defendant Rekenthaler and they spoke for eight (8) minutes.  Later that day, Patel called Green.  He returned the call and they spoke for nearly fifteen (15) minutes.

### ii.    Paricalcitol

447.    Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.

448.    Defendant Teva entered the market on Paricalcitol on September 30, 2013.  As the first generic to enter the market, it was entitled to 180 days of exclusivity.

449.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede.  Teva had advance knowledge that Defendant Zydus and another generic manufacturer not named as a Defendant in this case planned to enter the market on day 181, which was March 29, 2014.

450.    In the month leading up to the Zydus launch, Defendants Patel and Rekenthaler spoke with Defendant Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

451.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Defendants Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER.  After receiving that e-mail, Rekenthaler called Green.  The call lasted less than one (1) minute (likely a voicemail).  The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes.  On March 4, Patel called Green again and left a voicemail.

452.    On March 12, 2014, T.S. e-mailed Defendants Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC.  That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented.  This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

453.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing.  The next day, on March 14, 2014, Patel called Green.  A few minutes later, Green returned the call and they spoke for nineteen (19) minutes.  Rekenthaler then called Patel and they spoke for eleven (11) minutes.

454.    During the morning of March 17, 2014, Defendants Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.  A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying ██████████████ for several products on which Teva overlapped with Defendant Zydus – including Paricalcitol.  With respect to Paricalcitol, Patel recommended that Teva ████████████████████████████████████████████ Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

455.    Over the next several weeks, Defendant Teva would ██████████ concede several customers to the new entrant Zydus.

456.    For example, on March 27, 2014, Green called Patel.  Defendant Patel returned the call and they spoke for nearly nine (9) minutes.  The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business.  J.P.

forwarded the OptiSource e-mail to Patel.  Within minutes, Patel responded ██████████

██████

457.    That same day, Defendant Teva was notified by another customer, Publix, that

Zydus had submitted a proposal for its Paricalcitol business.  On April 1, 2014, Defendant Teva

conceded the customer to Zydus and noted in Delphi that the reason for the concession was

█████████████████████

458.    Also on April 1, 2014, Defendant Zydus bid for the Parcalcitol business at NC

Mutual, another Teva customer.  That same day, Patel called Green and left a 22-second

voicemail.  The next day, on April 2, 2014, Patel tried Green twice more and they connected on

the second call and spoke for nearly ten (10) minutes.  Later that evening L.R., an Associate

Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of

National Accounts assigned to NC Mutual, copying Patel, asking: ████████████████

███████████████████ Patel responded, ████████████████

████████

459.    On April 15, 2014, Walmart received a competitive bid for its Paricalcitol

business and provided Teva with the opportunity to retain.  Two days later, on April 17, 2014,

K.G. responded that he thought it might be Zydus.  Patel replied, ████████████

█████████████████████████████████████████████

█████████████████████████ Later that day, Green called

Patel.  She returned his call and they spoke for nearly twelve (12) minutes.  Later that day, after

her discussion with Defendant Green, Patel sent an internal e-mail stating ████████████

█████████████████████████ On April 22, 2014, Patel

sent an internal e-mail regarding Walmart directing, ███████████████████

███████

### iii.    Niacin ER

460.    Niacin Extended Release ("ER"), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

461.    Defendant Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.  Teva's exclusivity was set to expire on March 20, 2014.

462.    Teva had advance knowledge that Defendant Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter.  Teva also knew that Defendant Zydus planned to enter on June 28, 2014.

463.    Armed with that knowledge, Teva increased price on Niacin ER on March 7, 2014 in advance of the competitors' entry.  In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Defendant Green and Defendants Patel and Rekenthaler of Teva, and Defendant Berthold of Lupin are detailed in the chart below. (The calls between Defendants Teva and Lupin are discussed more fully below in Section IV.C.2.k.)

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

464.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER.  The communications between Defendant Green and Defendants Rekenthaler and Patel of Teva, and Defendant Berthold of Lupin, are detailed in the chart below.  (The calls between Defendants Teva and Lupin, and additional detail regarding Teva's concession of customers to Lupin, are discussed more fully below in Section IV.C.2.k.)

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

465.    In May 2014, Zydus began readying to enter the Niacin ER market.  On May 5, 2014, Zydus bid on the Niacin ER business at ABC – a Teva customer.  The next day, on May 6, 2014, Defendant Green called Defendant Rekenthaler and they spoke for three (3) minutes.  Less than an hour later, Green called Defendant Patel and they spoke for eight (8) minutes.  A few

minutes later, Green called Patel again and left a twelve-second voicemail. Later that evening, Defendant Patel e-mailed K.G. reporting what Teva had learned on those calls:



K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER, and include Rekenthaler.

466.    Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Defendant Berthold of Lupin. These calls are listed below.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 |

467.    Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

468.    On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Defendants Patel and Rekenthaler, stating: ███████████████████████████████████████████ ████████████  After receiving the e-mail, Rekenthaler called Green.  The call lasted two (2) minutes.  Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes.  Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

469.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail stating ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████  Patel replied, ████████████████████████████ Later that morning, Green called Rekenthaler.  The call lasted two (2) minutes.  Green then called Patel and they spoke for nearly six (6) minutes.

470.    On June 5, 2014, J.P. sent an internal e-mail regarding ████████████ stating ████████████████████████████████████████████  J.P. also entered the loss in Teva's internal database – Delphi – and noted that the reason for the concession was ████████████████████

471.    On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

### iv.    Etodolac Extended Release

472.    Etodolac Extended Release ("Etodolac ER") is a nonsteroidal anti-inflammatory drug that is used to treat symptoms of juvenile arthritis, rheumatoid arthritis, and osteoarthritis.

473.    Prior to Zydus' entry into the Etodolac ER market, Defendant Teva and Defendant Taro were the only generic suppliers of the product.  As described in detail in Section IV.C.2.i.(iii) below, Defendants Teva and Taro – through Defendants Patel and Aprahamian – colluded to significantly raise the price of Etodolac ER in August 2013.

474.    On May 12, 2014, Defendant Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing.  Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Defendants Green and Aprahamian.  During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

475.    On May 14, 2014, Anda – a wholesaler customer of Teva – notified Teva that Zydus had submitted a bid for its Etodolac ER business.  That same day, Patel exchanged eight (8) text messages and had a four (4) minute call with Aprahamian.  The next day, on May 15, 2014, Green called Patel and they spoke for twenty (20) minutes.

476.    On May 20, 2014, Defendant Green called Defendant Patel and they spoke for four (4) minutes.  That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second call with Defendant Maureen Cavanaugh of Teva.  The next day – May 21, 2014 – Defendant Green called Defendant Patel again and they spoke for twenty-eight (28) minutes.  That same day, K.R. of Zydus and Defendant Cavanaugh of Teva exchanged four (4) text messages.

477.    The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Defendant Patel, stating: ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Patel responded: ▮▮▮▮▮▮▮

478.    Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business.  Later that day, Patel spoke with Defendant Aprahamian at Taro for fourteen (14) minutes.

479.    On July 2, 2014, Patel called Green and left a four-second voicemail.  The next day, on July 3, 2014, Patel sent an internal e-mail advising that ▮▮▮▮▮▮▮ Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

480.    When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he sent an internal e-mail asking ▮▮▮▮▮▮▮ Patel responded, ▮▮▮ ▮▮▮▮▮▮▮ K.G. replied, ▮▮▮▮▮▮▮

    i.    **Teva/Glenmark**

133

### i.      Moexipril Hydrochloride Tablets

481.    Moexipril Hydrochloride ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors.  It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently.  Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril on December 31, 2010.

482.    As discussed more fully below in Section IV.C.2.f.i., Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril between May and July, 2013.  When Defendant Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

483.    On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC.  Upon hearing this news, Defendant Rekenthaler, the Vice President of Sales at Teva, forwarded an e-mail discussing the Glenmark challenge to Defendant Patel, expressing his confusion over why Glenmark would be challenging Teva's business:



Defendant Rekenthaler forwarded the e-mail only to Defendant Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

484.    Five (5) minutes after receiving the e-mail from Defendant Rekenthaler,

Defendant Patel responded:



The call that Defendant Patel had made earlier that day was to Defendant CW-5, a senior

executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

485.    Defendant Patel spoke to CW-5 three times that day. The following day – August

6, 2013 – Defendant Jim Brown, the Vice President of Sales at Glenmark, called Defendant Patel

at 9:45am but did not reach her.  Patel returned Brown's call at 10:08am and the two spoke for

approximately thirteen (13) minutes.  Later that day, at 1:11pm, the two spoke again for

approximately fifteen (15) minutes.  During these calls, Defendant Patel reminded Brown and

CW-5 of their prior agreement not to poach each other's customers after a price increase.

486.    As a result of these communications, Glenmark decided to withdraw its offer to

ABC and honor the agreement it had reached with Teva not to compete on Moexipril.  Later that

same day – August 6, 2013 – T.S. of Teva informed colleagues that ████████████████

████████████████████████████████████████████

████████

### ii.    Desogestrel/Ethinyl Estradiol Tablets (Kariva)

487.    Desogestrel/Ethinyl Estradiol ("Kariva") is a combination pill containing two

hormones: progestin and estrogen.  This medication is an oral contraceptive.  Defendant

135

Glenmark markets this drug under the name Viorele, while Defendant Teva markets the drug under the name Kariva.  These drugs are also known by the brand name, Mircette.  Glenmark entered the market for Kariva 0.15mg/0.02mg tablets on April 4, 2012.

488.    During the morning of May 19, 2014, Defendant Patel learned that Glenmark had bid a low price for its own version of Kariva – Viorele – at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, e-mailed Defendant Patel a list of suggested re-bid prices to send to Publix for various drugs, including Kariva.  The chart included a suggested re-bid price for Kariva of $76.14 – which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

489.    This sparked a flurry of communications that same day between Defendant Patel and three different Glenmark representatives – Defendants Brown and Grauso, and J.C., a sales and marketing executive at Glenmark – as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

490.    After this flurry of communications between the two competitors, Defendant Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed re-bid price of $76.14 – virtually guaranteeing that the business would be awarded to Glenmark.

### iii.    Gabapentin Tablets

491.    Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants.  The medication is used to treat epilepsy and neuropathic pain.  Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

136

492.    On October 13 and 14, 2014, Defendant Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  The PCMA described its Annual Meeting as ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

493.    Shortly after returning from that meeting, during the morning of October 15, 2014, Defendant Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin, and suggested that this would be a great opportunity to pick up some market share.  The Glenmark increase had not yet been made public, and would not be effective until November 13, 2014.  Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.  At around the time she sent the e-mail, Defendant Patel exchanged two (2) text messages with Defendant Brown of Glenmark.

494.    Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share.  Over the next several weeks, Teva did pick up ███████████ to be more in line with fair share principles, but cautioned internally that it did not ███████████████████████ ██████

      **j.**     **Teva/Lannett**

### i.  Baclofen

495.    Baclofen, also known by the brand names Gablofen and Lioresal, is a muscle relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and spinal cord injury or disease.  It is generally regarded as the first choice of physicians for the treatment of muscle spasms in patients with multiple sclerosis.

496.    In June 2014, Defendant Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply.  In an internal e-mail sent to his sales staff, K.S., a senior sales executive at Lannett, stated: █████████████████████████ ████████████████████████████  At that time, Teva had a large market share in relation to the existing competitors in the market.

497.    Defendant Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Defendant Patel (Teva was a competitor for Baclofen) using Facebook Messenger.  On June 12, 2014, Sullivan messaged Patel, stating:



The message was sent at 11:16am.  At 11:30am, Defendant Patel called Defendant Sullivan and they spoke for seven (7) minutes.  This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013.  During the conversation, Defendant Sullivan

informed Defendant Patel that Lannett would be entering the market for Baclofen shortly.  In a

follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



498.    True to her word, Defendant Sullivan called Defendant Patel on July 1, 2014 and

left a voicemail.  Patel promptly returned the call, and the two spoke for almost seven (7)

minutes.

499.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try

and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva

colleague: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  That same day,

Patel sent a text message to Sullivan asking ▮▮▮▮▮▮  Sullivan immediately called Patel and

left a voicemail.  Patel called Sullivan back promptly, and they spoke for more than three (3)

minutes.  After speaking, Patel sent another text message to Sullivan, stating: ▮▮▮▮▮▮

Sullivan responded: ▮▮▮▮▮

500.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer

a lower price to maintain the account).  Even though the new manufacturer's price was only

slightly below Teva's price, Teva declined to bid.  Defendant Patel specifically agreed with the

decision to concede, stating ▮▮▮▮▮▮▮▮▮▮  Teva's internal tracking database noted

that the customer had been conceded to a ▮▮▮▮▮▮▮▮▮▮

501.    Teva had significantly increased its price for Baclofen in April 2014 (following an

Upsher-Smith price increase), and was able to maintain those prices even after Lannett entered

the market a few months later.  In fact, when Lannett entered the market it came in at the exact

same WAC price as Teva.

### k.    Teva/Amneal

#### i.    Norethindrone Acetate

502.    Norethindrone Acetate, also known by the brand name Primolut-Nor among

others, is a female hormone used to treat endometriosis, uterine bleeding caused by abnormal

hormone levels, and secondary amenorrhea.

503.    On September 9, 2014, a customer approached Teva asking if Teva would lower

its pricing on certain drugs, including Norethindrone Acetate.  One of Teva's competitors for

Norethindrone Acetate was Defendant Amneal.  The same day, Defendant Patel received phone

calls from two different Amneal employees – S.R.(2), a senior sales executive (call lasting more

than three (3) minutes), and S.R.(1), a senior sales and finance executive (almost twenty-five

(25) minutes).  These were the first calls Defendant Patel had with either S.R.(1) or S.R.(2) since

she joined Teva in April 2013.  That same day, S.R.(1) also spoke several times with Defendant

Jim Brown, Vice President of Sales at Glenmark – the only other competitor in the market for

Norethindrone Acetate.

504.    After speaking with the two Amneal executives, Teva refused to significantly

reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt

the market.  At that time, market share was almost evenly split between the three competitors.

When discussing it later, Defendant Patel acknowledged internally that Teva had ███████ at

the customer based on its understanding ████████████████████

140

███████████████ By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

### l.     Teva/Dr. Reddy's

#### i.     Oxaprozin

505.    Oxaprozin, also known by the brand name Daypro, is a non-steroidal anti-inflammatory drug (NSAID) indicated for the treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis.

506.    In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year.  In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large chain and one large wholesaler in order to obtain at least 30% market share.  Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

507.    On June 13, 2013, members of the Dr. Reddy's sales force met for an ██████ ████████████████ to ████████████████████████████ ██████████

508.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.  Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

509.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens.  At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about ████████████████████████████ at Walgreens.

Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to ▮▮▮▮▮▮▮▮▮ to obtain that customer.

510.    Dr. Reddy's did bid aggressively at Walgreens.  On or around July 14, 2013, Walgreens informed Defendant Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price.  Per Defendant Green, Walgreens did not ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

511.    While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Defendant Green.  That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

512.    Two days later, Defendant Green noted that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will ▮▮▮▮ ▮▮▮▮ – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

513.    While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy.  On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.  Eager to avoid any further price erosion from the Dr. Reddy's entry, Defendant Rekenthaler immediately asked Defendant Patel to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

514.   At 12:33pm that day, Defendant Patel asked a colleague to ███████████

███████████████████████████████████ It was typical at Teva to run this type of report

before negotiating market share with a competitor.  At 2:20pm, that colleague provided the

information to Defendant Patel, copying Defendant Rekenthaler and K.G.  With this information

in hand, less than an hour later Defendant Rekenthaler placed a call to T.W., a Senior Director of

National Accounts at Dr. Reddy's.  The call lasted two (2) minutes, and was their only telephone

conversation in 2013.

515.   After having this conversation with T.W., Teva decided to maintain the

Walgreens business, but concede the Econdisc business to Dr. Reddy's.  Teva conceded the

Econdisc business on August 7, 2013.  Defendant Green listed ██████████████████ in

Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

516.   By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20%

share of the Oxaprozin market.  At that time, its customers included Econdisc, Keysource, and

Premier.

### ii.   Paricalcitol

517.   Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent

high levels of parathyroid hormone in patients with long-term kidney disease.

518.   Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-file

generic, and had 180 days of generic exclusivity.

519.   Following its period of exclusivity, Teva's ████████████████████████

████ but ██████████████████████████████████████████

████████████ As discussed more fully above in Section IV.C.1.h.ii, during March and

April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was

entering the market for Paricalcitol.  By mid-April 2014, Teva ████████████████

████████ to Zydus.

520.    By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market.  On

May 1, 2014, T.W. of Dr. Reddy's spoke with Defendant Rekenthaler of Teva for nearly eleven

(11) minutes.

521.    At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was

instructed to find out which customers were currently purchasing Paricalcitol from which

manufacturers, and their prices.  Dr. Reddy's was targeting a 20% market share.  At the time,

Teva's share was 73%.

522.    On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers –

including a large retail pharmacy customer ("The Pharmacy") – Defendant Patel spoke with

V.B., the Vice President of Sales for North American Generics at Dr. Reddy's, several times.  At

8:50am, Patel called V.B. and left a voicemail.  V.B. returned the call at 9:18am, and the two

spoke for more than ten (10) minutes.  Later that day, at 2:46pm, Dr. Reddy's provided The

Pharmacy with a market share report for Paricalcitol indicating that Teva was the market leader

at 60% share.  A representative of The Pharmacy responded that it ███████████████████

████████  Shortly after this e-mail exchange, at 3:21pm, V.B. called Defendant Patel again and the

two spoke for nearly nine (9) minutes.

523.    By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and

The Pharmacy.  The internal plan was that if The Pharmacy declined, then Dr. Reddy's would

make an offer to CVS.  That same day, Teva agreed to concede its Paricalcitol business at

Omnicare, dropping its market share by 3%.

524.    Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus).  After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the four mcg portion of the business.  Defendant Patel recommended to her boss, K.G., that Teva concede the business: ███

███████████████████████████████████████████████  K.G. agreed.

Defendant Patel then instructed S.B., a customer analyst at Teva, to concede ████████

████████  S.B. subsequently e-mailed T.C., Teva's Senior Director of Sales & Trade

Relations: ████████████████████████████████████████████

███████████████████████  T.C. relayed this statement, word-for-word, to

Cardinal.

525.    Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity.  ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014.  In internal e-mails discussing this price challenge, Teva employees noted that Dr. Reddy's was ██████████████████████████ and potentially eroding the price of the drug.  When asked for his thoughts on this, Defendant Rekenthaler remarked:

████████████████████████████████████████████

Despite the pricing challenge, Teva retained the ABC Paricalcitol business.  As ABC explained to Dr. Reddy's, ████████████████████████████████████████

145

526.    Dr. Reddy's formally launched Paricalcitol on June 24, 2014.  On or around that

date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks.  On June 26, 2014,

Teva's K.G. told Defendant Patel that he was ███████████████████████████████████

███████████ to Dr. Reddy's.

527.    Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol

from Dr. Reddy's.  Defendant Patel recommended that Teva concede the business.  Teva did,

and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

528.    Giant Eagle informed Teva that it had received a competing offer on Paricalcitol

on July 10, 2014.  That same day, V.B. of Dr. Reddy's called Defendant Patel and the two spoke

for more than twelve (12) minutes.  Shortly after getting off the phone with V.B., Patel

responded to a question from a colleague regarding an RFP to another supermarket chain.  One

of the potential bid items was Paricalcitrol.  Patel directed her colleague to ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████    Her colleague responded: ████████████████ on Paricalcitol.

529.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's.  S.B., a

Teva Strategic Customer Analyst, wrote in an internal e-mail, ████████████████████████████

████████████████████████████████  Giant Eagle accepted Dr. Reddy's proposal

the next day.

530.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced

pricing in order to retain the business.  Teva decided internally to concede Paricalcitol at

Schnucks ████████████████████████████████████████  In order to create the

appearance of competition with this customer, Teva engaged in what Defendant Patel referred to

as ██████████████ by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to

ensure that Teva did not win the business. Indeed, Schnucks was ███████ by Teva's price

that it moved to Dr. Reddy's the same day it received Teva's offer. When Defendant Patel

learned of this, she remarked to a Teva salesperson (who she had been discussing ███████

with recently):



Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

    531.    On July 16, 2014, McKesson informed Teva that it had received a competing bid

for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business.

Teva initially decided to concede the One Stop portion of McKesson's business only, while

retaining the RiteAid portion. Defendant Patel wrote internally to her team that ███████

███████████████████████████████████████████████████

███████████████████████████████████ Patel

further added that Teva had been ████████████████████████ and

that ████████████████████████

    532.    On July 18, 2014 – a Friday – Defendant Patel called V.B. at Dr. Reddy's at

4:20pm and left a message. V.B. returned the call on Monday morning, and the two spoke for

more than four (4) minutes. They spoke again the next morning, July 22, 2014, for more than six

(6) minutes. During these calls, Defendant Patel and V.B. agreed that Dr. Reddy's would stop

competing for additional market share (and driving price down further) if Teva conceded all of

its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed

to McKesson (that same day) that it ███████████ – meaning it would not compete

for additional business because it had attained its fair share.  McKesson passed this information

along to Teva on July 22.

533.     The next day, July 23, 2014, Teva decided to concede its entire McKesson

business – both RiteAid and One Stop – to Dr. Reddy's.  In making this decision, Defendant

Patel noted: In its Delphi database, Teva noted that the McKesson Paricalcitol business had been

conceded to a ███████████  After the fact, former customer McKesson

informed Teva that Dr. Reddy's had been ███████████████

███

534.     By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol

market, which it decided – pursuant to its understanding with Teva – it would █████████

███

### 2.     Taking The Overarching Conspiracy To A New Level:  Price Fixing (2012-2015)

535.     As evident from the many examples above, by 2012 the overarching "fair share"

conspiracy was well established in the industry, including among the Defendants.  Generic

manufacturers replaced competition with coordination in order to maintain their fair share of a

given generic drug market and avoid price erosion.  The structure and inner workings of the

agreement were well understood and adopted throughout the industry.

536.     Around this time, however, manufacturers began to focus more on price increases

than they had in the past.  They were no longer satisfied to simply maintain stable prices – there

was a concerted effort by many in the industry to significantly raise prices.  Manufacturers

started communicating with each other about those increases with greater and greater frequency.

537.   A troubling pattern began to emerge.  Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase.  The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase, or steal a competitor's market share on an increase.  There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

538.   It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly.  Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays.  In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

### a.   Teva July 31, 2012 Price Increase

539.   Effective July 31, 2012, Teva increased pricing on a number of different drugs.

Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced

competition, including the following:[2]

| Drug | Competitors |
|------|-------------|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

Before raising prices on these drugs, Teva coordinated each of these price increases with its

competitors.  For every drug on the list above, either Defendant Green or Defendant Rekenthaler

was communicating directly or indirectly with Teva's competitors to coordinate in the days and

weeks leading up to the price increase.  For example:

- **Mylan:**  Defendant Green spoke to Defendant Nesta on July 23 (7 minutes), July 24 (2 calls: 4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8 minutes); and July 31, 2012 (5 calls: 6, 2, 4, 7 and 2 minutes);

- **Watson:**  Defendant Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (2 calls: 1 and 9 minutes);

- **Sandoz:**  Defendant Green spoke to CW-2 at Sandoz on July 29, 2012 (2 calls: 2 and 4 minutes) and July 31, 2012 (6 minutes).

- **Breckenridge:**  Defendant Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (4 minutes);

---

[2]  Watson Pharmaceuticals, Inc. ("Watson"), acquired Actavis in or about October 2012.  The two companies operated as a single entity, albeit under separate names, until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.  **[See https://www.allergan.com/news/news/thomson-reuters/watson-pharmaceuticals-inc-is-now-actavis-inc]**

- **Alvogen**: Defendant Green had several calls with Defendant Nesta at Mylan (noted above) on July 31, 2012.  After some of those calls between Green and Nesta on July 31, Defendant Nesta called B.H., a senior sales and marketing executive at Alvogen.

540.     Teva continued to coordinate with these competitors on these drugs even after July 31, 2012.  Examples of this coordination with respect to specific drugs are discussed in more detail below.

### i.     Nadolol

541.     As early as 2012, Teva was speaking to competitors about the drug Nadolol.

Nadolol, also known by the brand name Corgard, is a "beta blocker" which is used to treat high blood pressure, reducing the risk of stroke and heart attack. It can also be used to treat chest pain (angina).

542.     In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability.  Nadolol was a high volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

543.     Teva's relationships with Mylan and Sandoz are discussed more fully below, but by 2012 an anticompetitive understanding among those companies was firmly entrenched.

544.     Teva raised its price on Nadolol on July 31, 2012.  In the days leading up to that increase – following a pattern that would become routine and systematic over the following years – Defendant Kevin Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan.  Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012.  Similarly,

Defendant Green was communicating with Defendant Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

545.    Sandoz followed with its own increase on August 27, 2012.  The increases were staggering – varying from 746% to 2,762% depending on the formulation.  The day before the Sandoz increase, Defendant Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Defendant Green.  They had also spoken once earlier in the month, shortly after the Teva increase.  CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price.  The day after the Sandoz increase, Defendant Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

546.    Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013.  In what had become a routine component of the scheme, the day before the Mylan increase Nesta spoke to Green four (4) times.  The next day, Defendant Green conveyed the information he had learned from Defendant Nesta directly to his counterpart at Sandoz.  On January 4, 2013 – the day of the Mylan increase – Defendant Green called Defendant Kellum twice in the morning, including a six (6) minute call at 9:43am.  Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:



Being [redacted] on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

547.   Defendant Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013.  At 11:50am the same morning, Defendant Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

548.   Significantly, Defendant Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine.  Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

549.   To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years.  In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol.  Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

550.   As discussed more fully below, Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

ii.      **Labetalol**

551.    Labetalol, also known by brand names such as Normodyne and Trandate, is a medication used to treat high blood pressure.  Labetalol, like Nadolol, is in a class of drugs called beta blockers, and it works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.

552.    After Teva increased its pricing on Labetalol on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug.  For example, In October 2012, Teva learned that Sandoz was ▮▮▮▮▮▮▮▮▮▮▮▮▮ but that ▮▮▮▮▮▮▮▮▮ (i.e., did not have enough supply to meet all of its demand).   In an internal e-mail sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering ▮▮▮▮▮▮▮▮ in order to retain its market share.

553.    That same day, Defendant Green spoke to CW-2 of Sandoz two (2) times.  After those calls with CW-2, Green responded to the analyst's question:



T.C. of Teva agreed: ▮▮▮▮▮▮▮▮▮▮

554.    Defendant Rekenthaler was not satisfied, however.  In order to confirm that Watson was also still committed to maintain high pricing on Labetalol, Defendant Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

iii.      **Nitrofurantoin MAC Capsules**

555.    Nitrofurantoin Macrocrystal, also known by the brand name Macrodantin, is a medication used to treat certain urinary tract infections.

154

556.    Teva's July 31, 2012 price increase on Nitrofurantoin Macrocrystal was between 90-95% depending on the dosage and formulation.  After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

557.    For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors).  At 9:49am on October 10, 2012, K.G. of Teva sent an internal e-mail to the Teva sales team, including Defendants Green and Rekenthaler, among others, saying:



Immediately after receiving that e-mail, Defendant Green reached out to both Defendant Nesta at Mylan and B.H., his counterpart at Alvogen.  At 10:01am, Green called Nesta and the two spoke for ten (10) minutes.  After hanging up – at 10:11am – Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes.  To close the loop, Defendant Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten (10) minutes.  Teva did not lower its price.

### b.    Increasing Prices Before A New Competitor Enters The Market:  Budesonide Inhalation Suspension (February – April 2013)

558.    Budesonide Inhalation Suspension, also known by the brand name Pulmicort Respules, is a medication used to control and prevent symptoms caused by asthma.  It belongs to a class of drugs called corticosteroids, and works directly in the lungs to make breathing easier by reducing the irritation and swelling of the airways.

559.    As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension.  Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly.  So before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide Inhalation Suspension by 9%.  Although a very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

560.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent.  That same day, Defendant David Rekenthaler of Teva called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two (2) minutes. This was the first-ever phone call between them based on the phone records produced.

561.    The next day, April 2, 2013, Defendant Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes.  Actavis then immediately began shipping the product.  Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva.  Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was ███████████████████████████

562.    At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market, but in the interim Teva was able to

continue to charge the agreed-upon prices.  In addition, once Actavis entered the market in 2015,

Teva immediately conceded customers to Actavis in accordance with the fair share agreement –

after calls between Rekenthaler and Defendant Falkin, by then a Vice President at Actavis.  See

Section IV.C.1.e.v., *supra..*

**c.       Early 2013:  Teva's Generics Business Struggles**

563.     Despite Teva's initial attempts to increase its revenues through price increases in

2012 and early 2013, its generic business was struggling as of early 2013.  Throughout the first

quarter of 2013, Teva realized it needed to do something drastic to increase profitability.  On

May 2, 2013, Teva publicly announced disappointing first quarter 2013 results.  Among other

things:  (1) net income was down 26% compared to the prior year; (2) total net sales were down

4%; and (3) generic sales declined by 7%.

564.     By this time, Teva had already started to consider new options to increase its

profitability, including more product price increases.  Over the next several years, Teva

embarked on an aggressive plan to conspire with its competitors to increase and sustain price on

many generic drugs – completely turning around the company's fortunes.

####       d.       April 2013:  Teva Hires Defendant Nisha Patel

565.     In April 2013, Teva took a major step toward implementing more significant price

increases by hiring Defendant Nisha Patel as its Director of Strategic Customer Marketing.  In

that position, her job responsibilities included, among other things:  (1) serving as the interface

between the marketing (pricing) department and the sales force teams to develop customer

programs; (2) establishing pricing strategies for new product launches and in-line product

opportunities; and (3) overseeing the customer bid process and product pricing administration at

Teva.

566.     Most importantly, she was responsible for – in her own words – ███████

██████████████████████████████████████████████████████

██████████████████     In that role, Patel had 9-10 direct reports in the pricing

department at Teva.  One of Patel's primary job goals was to effectuate price increases.  This was

a significant factor in her performance evaluations and bonus calculations and, as discussed more

fully below, Patel was rewarded handsomely by Teva for doing it.

567.     Prior to joining Teva, Defendant Patel had worked for eight years at a large drug

wholesaler, ABC, working her way up to Director of Global Generic Sourcing.  During her time

at ABC, Patel had routine interaction with representatives from every major generic drug

manufacturer, and developed and maintained relationships with many of the most important sales

and marketing executives at Teva's competitors.

568.     Teva hired Defendant Patel specifically to identify potential generic drugs for

which Teva could raise prices, and then utilize her relationships to effectuate those price

increases.

569.    Even before Defendant Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role.  For example, on April 2, 2013 – nearly three weeks before Defendant Patel started at Teva – Defendant Ara Aprahamian, the Vice President of Sales and Marketing at Defendant Taro, sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: ███████████████████████████ The COO responded by saying ███████████████████████ ██████  Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Defendant Patel as someone who would change that mindset at Teva.  Defendant Patel had also worked with Defendant Aprahamian several years earlier at ABC.

570.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013.  Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva.  For example:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

Once Defendant Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent – and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

571.    When she joined Teva, Defendant Patel's highest priority was identifying drugs where Teva could effectively raise price without competition.  On May 1, 2013, Defendant Patel

began creating an initial spreadsheet with a list of ▮▮▮▮▮▮▮▮▮▮▮▮▮  As part of her

process of identifying candidates for price increases, Patel started to look very closely at Teva's

relationships with its competitors, and also her own relationships with individuals at those

competitors.  In a separate tab of the same ▮▮▮▮▮▮▮▮▮▮▮ spreadsheet, Patel began

ranking Teva's ▮▮▮▮▮▮▮▮▮▮ by assigning companies into several categories,

including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

572.    Patel understood – and stressed internally at Teva – that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Thus, it was

very important for Patel to identify those competitors who were willing to share information

about their price increases in advance, so that Teva would be prepared to follow quickly.

Conversely, it was important for Patel to be able to inform Teva's competitors of Teva's increase

plans so those competitors could also follow quickly.  Either way, significant coordination would

be required for price increases to be successful – and quality competitors were those who were

more willing to coordinate.

573.    As she was creating the list, Defendant Patel was talking to competitors to

determine their willingness to increase prices and, therefore, where they should be ranked on the

scale.  For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel

told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its

prices.  She asked CW-1 how Sandoz handled price increases.  CW-1 told Patel that Sandoz

would follow Teva's price increases and, importantly, would not poach Teva's customers after

Teva increased.  Not surprisingly, Sandoz was one of Teva's highest "quality" competitors.  Patel

and Teva based many price increase (and market allocation) decisions on this understanding with

Sandoz over the next several years.

160

574.    It is important to note that Defendant Patel had several different ways of communicating with competitors.  Throughout this Complaint, you will see references to various phone calls and text messages that she was exchanging with competitors.  But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications.  Although the Plaintiff States have been able to obtain some of these communications, many of them have been destroyed by Patel.

575.    Through her communications with her competitors, Defendant Patel learned more about their planned price increases and entered into agreements for Teva to follow them.  On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

After one of her calls with CW-5 of Glenmark, Defendant Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's ███████ price increase list:  Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril; and Moexipril HCTZ.  As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

e.      **Ranking "Quality of Competition" to Identify Price Increase Candidates**

576.    By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Defendant Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:



The lowest ranked competitors were:



577.    Defendant Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the

potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

578.   Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships.  Some of the notable relationships are discussed in more detail below.

### i.   The "High Quality" Competitor Relationships

579.   The highest quality competitors in Defendant Patel's rankings were competitors where Teva had agreements to lead and follow each others' price increases.  The agreements and understandings regarding price increases were what made each of those competitors a high quality competitor.  As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

### a)   Mylan (+3)

580.   Mylan was Teva's highest-ranked competitor by "quality."  The relationship between these two competitors was longstanding, and deeply engrained.  It survived changes in personnel over time, and pre-dated Defendant Patel's creation of the quality competitor rankings.

581.   Defendant Kevin Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Defendant Jim Nesta of Mylan by telephone on February 21, 2012.  From that time until the time that Defendant Green left Teva, Defendants Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least twelve (12) text messages – including at or around every significant price increase taken by either company.  This amounts to an average of nearly one call or text message every business day during this period.

163

582.     Shortly after Defendant Patel started her employment at Teva, she called

Defendant Nesta on May 10, 2013 and the two spoke for over five (5) minutes.  Because

Defendant Green had already established a relationship with Mylan, Patel did not need to speak

directly with Defendant Nesta very often.  Typically, Patel would e-mail Green and ask him to

obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often

about a long list of drugs – and report his findings back to Patel.  Several examples of these

communications are outlined more fully in various sections below.

583.     When Defendant Green left Teva to join Zydus in late October 2013, the

institutional relationship and understanding between Teva and Mylan remained strong.

Defendant Rekenthaler promptly took over the role of communicating with Defendant Nesta.

Starting in December 2013, through the time that Defendant Rekenthaler left Teva in April,

2015, Rekenthaler spoke to Nesta 100 times.  Prior to Defendant Green leaving Teva in late-

October 2013, Defendants Rekenthaler and Nesta had only spoken by phone once, more than a

year earlier in 2012.

584.     The relationship between Teva and Mylan even pre-dated the relationship

between Defendants Green and Nesta.  For example, between January 1, 2010 and October 26,

2011, R.C., a senior executive at Teva, communicated with R.P., a senior executive counterpart

at Mylan, by phone or text at least 135 times.  The pace of communications between the two

companies slowed dramatically in November 2011 after R.C. left Teva and before Green began

communicating with Nesta – but continued nevertheless as needed during that time through

communications between Defendant Rekenthaler and R.P. at Mylan.

164

b)      **Watson/Actavis (+3)**

585.     Actavis was Teva's next highest quality competitor by ranking.  Defendant Patel

had strong relationships with several executives at Actavis, including Defendant Rogerson, the

Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at

Actavis.  Defendant Rekenthaler also communicated frequently with A.S., a senior sales

executive at Watson – a relationship that pre-dated Defendant Patel joining Teva.

586.     Defendant Patel contacted A.B. shortly after she started her employment at Teva,

as she was creating the quality competitor rankings.  She called him on April 30, 2013, and the

two exchanged several text messages the next day, May 1, 2013.  But as detailed herein,

Defendant Patel communicated on a more frequent basis with Defendant Rogerson, her

counterpart in the pricing department at Actavis.  From May 2, 2013 through November 9, 2015,

Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant

price increase taken by the respective companies.

587.     In August 2013, Defendant Marc Falkin joined Actavis and the relationship

between Teva and Actavis grew stronger through his communications with Defendant

Rekenthaler.  From August 7, 2013 through the date that Rekenthaler left Teva in April, 2015,

Rekenthaler and Falkin communicated by phone or text at least 433 times.

588.     Defendant Maureen Cavanaugh also had a very strong relationship with

Defendant Falkin.  The two communicated with great frequency.  From August 7, 2013 through

the end of May 2016, Defendants Cavanaugh and Falkin spoke or texted with each other 410

times.

165

### c)   Sandoz (+3)

589.   Sandoz was also considered a top-quality competitor by Teva.  Defendant Patel had a very strong relationship with CW-1 at Sandoz.

590.   Beginning on April 12, 2013 – the day after Defendant Patel's last day at ABC – until August 2016, Defendant Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company.  As detailed above, in one of her initial calls with CW-1 after she joined Teva, Defendant Patel asked CW-1 how Sandoz handled price increases.  Defendant Patel explained that she had been hired at Teva to identify products where Teva could increase prices.  CW-1 reassured Defendant Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

591.   Defendants Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was -- at that time – a senior Sandoz executive.  These relationships pre-dated Defendant Patel joining Teva.

### d)   Glenmark (+3)

593.   Glenmark was one of Teva's highest-ranked competitors primarily because Defendant Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Defendant Brown and J.C., a sales and marketing executive at Glenmark.

594.   As stated above, Defendant Patel began communicating with CW-5 even before she began her employment at Teva.  Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

595.    Defendant Patel and CW-5 communicated by phone with great frequency –
including at or around the time of every significant price increase affecting the two companies –
until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly
six (6) months.  After CW-5 left Glenmark, Defendant Patel began communicating with
Defendant Brown with much greater frequency to obtain competitively sensitive information
from Glenmark.  Defendants Patel and Brown had never spoken by phone before Patel started at
Teva, according to the phone records produced.

### e)      Taro (+3)

596.    Taro was highly rated because of Patel's longstanding relationship with the Vice
President of Sales at Taro, Defendant Ara Aprahamian.  Defendant Patel had known Defendant
Aprahamian for many years, dating back to when Defendant Patel had started her professional
career as an intern at ABC.

597.    Even though she knew Defendant Aprahamian well, they rarely ever spoke or
texted by phone until Defendant Patel started at Teva.  From April 22, 2013 through March
2016, however, Defendants Patel and Aprahamian spoke or texted at least 100 times, including
calls or text messages at or around the time of every significant price increase affecting the
companies during those years.

### f)      Lupin (+2)

598.    Although initially not the highest ranked competitor, Lupin was assigned a high
rating because of Defendant Patel's strong relationship with Defendant David Berthold, the Vice
President of Sales at Lupin.  The relationship between Teva and Lupin, however, pre-dated
Defendant Patel.  Prior to Patel starting at Teva, Defendant Green and others at Teva conspired
directly with Berthold.  Several of those examples are discussed above in Section IV.C.1.c.

167

Between January 2012 and October 2013, Defendants Berthold and Green, for example, communicated by phone 125 times.

599.     From May 6, 2013 through April 8, 2014, Defendants Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

600.     Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Defendants Teva and Lupin even when Defendant Green had left Teva and when Defendant Patel was out on maternity leave.  For example, as discussed more fully below in Section IV.C.2.l.1, in October 2013 Lupin was preparing to increase its pricing on the drug Cephalexin Oral Suspension.  Without Defendants Green or Patel to communicate with, Defendant Berthold instead communicated with Defendant Rekenthaler and T.S. of Teva in order to coordinate the price increase.

### f.     May 24, 2013:  The First List of Increase Candidates

601.     Defendant Patel completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013.  She sent the list via e-mail, with an attached spreadsheet entitled ▮▮▮▮▮▮▮▮  The attached list included twelve (12) different drugs where Defendant Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible.  The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Defendant Patel could have only learned through her discussions with those competitors.  The relevant columns from that spreadsheet are set forth below:

168



602.    For every one of the relevant drugs on the list, Defendant Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. For some of these drugs – including the four different formulations of Fluocinonide – Defendant Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Defendant Aprahamian of Taro.

603.    The following graphic summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013:



604.    The [REDACTED] including the competitively sensitive information Defendant Patel had obtained from competitors, was sent by Patel's supervisor K.G. to Defendant Maureen Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013.  Defendant Cavanaugh adopted and approved Defendant Patel's price increase recommendations on May 28, 2013.

605.    The Teva price increases for the drugs identified in Defendant Patel's May 24, 2013 [REDACTED] went into effect on July 3, 2013.  Defendant Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013.  Some illustrative examples of that coordination are set forth below.

### i.    Glenmark

606.    A number of the drugs identified in the [REDACTED] were targeted because of a recent Glenmark price increase on May 16, 2013.  As soon as Defendant Patel

170

started at Teva, she began to identify price increase candidates through her conversations with

various sales and marketing executives at Glenmark, including:

- **CW-5:** 4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06); 1 text message on 5/3/13;

- **J.C.:** 3 calls on 5/6/13 (6:45; 20:44; 8:39); 2 calls on 5/7/13 (7:59 and 1:03);

For example, early in the morning on May 2, 2013, Defendant Patel informed a colleague that

she expected to have some new drugs to add to the price increase list imminently:



Less than fifteen minutes later, Defendant Patel received a call from CW-5 of Glenmark and the

two spoke for just over five (5) minutes. Shortly after that call, at 7:44am, Defendant Patel sent

a follow-up e-mail where she identified six different ▬▬▬▬ Glenmark drugs to add to the

price increase list, including: Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril;

and Moexipril HCTZ. Glenmark had not yet increased price on any of those drugs, nor had it

sent any notices to customers indicating that it would be doing so (and would not send such

notices until May 15, 2013).

607.    As the Glenmark price increases were approaching, Defendant Patel took steps to

make sure that Teva did not undermine its competitor's action. During the morning on May 15,

2013, in anticipation of the Glenmark price increases that had not yet been implemented or made

public, Defendant Patel instructed her Teva colleagues to alert her of any requests by customers

for pricing relating to eight different Glenmark drugs:

171



In accordance with the fair share understanding outlined above, Defendant Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

608.    Following the normal pattern, Defendant Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva:  Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron.  Patel also spoke to CW-5 and J.C. at Glenmark multiple times on May 17, 2013.

609.    After the implementation of the Glenmark price increases on May 16, 2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price.  Teva refused to bid on most of these solicitations in order

172

to maintain market stability.  When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Defendant Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: ███

████████████████████████████

610.    Defendant Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved competitors that were not of the highest "quality."  For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

611.    For example, the market for Fluconazole Tablets included Defendant Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark.  As of Friday May 17, 2013, Defendant Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor.  In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was ████████████████ about Fluconazole in order to determine next steps.  The following Monday, May 20, Patel called R.H., a national account manager at Greenstone but was unable to connect.  Patel was ultimately not able to communicate with R.H. by phone until May 28, 2013 when the two had a twenty-one (21) minute call.  The next day after speaking to R.H. – May 29, 2013 – Defendant Patel promptly added Fluconazole to the Teva price increase list.

612.    As discussed more fully below, Teva followed the Glenmark price increase for Fluconazole Tablets on July 3, 2013.  That same day, Defendant Patel spoke to R.H. for nearly sixteen (16) minutes; she also spoke to CW-5 at Glenmark for almost five (5) minutes.  The Teva price increases were a staggering 875% - 1,570%, depending on the dosage strength.  Greenstone

173

then followed with an increase of its own on August 16, 2013. Defendant Patel coordinated those increases with both Glenmark and Greenstone.

613. Another example of a drug that required even more effort and coordination among several competitors before it could be included on the Teva price increase list was Pravastatin, which is discussed more fully below in the Section relating to Teva's August 9, 2013 price increases.

### ii. Sandoz

614. In her May 24 ██████████ Defendant Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was ██████ on that drug. In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase. Defendant Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned this information.

615. At the same time, Sandoz was internally discussing its ██████ strategy for Nabumetone. Two days before Defendant Patel sent the ██████ to her supervisor, a Sandoz pricing analyst sent the following e-mail to Defendant Kellum and CW-1 confirming the strategy:



616.    Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013. For example, at 8:15am on May 30, 2013, Defendant Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine). She left CW-1 a voicemail, and he called her back promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

617.    After these conversations with Defendant Patel, at 10:02am, CW-1 sent an e-mail to Defendant Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine, and suggesting a potentially substantial increase in Sandoz's price:



618.    The communication between Defendant Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013 Teva was ███████████████████████████████████████████████████████ ████████    On June 11, 2013, L.R., a Teva marketing representative, asked Defendant Patel whether she was ████████████████████████████████    According to the marketing representative, Sandoz was also in the market for Isoniazid and had ██████████

███████████████ in January 2013.  Defendant Patel responded: ████████████

███████████████████████████████████

619.   The next day – June 12, 2013 – Patel exchanged at least five (5) calls with CW-1

at Sandoz, including those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

At 8:27am, after the first two of the phone calls listed above, Patel sent the following e-mail

clarifying some of the information that L.R. had provided, reflecting some of the conversations

about market share she was having with CW-1:



620.   Later that day, at 3:21pm, Defendant Patel passed along additional information

with specific price points she had received from CW-1 at Sandoz:



621.    As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz.  Defendant Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

### iii.    Taro

622.    Defendant Patel noted in her May 24, 2013 ███████████ that for the drug Adapalene Gel, she was confident in following the Glenmark price increase because there were also ████████████████ on that drug.  In addition to Teva and Glenmark, Taro was the only other competitor in the market for Adapalene Gel at that time.  Defendant Patel had heard the ███████ about a Taro increase directly from Defendant Ara Aprahamian, the Vice President of Sales and Marketing at Taro.  During a nearly eleven (11) minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase.  This was the first call between Defendants Patel and Aprahamian since Patel joined Teva.

623.    Shortly after the phone call with Defendant Patel, Defendant Aprahamian made an internal request for a report with specific information about Adapalene Gel in order to evaluate a potential Taro increase on the drug, including volume and pricing.  Defendant Aprahamian indicated that the reason for his request was that the ████████████████████ ████████████

624.    The next day, May 23, 2013, Defendant Aprahamian directed a Taro employee to implement a price increase on Adapalene Gel:

177



Exactly one week after the call between Defendants Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene Gel. As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

### g.      July 3, 2013 Price Increases

625.    Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 ▮▮▮▮▮▮▮▮ but several others had been added in the interim. Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments:



Following the now-established pattern, Defendants Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

626.   The following graphic details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase; color coded to show the calls with specific competitors relating to each drug:



The only drugs that Defendants Patel or Green did not coordinate with Teva's competitors (those not highlighted in the graphic above) were drugs where Teva was exclusive – i.e., had no competitors.

627.    Defendant Patel – and other executives at Teva –went to great efforts to coordinate these price increases with competitors prior to July 3, 2013.  Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

### i.    Upsher-Smith

628.    On June 13, 2013, as Defendant Patel was in the process of finalizing the Teva price increase list, she learned that Defendant Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride Tablets.

629.    Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions.  Belonging to a class of drugs called antispasmodics, Oxybutynin Chloride relaxes the muscles in the bladder to help decrease problems of urgency and frequent urination.

630.    On June 13, 2013, K.G. of Teva sent an e-mail to several Teva employees, including Defendant Patel, asking them to ███████████████████████████████ ████████ regarding Oxybutynin Chloride.  At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability.  One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase.  On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Defendant Patel whether she could ████████████████████████ █████████████████████

631.    On June 15, 2013, Defendant Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

632.    Defendant Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L.  In the week before she began her employment at Teva (after leaving her previous employment), Defendant Patel and B.L. exchanged several text messages.  During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes.  During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Defendant Patel.

181

633.   On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a Defendant in this Complaint, also increased its price for that drug.  As a result, a national account executive at Teva sent an e-mail to Defendant Patel stating ████████████████████████████████████████ ████████████ Patel responded: ████████████████████████████ ████████████████████ That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

634.   On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500% increase on Oxybutynin Chloride, depending on the dosage strength.  Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

### ii.   Mylan

635.   Immediately after she began at Teva, Defendant Patel began to investigate Mylan drugs as a potential source for coordinated price increases.  For example, on May 6, 2013, as she was creating the list of ████████ candidates, Defendant Patel sent Defendant Green an e-mail with an attached spreadsheet titled █████████████████████████████ Defendant Patel asked Defendant Green to █████████████████████████████ for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs: Tolmetin Sodium Capsules; Doxazosin Mesylate Tablets; Methotrexate Tablets; Diltiazem HCL Tablets; Flurbiprofen Tablets; Nadolol Tablets; Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; and Estradiol Tablets.

636.   The next day, May 7, 2013, Defendant Green spoke to Defendant Nesta at Mylan three times, including one call lasting more than eleven (11) minutes.  Defendant Green also

called Defendant Patel twice that day to report on what he had learned.  Defendants Green and

Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9

(4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

637.    On May 14, 2013, Defendant Patel asked several Teva national account managers,

including Defendant Green, to obtain ████████████ on certain Mylan drugs including Cimetidine

and Nadolol in preparation for a potential price increase.  She indicated internally to another

Teva colleague that she was expecting ██████████████ and that she was expecting

Mylan ███████████████████ on those items.  On May 17, 2013, Defendant Green

spoke to Defendant Nesta six (6) times, including calls lasting 11:50, 2:23, 4:25 and 16:02.

638.    On May 29, 2013, after a discussion with Defendant Cavanaugh, Defendant Patel

added four Mylan drugs to the Teva price increase list:  Nadolol, Cimetidine, Prazosin and

Methotrexate.

639.    Discussions between Defendants Green and Nesta about specific drugs continued

into June, as Mylan was also preparing for its own major price increase on a number of drugs.

From June 24 through June 28, 2013, for example, Defendants Green and Nesta had at least the

following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

640.    On June 26, 2013, in the midst of this flurry of communications between Teva

and Mylan (and the same day that Defendants Green and Nesta had a one-hour phone call), one

of Defendant Patel's colleagues sent her a suggestion with the following list of potential drugs to

add to the price increase list:

| Product | | Competitors (Mkt Share) | |
|---|---|---|---|
| Disopyramide Phosphate Capsules | | Actavis (61%) | |
| Ketorolac Tablets | | Mylan (32%) | |
| Ketoprofen Capsules | | Mylan (63%) | |
| Hydorxyzine Pamoate Capsules | | Sandoz (39%); Actavis (9%) | |
| Nystatin Tablets | | Heritage (35%); Mutual (32%) | |

In response, Defendant Patel's supervisor, K.G. of Teva, commented that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Patel also responded favorably with regard to some of the

drugs, alluding to the fact that she had inside information about at least Ketoprofen:



At that time, Nystatin was not considered a strong candidate for a price increase because of the

quality of the competitors in the market. As discussed more fully below, those dynamics would

later change after Defendant Patel struck up a collusive relationship with a high-level executive

at Heritage.

641.   Not surprisingly given the ▮▮▮▮▮ Mylan raised its price for both Ketorolac and

Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013. Teva then

quickly followed with its own price increase for both drugs (and others) on August 9, 2013. As

discussed more fully below, those price increases were closely coordinated and agreed to by

Teva and Mylan.

642.   At the end of the flurry of phone communications between Teva and Mylan

described above – on June 28, 2013 – Defendant Green and Defendant Nesta had a four (4)

minute call starting at 10:59am.  Within minutes after that call, Defendant Patel sent the

following e-mail internally at Teva:



Defendant Patel obtained this information directly from Defendant Green, but got one significant

point wrong (which confirms that she had advance notice of the Mylan increase).  In actuality,

Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an

effective date of July 2, 2013.

     643.     █████████ was a term consistently used by Defendant Patel in e-mails to

camouflage the fact that she and her co-conspirators within Teva were communicating with

competitors about future price increases.  She used the term when discussing Taro in the May 24,

2013 █████████ spreadsheet, after speaking with Defendant Aprahamian and before Taro

raised its price on Adapalene Gel.  She used it again on June 26, 2013 – after Defendants Green

and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

     644.     Similarly, on July 2, 2013 – the day before Teva's price increases (including for

the drug Methotrexate) went into effect, a colleague asked Defendant Patel how Teva's

competitors' pricing compared with regard to Methotrexate.  Defendant Patel responded that

Mylan's pricing was a little low on that drug, ████████████████████ ██████ so Teva felt comfortable increasing the price of that drug on July 3, 2013.  These ██████ – which were based on the direct communications between Defendants Green and Nesta noted above – again turned out to be accurate:  Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

**iii.      Sandoz**

645.    After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a ████████████████████ increased so that it would ████████████ ████████████████ by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

646.    On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would ██████ ████████████████████████████████████████████ ██████

647.    Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Defendant Rekenthaler at Teva and left a message.  Defendant Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz.  Defendant Rekenthaler complied.  Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Defendant Rekenthaler first sent the Teva price increase list

from his Teva work e-mail account to a personal e-mail account, and then forwarded the list

from his personal e-mail account to CW-2's personal e-mail account:



CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the

information into a spreadsheet.

648.    One of the drugs that both Teva and Mylan increased the price of in early July

2013 was Nadolol.  Sandoz was the only other competitor in that market.  Shortly after the Teva

increase, CW-1 sent Defendant Patel a congratulatory message regarding the increase.

### h.    July 19, 2013 Price Increase (Enalapril Maleate)

649.    Immediately after the July 3, 2013 price increases, Patel began preparing for what

she called ▮▮▮▮▮ – another large set of Teva price increases.  In the interim, however, Teva

was presented with an opportunity to coordinate a price increase with competitors on a single

drug – Enalapril Maleate Tablets.

650.     Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug belonging to the class called ACE inhibitors, and is used to treat high blood pressure.

651.     Mylan previously increased its price for Enalapril effective July 2, 2013.  At that time, there were only three manufacturers in the market:  Mylan, Teva and Wockhardt.  Enalapril was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above in Section IV.C.2.h).

652.     Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril.  Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase.  K.G. of Teva confirmed that Enalapril ████████████████████████████████████████ ██████████████████████████

653.     The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify.  That same day, Defendants Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes.  The next day, July 11, 2013, Defendants Green and Nesta spoke two more times.  During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril.  This information sparked the following e-mail exchange between Defendants Green and Patel (starting from the bottom):



As it turned out, there must have been a miscommunication between Defendants Green and Nesta because although Wockhardt did in fact *plan* to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

654.    On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Defendant Patel whether Teva was ███████████████████████████ Defendant Patel responded: ████████████████████████████████ ████████████    J.P. then inquired whether Teva would make an offer to the customer, and Defendant Patel responded: █████████████████████████████ ████████████████████████████████████



655.    That same day, Defendants Patel and Green each started ██████████ ██████████ and ██████████████████ by reaching out to Teva's two competitors for Enalapril. Defendant Patel called Defendant Nesta of Mylan directly and they spoke three times, including

calls lasting six (6) and five (5) minutes.  Defendant Patel likely called Defendant Nesta directly

in this instance because Defendant Green was attending the PBA Health[3] Conference at the

Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing.

Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended

the same conference, and likely spoke directly to Defendant Green either at the golf outing

during the day or the trade show at night, because at 12:40am that evening (now the morning of

July 13, 2013) K.K. created a contact on his cell phone with Defendant Green's cell phone

number in it.

656.    On Sunday, July 14, 2013, after Defendant Green returned home from the

conference, Defendants Green and Patel spoke three times, including one call lasting twenty-one

(21) minutes.  During these calls, Defendant Green conveyed to Defendant Patel what he had

learned from K.K.:  that Wockhardt planned to follow the Mylan price increase.

657.    First thing the next morning, on Monday, July 15, 2013, Defendant Patel sent an

e-mail to a Teva executive stating ██████████████████████████████████████

██████████████████████  At the same time, Wockhardt began planning to raise the price of

Enalapril and sought to confirm specific price points for the increase.  Internally, Wockhardt

employees understood that K.K. would try to obtain price points from a competitor.  That

morning, K.K. of Wockhardt called Defendant Green for a one (1) minute call; shortly thereafter,

Defendant Green returned the call and they spoke for two (2) more minutes.  At 9:57am that

morning, K.K. reported internally the specific price ranges that he had obtained from Defendant

Green.

---

[3] PBA Health is a pharmacy services organization that serves independent community pharmacies with group
purchasing and other services.

658.    Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase.  On Tuesday, July 16, 2013, Defendant Patel sent the following internal e-mail to her supervisor K.G., again using the term ▋▋▋▋ to obfuscate the true source of her information:



That same day, Defendant Nesta called Defendant Patel and left a voice mail.

659.    Defendant Patel's July 16, 2013 e-mail referred to above was forwarded to Defendant Cavanaugh, who promptly approved the price increase.  That same day, July 16, 2013, Defendant Patel then scheduled a ▋▋▋▋▋▋▋ with members of Teva's sales and pricing teams, and sent the following agenda:



660.    Teva and Wockhardt simultaneously implemented price increases on July 19,

2013.  Although the timing of the price increase was coordinated among the competitors,

Defendant Patel nevertheless described the simultaneous increase as a coincidence in an internal

e-mail that same day:



661.    Within a few days after the increases, a customer complained to K.K. at

Wockhardt, asking: ████████████████████████████████ K.K.'s

response to the customer was direct: ██████████████████████ Similarly, in

early August a different customer asked Wockhardt to reconsider its increase, suggesting that

Wockhardt's competitors were offering a lower price point.  Knowing this to be untrue, K.K.

replied again ███████████████████████

### i.    August 9, 2013 Price Increases ████████

662.    On August 9, 2013, Teva raised prices on twelve (12) different drugs.  These

increases were again coordinated with a number of Teva's competitors, including Defendants

Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

663.    Defendant Patel began planning for the increase shortly after the July 3 increases

were implemented.  On July 11, 2013, Defendant Patel sent a preliminary draft list of price

increase candidates to a colleague for what she referred to as ████████  For the drugs on the

preliminary list, Defendant Patel stated that █████████████████████████

████████████████████████████

664.    The list included a number of drugs involving the following competitors,

primarily:  Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz.  In the days

leading up to July 11, 2013, Defendant Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

665.    Defendant Patel was also communicating indirectly with Mylan through Defendant Kevin Green. For example, on July 10, 2013 – the day before Defendant Patel sent the preliminary ▮▮▮ increase list – Defendants Green and Nesta spoke twice. Shortly after the second call, Defendant Green called Defendant Patel and the two spoke for just over seven (7) minutes. The next day, on July 11, Defendants Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

666.    Defendant Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva increase.

667.    By August 7, 2013, Defendant Patel had finalized the list.  That day she sent an e-mail to her supervisor, K.G., with a ████████████ spreadsheet which she had prepared for Defendant Maureen Cavanaugh, summarizing the increases.  As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Defendants Patel and/or Green could have only learned from directly colluding with those competitors:



668.    K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva.  In response to the e-mail, K.G. politely asked Defendant Patel to remove some of the incriminating information:



In accordance with the executive's request, Patel deleted the information.

669.    Following the now common and systematic pattern, Defendants Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase.  The following graphic details some of the calls with competitors in the days and weeks leading up to the increases:



670.    The only drug on the list that Defendants Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate Oral Liquids) was a drug where Teva was exclusive and thus had no competitors.  Interestingly, that drug was slated for the lowest increase of all drugs on the list (7%).

671.    The day before the price increase went into effect – August 8, 2013 – Defendant Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Defendant Nesta reached out to Defendant Patel to coordinate those increases.

### i.   Mylan

672.    Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases.  During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions.  The communications were typically initiated by Defendant Patel, who asked Defendant Green to communicate with Defendant Nesta of Mylan and obtain what she referred to as ███ on many different drugs.  But at times, Defendant Patel communicated directly with Defendant Nesta.

673.    For example, on July 22, 2013, Defendant Patel sent Defendant Green an e-mail with an attached spreadsheet of ███ increase items.  She indicated that she was ███ ███ for a group of drugs in the attached spreadsheet with a highlighted yellow █ and included in a column titled ███



A large majority were Mylan drugs.

674.    The next day – July 23, 2013 – at 4:30pm, Defendants Green and Nesta spoke for more than six (6) minutes.  Immediately after hanging up the phone, Defendant Green called

Defendant Patel to convey the intel he had obtained from Mylan.  The call lasted more than three (3) minutes.

675.    On July 29, 2013, Defendant Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July.  Defendant Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:



676.    The next day, July 30, 2013, Defendant Patel sent Defendant Green the ▆▆▆▆ price increase file as an attachment, saying that she ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆ Defendant Patel asked Defendant Green to obtain additional ▆▆▆ for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

677.    Following the same consistent pattern, Defendants Green and Nesta spoke six (6) times over the next two days.  After hanging up from the last call between the two on August 1, 2013, Defendant Green called Defendant Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

678.   In the midst of the phone calls between Defendants Green and Nesta on July 31,

2013, Defendant Patel sent the following e-mail with ▉▉▉▉▉▉ about the customer request,

with a particular focus on balancing Teva's desire to increase prices against its commitment to

adhere to the fair share agreement and how that may affect its market share for certain products

sold by Mylan:



679.    Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different Mylan drugs on August 9, 2013, as set forth above.

### ii.       Pravastatin (Glenmark/Apotex/Zydus/Lupin)

680.    Pravastatin, also known by the brand name Pravachol, is a medication belonging to a class of drugs called "statins," and is used to treat high cholesterol and triglyceride levels.

681.    As early as May 2, 2013, Defendant Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark.  Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Defendant Patel informed a colleague that she expected to have some ▮▮▮▮▮▮▮▮ to add to the price increase list ▮▮▮▮▮▮  Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin.  Shortly after that call, Defendant Patel sent an e-mail to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list.  In all, Defendant Patel spoke to CW-5 four (4) times throughout the day on May 2, 2013, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

682.    As of May 2013, the market for Pravastatin included five competitors:  Glenmark, Teva, Lupin, Zydus and Apotex.  The number of competitors made it more difficult to coordinate a price increase.  This difficulty stemmed in part because two of those competitors – Zydus and Apotex – were also the two lowest quality competitors in Defendant Patel's quality of

competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

683.    Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several months.

684.    On May 3, 2013, Defendant Green called M.K., a senior executive at Zydus, twice with one call lasting four (4) minutes.  Over the next several weeks, Defendant Green communicated numerous times with both M.K. and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

685.    On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Defendant Berthold) and Glenmark (J.C., a national account executive) multiple times.  Those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Defendant Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

686.    By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase, and were comfortable enough with the situation that one

marketing executive at Teva indicated in an e-mail to Defendant Patel that he was hoping to raise

price on Pravastatin ███████████████████

687.    As the Glenmark increase for Pravastatin was approaching, Defendant Patel

began preparing.  On May 15, 2013 – the day before Glenmark's increase would become

effective – a Teva executive sent an e-mail out to the pricing team stating that ████████████

████████████████████████████████████████ several of the

Glenmark product families, including Pravastatin.  The Teva executive concluded: ████████

████████████████████████████████████████████████████

████████████████████████████████

688.    That same day, Glenmark notified its customers that it would substantially raise

the price of Pravastatin, effective May 16, 2013.

689.    As was now the practice among co-conspirators, the day before and the day of the

Glenmark increase brought a flurry of phone calls among several of the competitors, including

Teva executives.  At least some of those calls are set forth below:



| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

690.    As of May 16, 2013, Defendant Patel was still considering whether Teva should

increase its price for Pravastatin, because she was concerned about whether Zydus would act

responsibly and follow a price increase.  At that time, Defendant Patel did not view Zydus as a

quality competitor.  Defendant Patel stated: ████████████████████████████

████████████████████████████████ Patel later indicated that ██████

████████████████████████████████████

691.    Defendant Green was responsible for coordinating with Zydus.  As seen in the

table above, on May 15, 2013, Defendant Green spoke with three Zydus employees, including a

call with K.R. of Zydus lasting sixteen (16) minutes.  The next day, on May 16, Green spoke

with M.K. for 4 minutes.  Later that day, K.R. called M.K. and the two Zydus executives spoke

for more than seventeen (17) minutes.  Defendant Green also spoke to Defendants Rekenthaler

and Patel the same day, conveying what he had learned from his communications with the Zydus

executives.

692.    Also on May 16, Defendant Patel's supervisor, K.G., sent an internal e-mail to

several colleagues, including Defendants Patel and Rekenthaler, stating ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ In response, Defendant Rekenthaler indicated that he was

now comfortable with the price increase, but he did not want to put his reasoning in writing:

████████████████████████████████████████████

693.    The next day – May 17, 2013 -- Defendant Patel continued to coordinate the price

increase with executives at both Glenmark and Lupin.  For example, at 12:08pm, Defendant

Patel called Defendant Berthold at Lupin for an eleven (11) minute call.  While she was on the

phone with Berthold, CW-5 of Glenmark called Patel (at 12:09pm) and left a 23-second voice mail.  Immediately after she hung up the phone with Defendant Berthold, Defendant Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

694.    As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex.  From May 20-24, Defendant Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

These were the first documented phone calls between Defendant Patel and B.H. since Defendant Patel had joined Teva.

695.    But even with this agreement in hand, Defendant Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price.  For example, when she sent the ▮▮▮▮▮▮▮ spreadsheet to her supervisor K.G. on May 24, 2013, Pravastatin was still not on the list.

696.    That would change shortly.  On May 28, 2013, Apotex raised its price for Pravastatin.  That same day, Defendant Green also exchanged six (6) text messages with K.R. at Zydus.  The next day, after a conversation with Defendant Maureen Cavanaugh, Defendant Patel added Pravastatin to the Teva price increase list.

697.    The day after the Apotex increase, Defendant Green spoke to K.R. at Zydus two more times, and exchanged four (4) more text messages.  Zydus then quickly followed with a price increase of its own on June 14, 2013.

698.    Following the normal pattern, Defendant Green spoke to K.R. and M.K. at Zydus

several times in the days leading up to the Zydus increase, including at least the following calls

and text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

699.    Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%)

price increase of its own on August 9, 2013.  As described in more detail above, in the days and

weeks leading up to August 9, Defendants Patel and Green were communicating with all of

Teva's competitors for Pravastatin to coordinate the increase.

700.    When Defendant Patel sent the ███████████████ to her supervisor, K.G.,

on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very

telling information about the agreement she had in place with Defendants Berthold and Lupin:

specifically, that Lupin was ██████████ before implementing its own increase.  Based on

this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives

felt comfortable implementing the significant price increase.

701.    A couple of days after Teva implemented its increase, a colleague at Teva asked

Defendant Patel when Zydus and Apotex implemented their price increases.  In her response,

Patel confirmed that it was Defendant Kevin Green ██████ who had indeed coordinated the

Pravastatin price increase with Zydus:

702.    Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 –
Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

703.    The extra work required to implement the Pravastatin price increase was well
worth it to Teva.  On August 8, 2013 – the day before the Teva increase – Patel sent her
supervisor K.G. an estimate of the ▮▮▮▮▮ to Teva as a result of certain price increases.  She
estimated that, for Pravastatin alone, the ▮▮▮▮▮▮▮▮ to Teva was $674,670,548 *per
quarter*.

### iii.    Etodolac and Etodolac ER

704.    Etodolac, also known by the brand name Lodine, is a medication known as a non-
steroidal anti-inflammatory drug (NSAID).  It is used to reduce pain, swelling and joint stiffness
from arthritis.  It works by blocking the body's production of certain natural substances that
cause inflammation.  An extended release version of Etodolac – Etodolac ER –also known by the
brand name Lodine XL, is also available.

705.    As of July 13, 2013, Teva sold both Etodolac and Etodolac ER.  Teva's
competitors for the standard version of Etodolac were Taro and Sandoz.  For Etodolac ER, Teva
had only one competitor – Taro.

706.    When Defendant Patel first began planning for ▮▮▮▮ of Teva's price
increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she
circulated a long list of potential ▮▮▮▮ increases on July 11, 2013 (that would later be cut
down substantially) – neither of those drugs was on the list.

707.    Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

708.    On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Defendant Aprahamian at Taro and they spoke for sixteen (16) minutes.  Defendant Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes.  After hanging up the phone with CW-3, Defendant Aprahamian immediately called Defendant Patel.  They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes.  On July 18, 2013, Defendant Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

709.    During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

710.    On July 22, 2013 – before any price increases took effect or were made public, Defendant Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:



Based on her conversations with CW-1 and Defendant Aprahamian, Defendant Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER.  During those conversations, Teva agreed to follow both price increases.

711.    That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases,

including for Etodolac.  Prior to the conference call on July 23, CW-1 called Defendant Patel at Teva.  After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day.  During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac.  Similarly, CW-3 of Sandoz called Defendant Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

712.  The Sandoz price increase for Etodolac became effective on July 26, 2013.  That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets.  After learning of the request, Aprahamian responded swiftly internally: ████████

█████████████████████████████████████████

713.  When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:



714.  Also on July 26, Defendant Patel sent an e-mail to others at Teva – including her supervisor K.G., Defendant Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release).  She instructed them to ████████████████████

████████████████████████████████████████████

███████

715.  Defendant Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things).  Between July 29 and August 2,

2013, for example, Defendant Patel engaged in the following series of calls with CW-1 of

Sandoz and Defendant Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

Defendant Aprahamian was also speaking to his contact at Sandoz – CW-3 – during this time,

including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

716.    On August 1, 2013 – shortly after speaking with Defendant Patel – Defendant

Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac

and Etodolac ER.  Defendant Aprahamian stated  Not

wanting to provide the details in writing, Defendant Aprahamian concluded:

717.    By August 5, 2013, it was well known internally at Teva that Taro would soon be

raising prices on both Etodolac and Etodolac ER.  The minutes from a Teva

meeting on August 5, 2013 – which Defendant Patel attended – reflect the following:



718.   When Defendant Patel sent the ▮▮▮▮▮▮▮▮ spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs ▮▮▮▮▮▮▮▮ K.G. quickly instructed Defendant Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

719.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were increased to the exact same price points.  The increases were substantial.  For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

### iv.       Impact of Price Increases

720.   As she was preparing to implement Teva's August 9, 2013 price increases, Defendant Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013.  The analysis also included the financial impact of the recent Pravastatin increase.  The results were staggering.

721.   According to her analysis, the ▮▮▮▮▮▮▮▮ as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) *per quarter* to Teva, as shown below:



722.    Patel was rewarded handsomely by Teva for effectuating these price increases.  In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

### j.    Price Increase Hiatus

723.    Shortly after the August 9, 2013 price increase went into effect, Defendant Patel left the office for several months while on maternity leave.

724.    This slowed down Teva's plans for its next round of price increases.  During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Defendant Patel to return and continue her work. Defendant Patel began to return to the office on a part-time basis beginning in November 2013.

725.    During this time period, Defendant Kevin Green left Teva to join Defendant Zydus as the Associate Vice President of National Accounts.  His last day of employment at Teva was October 23, 2013.  This prompted Defendant Rekenthaler to assume the role of communicating with specific competitors, including Mylan.  Defendant Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

726.    As discussed more fully below, although Defendant Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases.  In Defendant Patel's absence, they simply communicated through different channels.  These communications were conveyed to Defendant Patel upon her return and she included the information in her efforts to identify new price increase candidates.

727.   As discussed more fully below, by early 2014 Defendant Patel had picked up right where she left off planning for the next round of Teva increases.

**k.   March 7, 2014:  Price Increases and Overarching Conspiracy Converge (Niacin ER)**

728.   Niacin Extended Release (ER), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

729.   On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer.  As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

730.   Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014.  As that date approached, Teva began to plan for loss of its exclusivity.  By at least as early as February, Teva learned that Defendant Lupin would be the only competitor entering the market on March 20.

731.   The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price.  On February 28, 2014, Defendant Maureen Cavanaugh instructed K.G. and others at Teva that ███████████████████████████ ███████████████████████████████████  K.G. immediately forwarded the e-mail to Defendant Patel with the instruction: ████████████████████████████████ ████████████████████  Later that day, Defendant Patel called Defendant Berthold at Lupin and the two spoke for nearly seven (7) minutes.

732.   Within a week, Teva was ready to implement the price increase.  On March 5, 2014, Defendant Patel sent an e-mail to the Teva pricing group stating ████████████████ ████████████████████████████████████████████████████████████ ██████████  The next day, March 6, Teva notified its customers that it would be implementing

213

a price increase on Niacin ER effective March 7, 2014. The increase was for 10% across the board, on all formulations.

733. Once Teva coordinated the price increase, it next began taking the necessary steps to divvy up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Defendant Patel scheduled a meeting with Defendant Rekenthaler for March 6, 2014 to discuss an ███████ for Niacin ER. ███████ in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's ███████ in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

734. This situation was no different. During the morning of March 6, 2014, Defendant Patel called Defendant Berthold and they spoke for more than seven (7) minutes. During this and several subsequent calls, discussed in more detail below, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

735. When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. In the days leading up to Lupin's entry, Defendants Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

736. In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing – so it was expected that pricing would remain at least at Teva's pre-increase

214

exclusive pricing levels.  In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

737.    Over the next several days, Defendants Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers.  For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Cardinal was one of the customers that Teva had already agreed to concede to Lupin.  The Teva executive forwarded the e-mail to several people internally at Teva, including Defendants Patel, Rekenthaler and Cavanaugh, confirming the plan:



That same day, Defendant Patel spoke to Defendant Berthold at Lupin three times, as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

Defendant Patel responded:



738.    The next day – March 25, 2014 – K.G. of Teva summarized the status of Teva's

LOE Plan and the company's agreement with Lupin on Niacin ER: ████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

### l.      April 4, 2014 Price Increases

739.    On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs.

Again, nearly all of these increases were coordinated with a number of Teva's high-quality

competitors who by now were familiar co-conspirators, including Defendants Sandoz, Taro,

Actavis, Mylan, Lupin and Greenstone.  But for this price increase, Teva also began coordinating

with some of what it regarded as "lesser-quality" competitors – such as Defendant Breckenridge,

Heritage,[4] Versapharm, Inc. ("Versapharm") and Rising Pharmaceuticals, Inc. ("Rising") – as

new sources for anticompetitive agreements.  For this price increase, Teva also decided to lead

many more price increases – which was riskier for Teva and required even greater coordination

with competitors.

740.    Leading more price increases was part of a strategy that Defendant Patel

memorialized in writing in January of 2014, documenting in many respects the successful

strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships

with high-quality competitors.  This strategy was well known, understood and authorized by

individuals at much higher levels at Teva, including Defendants Cavanaugh and Rekenthaler,

and Patel's direct supervisor K.G.  For example, on January 16, 2014, Patel sent a document to

---

[4] The collusive relationship and interactions between Teva and Heritage described in this sub-section –including anticompetitive agreements relating to the drugs Nystatin and Theophylline – are addressed in greater detail in the States' Consolidated Amended Complaint dated June 15, 2018, MDL No. 2724, 2:17-cv-03768, Dkt No. 15 (E.D. Pa).  Although Heritage is not named as a defendant in this Complaint, and the Plaintiff States do not seek relief relating to Nystatin or Theophylline herein, the collusive relationship between Heritage and Teva is part of a larger pattern of conduct involving Teva and provides further support for the allegations herein.

K.G. titled █████████████████████ where she outlined her plan for implementing

price increases:



741.    Defendant Patel began planning for the next round of Teva price increases in

early January 2014, shortly after returning to full-time status from maternity leave.  On January

14, 2014, Patel sent K.G. a preliminary draft list of price ███████████████████  She

stated: ████████████████████████████████████████████████

█████████

742.    The initial list contained drugs sold by Actavis, Lupin and Greenstone, among

others.  Not surprisingly, Defendant Patel was communicating frequently with each of those

competitors throughout December 2013 and into early January 2014.

743.    On February 7, 2014, Patel created a formal list of ████████████ in a

spreadsheet.  In the days leading up to February 7, Patel was feverishly coordinating by phone

with a number of different competitors to identify price increase candidates, including at least the

following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

744.    Those efforts were successful.  By February 26, 2014, Defendant Patel had a more

refined list of ▅▅▅▅▅▅▅ which she forwarded to another colleague for his review.  That

list included the following drugs and notes about each drug:



Patel continued to refine the list over the next several weeks.

745.    On March 17, 2014, Defendant Patel sent a near final version of the ▅

▅▅▅▅ spreadsheet to K.G. with the statement: ▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅  In a practice that had now become routine at Teva, Defendants

Patel and Rekenthaler both were communicating frequently with competitors – in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising – to coordinate the price increases in the week before Patel sent the price increase list to K.G.  At least some of those communications are reflected in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

Defendant Rekenthaler had also previously spoken with his contact at Versapharm – J.J., a senior national accounts executive – on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure Versapharm's agreement to follow the Teva increase on two drugs.  Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012.  As discussed more fully below, Versapharm followed with its own price increase shortly after the Teva increase.

746.    In the days leading up to the price increase, Defendant Rekenthaler asked Defendant Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone.  On April 1, 2014, Defendant Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

747.    Satisfied that Defendants Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:



748.   These price increases were all coordinated and agreed to between Teva and its competitors.  As was now their standard procedure, Defendants Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase.  Many of those communications are set forth in the graphic below:



749.   Defendant Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Defendant Patel was out on maternity leave.  Some illustrative examples of those efforts are set forth below.

### i.     Lupin (Cephalexin Oral Suspension)

750.    Throughout 2013, Defendant David Berthold of Lupin colluded with two different individuals at Teva:  Defendants Patel and Green.  As discussed above, at times Defendants Patel and Green would even coordinate with each other regarding who would communicate with Defendant Berthold, and take turns doing so.

751.    As of late October, 2013, however, neither of those options was available to Defendant Berthold.  Defendant Patel was out of the office on maternity leave, and Defendant Green had left Teva to join Zydus as of October 23, 2013.

752.    This did not deter Defendant Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with.  The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals.  So in October 2013, when Lupin decided to raise price on Cephalexin Oral Suspension – a drug where Teva was the only other competitor in the market – Defendant Berthold already knew that Teva would follow the increase.

753.    On October 14, 2013, Defendant Berthold called Defendant Rekenthaler at Teva.  They ultimately spoke for sixteen (16) minutes that day.  Communication was rare between those two executives.  Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

754.    On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin Oral Suspension – Defendant Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase.  He called T.S. at 9:18am that morning and left a message.  T.S. returned the call at 9:57am, and the two spoke for nearly five (5) minutes.

755.   Within minutes after hanging up the phone with Defendant Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:



The Lupin increase on Cephalexin Oral Suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

756.   K.G. of Teva responded later that day, asking: ███████████████████ ██████ Defendant Rekenthaler answered immediately, with information he had learned from Defendant Berthold in mid-October: ██████████████████████████

757.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. T.S. forwarded the e-mail from the customer to Defendant Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. K.G. agreed, and simultaneously forwarded the e-mail to Defendant Patel stating: ██████████████████ Defendant Patel called Defendant Berthold the same day and left a message.

758.   And discuss they did. When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin Oral Suspension was on the

list.  Defendant Patel coordinated the increase consistently with Defendant Berthold throughout the period.

759.    On April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly.  The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

**ii.**    **Greenstone (Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets)**

760.    In November 2013, Defendant Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva:  Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets.  Defendant Patel and R.H., a national account executive at Greenstone, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013.  Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

761.    Defendant Pfizer was directly involved in the approval process for these price increases.  On November 18, 2013 – only two days after Defendant Patel and R.H. exchanged six (6) text messages – a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager seeking approval to implement the price increases.  The General Manager approved of the price increases the next day, but indicated that he had sent a message to a senior Pfizer executive for sign off, and wanted ███████████████ and let him know that the price increases that Greenstone was seeking to take were consistent with the other price increases

224

currently happening with great frequency in the U.S. generic industry.  Part of that socialization

process included explaining the strategy behind the price increases.  Pfizer approved the price

increases on November 22, 2013.  The next day, Defendant Patel spoke to R.H. at Greenstone for

nearly one (1) minute.

762.    On December 2, 2013 – the same day that Greenstone was slated to send out

notices of the price increases to its customers – Defendant Patel spoke to R.H. at Greenstone

three times within a span of twenty (20) minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

763.    After the last of those three calls, Defendant Patel sent an e-mail to several

colleagues at Teva notifying them of an impending Greenstone price increase – one that would

not be effective for another month:



764.    On December 5, 2013, Defendant Patel continued to communicate with R.H.

about the Greenstone increases, and how Teva would react to unsolicited customer requests for

bids – trading two voicemails.  The next day, Patel sent another e-mail to K.G. about

Azithromycin Suspension:



K.G. agreed with Patel's recommendation.  Later that day, J.L. of Teva sent the following notice
to several Teva colleagues:



That same day, Teva declined to bid on Azithromycin at multiple customers.

     765.    Over the next several months – during the period of time before Teva followed
Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's

226

market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxyprogesterone due to a ████████████████████ After speaking with R.H. of Greenstone for more than five (5) minutes that same day, Defendant Patel agreed with the recommendation not to provide a bid to that customer.

766.    Similarly, on March 17, 2014 – which was the same day that Defendant Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin Oral Suspension. A national account executive at Teva asked Defendant Patel: ██████████████████████████████████████ ████████████████████ Defendant Patel had spoken with R.H. of Greenstone twice earlier that day, including one call lasting more than fifteen (15) minutes. Patel's response to the national account executive was: ████████████████

767.    Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets on April 4, 2014. Defendant Patel spoke twice with R.H. from Greenstone that same day.

> **iii.    Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam)**

768.    Teva and Actavis were coordinating about several drugs increased by Teva on April 4, 2014. One of them was Clarithromycin ER Tablets. As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

769.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market.  Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer.  Cardinal agreed.

770.   The Cardinal bid request was forwarded to Defendant Patel on the morning of January 2, 2014.  At 9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at ██████████████████████████ ████████████████   L.R. also stated: ███████████████████████████ ████████████████████████████████████

771.   Immediately after receiving that e-mail, at 9:40am, Defendant Patel called Defendant Rogerson at Actavis and the two spoke for more than seventeen (17) minutes.  Shortly after hanging up the phone with Defendant Rogerson, at 10:12am, Defendant Patel responded to the e-mail, saying: ████████████████████████████████████ ███████████████

772.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price.  At 9:19am that morning, Defendant Patel called Defendant Rogerson at Actavis and they spoke for more than six (6) minutes.  Shortly after that call, at 9:45am, Patel sent an e-mail internally at Teva stating: ██████████████████████████████████ ██████████████████████

773.   When Defendant Patel sent her supervisor the initial list of ████████████ ████████ on January 14, 2014, Clarithromycin ER was on the list.

774.   Similarly, in March, 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva.  Consistent with the ongoing

understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

775.    Following a now very familiar pattern, at 9:54am on March 14, 2014 Defendant Rogerson called Defendant Patel and left a message.  Patel called Rogerson back at 10:31am, and the two spoke for more than twelve (12) minutes.  Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:



In actuality, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

776.    Within half an hour of sending that e-mail, Defendant Patel instructed colleagues to add the Actavis drugs to the Teva price increase list.  She added: ████████████████ ██████████

777.    Less than two hours later, at 12:37pm, Defendant Patel called Defendant Rogerson again.  They spoke for more than five (5) minutes.  Shortly after hanging up the phone, at 12:51pm, Patel wrote another e-mail to certain colleagues at Teva, stating: ████████████

████████████████████████████████████████████████████████████

██████████████████████████

778.    First thing the next business day – which was the following Monday, March 17,

2014 – Defendant Patel forwarded the ████████████ list to K.G. at Teva.  The list included

both Tamoxifen Citrate and Estazolam.  Later that morning, Defendant Patel called Defendant

Rogerson.  After quickly exchanging voicemails, they spoke for more than nineteen (19)

minutes.  Defendants Rekenthaler of Teva and Falkin of Actavis also exchanged four (4) text

messages that day, and had one call lasting more than six (6) minutes.

779.    Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam

less than three weeks later, on April 4, 2014.  Defendants Patel and Rogerson spoke twice by

phone that day.  Defendants Rekenthaler and Falkin also spoke by phone that day.  Because Teva

was able to follow the price increase so quickly, Teva's increase became effective even before

the Actavis price increase for those drugs.

780.    After the price increases became effective, Teva took consistent steps not to

disrupt the market or steal market share from Actavis.  For example, on May 14, Defendant Patel

declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: ████████████

████████████████████████  When Defendant Patel and her other conspirators at

Teva used the term ████████ in this context, it was code for the fact that there was an

understanding in place with a competitor.

781.    Similarly, on May 21, 2014, Teva received a request from a large customer for a

bid on Tamoxifen Citrate.  As of that date, Teva had 58.4% of the market, and Actavis had

40.7%.  A Teva analyst forwarded the request to Defendant Patel and others, recommending

(pursuant to the fair share understanding in the industry) that Teva not bid ████████████

███████████████████████████████ Defendant Patel responded: ██████████████

████████████

#### iv.   Multiple Manufacturers (Ketoconazole Cream and Tablets)

782.   Defendant Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in February 2014. They were not listed on her original ████████████████ list that she sent to K.G. on January 14, 2014, but they were on the list of ████████████ that she sent to a colleague on February 26, 2014, with the following notes about each:

█████████████████████████████

783.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole Cream, Teva's competitors were Taro and Sandoz. For Ketoconazole Tablets, Teva's competitors were Taro, Mylan and Apotex.

784.   Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Defendant Aprahamian of Taro and CW-1 of Sandoz. During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Defendant Rekenthaler spoke to Defendant Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

785.   On Ketoconazole Cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Defendant Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:



CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the

drugs, and instead put the products on ████████████ until Sandoz determined how to

proceed.

786.    That same day, Defendant Aprahamian sent a similar e-mail internally to his

colleagues at Taro.

787.    The following Monday, April 7, 2014, Taro received a request from a customer –

the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a group purchasing

organization acting on behalf of a number of the Plaintiff States – seeking a competitive bid on

Ketoconazole Tablets due to the Teva price increase.  After reviewing the request, a Taro sales

executive sent an internal e-mail stating: ████████████████████████████

████████████████    In a follow-up e-mail, E.G., a Director of Corporate Accounts at

Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about

the reason: ████████████████████████████████████

788.    Four days after the Teva increase, on April 8, 2014, Defendant Aprahamian called

Defendant Patel and the two spoke for more than nineteen (19) minutes.  Later that same day, he

initiated a price increase for all of Taro's customers on both the Ketoconazole Cream and the

Tablets.  Defendant Aprahamian directed that the notice letters be sent to customers on April 16,

2014, with an effective date of April 17, 2014.

789.    Although Sandoz immediately understood that it would follow these price

increases, it was not able to implement them until October.  The delay was due to the fact that

Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

790.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The e-mail from Cardinal was forwarded to Defendant Patel, who responded immediately:



Shortly before sending the e-mail, Defendant Patel exchanged several text messages with Defendant Aprahamian at Taro. She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

791.   Later that same day, Defendant Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic:

792.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014. That same day, Defendant Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

793.     The Teva increases on Ketoconazole were significant.  For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%.  For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

**v.     New Relationships Emerge**

794.     By early 2014, the generic drug industry was in the midst of a price increase explosion.  In an internal Teva presentation given shortly after the April 2014 price increases – titled ████████████████ – Teva reflected on the current state of the industry, noting that the ███████████████████████████ In commenting on the future implications for Teva's pricing strategy, the company stated: ██████████████████ ████████████████████

795.     Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases.  Some illustrative examples are set forth below.

**a)     Breckenridge**

796.     One of those new co-conspirators was Defendant Breckenridge.  Defendant Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Defendant Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

234

797.    On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets.[5]  For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%.  The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.[6]

798.    In the weeks leading up to those increases – when Defendant Patel was still out on maternity leave – Defendant Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013.   After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

799.    Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

800.    With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market.  For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase.  For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine.  When she learned the news, Defendant Patel called S.C. at Breckenridge.  They ended up speaking twice that day – the first and only phone calls ever between them.  After speaking to S.C., Defendant Patel sent the following e-mail regarding the customer's request:

---

[5]  Breckenridge had acquired the ANDA for Cyproheptadine HCL Tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.

[6]  As discussed above in Section IV.B.2.a, Defendants Teva and Breckenridge had previously coordinated with regard to a price increase on Mimvey on July 31, 2012.



801.   With regard to Mimvey, however, Teva only had 19% market share in a two-player market.  For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

802.   On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Mimvey (contract increases of as much as 393%) and Cyproheptadine HCL Tablets (contract increases of as much as 526%).  In addition, Teva increased the WAC price on Mimvey (Estradiol/Norethindrone Acetate Tablets) by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

### b)   Rising

803.   Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013.  Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

804.   Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal.  For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

805.   Defendant Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes.  When Defendant Patel sent her initial list of ████████████ to K.G. on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

806.    Teva and Rising continued to coordinate the increase over the next several months. For example, when Defendant Patel sent a nearly final list of ███████████ to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

███████████████████████████████████████

That same day, Defendant Rekenthaler spoke with CW-2 twice. During those calls, CW-2 informed Defendant Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

807.    Defendant Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

808.    Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Defendant Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal. Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Defendant Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

c)    **Versapharm**

809.    On the April 4, 2014 Teva price increase list, Versapharm was a competitor on two different drugs:  Ethosuximide Capsules and Ethosuximide Oral Solution.

810.    When Defendant Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase.  For example, when Defendant Patel sent her initial ███████████ list to K.G. in mid-January 2014, neither drug was on the list.

811.    Versapharm was not considered a high-quality competitor.  When Defendant Patel created the quality competitor rankings in May 2013, Versapharm was given a -2 score in the rankings.  That did not stop Defendant Rekenthaler, however, from calling J.J., a senior national account executive at Versapharm, and speaking for five (5) minutes on January 22, 2014.  When Defendant Patel sent the next ██████████ list to a colleague on February 26, 2014 – Ethosuximide Capsules and Oral Solution were both on the list, with the following notation:



812.    Defendant Rekenthaler called again and spoke with J.J. at Versapharm on March 7, 2014.  Teva then raised prices on both drugs on April 4, 2014.  For Ethosuximide Capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%.  For Ethosuximide Oral Solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

813.    If Versapharm was being tested by Defendants Patel and Teva, it passed with flying colors.  On April 9, 2014 – only five days after the Teva increase -- Versapharm increased its pricing on both Ethosuximide Capsules and Oral Solution to a nearly identical price to Teva.

814.    Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of Versapharm never spoke by phone again.

### vi.      Impact

815.     A few weeks after Teva's April 4, 2014 price increases went into effect,

Defendant Patel calculated the impact to Teva's net sales as a result of the April 4 increase.

Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase

in sales to Teva of $214,214,338 per year.

### m.      April 15, 2014 Price Increase (Baclofen)

816.     Baclofen, also known by the brand names Gablofen and Lioresal, is a muscle

relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and

spinal cord injury or disease.  It is generally regarded as the first choice by physicians for the

treatment of muscle spasms in patients with multiple sclerosis.

817.     Effective February 21, 2014, Defendant Upsher-Smith took a significant price

increase on Baclofen, ranging from 350 - 420% to the WAC price, depending on the formulation.

Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith

was considering whether to exit the market or significantly raise price.  It chose the latter.

818.     The primary competitors in the market for Baclofen at this time were Teva

(62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

819.     Teva initially considered following the Upsher-Smith price increase quickly, as

part of its April 4, 2014 price increases – but decided against it.  The primary reason was that

Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor.  In other

words, Qualitest would likely compete for market share if Teva increased its price.

820.     Starting on April 10, 2014, however, Teva learned that Qualitest was having

supply problems, and could exit the market for at least 3-4 months, if not permanently.

821.    Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase.  Defendant Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

822.    Upsher-Smith was a highly-ranked competitor by Defendant Patel (+2) in large part because of Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith.  In the week before she started her employment at Teva (after leaving her previous employment), Defendant Patel and B.L. exchanged several text messages.  During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Defendant Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes.  During these initial communications, Defendant Patel and B.L. reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each others customers after a price increase.  Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

823.    There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Defendant Patel's prior conversations with B.L., and based on the history of collusion between the two competitors.

824.    Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly.  Teva increased its WAC pricing from 350% – 447%, depending on the dosage strength.  Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

825.    Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow.  Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith.  As Defendant Patel told K.G. in a June 11, 2014 e-mail: ████████████████████████████████████

████████████████████████████████████ K.G. agreed: ████████████

████████████████████████

826.    Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit.  In short order, Baclofen became a very profitable product for Upsher-Smith.  On April 18, 2014 – only three days after the Teva price increase – J.M., a Senior Director of Sales and Marketing at Upsher-Smtih, made the following pronouncement:



827.    Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith.  As discussed more fully above in Section IV.C.1.j., Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

### n.    July 1, 2014 Price Increase (Fluocinonide)

828.    Fluocinonide, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.

829.    There are several different formulations of Fluocinonide including, among others:
Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel
and Fluocinonide 0.05% ointment.   As of June 2014, Teva, Taro and Sandoz were the only three
manufacturers actively selling any of the four Fluocinonide formulations mentioned above.   On
June 11, 2014, Teva identified the market-share breakdown for each of the different formulations
of those drugs as follows:



830.    As discussed above, Teva coordinated with Taro and Sandoz to increase the price
of all four of those formations of Fluocinonide in July 2013, based in part on discussions that
started between Defendants Patel and Aprahamian even before Defendant Patel started her
employment at Teva. The increases to the WAC prices in 2013 were a modest 10-17%,
depending on the formulation.

831.    The second coordinated increase of Fluocinonide was much more significant.
Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014.  For each, the
increases to Taro's WAC prices are set forth below:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

Taro notified its customers of the increases the day before they became effective – June 2, 2014.

832.    Defendant Patel knew of these (and other) Taro increases well in advance, and was prepared so that Teva would be able to quickly follow the price increases.  Defendant Patel was already preparing for the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

833.    On May 14, 2014, Defendants Patel and Aprahamian exchanged eight (8) text messages, and had one phone conversation lasting more than four (4) minutes.

834.    Subsequent to the May 14 communications Defendant Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him.  On May 28, 2014, that colleague sent her a list titled ███████████████ ██████████████  The list included several drugs sold by Taro –including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole) – with the notation ████████████ listed as the reason for the increase, *even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.*  The relevant portions of that spreadsheet are set forth below:



835.    On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an ████████

███████████ on Fluocinonide 0.05% Cream  and Fluocinonide 0.05% Emollient Cream, but did

not give a reason for providing that opportunity to Teva.  The CVS representative offered to

move a significant amount of business from Taro to Teva, stating: ███████████████  The

e-mail was forwarded to Defendant Patel, who responded:

███████████████████████████

Of course Defendant Patel already knew the bid request was due to a price increase, because she

had spoken to Defendant Aprahamian in May and included Fluocinonide on her list of price

increases with a notation to ███████████  But she still needed to determine the specific price

points so that Teva could follow quickly.

836.    T.C. stated that she had not heard about a price increase from anyone else, but

indicated that she would ███████████  Defendant Patel stated: ███████████████

███████

837.    Defendant Patel immediately began snooping around by exchanging five (5) text

messages with Defendant Aprahamian at Taro.  Later that afternoon, she reported that she had

███████████████████████ but that she was ███████████████ K.G. at Teva

suggested that it might be a good opportunity to take some share from Taro – the market share

leader on several of the Fluocinonide formulations.  He asked Defendant Patel to provide

███████████ by the next day.  Patel responded at 4:23pm, making it clear that she had been talking

to Defendant Aprahamian not only about Fluocinonide, but other drugs as well:



Shortly after sending that e-mail Patel called Defendant Aprahamian and they spoke for nearly seven (7) minutes.  As discussed more fully below, Taro had also increased its prices for Warfarin and Carbamazepine on June 3.  Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

838.    First thing the next morning – June 4, 2014 – Defendant Patel exchanged two (2) more text messages with Defendant Aprahamian, and then the two spoke on the phone for more than twenty-five (25) minutes.  Within minutes after hanging up the phone with Defendant Aprahamian, Defendant Patel sent the following e-mail to K.G., making it clear that she had obtained additional ▮▮▮ that she did not want to put in writing:

839.    That same day, Teva received a bid request from another large customer, Walmart.  Shortly after that e-mail was forwarded to her, Defendant Patel responded by making it clear that Teva would play nice in the sandbox with Taro:



After further deliberation, Teva decided not to bid on any of the Walmart business at all.

840.    On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Defendant Patel forwarded a spreadsheet to a subordinate with ▮▮▮▮ she had obtained directly from Defendant Aprahamian. That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order and GPO). Prior to sending that ▮▮▮▮ Defendant Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes. The contract price points obtained by Defendant Patel were not otherwise publicly available.

841.    Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel. Not coincidentally, Defendant Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period. At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

During one of the calls on June 20 referenced above, Defendant Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Defendant Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz. CW-3 took very detailed notes of the pricing information Defendant Aprahamian provided, which again were not publicly available. Based on a history and pattern of practice between CW-3 and Defendant Aprahamian, it was understood that Sandoz would follow the Taro price increase.

842. On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees – including Defendants Patel and Rekenthaler – for a 3pm conference call that day. The notice stated: ████████████████████████████

████████████████████████████████████

████████████████████████████   ███   ████████████

███  ██  The next morning, at 9:57am, Defendants Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

843. The Teva price increases on Fluocinonide became effective on July 1, 2014. Teva increased its WAC pricing to match Taro's pricing almost exactly. That same day, Defendant Patel spoke to her contact at Sandoz – CW-1 – several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

During those calls, Defendant Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

844.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014, but followed the increase on the gel three months later, on October 10, 2014). Sandoz increased its WAC pricing on the gel by 491%. That same day, Defendant Patel spoke to CW-1 at Sandoz by phone for more than three (3) minutes.

845.   During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream, but had not yet gained any significant market share due to supply problems. Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream was effective December 19, 2014. Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently. At least some of those communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

o.   **August 28, 2014 Price Increases**

846.   On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:



Following the normal pattern, in the days and weeks leading up to the price increase, Defendants Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to

coordinate the increases in advance.  At least some of those communications are set forth in the

**graphic below:**



847.    The day before the increase became effective – August 27, 2014 – Defendant

Patel spent most of her morning discussing the price increases with her contacts at Sandoz,

Actavis, Taro, Zydus and Glenmark:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

848.    In addition to those phone communications noted above, representatives from Teva and every other defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Defendants Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

849.    For those few drugs where the phone records do not identify direct communications between Teva executives and their competitors, these executives, at a minimum, communicated through other competitors.

850.    For example, with regard to Enalapril, Defendant Patel was speaking to Defendant Aprahamian at Taro as shown above. Defendant Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

851.    Similarly, with regard to the drug Prochlorperazine, Defendant Rekenthaler communicated with Defendant Nesta at Mylan on August 7 and August 11, as shown above. Defendant Nesta, in turn, communicated with M.D., a senior sales executive at non-Defendant Cadista Pharmaceuticals, on the same days that he had been communicating with Defendant Rekenthaler.

852.    A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor. The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

### i.      Mylan

853.    Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

854.    Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, forwarded to Defendant Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

855.    Defendant Patel, in turn, forwarded the e-mail to the Teva sales team and stated:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████            The list that Defendant Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; Enalapril Maleate Tablets; Fluvastatin Sodium Capsules; Loperamide HCL Capsules; Prazosin HCL Capsules; and Sotalol Hydrochloride Tablets.

856.    Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases. On April 24, 2014, Defendant Patel began to formulate a ███████

████████████  in order to respond to those requests, but noted that Teva was ████████

████  about the Mylan customer contract price points, which were not publicly available.

Previously, Defendant Patel had relied on Defendant Kevin Green to obtain specific Mylan

customer price points (referred to as ████) through his communications with Defendant Nesta

of Mylan, which she used to follow Mylan's pricing.  The next day, in a follow-up e-mail about

the Mylan strategy, Defendant Patel noted that one of her Mylan increase strategies would not

have been appropriate for this situation, and concluded that: ████████████████

about the Mylan contract price points.

857.    Defendant Patel continued to push for specific contract price points from Mylan.

On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating: ████████████

████████████████████████████████████████

████████████████████

858.    On May 9, 2014, Defendant Patel sent another e-mail:



Shortly after receiving that e-mail – at 11:15am that morning – Defendant Rekenthaler called

Defendant Nesta at Mylan and left a message.  Nesta returned the call at 11:23am, and the two

spoke for nearly eight (8) minutes.

859.    Separately, and before Defendant Rekenthaler was able to convey any

information he had obtained, Defendant Patel forwarded a customer request from ABC (relating

to the Mylan increase items) directly to T.S. at Teva, lamenting the absence of Defendant Green

to obtain the Mylan intel:



860.    The next day, T.S. sent Defendant Patel an e-mail with an attached spreadsheet

listing the Mylan contract price points for all of the recent increases:



The e-mail was unclear on where T.S. had obtained this ▮▮▮ but the spreadsheet attached to

her e-mail was created by a Mylan employee.

861.    Defendants Rekenthaler and Nesta spoke again on May 20, 2014.  Armed with

this new source of ▮▮▮ Defendant Patel was more confident that Teva could follow the Mylan

price increases exactly, without disrupting the market.  That same day, as Defendant Patel began

to create a new list of Teva price increase candidates, she instructed a colleague to include the

Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

862.    On May 27, 2014, Defendants Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes.  By May 28, Teva had a much more comprehensive list of price increase items.  On that list, seven of the Mylan items were prominently listed with a  notation listed next to each:



Also on the list were three additional Mylan drugs for which Teva would be leading the price increase:  Diclofenac Potassium Tablets; Flurbiprofen Tablets; and Prochlorperazine Tablets.

863.    With the list firmly squared away at the end of May, Defendants Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price

increases.  In the weeks leading up to the August 28, 2014 Teva price increases, Defendants

Rekenthaler and Nesta spoke several times to coordinate, including at least the calls set forth

below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/7/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:02:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:13:00 |
| 8/21/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:06█ |

## ii.     Taro

864.    As discussed above, Taro implemented a substantial price increase on various

formulations of Fluocinonide on June 3, 2014.  In addition to Fluocinonide, Taro also

significantly raised its prices on the following additional drugs, which overlapped with Teva:

Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and

Warfarin Sodium Tablets.

865.    Defendant Patel learned of the prices increases for certain of these drugs in

advance, based on her conversations with Defendant Aprahamian.  It was understood that Teva

would follow the Taro price increases based on these and prior conversations.  In fact, Teva

agreed and made plans to follow them before Taro had even put them into effect.

866.    Specifically, on May 28, 2014, T.S. of Teva sent Defendant Patel the then-current

version of her ██████████████████████ spreadsheet.  That list included the following

Taro drugs, which had not yet been increased by Taro:



Defendant Patel likely obtained this information from Defendant Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

867.    On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs – Defendants Patel and Aprahamian exchanged five (5) text messages.  After exchanging those text messages, Defendant Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide.  Defendant Patel then added:   At 5:08pm that evening, Defendant Patel called Defendant Aprahamian and the two spoke for nearly seven (7) minutes.

868.    First thing the next morning, Defendants Patel and Aprahamian exchanged two (2) text messages.  Then, at 9:56am, the two spoke again for almost twenty-six (26) minutes.  Shortly after hanging up the phone with Defendant Aprahamian, Defendant Patel sent an e-mail to K.G. making it clear that she had obtained additional ▇▇▇ regarding the Taro price increases that she did not want to put into writing, stating: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇

869.    On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015.  One of the options discussed was a price increase.  K.G. – aware that Defendant Patel had been in discussions with Defendant Aprahamian and had ▇▇▇ regarding the Taro price increase on Carbamazepine (and other drugs) – stated: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

257

████████████████████████████████████████ In

fact, Defendant Patel had communicated with Defendant Aprahamian earlier that same day for

more than nine (9) minutes.

870.    One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium

Tablets ("Warfarin").  Also known by the brand name Coumadin, Warfarin is a blood thinner

medication used to treat and prevent blood clots.

871.    As of June 2014, there were three competitors in the market for Warfarin:  Teva,

Taro and Zydus.  Ten days after Taro increased its price, Zydus quickly followed with a price

increase of its own on June 13, 2014.  In the days between the Taro and Zydus price increases for

Warfarin, Teva, Taro and Zydus coordinated through various phone communications with each

other, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

872.    On June 13, 2014 – the date of the Zydus increase on Warfarin – Teva was

presented with an offer from a customer for a one-time buy on that drug.  Defendant Patel

responded that ████████████████████████████████████████

███████   Later that same day, Defendant Patel sent an internal e-mail alerting her group, including

her supervisor K.G., about a list of drugs on which Teva planned to raise prices.  A number of

them – including Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole

Topical Solution, Fluocinonide Cream, Emollient Cream, Gel and Ointment, and Warfarin

Sodium Tablets – included the notation ████████████████ as the reason for the increase.

For that list of drugs, Defendant Patel directed that ██████████████████████████

██████████████    Defendant Patel's directive meant that Teva would not seek to compete for

market share against Taro or Zydus when approached by customers due to those competitors'

price increases.

873.    On June 18, 2014, Defendant Patel sent that same list to the entire sales team at

Teva, informing them of the status of Teva's next price increase.  She noted that Teva had

already been ██████████████████████████████████████████

██████████    Defendant Patel continued: ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████    Finally, Patel stated:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Some of the ████████████ referred to by Defendant Patel was gathered during a phone

conversation she had with Defendant Aprahamian of Taro the day before, on June 17, 2014,

which lasted more than fifteen (15) minutes.

874.    The next day, Defendant Patel continued to gather ████████████ and made

concerted efforts to simultaneously coordinate with both Defendant Aprahamian and Defendant

Green at Zydus.  The timing and duration of those phone calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

875.     On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets. As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

### iii.     Zydus

876.     In addition to their agreement on Warfarin, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle Capsules.

877.     Topiramate Sprinkle Capsules, also known by the brand name Topamax, is a medication used to treat seizures caused by epilepsy, and also to treat migraine headaches. As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate, while Actavis had just 3% of the market.

878.     In April 2014, Zydus raised its price for Topiramate Sprinkle Capsules. Defendant Patel was in frequent communication with Defendant Green at the time of the Zydus price increase.

879.     In the days leading up to the June 13 Zydus price increase on Warfarin, which is discussed more fully above, Defendant Kevin Green coordinated with both Defendant Patel and Defendant Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

880.    Defendant Green was likely speaking to Defendants Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle Capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin became effective, and after the conversations noted above – Defendant Patel added Topiramate Sprinkle Capsules to Teva's price increase list, with a notation: ███████████     Two days before that – the same day that Defendant Green had extensive phone calls with both Defendants Rekenthaler and Patel – Rekenthaler also spoke twice with Defendant Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle Capsules.

881.    Teva followed the Zydus price increase for Topiramate Sprinkle Capsules on August 28, 2014.  As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

### iv.    Competitors Follow Teva

882.    For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

883.    For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs:  (1) Amoxicillin/Potassium Clavulanate Chewable Tablets; (2) Diclofenac Potassium Tablets; and (3) Penicillin V Potassium Tablets.  Following the normal pattern, Defendant Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three (3) minutes.

884.    Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate Tablets.  Defendants Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21 and November 25, 2014.

885.    Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase.  For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Defendant Patel's initial response to the customer was ███████████████████████ ████████████████████████████████████ ████████████  In a subsequent internal discussion, Defendant Patel expressed how difficult it was to actually keep track of all of Teva's different collusive agreements, saying: ██████████ ████████████████████████████████████████ █████████

886.    Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium Tablets.  Defendant Rekenthaler coordinated that price increase with Defendant Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

**p.      January 28, 2015 Price Increases**

887.    Shortly after the August 28, 2014 Teva price increases, Defendant Patel accepted a new position at Teva.  She left her position in the pricing department to take on the role of Director of National Accounts at Teva.  Her new position meant new responsibilities,

necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

888.    When Defendant Patel left the pricing department at Teva her position was not re-filled.  K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

889.    On January 28, 2015, Teva raised prices on a number of different drugs.  Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:



890.    Consistent with their normal pattern, Defendants Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015.  The relevant phone communications between Teva and several of its competitors related to these drugs are set forth below:



891.    Upon information and belief, Defendant Patel also spoke in-person with many of these competitors.  For example, in her new role as a Director of National Accounts, Defendant Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15:  NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015).  These industry events were all well-attended by Teva's competitors.

892.    Some specific examples of Teva's coordination with competitors about its January 28, 2015 price increases are set forth below.

### i.    Propranolol

893.    Propranolol HCL Tablets, also known by various brand names including Inderal LA, Inderal XL, Hemangeol and InnoPran XL, is a beta-blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions.

894.    On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol. The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

895.    In the days before Actavis sent this notice to its customers, Defendants Falkin of Actavis and Rekenthaler of Teva spoke frequently. For example:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

896.    Indeed, the day before Actavis sent the price increase notice to its customers, Defendant Rekenthaler coordinated the price increase with Defendant Falkin and Defendant Nesta of Mylan – the other quality competitor in the market for Propranolol.[7] The timing and duration of those phone calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

897.    On January 16, 2015 – more than a month before the Actavis price increase for Propranolol was disclosed to the public – Defendant Rekenthaler forwarded Teva's price increase

_____

[7] During this time period, Heritage and Qualitest were both suffering from long-term supply issues on Propranolol and were not viable competitors in the market.

list to Defendant Patel.  Propranolol was on the list, with the following explanations about pricing strategy and reasons for the price increase:



898.    Teva raised its pricing for Propranolol on January 28, 2015 – before the Actavis price increase even became effective.  As discussed above, Defendant Rekenthaler was in constant communication with Defendant Falkin of Actavis and Defendant Nesta of Mylan in the days leading up to Teva's price increase.

899.    When the Actavis price increase on Propranolol did become effective – on February 17, 2015 – Defendants Rekenthaler and Falkin continued to discuss pricing.  For example, the day before those price increases became visible to the public – February 16, 2015 – Defendants Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty-three (23) minutes.  Defendant Rekenthaler then spoke to Defendant Nesta twice on February 18, 2015 and again on February 19, 2015.

900.    Mylan ultimately followed the Teva and Actavis price increases for Propranolol with a price increase of its own on July 10, 2015.

### ii.    Ciprofloxacin HCL and Glimepiride

901.    Ciprofloxacin HCL Tablets, also known by various brand names including Cetraxal, Otiprio and Ciloxan, is an antibiotic that fights bacteria in the body.  It is used to treat different types of bacterial infections, including skin infections, bone and joint infections, respiratory or sinus infections, urinary tract infections, and certain types of diarrhea.

902.    Glimepiride Tablets, also known by the brand name Amaryl, is a medication used to control high blood sugar in people with type 2 diabetes.

903.    Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014.  The increases to the Ciprofloxacin HCL WAC were 201% - 533% depending on the dosage strength.  The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

904.    In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Defendant Patel about the planned price increases.  At least some of those phone communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

905.    V.B. continued to communicate with Defendant Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases.  The two exchanged four (4) text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

906.    Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase.  On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's).  Although unclear how T.W. obtained this information, the subject line of the e-mail clearly

267

identified the information as ████████████████ In her message to several other Dr.

Reddy's colleagues, T.W. stated:



J.M., a senior marketing executive at Dr. Reddy's, replied: ████████████████

████████████████████████████████████████

████████████████████████████████████████

████ Dr. Reddy's anticipated that Teva would follow its price increases based on the

understanding that had been reached between V.B. and Defendant Patel during their various

conversations.

907.    In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin

HCL and Glimepiride – during its next round of price increases on January 28, 2015.  In the

interim, V.B. and Defendant Patel continued to communicate, exchanging four (4) text messages

on October 10, 2014.

908.    Actavis – the only other quality competitor in the market for Ciprofloxacin HCL –

increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC

pricing.  In the days leading up to the Actavis price increase, Defendant Rekenthaler of Teva

spoke to Defendant Falkin of Actavis several times to coordinate the increase, including twice on

December 17 (including one call lasting nearly nine (9) minutes) and once on December 18,

2014.

909.    When Teva did follow the Dr. Reddy's (and Actavis) price increases on

Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match

Dr. Reddy's WAC prices exactly.  That same day, Dr. Reddy's was (again) able to obtain a full

copy of Teva's price increase list.  That list included many drugs that Dr. Reddy's did not market.

### iii.    Griseofulvin

910.    Griseofulvin Microsize Oral Suspension, also known by the brand name Grifulvin

V, is a medication used to treat fungal infections of the skin, hair and nails that do not respond to

creams or lotions.  The medication works by stopping the growth of fungi.

911.    On September 9, 2014, Actavis notified its customers of a price increase on

Griseofulvin Microsize Oral Suspension.  In the days leading up to September 9, 2014,

Defendants Patel and Rekenthaler of Teva communicated with Defendants Falkin and Rogerson

of Actavis to coordinate the increase.  Some of those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

The Actavis price increase for Griseofulvin became effective on October 6, 2014.

912.    Teva promptly added Griseofulvin to its own price increase list, with the notation

██████████████████████ as the reason for the price increase.

913.    Teva followed the Actavis increase for Griseofulvin during its next price increase

event on January 28, 2015.  As discussed above, in the days leading up to that price increase

Defendants Rekenthaler of Teva and Falkin of Actavis coordinated frequently.  Teva's price increase for Griseofulvin Microsize Oral Suspension matched Actavis's WAC pricing exactly.

### 3. Competitors Become "High Quality" After Successfully Colluding With Teva

#### a. May 2014:  Defendant Patel Updates The Quality Competitor Rankings to Reflect New Relationships

914.    A little more than a year after she first circulated her Quality of Competitor List, Defendant Patel finalized an updated list on May 9, 2014.  This updated list reflected changes in Teva's conspiratorial relationships.

915.    Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Defendants Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Defendant Patel or others at Teva on one or more drugs during the prior twelve-month period.  These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co-conspirators that Teva could trust to adhere to the illegal agreements.

#### i. Apotex

916.    Apotex, for instance, was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  When Defendant Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 -- an increase in five points over that twelve-month period.

917.    Apotex made this jump in Teva's quality competitor rankings in large part due to Defendant Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate, discussed above in Section IV.C.2.i.ii.

918.     As noted above, Defendant Patel revised her May 2013 price increase list on May 29, 2013 to add, *inter alia*, Pravastatin.  The day before – May 28 – Apotex increased its price on Pravastatin by over 100%.  Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

919.     In the days leading up to Defendant Patel's decision to add Pravastatin to her list of price increase candidates – and Apotex actually increasing its prices – Defendant Patel communicated frequently with B.H. at Apotex.  Between May 20 and May 24, 2013, the two spoke five (5) times.

920.     Teva ultimately raised its prices on Pravastatin – to follow Glenmark, Apotex and Zydus – on August 9, 2013.  In the days leading up to the Teva price increase, Defendant Patel spoke to B.H. at Apotex three (3) times to coordinate.

921.     At the same time that Teva raised its prices on Pravastatin in August 2013, it also increased its pricing on Doxazosin Mesylate.  Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases.  Apotex itself had increased the price of this drug on July 23, 2013.  B.H. of Apotex and Defendant Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

922.     Apotex soared dramatically in the quality competitor rankings for one additional reason:  in April 2013, Apotex hired J.H. as a senior executive.  Defendant Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex.  There is no record that they had ever communicated by phone before that.

923.     That relationship continued through 2014.  On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%.  Despite the fact that Apotex was the market leader

271

at that time, Teva chose to lead the price increase on Pentoxifylline.  In the weeks leading up to Teva's price increase, Defendant Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex.  The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively. They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes.  During these calls, Defendant Rekenthaler gathered Apotex's pricing plans and conveyed them to Defendant Patel.

924.    As a result of Defendant Patel and Defendant Rekenthaler's successful coordination with Apotex executives, Defendant Patel dramatically increased Apotex's quality competitor ranking in May 2014.

ii.      <strong>Zydus</strong>

925.    Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  But, when Defendant Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period.  While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel-oriented:  Defendant Kevin Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Defendants Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013.  With Defendant Green firmly installed at Zydus, Defendant Patel was emboldened to more fully include Zydus in the conspiracy.

926.    Defendant Patel's confidence was well-founded.  In the year after Defendant Green joined Zydus, the two companies successfully conspired to divide markets and allocate

272

customers relating to Zydus's entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin (May – June 2014), and Etodolac ER (May – July 2014). These agreements are discussed more fully above in Section IV.C.1.h.

927.    Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

928.    In the days leading up to both companies' price increases, Defendants Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014 – four days before Zydus increased its prices – Defendants Green and Patel spoke four (4) times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

929.    Defendant Green was also communicating frequently with Defendant Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes. On August 20, the two exchanged an additional pair of phone calls.

930.    Defendants Patel and Rekenthaler did not communicate with Defendant Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Defendants Patel and Rekenthaler both worked largely out of Teva's home office. After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

931.    Even before Defendant Green joined Zydus in November 2013, Teva had some

success in coordinating price increases with Zydus.  As discussed above, Defendant Patel

decided to add Pravastatin to her price increase list only after determining that Zydus agreed to

the increase.  In the week leading up to Defendant Patel's decision to revise her price increase list

to include Pravastatin, Defendant Green (still at Teva) spoke to K.R. and M.K., both senior

executives at Zydus.

932.    Just two weeks later, on June 14, 2013, Zydus increased its price on Pravastin by

over 150%.  Defendant Green similarly had numerous conversations with Zydus executives in

the week prior to that company's Pravastatin increase, as shown in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

933.    As noted above, Teva ultimately raised its prices on Pravastatin on August 9,

2013.  At that time, Defendant Patel recommended that Teva follow the competitors that had

already raised their prices – including Zydus.  Prior to Teva raising its prices on August 9, 2013,

Defendant Green spoke to K.R. at Zydus three times—twice on August 4, 2013 and once on

August 5.

### iii.    Heritage

934.    Heritage, like Apotex and Zydus, was not a highly-ranked competitor when

Defendant Patel first created the quality of competitor ranking list in May 2013.  Initially,

Defendant Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

935. The reason for Heritage's significant improvement in Defendant Patel's quality competitor rankings was the relationship that Defendant Patel established with the Vice President of Heritage, Jason Malek. After moving to Teva, Defendant Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least 37 times.

936. Heritage's successful effort to coordinate price increases with Teva on seven drugs – Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline – is described in the Plaintiff States' Consolidated Amended Complaint dated June 15, 2018, MDL No. 2724, 2:17-cv-03768 (E.D. Pa.), which is incorporated herein by reference.

### iv.      Lupin

937. In Defendant Patel's initial May 2013 quality competitor ranking list, Defendant Lupin was given a ranking of +2. When Defendant Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

938. Defendant Lupin was awarded the highest score in the quality competitor ranking in 2014 because Defendant Berthold of Lupin earned Defendant Patel's trust by consistently agreeing to her price increase plans. From May 2013 through April 2014, for example, Defendants Patel and Berthold spoke at least 76 times by phone. Defendant Green, while still at Teva, also had a very strong relationship with Defendant Berthold. As discussed above, at times Defendants Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Defendant Berthold.

939.    As discussed more fully above, in 2013 – after Defendant Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs:  Cefdinir Oral Suspension, Cefdinir Capsules, Cefprozil Tablets and Pravastatin.  Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

940.    The relationship was so strong between Teva and Lupin that even when Defendant Green left Teva, and Defendant Patel was out of the office on maternity leave, Defendant Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin Oral Suspension.  As discussed above, in October 2013 Defendant Berthold called Defendant Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension.  When Defendant Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Defendant Berthold until Teva followed Lupin's price increase on April 4, 2014.

941.    Defendants Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014.  Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Defendant Patel updated them in May 2014.

#### v.      Par

942.    In Defendant Patel's initial May 2013 quality competitor ranking list, Defendant Par was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

276

943.    Defendant Par rose in the rankings largely because of several strong relationships between executives at the two companies.  For example, T.S., a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par.  The two began communicating by telephone in September 2013.  Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

944.    Similarly, Defendant Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B.  Rekenthaler spoke with M.B. frequently throughout 2013 and 2014.  From the beginning of 2013 through May 2014, Defendant Rekenthaler spoke to M.B. at Par at least thirty-two (32) times by phone.

945.    Defendant Patel was well aware of these strong relationships, and relied on the information that T.S. and Defendant Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs.  One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets.  Defendant Patel forwarded the e-mail to T.S. with three question marks:  ██████  T.S. responded immediately:  ██████████  The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day.  After these calls with R.K., T.S. responded back to Defendant Patel saying ███████████████████████████ ██████████

946.    The following Monday, Defendant Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol) to Defendant Rekenthaler, saying ████████████████████████  One (1) minute after receiving that e-mail, Defendant Rekenthaler called M.B. at Par and the two spoke for eighteen (18) minutes.  Shortly after

hanging up the phone with M.B., Defendant Rekenthaler sent another e-mail to Defendant Patel,

stating: ████████████████████████████ Defendant Rekenthaler spoke to M.B.

again later that afternoon for three (3) minutes.

947.    After these discussions between Teva and Par executives, Teva ultimately offered

only a nominal price reduction to that customer – knowing that this would likely concede the

business to Par.

948.    As discussed more fully above, Teva continued to conspire with Defendant Par on

various market allocation and price fixing schemes throughout the remainder of 2014 and into

2015.

### vi.    Greenstone

949.    Greenstone was not a highly-ranked competitor when Defendant Patel first

created the quality competitor ranking list in May 2013.  Defendant Patel had, at that time, given

Greenstone a ranking of "0."  However, when Defendant Patel updated her quality competitor

rankings in May 2014, Greenstone improved to a +1 ranking.

950.    One of the reasons for Greenstone's improvement in the rankings was Defendant

Patel's developing relationship with Defendant R.H., a national account executive at Greenstone.

Defendant Patel and R.H. were former co-workers at ABC, and had a longstanding relationship.

From the time Defendant Patel started her employment at Teva in April 2013, through the time

that she updated the quality competitor rankings in May 2014, Defendant Patel and R.H.

communicated by phone or text at least 66 times.  Defendant Patel also spoke to R.H.'s

supervisor, Defendant Jill Nailor of Greenstone, numerous times in early 2014 to coordinate

Greenstone and Teva price increases and customer allocation agreements.

278

951.    Defendant Patel and R.H. of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 – the day that Greenstone sent notices to customers of its price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone.

952.    Given the willingness of Greenstone's executives to coordinate price increases with Teva, Defendant Patel increased Greenstone's quality competitor ranking in May 2014.

### vii.    Amneal

953.    In Defendant Patel's initial May 2013 quality of competitor ranking list, Defendant Amneal was given a ranking of +1.  When Defendant Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

954.    One of the reasons why Defendant Amneal rose in the rankings was because of several strong relationships between executives at the two companies.  For example, Defendant Rekenthaler of Teva had a strong relationship with S.R.(2), a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well.  Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as █████████ and █████████ █████████ (Defendants Green and Ostaficiuk were also participants.)

955.    Similarly, Defendant Patel also developed strong relationships with two Amneal executives:  S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2).  As discussed above, Defendant Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

956.    Defendant Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication.  In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct.  In the message exchange below (relating to a drug not identified in this Complaint), S.R.(2) informs Defendant Patel that Amneal will concede one customer – Econdisc (█) – so long as Amneal is able to retain another large customer, Red Oak Sourcing (█):



On the day of this message exchange, Defendant Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

280

### viii.    Rising

957.    In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1.  When Defendant Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

958.    Rising improved in the quality competitor rankings because of the relationship between Defendant Rekenthaler and CW-2.  In 2013, CW-2 left Sandoz to join Rising.  At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market.   During several calls in early October 2013, CW-2 coordinated with Defendants Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

959.    Later, in March 2014, CW-2 sought to return the favor.  At that time, Rising experienced supply problems for the drug Diflunisal Tablets – a two-player market involving only Teva and Rising.  In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Defendant Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Defendant Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

960.    On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%).  In the weeks leading up to those price increases, Defendant Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases.  The two spoke by phone twice on March 17, 2014 and once on March 31.

961.    When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know.  Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal.  Consistent with the fair share understanding discussed above, and the rules of engagement that were generally followed in the industry, CW-2 and Defendant Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing matched Teva's WAC price increase from April 2014.

962.    Defendant Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Defendant Patel to increase Rising's quality competitor ranking in May 2014.

### ix.    Breckenridge

963.    In Defendant Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1.  When Defendant Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

964.    Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Defendants Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

965.    For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Mimvey and Cyproheptadine HCL Tablets.  In the weeks leading up to those Breckenridge price increases, Defendant Rekenthaler communicated by phone several times with D.N., a sales

executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013.  The call on October 24 lasted twenty-six (26) minutes.

966.    On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100%) and Cyproheptadine HCL Tablets (increasing the WAC pricing by over 90%), to match Breckenridge's WAC pricing on both products.  Teva raised prices even higher on its customer contracts.  Teva increased the contract pricing of Mimvey by as much as 393%, and the contract pricing of Cyproheptadine HCL Tablets by as much as 526%, depending on the dosage strength.

967.    As Defendant Patel planned for Teva's April 4, 2014 price increases, both she and Defendant Rekenthaler continued to communicate with their counterparts at Breckenridge. Defendant Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Defendant Patel sent her first list of ▮▮▮▮▮▮▮▮▮▮▮▮▮ to K.G. – for nineteen (19) minutes.  Similarly, Defendant Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer.  After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

968.    As a result of the successful coordination of these price increases between Teva and Breckenridge, Defendant Patel increased Breckenridge's quality competitor ranking in May 2014.

### x.    Glenmark

969.    Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014.  Defendant Glenmark, for example, declined slightly in the rankings.  In Defendant Patel's initial May 2013 quality competitor ranking list, Glenmark was given a

283

ranking of +3.  When Defendant Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

970.    The reason that Defendant Glenmark declined in the rankings was because Defendant Patel lost her most valuable relationship at that company – CW-5.  CW-5 left Glenmark in April 2014.  In the eleven-month period between Defendant Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times.  They also communicated frequently using an encrypted messaging application, WhatsApp.  As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexpiril HCTZ and Pravastatin.

971.    In addition to CW-5, Defendant Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company.  For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015.  Similarly, Defendant Patel exchanged 36 calls with Defendant Jim Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014.  As discussed more fully above, Defendant Patel continued to coordinate with J.C. and Defendant Brown throughout 2014 on several drugs, including Kariva and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### 4.    "Quality Competitors" Collude With Each Other As Well (Not Just With Teva)

a.     **One Example:  The Sandoz/Mylan Relationship**

972.     In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market.  Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped.  The relationship highlighted in this section is the relationship between executives at Defendants Sandoz and Mylan.  However, to the extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

973.     In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment.  CW-4 contacted Defendant Nesta because she was interested in potentially working at Mylan.  CW-4 obtained Defendant Nesta's phone number from a mutual contact and called to introduce herself.  During that phone call, Defendant Nesta immediately started talking about competitively-sensitive information.  Although CW-4 was surprised that Defendant Nesta was being so blatant, she did not stop him.

974.     In the year that followed, between September 2012 and October 2013, CW-4 and Defendant Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases.  Notably, CW-4 and Defendant Nesta were not friends and communicated almost exclusively by phone.  Examples of their coordination with respect to specific drugs are discussed in more detail below.

### i.     Market Allocation – Valsartan HCTZ

975.    The first drug that CW-4 and Defendant Nesta coordinated about was Valsartan HCTZ.  Valsartan HCTZ, also known by the brand name Diovan, is used to treat high blood pressure.

976.    Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

977.    Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity.  Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

978.    Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  In the days leading up to the launch, CW-4 and Defendant Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this product.  These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

979.    During these phone calls, Sandoz and Mylan – through CW-4 and Defendant

Nesta – agreed to divvy up the market so that each competitor obtained roughly a 50% market

share.

980.    Throughout this time, CW-4 also kept Defendant Kellum (her supervisor)

regularly informed of her discussions with Defendant Nesta and met with Kellum in person to

discuss her customer accounts, including a meeting on September 14, 2012.

981.    On September 21, 2012 – the date of the Valsartan HCTZ launch – R.T., a senior

sales and marketing executive at Sandoz, sent an internal e-mail stating ███████████████

████████████████████████████████████████

████████████████████████

982.    That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ.  In an internal series of e-mails reacting to this news, a Sandoz employee remarked: ███████████████████████████████████ H.F., a senior-most executive of Sandoz Germany responded, ███████████████ ████████████████████████████ D.D., a senior-most executive of Sandoz North America, replied:

███████████████████████████

983.    Defendant Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams.  S.G., a national account executive at Sandoz, replied ████████████████

984.    On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ.  S.G. forwarded the request to CW-1 and Defendant Kellum stating ███████████████████

███████████████████████████████

███████████████████████████

████████████████

985.    On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ.  R.T. sent an internal e-mail in advance of the meeting asking ██████ ████████████████████████████ After a colleague responded with a list of potential Mylan customers, Kellum responded, ████████████

████████████████████████████████

R.T. then informed the Sandoz team ████████████████████

███████████

ii.      **Price Increases – Summer 2013**

986.      As detailed in Section IV.C.2.g.iii above, after Mylan and Teva implemented

significant price increases in early July 2013, Sandoz executives sought to obtain a

███████████ of those Teva and Mylan price increases.  Sandoz sought this information

because it did not want to accidentally compete for market share on any of the Teva or Mylan

drugs that overlapped with Sandoz.

987.      To that end, on July 15, 2013, Sandoz executives held an internal meeting during

which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, █

████████████████████████

988.      That same day, as detailed above, CW-2 contacted his counterpart at Teva,

Defendant Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along

with the percentage increases for each.  Similarly, on July 16, 2013, CW-4 called her contact at

Mylan, Defendant Nesta.  The call lasted two-and-a-half (2.5) minutes.  A half hour later,

Defendant Nesta returned the call and they spoke for nearly nineteen (19) minutes.

989.      During those two calls, CW-4 asked Defendant Nesta to identify the drugs Mylan

had increased prices on so that Sandoz could follow with its own price increase.  Defendant

Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be

large.  Defendant Nesta also emphasized that Mylan did not appreciate having its prices

challenged and that prices should be kept high.  After the phone call ended, CW-4 sent the

following e-mail to her superiors (the "July 2013 E-mail"):



990.    For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 E-mail. Indeed, Mylan would not raise price on this product until August 9, 2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

991.    Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products. Some examples of this conduct are detailed below.

### a)      Haloperidol and Trifluoperazine HCL

992.    Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL, also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

993.    On August 6, 2013, Defendant Nesta of Mylan called CW-4 at Sandoz twice. Both calls were less than a minute long.  Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

994.    On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to ███████████████.

995.    On August 22, 2013, CW-2 e-mailed Defendant Kellum stating that CVS ██████ ███████████████████████████████████████████████████████████ ███████  Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz.  F.R. responded, ████████████████████████████████████████████████████ ██████████████████████████  CW-1 replied that he would obtain the pricing data, ██████████████████.

996.    On September 18, 2013, CW-1 e-mailed Defendant Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL.  For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%.  For Trifluoperazine HCL, CW-1 stated that ████████████████████████████.

997.    On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL.  CW-1 sent an internal e-mail explaining that ███████████████████████████████████████ ███████████████████.

998. On October 2, 2013, CW-1 e-mailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so:



999. Over the next several days, CW-4 and Defendant Nesta spoke by phone several times. These communications are detailed in the table below. Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

1000. On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price

increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. As O.K. explained, ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

1001.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but waited to follow on Trifluoperazine HCL until January 31, 2014.

### b)      Benazepril HCTZ

1002.   Benazepril HCTZ, also known by the brand name Lotensin, is an angiotensin converting enzyme (ACE) inhibitor that is used to treat high blood pressure.

1003.   In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ.  However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

1004.   On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding ████████████████████ stating: ██████████████████████████ ████████████████████ Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

1005.   The next day, on July 16, 2013, CW-4 spoke with Defendant Nesta and sent the July 2013 E-mail outlining the Mylan price increase drugs that Defendant Nesta had provided to her (discussed more fully above).  That list did not include Benazepril HCTZ.  CW-1 forwarded

the July 2013 E-mail to Defendant Kellum stating ███████████████████████

███████████████████████████████████████████████████ CW-1 then e-

mailed CW-4 asking, ███████████████████████████

1006.   Over the next few days, CW-4 and Defendant Nesta communicated several times,

during which they discussed Benazepril HCTZ.  These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

1007.   On August 2, 2013, CW-1 sent a spreadsheet to Defendant Kellum entitled, ████

███████████████   In the e-mail, CW-1 stated: ███████████████████████████

████████████████████████

1008.   One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril

HCTZ.  The increase was large – nearly 334% on all dosage strengths.

1009.   On August 20, 2013, consistent with their agreement to maintain high prices,

Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC

pricing.

1010.   A third competitor – Rising Pharmaceuticals – entered the Benazepril HCTZ

market on April 2, 2014 as the authorized generic.  When Rising entered, it essentially matched

the WAC pricing of Sandoz and Mylan.  Both before and after entering the market, CW-2 – then

at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and L.J.) about

obtaining market share on Benazepril HCTZ.  Through those communications, Sandoz

ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share

of the market.

c)       **Levothyroxine**

1011.   Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, thyroid cancer, and cretinism.

1012.   Levothyroxine was the second most prescribed drug, measured by number of prescriptions, in the United States in the first quarter of 2010.  Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating 15% of the population over the age of 55.

1013.   Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1014.   In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine.  Defendant Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz.  In addition to communicating directly with CW-4 on this drug, Defendant Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Defendant Green of Teva.  Notably, Levothyroxine was not a drug that Teva sold.

1015.   As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine.  The day before the Mylan increase, on January 3, 2013, Defendant Nesta of Mylan and Defendant Green of Teva spoke at least four times by phone.  The next morning – the day of the Mylan price increases – Defendant Green spoke twice with Defendant Kellum, including a six (6) minute call at 9:34am.

1016.   Shortly after hanging up the phone with Defendant Green, Defendant Kellum sent an internal e-mail stating, among other things, that he ███████████████████ ██████████████████████████████████ and Defendant Kellum advised his

team to ███████████ on this product.  As the phone records demonstrate, Defendant

Kellum's source for the information was not ████████ but rather Defendant Green of Teva.

1017.  That same morning, K.S. of Lannett called Defendant Nesta of Mylan.  The phone

call lasted 44 seconds.  Then, on January 10, 2013, Defendant Nesta called K.S. back and they

spoke for more than six (6) minutes.  That same day, McKesson e-mailed Sandoz and requested

a price reduction on Levothyroxine.  Kellum responded internally, ████████████████

██████████████████

1018.  The following Monday – January 14, 2013 – Lannett raised its WAC pricing for

Levothyroxine to match Mylan.  Notably, after these phone calls, Defendant Nesta would not

speak again with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its

prices for Levothyroxine a second time.

1019.  On July 16, 2013 -- as detailed above – CW-4 spoke with Defendant Nesta and

sent the July 2013 E-mail identifying the Mylan price increases.  The price list included

Levothyroxine and noted that Lannett had followed.

1020.  On August 6, 2013, Defendant Nesta called CW-4 two times.  Both calls lasted

less than a minute.  A few minutes after the second call, Defendant Nesta called K.S. at Lannett.

The call lasted 24 seconds (likely a voicemail).  Three days later, on August 9, 2013, Mylan

increased WAC pricing on Levothyroxine for a second time.

1021.  On August 10, 2013, S.G., a national account executive at Sandoz, sent an

internal e-mail that stated: ██████████████████████████████

███████████████████████████████████

██████████████████████████ CW-4 replied to S.G.'s e-mail

stating, ███████████████████

1022.   Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1023.   On August 14, 2013, S.G. sent an e-mail to Defendant Kellum, copying CW-1, regarding ███████████████ and asked ███████████████ CW-1 responded: ███████████   In response, S.G. replied: ██████████████████████ ██████████   CW-1 answered ██████████████████

1024.   On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine.  J.M., a national account manager at Lannett, forwarded the request to K.S. stating ████████████████████████████ ████████████████████████   J.M. explained that ███ ████████████████████████████████ ██████   Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating ████████████████████████ ██████████

1025.   During a September 10, 2013 earnings call, Lannett's CEO, A.B., was asked for his reaction to Mylan's Levothyroxine price increase.  A.B. responded, ██████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████

1026.   On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1027.   The three competitors – Defendants Mylan, Lannett, and Sandoz – did not stop there.  They coordinated again to raise price on Levothyroxine in April/May 2014.

1028.   Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014.  In the two days leading up to the increase, Defendant Nesta and K.S. of Lannett spoke by phone several times.  These calls are listed below.  Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

1029.   On April 25, 2014 - the day that Mylan increased its pricing for Levothyroxine – P.C., a sourcing manager at Cardinal Health, sent a text message to Defendant Sullivan of Lannett stating: ██████████████████████████████ Defendant Sullivan responded: ████████████████████████████████ ████████████████████████ Defendant Sullivan had ████████ about the Mylan increase from her supervisor, K.S., who had communicated with Defendant Nesta only days prior.

1030.   Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014.  In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

d)    **Clomipramine HCL**

1031.   Clomipramine HCL, also known by the brand name Anafranil, is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

1032.   In addition to Defendants Sandoz and Mylan, Defendant Taro also manufactured Clomipramine HCL.   Indeed, it was Taro that led a price increase on this product on May 1, 2013.   The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.[8]

1033.   In the weeks leading up to the Taro price increase on Clomipramine HCL, Defendant Aprahamian of Taro spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan.   In fact, on several occasions during this time period, Defendant Aprahamian hung up the phone with one competitor and immediately called the next. At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro.   During these conversations, Defendants Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine HCL.   Certain of these phone calls are detailed in the table below:

---

[8] Defendant Taro also increased pricing on a number of other products on this date.   These other products will be the subject of a subsequent Complaint.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

1034.   CW-3 of Sandoz also took contemporaneous notes of some of his conversations with competitors.  For example, after speaking with Defendant Aprahamian of Taro twice on April 30, 2013, CW-3 made the following notes identifying Clomipramine HCL as one of the products that Taro planned to increase on May 1st:



Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Defendant Aprahamian about Taro's May 1 increase as early as April 2, 2013.

1035.   As part of the agreement to raise prices and not poach each other's customers on Clomipramine HCL, Defendant Sandoz consistently refused to bid for Taro's customers after Taro raised its price.  For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine HCL, and asked whether Sandoz wanted to bid for the business.  Defendant Kellum e-mailed CW-4 stating ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

1036.   Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market.  On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine HCL.  Defendant Kellum responded: ████████████████████

████████████████████████████████████████████

██████████████████████

1037.   The next day, on May 2, 2013, Defendant Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes.  CW-3 hung up the phone and then immediately called Defendant Kellum.  The two spoke for eight (8) minutes.  First thing the next morning – on May 3, 2013 – CW-3 called Defendant Aprahamian back and they spoke for another five (5) minutes.  Within a half hour, CW-3 again contacted Defendant Kellum and spoke for two (2) minutes.  Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating: ████████████████████████████████████████

████████████████████████████████████

1038.   Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid.
When Rite Aid notified Taro, Defendant Aprahamian forwarded the e-mail to M.P., Chief
Commercial Officer at Taro, stating ███████████████████████████████████

1039.   Mylan was the next to increase price on Clomipramine HCL.  On May 16, 2013,
Mylan increased to the same WAC per unit cost as Taro.  In the days leading up to the Mylan
price increase, all three competitors were in contact with each other to coordinate efforts.  Some
of these calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:20 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:06:00 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:04:06 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:02:00 |
| 5/16/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:22:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:01:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:01:00 |

1040.   On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order
for Clomipramine HCL and asked Taro to bid for the business.  Defendant Aprahamian
responded that he was ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

1041.   On July 16, 2013, CW-4 of Sandoz sent the July 2013 E-mail identifying
Clomipramine HCL as a Mylan price increase product.  By this time, Sandoz knew that Mylan
had increased its price on this product.

1042.   On July 20, 2013, Taro received a ████████ notification that Sandoz was increasing price on Clomipramine HCL.  Defendant Aprahamian forwarded the notice to M.P. stating: ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

1043.   Two days later – on July 22, 2013 – Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

1044.   On August 5, 2013, Walgreens – a Mylan customer – e-mailed Sandoz and requested a bid on Clomipramine HCL.  S.G., a national account executive at Sandoz, sent an internal e-mail asking ██████████████████████████████ Defendant Kellum responded negatively, based on the agreement in place with Mylan, stating: ████████████

████████████████████████ On August 6, 2013, Defendant Nesta of Mylan called CW-4 at Sandoz twice.  Both calls lasted less than a minute (likely voicemails).  The next day, on August 7, 2013, S.G. replied to Defendant Kellum's e-mail, stating: ██████████████████████

██████████████████████

1045.   In October 2013, CW-4 and Nesta spoke by phone several times.  At least some of these calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:11:19 |

1046.   After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Defendant Kellum.  The call lasted one minute.  Approximately one half hour later, Defendant Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

1047.   On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro.  CW-1 was surprised and forwarded the request to CW-4, copying Defendant Kellum, stating: ██████████████████████████████████████

██████████████████   CW-4 responded, ████████████████████

██████████████████████

1048.   In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint.  After several conversations with antitrust counsel, Defendant Kellum prepared the following response to Bloomberg with regard to Clomipramine HCL:



1049.   As is clear from the above allegations, Defendant Kellum's statement was a lie. In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance, and stayed true to its commitments to keep those prices high.

e)     **Tizanidine**

1050.   Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

1051.   As of May 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine.  Dr. Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold.  At that time, Dr. Reddy's was the market leader with 59% market share, while Mylan had 24%, and Sandoz had 17%.

1052.   Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug.  As Dr. Reddy's explained in an internal presentation, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and stated that Dr. Reddy's assumes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

1053.   Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine.  For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendant Kellum responded, ▮▮▮▮▮▮ Kellum then quickly sent out a directive to the team to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1054.   On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Defendant Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes. Two days later, CW-1 of Sandoz sent an internal e-mail to Defendant Kellum regarding ███████ stating ██████████████

1055.   On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's WAC increases were significant -- ranging from 248% to 344%, depending on the formulation. In the days leading up to the Sandoz increase, Defendant Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

Notably, after this, Defendant Nesta would not speak with J.A. again until three months later in August 2013.

1056.   On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW-1 and Defendant Kellum asking ████████████████████████████ A few minutes later, Defendant Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes. Later that day,

CW-1 replied to CW-3's e-mail stating, ███████████████ CW-3 then responded to Omnicare, stating that ██████████████████████████████ ████████████████████████████████

1057.   On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. of Dr. Reddy's asking ███████████████████ J.A. responded, ███████████████ J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Defendant Nesta.  However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry, and would not do so until July 2, 2013.

1058.   On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine.  J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: ████████████████████ N.M. responded: ████████████ ██████████████████████████████████████████ ████████████████████████ J.A. replied, ████████████ ████████████████████ A few weeks later, Meijer forwarded the same request to Sandoz.  Sandoz's response was similar: ██████████████████████



### b.   Individual Defendant Relationships

1059.   The relationship between CW-4 and Defendant Nesta discussed in detail above is just one example of two competitors capitalizing on their relationship to fix prices and allocate markets on drugs that both companies manufactured.  Each of the individual Defendants had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlap drugs.  Many of these relationships are discussed throughout this Complaint.

1060.   The following sections profile each individual Defendant and their primary contacts at competitor Defendants, including cataloging the number of phone calls and/or text messages exchanged between them.  The charts that follow are limited to communications with employees at other Defendants and do not include communications the individual Defendants may have had with executives at competitor companies that are not named as Defendants in this Complaint.

**i.        Ara Aprahamian**

1061.   Defendant Aprahamian is the Vice President of Sales at Defendant Taro and has held that position since he moved to Taro from Actavis in March 2013.  Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the corporate Defendants.  For example, between March 2013 and October 2018, Aprahamian exchanged at least 706 phone calls and text messages with his contacts at Defendants Sandoz, Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, Greenstone, and Aurobindo.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| Patel, Nisha (Teva) | 100 | 5/22/2013 | 3/3/2016 |
| J.M. (Dr. Reddy's) | 61 | 3/27/2013 | 7/23/2018 |
| M.D. (Actavis) | 52 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| M.C. (Wockhardt) | 26 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 22 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2013 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| S.R. (Amneal) | 13 | 6/6/2014 | 4/29/2016 |
| M.B. (Actavis) | 12 | 5/13/2013 | 8/22/2015 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| R.H. (Greenstone) | 4 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |

ii.    **David Berthold**

1062.   Defendant Berthold is the Vice President of Sales at Defendant Lupin and has held that position since June 2006.  During his tenure at Lupin, Defendant Berthold has been the primary person at the company communicating with competitors.  Indeed, Defendant Berthold has relationships with individuals at many of the corporate Defendants and is one of the most prolific communicators of all the individual Defendants.  For example, between March 2011 and October 2018, Berthold exchanged at least 4,185 phone calls and text messages with his contacts at Defendants Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannett.  These communications are detailed in the table below:

309

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 977 | 12/10/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 959 | 2/3/2014 | 10/3/2018 |
| R.H. (Greenstone) | 791 | 3/9/2011 | 7/14/2017 |
| A.G. (Actavis) | 301 | 3/22/2011 | 12/14/2017 |
| K.K. (Wockhardt) | 153 | 12/14/2011 | 7/30/2013 |
| A.T. (Aurobindo) | 123 | 8/15/2012 | 4/28/2013 |
| Green, Kevin (Zydus) | 124 | 11/8/2012 | 10/11/2017 |
| Green, Kevin (Teva) | 118 | 1/26/2012 | 10/9/2013 |
| Patel, Nisha (Teva) | 76 | 5/6/2013 | 4/8/2014 |
| P.G. (Breckenridge) | 76 | 3/10/2013 | 5/20/2016 |
| Nesta, Jim (Mylan) | 68 | 4/21/2013 | 10/13/2014 |
| P.M. (Aurobindo) | 60 | 3/30/2011 | 2/4/2016 |
| Falkin, Marc (Actavis) | 52 | 9/3/2013 | 4/1/2016 |
| Kellum, Armando (Sandoz) | 41 | 1/24/2012 | 8/14/2014 |
| B.R. (Dr. Reddy's) | 37 | 12/9/2011 | 6/13/2012 |
| T.S. (Teva) | 36 | 12/15/2011 | 1/15/2014 |
| V.B. (Dr. Reddy's) | 33 | 12/16/2011 | 9/21/2015 |
| S.R.(2) (Amneal) | 22 | 8/8/2012 | 11/16/2016 |
| P.M. (Teva) | 21 | 3/29/2011 | 1/20/2012 |
| K.R. (Zydus) | 21 | 9/25/2012 | 9/30/2012 |
| Ostaficiuk, Kon (Camber) | 19 | 5/14/2012 | 4/4/2016 |
| Brown, Jim (Glenmark) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 11 | 4/16/2013 | 2/13/2015 |
| Rekenthaler, David (Teva) | 9 | 10/14/2013 | 1/16/2014 |
| J.A. (Dr. Reddy's) | 7 | 6/12/2012 | 4/8/2014 |
| K.S. (Lannett) | 4 | 6/20/2014 | 6/23/2014 |
| Nailor, Jill (Greenstone) | 8 | 4/16/2013 | 6/19/2015 |
| S.G. (Sandoz) | 3 | 3/11/2014 | 11/26/2014 |
| L.S. (Zydus) | 3 | 8/23/2012 | 9/19/2013 |
| A.S. (Actavis) | 3 | 2/13/2012 | 5/24/2012 |
| K.S. (Zydus) | 2 | 9/18/2012 | 9/19/2012 |
| CW-3 (Sandoz) | 2 | 2/7/2012 | 10/18/2012 |
| B.M. (Amneal) | 2 | 9/26/2012 | 3/7/2018 |
| B.G. (Sandoz) | 1 | 7/31/2015 | 7/31/2015 |
| Teva Pharmaceuticals | 1 | 1/25/2012 | 1/25/2012 |
| K.A. (Wockhardt) | 1 | 8/25/2012 | 8/25/2012 |
| Zydus Pharmaceuticals | 1 | 1/17/2018 | 1/17/2018 |

### iii.      Jim Brown

1063.   Defendant Brown is the Vice President of Sales at Defendant Glenmark and has

held that position since November 2012.  Brown was one of several Glenmark executives that

conspired with competitors.  Although not as prolific in his communications with competitors as

some of the other individual Defendants, he did communicate when necessary to further the

agreements.  For example, between June 2012 and August 2018, Brown exchanged at least 395

calls and text messages with his contacts at Defendants Actavis, Teva, Lupin, Amneal,

Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus, Par, Apotex, and Taro.  These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 270 | 8/9/2013 | 6/16/2016 |
| Patel, Nisha (Teva) | 36 | 8/6/2013 | 10/15/2014 |
| Berthold, David (Lupin) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 16 | 12/18/2013 | 2/22/2018 |
| B.W. (Wockhardt) | 9 | 6/25/2012 | 10/27/2017 |
| D.N. (Breckenridge) | 8 | 11/12/2012 | 3/30/2015 |
| K.S. (Lannett) | 7 | 6/18/2012 | 8/10/2017 |
| CW-3 (Sandoz) | 4 | 6/10/2016 | 6/14/2016 |
| Grauso, Jim (Aurobindo) | 9 | 3/28/2013 | 12/6/2013 |
| Green, Kevin (Zydus) | 4 | 4/12/2018 | 8/21/2018 |
| J.H. (Par) | 2 | 10/1/2013 | 11/1/2013 |
| S.R. (Lupin) | 2 | 11/28/2012 | 11/29/2012 |
| J.H. (Apotex) | 2 | 5/6/2015 | 3/10/2016 |
| L.P. (Taro) | 2 | 12/7/2012 | 12/7/2012 |
| P.M. (Aurobindo) | 1 | 2/28/2014 | 2/28/2014 |
| Breckenridge Pharmaceuticals | 1 | 10/17/2014 | 10/17/2014 |
| P.G. (Breckenridge) | 1 | 6/18/2012 | 6/18/2012 |
| Ostaficiuk, Kon (Camber) | 1 | 10/29/2014 | 10/29/2014 |
| Rekenthaler, David (Teva) | 1 | 3/24/2014 | 3/24/2014 |

#### iv.     Maureen Cavanaugh

1064.  Defendant Cavanaugh was the Senior Vice President and Commercial Officer,

North America, at Defendant Teva until April 2018.  She is currently the Senior Vice President

and Chief Commercial Officer at Defendant Lannett.  During her employment at Teva,

Defendant Cavanaugh knew that her subordinates were communicating with competitors about

pricing and customer allocation.  In addition, Defendant Cavanaugh maintained her own

relationships with certain competitors and coordinated with them directly when necessary to

further the agreements.  For example, between January 2011 and August 2017, Cavanaugh

exchanged at least 612 phone calls and text messages with her contacts at Defendants Actavis,

Amneal, Zydus, Sandoz, Glenmark, and Greenstone.  These communications are detailed in the

table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 410 | 9/10/2013 | 7/29/2016 |
| A.B. (Actavis) | 113 | 8/12/2015 | 7/25/2016 |
| S.R.(1) (Amneal) | 45 | 1/18/2011 | 11/14/2012 |
| A.S. (Actavis) | 17 | 8/21/2015 | 7/26/2016 |
| K.R. (Zydus) | 10 | 9/16/2013 | 5/20/2016 |
| Green, Kevin (Zydus) | 8 | 5/14/2017 | 8/3/2017 |
| J.K. (Actavis) | 4 | 4/29/2014 | 3/31/2015 |
| R.S. (Sandoz) | 2 | 10/6/2016 | 10/6/2016 |
| M.K. (Zydus) | 1 | 3/15/2011 | 3/15/2011 |
| Grauso, Jim (Glenmark) | 1 | 7/8/2015 | 7/8/2015 |
| Nailor, Jill (Greenstone) | 1 | 12/5/2012 | 12/5/2012 |

### v.  Marc Falkin

1065.  Defendant Falkin was the Vice President of Marketing, Pricing and Contracts at

Defendant Actavis until Actavis was acquired by Teva in August 2016.  For a period of time,

Defendant Falkin was also the Senior Vice President, US Generic Sales, at Teva.  During his

employment at Actavis, which is the focus of this Complaint, Defendant Falkin was a prolific

communicator and had established relationships with executives at many of the corporate

Defendants.  For example, between August 2013 and July 2016, Defendant Falkin exchanged at

least 2,562 phone calls and text messages with his contacts at Defendants Zydus, Teva,

Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz,

and Wockhardt.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Rekenthaler, David (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Cavanaugh, Maureen (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Brown, Jim (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| C.B. (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| K.S. (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| R.C. (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Nesta, Jim (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Berthold, David (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| J.H. (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Nailor, Jill (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| T.C. (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Teva Pharmaceuticals | 26 | 5/28/2015 | 7/19/2016 |
| T.K. (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| CW-5 (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Aprahamian, Ara (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| S.R.(2) (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Patel, Nisha (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| J.B. (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| C.D. (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| M.P. (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| J.P. (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| J.H. (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| K.G. (Teva) | 6 | 1/14/2016 | 5/12/2016 |
| S.G. (Sandoz) | 5 | 4/30/2014 | 6/23/2014 |
| M.K. (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| M.C. (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Ostaficiuk, Kon (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| S.R. (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| B.H. (Apotex) | 1 | 6/10/2014 | 6/10/2014 |

### vi.      Jim Grauso

1066.   Defendant Grauso was employed as a Senior Vice President of Commercial

Operations at Defendant Aurobindo until January 2014.  In February 2014, Defendant Grauso

moved to Defendant Glenmark and currently holds the position of Executive Vice President,

North America, Commercial Operations.  Defendant Grauso regularly communicated with

competitors while he was at Aurobindo and continued those relationships when he transferred to

Glenmark.  For example, between December 2011 and January 2014, Defendant Grauso

exchanged at least 1,763 phone calls and text messages with his contacts at Defendants Lupin,

313

Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Greenstone, Wockhardt, and Breckenridge.

These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 977 | 12/10/2011 | 1/31/2014 |
| T.S. (Teva) | 243 | 12/1/2011 | 1/21/2014 |
| Green, Kevin (Teva) | 158 | 12/6/2011 | 10/30/2013 |
| M.P. (Actavis and Taro) | 57 | 12/6/2011 | 1/13/2014 |
| D.L. (Zydus) | 54 | 1/7/2013 | 10/25/2013 |
| Ostaficiuk, Kon (Camber) | 39 | 3/21/2012 | 12/9/2013 |
| S.R.(1) (Amneal) | 32 | 3/27/2012 | 1/3/2014 |
| Brown, Jim (Glenmark) | 31 | 7/19/2012 | 1/6/2014 |
| Nailor, Jill (Greenstone) | 31 | 7/19/2012 | 1/6/2014 |
| M.C. (Wockhardt) | 26 | 12/8/2011 | 1/13/2014 |
| Green, Kevin (Zydus) | 20 | 11/11/2013 | 1/29/2014 |
| B.W. (Wockhardt) | 16 | 12/8/2011 | 1/14/2014 |
| K.K. (Wockhardt) | 11 | 8/6/2013 | 1/13/2014 |
| Patel, Nisha (Teva) | 12 | 5/14/2013 | 7/8/2013 |
| L.S. (Zydus) | 8 | 5/23/2013 | 6/6/2013 |
| M.B. (Taro) | 7 | 12/6/2011 | 3/22/2012 |
| K.S. (Zydus) | 6 | 9/19/2013 | 9/30/2013 |
| Aprahamian, Ara (Actavis) | 6 | 1/20/2012 | 1/27/2012 |
| J.P. (Teva) | 6 | 5/2/2012 | 12/19/2013 |
| S.R. (2) (Amneal) | 4 | 8/20/2012 | 12/4/2013 |
| D.N. (Breckenridge) | 4 | 6/25/2013 | 1/28/2014 |
| D.S. (Taro) | 3 | 8/6/2013 | 8/6/2013 |
| Teva Pharmaceuticals | 3 | 6/20/2012 | 3/21/2013 |
| M.B. (Glenmark) | 3 | 4/12/2013 | 6/17/2013 |
| Aprahamian, Ara (Taro) | 2 | 1/10/2014 | 1/10/2014 |
| Lupin Pharmaceuticals | 2 | 1/24/2013 | 1/24/2013 |
| E.S. (Lupin) | 1 | 9/6/2012 | 9/6/2012 |
| Rekenthaler, David (Teva) | 1 | 12/8/2011 | 12/8/2011 |

1067.   Similarly, after moving to Glenmark, Defendant Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo.  For example, between February 2014 and October 2018, he exchanged at least 2,018 phone calls and text messages with his contacts at Defendants Lupin, Aurobindo,

314

Zydus, Teva, Taro, Wockhardt, Sandoz, Greenstone, Dr. Reddy's, Amneal, Rising, Par,

Breckenridge, Upsher-Smith, and Mylan.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
| --- | --- | --- | --- |
| Berthold, David (Lupin) | 959 | 2/3/2014 | 10/3/2018 |
| R.C. (Aurobindo) | 215 | 2/3/2014 | 5/31/2017 |
| Green, Kevin (Zydus) | 161 | 2/4/2014 | 6/25/2018 |
| T.S. (Teva) | 128 | 2/3/2014 | 10/4/2018 |
| Aprahamian, Ara (Taro) | 106 | 7/1/2014 | 10/16/2018 |
| B.W. (Wockhardt) | 76 | 2/28/2014 | 10/2/2018 |
| M.P. (Taro) | 59 | 2/10/2014 | 2/3/2018 |
| Taro Pharmaceuticals | 59 | 3/5/2014 | 8/29/2018 |
| J.K. (Aurobindo) | 46 | 3/11/2014 | 10/3/2018 |
| J.J. (Aurobindo) | 36 | 2/19/2014 | 6/17/2018 |
| M.C. (Wockhardt) | 29 | 3/27/2014 | 10/1/2018 |
| J.H. (Sandoz) | 22 | 4/20/2018 | 9/27/2018 |
| R.S. (Sandoz) | 18 | 11/5/2015 | 8/8/2018 |
| Nailor, Jill (Greenstone) | 17 | 1/30/2015 | 5/26/2016 |
| P.S. (Aurobindo) | 10 | 2/20/2014 | 11/10/2017 |
| J.M. (Dr. Reddy's) | 10 | 9/27/2014 | 9/27/2017 |
| S.R.(1) (Amneal) | 9 | 2/3/2014 | 3/14/2018 |
| S.G. (Rising) | 9 | 3/2/2017 | 9/20/2018 |
| M.A. (Par) | 8 | 6/29/2015 | 7/12/2018 |
| Lupin Pharmaceuticals | 8 | 4/15/2014 | 4/10/2018 |
| L.C. (Lupin) | 7 | 4/30/2018 | 9/12/2018 |
| D.N. (Breckenridge) | 6 | 5/4/2018 | 8/10/2018 |
| Patel, Nisha (Teva) | 6 | 2/28/2014 | 1/5/2015 |
| Ostaficiuk, Kon (Camber) | 5 | 7/30/2014 | 10/29/2014 |
| M.M. (Upsher-Smith) | 3 | 10/4/2017 | 10/4/2017 |
| S.S. (Aurobindo) | 1 | 6/15/2017 | 6/15/2017 |
| Cavanaugh, Maureen (Teva) | 1 | 7/8/2015 | 7/8/2015 |
| J.P. (Teva) | 1 | 3/9/2015 | 3/9/2015 |
| L.W. (Lupin) | 1 | 8/22/2015 | 8/22/2015 |
| Teva Pharmaceuticals | 1 | 1/11/2018 | 1/11/2018 |
| Mylan Pharmaceuticals | 1 | 7/9/2018 | 7/9/2018 |

### vii.     Kevin Green

1068.   Defendant Green worked at Defendant Teva as a Director of National Accounts

until November 2013 when he took a position with Defendant Zydus.  Defendant Green is

currently the Vice President of Sales at Zydus.  Defendant Green developed a number of

relationships with individuals at many of the corporate Defendants.  He regularly communicated

with competitors while at Teva and then carried those relationships over to his time at Zydus. For example, between January 2010 and October 2013, Defendant Green exchanged at least 1,410 phone calls and text messages with his contacts at Defendants Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Greenstone, Breckenridge, Wockhardt, and Lannett. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Nesta, Jim (Mylan) | 461 | 2/21/2012 | 10/4/2013 |
| K.R. (Zydus) | 182 | 4/26/2010 | 10/31/2013 |
| B.R. (Dr. Reddy's) | 139 | 1/28/2010 | 6/29/2012 |
| Grauso, Jim (Aurobindo) | 158 | 12/6/2011 | 10/30/2013 |
| Berthold, David (Lupin) | 118 | 1/26/2012 | 10/9/2013 |
| CW-2 (Sandoz) | 84 | 4/26/2010 | 1/14/2013 |
| M.K. (Zydus) | 73 | 3/18/2010 | 10/28/2013 |
| P.H. (Zydus) | 52 | 3/29/2010 | 6/11/2012 |
| M.F. (Zydus) | 32 | 2/10/2013 | 10/30/2013 |
| R.H. (Greenstone) | 26 | 3/8/2010 | 10/16/2013 |
| P.M. (Aurobindo) | 19 | 9/27/2010 | 10/14/2013 |
| Kellum, Armando (Sandoz) | 14 | 3/21/2012 | 8/14/2013 |
| S.G. (Sandoz) | 9 | 4/25/2010 | 6/19/2013 |
| D.N. (Breckenridge) | 6 | 7/12/2012 | 3/3/2013 |
| M.M. (Wockhardt) | 5 | 2/19/2013 | 6/26/2013 |
| G.R. (Aurobindo) | 5 | 3/17/2010 | 3/24/2010 |
| M.A. (Mylan) | 5 | 10/27/2013 | 10/30/2013 |
| R.T. (Sandoz) | 4 | 5/23/2010 | 5/15/2013 |
| Sullivan, Tracey (Lannett) | 4 | 5/23/2011 | 11/14/2012 |
| Zydus Pharmaceuticals | 3 | 1/30/2013 | 8/20/2013 |
| S.R. (Lupin) | 3 | 10/17/2013 | 10/27/2013 |
| R.C. (Aurobindo) | 3 | 6/4/2012 | 6/29/2012 |
| CW-4 (Sandoz) | 2 | 5/20/2010 | 2/7/2012 |
| J.A. (Dr. Reddy's) | 1 | 7/23/2013 | 7/23/2013 |
| E.P. (Zydus) | 1 | 10/22/2013 | 10/22/2013 |
| K.K. (Wockhardt) | 1 | 7/15/2012 | 7/15/2012 |

1069.   Similarly, when Defendant Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva. For example, between November 2013 and August 2018, Defendant Green exchanged at least 969 phone calls and text messages with his contacts at Defendants Teva, Glenmark, Mylan, Lupin,

316

Aurobindo, Rising, Amneal, Sandoz, Greenstone, Lannett, and Dr. Reddy's.  These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Patel, Nisha (Teva) | 184 | 11/8/2013 | 8/31/2016 |
| Grauso, Jim (Glenmark) | 161 | 2/4/2014 | 6/25/2018 |
| Nesta, Jim (Mylan) | 117 | 1/7/2014 | 8/17/2017 |
| Berthold, David (Lupin) | 124 | 11/8/2013 | 10/11/2017 |
| M.A. (Mylan) | 51 | 11/14/2013 | 3/16/2016 |
| P.M. (Aurobindo) | 49 | 11/4/2013 | 7/28/2016 |
| J.P. (Teva) | 44 | 9/15/2014 | 8/20/2017 |
| Rekenthaler, David (Teva) | 42 | 11/8/2013 | 3/30/2015 |
| Teva Pharmaceuticals | 36 | 11/3/2013 | 8/10/2017 |
| T.S. (Teva) | 31 | 1/8/2014 | 8/9/2017 |
| Grauso, Jim (Aurobindo) | 20 | 11/11/2013 | 1/29/2014 |
| CW-2 (Rising and Aurobindo) | 15 | 8/4/2014 | 4/23/2017 |
| L.K. (Amneal) | 14 | 9/15/2014 | 6/27/2018 |
| T.C. (Teva) | 13 | 12/4/2013 | 4/30/2017 |
| S.G. (Sandoz and Rising) | 10 | 6/22/2014 | 11/26/2016 |
| K.G. (Teva) | 9 | 5/3/2017 | 8/17/2017 |
| Cavanaugh, Maureen (Teva) | 8 | 5/14/2017 | 8/3/2017 |
| Kellum, Armando (Sandoz) | 8 | 4/30/2014 | 2/12/2017 |
| S.G. (Teva) | 5 | 11/4/2013 | 11/26/2013 |
| Brown, Jim (Glenmark) | 4 | 4/12/2018 | 8/21/2018 |
| J.L. (Teva) | 4 | 12/13/2016 | 2/20/2017 |
| R.H. (Greenstone) | 4 | 10/12/2014 | 5/14/2017 |
| Sullivan, Tracey (Lannett) | 4 | 2/16/2014 | 2/16/2014 |
| S.R.(2) (Amneal) | 3 | 9/26/2016 | 3/15/2018 |
| M.W. (Mylan) | 3 | 5/15/2018 | 6/11/2018 |
| C.B. (Teva) | 3 | 12/20/2016 | 8/9/2017 |
| S.R. (Lupin) | 1 | 3/24/2014 | 3/24/2014 |
| J.A. (Dr. Reddy's) | 1 | 7/1/2014 | 7/1/2014 |
| T.G. (Aurobindo) | 1 | 7/9/2018 | 7/9/2018 |

**viii.      Armando Kellum**

1070.   Defendant Kellum was the Director of Pricing and Contracts at Defendant Sandoz

until July 2015.  While at Sandoz, Defendant Kellum directed his subordinates, including CW-1,

CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with

competitors.  In addition, Kellum had his own relationships with certain competitors and

communicated with those contacts directly when necessary to further the agreements.  For

example, between May 2011 and April 2015, Defendant Kellum exchanged at least 182 phone

calls and text messages with his contacts at Defendants Greenstone, Lupin, Teva, Upsher-Smith,

Zydus, Actavis, Rising, Amneal, and Dr. Reddy's. These communications are detailed in the

table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 66 | 7/20/2011 | 8/14/2014 |
| Berthold, David (Lupin) | 41 | 1/24/2012 | 8/14/2014 |
| Green, Kevin (Teva) | 14 | 3/21/2012 | 8/14/2013 |
| J.M. (Upsher-Smith) | 10 | 8/7/2014 | 3/5/2015 |
| Nailor, Jill (Greenstone) | 9 | 4/2/2014 | 10/15/2014 |
| Green, Kevin (Zydus) | 8 | 11/7/2013 | 4/30/2015 |
| M.F. (Zydus) | 7 | 7/23/2012 | 1/23/2014 |
| S.H. (Upsher-Smith) | 6 | 9/17/2014 | 3/26/2015 |
| Upsher-Smith Laboratories | 4 | 9/15/2014 | 10/13/2014 |
| Rogerson, Rick (Actavis) | 3 | 5/5/2011 | 9/28/2011 |
| C.P. (Rising) | 3 | 4/28/2014 | 10/24/2014 |
| S.R.(1) (Amneal) | 2 | 5/20/2013 | 12/18/2013 |
| S.R.(2) (Amneal) | 2 | 11/27/2013 | 8/8/2014 |
| M.M. (Upsher-Smith) | 2 | 11/9/2013 | 11/20/2013 |
| E.H. (Upsher-Smith) | 2 | 9/12/2014 | 9/16/2014 |
| N.M. (Dr. Reddy's) | 1 | 7/23/2012 | 7/23/2012 |
| D.C. (Upsher-Smith) | 1 | 4/18/2013 | 4/18/2013 |
| B.L. (Upsher-Smith) | 1 | 9/12/2014 | 9/12/2014 |

### ix.      Jill Nailor

1071. Defendant Nailor has worked at Defendant Greenstone since August 2010 and is

currently the Senior Director of Sales and National Accounts. Defendant Nailor directed her

subordinate R.H., a national account executive, and others at Greenstone to fix prices and

allocate customers with competitors on overlap drugs, including with several of the corporate

Defendants. She also instructed them to avoid putting any evidence of such communications

into writing.

1072. In addition, Defendant Nailor regularly communicated directly with competitors

herself. For example, between August 2010 and May 2017, Nailor exchanged at least 4,439

phone calls and text messages with her contacts at Defendants Amneal, Dr. Reddy's, Actavis,

318

Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 3769 | 8/26/2010 | 5/1/2018 |
| V.B. (Dr. Reddy's) | 125 | 10/16/2014 | 5/8/2017 |
| A.B. (Actavis) | 86 | 9/21/2011 | 7/14/2016 |
| J.P. (Amneal) | 75 | 8/27/2010 | 9/28/2016 |
| T.W. (Dr. Reddy's) | 62 | 8/28/2010 | 5/23/2016 |
| A.T. (Aurobindo) | 46 | 8/26/2012 | 5/12/2013 |
| Falkin, Marc (Actavis) | 41 | 1/6/2014 | 3/14/2016 |
| Nesta, Jim (Mylan) | 40 | 12/5/2012 | 11/13/2015 |
| Grauso, Jim (Aurobindo) | 31 | 7/19/2012 | 1/6/2014 |
| Brown, Jim (Glenmark) | 23 | 9/5/2013 | 8/25/2016 |
| L.S. (Zydus) | 20 | 4/27/2012 | 8/22/2013 |
| Grauso, Jim (Glenmark) | 17 | 1/30/2015 | 5/26/2016 |
| D.C. (Glenmark) | 11 | 5/29/2013 | 7/7/2013 |
| Patel, Nisha (Teva) | 13 | 1/21/2014 | 3/6/2012 |
| Kellum, Armando (Sandoz) | 9 | 4/2/2014 | 10/15/2014 |
| K.S. (Zydus) | 8 | 6/13/2012 | 6/13/2012 |
| Berthold, David (Lupin) | 8 | 4/16/2013 | 6/19/2015 |
| M.C. (Wockhardt) | 7 | 8/9/2016 | 8/9/2016 |
| J.D. (Teva) | 6 | 2/16/2011 | 5/15/2012 |
| Teva Pharmaceuticals | 6 | 2/16/2011 | 1/22/2014 |
| D.S. (Actavis) | 5 | 11/27/2010 | 1/31/2012 |
| S.C. (Actavis) | 5 | 4/18/2012 | 4/22/2012 |
| Rekenthaler, David (Teva) | 4 | 12/12/2013 | 1/22/2014 |
| K.S. (Lannett) | 3 | 12/12/2014 | 1/6/2015 |
| R.C. (Aurobindo) | 3 | 10/8/2013 | 10/18/2013 |
| B.A. (Apotex) | 3 | 6/25/2015 | 6/28/2016 |
| P.M. (Aurobindo) | 2 | 7/22/2014 | 8/13/2014 |
| D.Z. (Upsher-Smith) | 2 | 5/24/2017 | 5/24/2017 |
| J.H. (Par) | 2 | 4/20/2016 | 4/21/2016 |
| Cavanaugh, Maureen (Teva) | 1 | 12/5/2012 | 12/5/2012 |
| CW-3 (Sandoz) | 1 | 5/29/2013 | 5/29/2013 |
| J.H. (Apotex) | 1 | 7/15/2015 | 7/15/2015 |
| Taro Pharmaceuticals | 1 | 3/23/2011 | 3/23/2011 |
| B.R. (Dr. Reddy's) | 1 | 3/15/2012 | 3/15/2012 |
| N.C. (Actavis) | 1 | 1/29/2013 | 1/29/2013 |
| Lupin Pharmaceuticals | 1 | 6/17/2015 | 6/17/2015 |

**x.   James Nesta**

1073.   Defendant Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Defendant Mylan.  Nesta communicates regularly with his

counterparts at many of the corporate Defendants.  For example, between January 2011 and

February 2016, Defendant Nesta exchanged at least 5,293 phone calls and text messages with his

contacts at Defendants Greenstone, Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis,

Lupin, Sandoz, Lannett, Taro, and Par.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 2310 | 6/9/2011 | 8/24/2015 |
| S.R.(1) (Amneal) | 1079 | 1/3/2011 | 12/17/2015 |
| Green, Kevin (Teva) | 461 | 2/21/2012 | 10/4/2013 |
| B.R. (Dr. Reddy's) | 386 | 1/6/2011 | 6/28/2012 |
| K.R. (Zydus) | 121 | 7/21/2011 | 10/1/2014 |
| Green, Kevin (Zydus) | 117 | 1/7/2014 | 8/17/2017 |
| Rekenthaler, David (Teva) | 102 | 4/5/2012 | 3/17/2015 |
| A.T. (Aurobindo) | 95 | 8/26/2012 | 5/1/2013 |
| Falkin, Marc (Actavis) | 78 | 12/3/2013 | 8/17/2015 |
| J.K. (Aurobindo) | 76 | 10/1/2013 | 1/8/2016 |
| V.B. (Dr. Reddy's) | 71 | 8/7/2014 | 2/2/2016 |
| Berthold, David (Lupin) | 68 | 4/21/2013 | 10/13/2014 |
| CW-4 (Sandoz) | 67 | 9/6/2012 | 10/14/2013 |
| J.A. (Dr. Reddy's) | 52 | 3/9/2011 | 2/27/2014 |
| K.N. (Dr. Reddy's) | 42 | 6/7/2011 | 6/9/2011 |
| Nailor, Jill (Greenstone) | 40 | 12/5/2012 | 11/13/2015 |
| K.S. (Lannett) | 35 | 1/4/2013 | 4/23/2014 |
| T.W. (Dr. Reddy's) | 14 | 1/11/2013 | 2/5/2013 |
| P.M. (Aurobindo) | 13 | 4/5/2013 | 6/19/2013 |
| T.G. (Aurobindo) | 12 | 2/25/2016 | 2/25/2016 |
| S.R.(2) (Amneal) | 11 | 10/1/2014 | 1/15/2015 |
| R.C. (Teva and Aurobindo) | 10 | 7/20/2011 | 11/2/2011 |
| Patel, Nisha (Teva) | 10 | 5/10/2013 | 8/8/2013 |
| Sullivan, Tracy (Lannett) | 7 | 7/21/2014 | 7/22/2014 |
| L.P. (Taro) | 4 | 11/2/2012 | 1/17/2013 |
| B.P. (Zydus) | 4 | 7/21/2011 | 7/21/2011 |
| C.N. (Sandoz) | 3 | 12/2/2012 | 12/17/2012 |
| Teva Pharmaceuticals | 3 | 8/2/2011 | 8/2/2011 |
| J.H. (Par) | 2 | 2/4/2014 | 2/4/2014 |

### xi.     Konstantin Ostaficiuk

1074.   Defendant Ostaficiuk is the President of Camber Pharmaceuticals and has held

that position since 2009.  During his tenure at Camber, Defendant Ostaficiuk has been the

primary person responsible for furthering price fixing and market allocation agreements with his

competitors.  Indeed, Defendant Ostaficiuk regularly communicated with competitors and

maintained relationships with executives at many of the corporate Defendants.  For example,

between March 2011 and August 2017, Defendant Ostaficiuk exchanged at least 464 phone calls

with his contacts at Defendants Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, Rising,

Breckenridge, Taro, Glenmark, Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis.  These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(2) (Amneal) | 128 | 3/22/2011 | 6/11/2017 |
| K.S. (Lannett) | 122 | 3/10/2011 | 8/24/2017 |
| S.C. (Breckenridge) | 46 | 3/25/2011 | 7/24/2017 |
| Grauso, Jim (Aurobindo) | 39 | 3/21/2012 | 12/9/2012 |
| Berthold, David (Lupin) | 19 | 5/14/2012 | 4/4/2016 |
| S.R.(1) (Amneal) | 12 | 3/12/2012 | 10/25/2016 |
| R.M. (Lannett) | 10 | 12/15/2011 | 2/14/2012 |
| Rekenthaler, David (Teva) | 10 | 9/22/2014 | 2/19/2015 |
| C.M. (Aurobindo) | 9 | 5/27/2015 | 11/12/2015 |
| K.M. (Rising) | 8 | 7/17/2014 | 6/8/2016 |
| Breckenridge Pharmaceuticals | 7 | 11/9/2011 | 10/29/2014 |
| M.B. (Taro and Glenmark) | 6 | 5/30/2012 | 6/6/2012 |
| Sullivan, Tracy (Lannett) | 6 | 5/19/2012 | 8/28/2012 |
| P.H. (Zydus) | 5 | 5/8/2012 | 5/16/2012 |
| Grauso, Jim (Glenmark) | 5 | 7/30/2014 | 10/29/2014 |
| P.G. (Breckenridge) | 4 | 5/20/2011 | 12/17/2015 |
| M.K. (Zydus) | 4 | 1/5/2015 | 12/30/2015 |
| B.R. (Dr. Reddy's) | 4 | 1/18/2012 | 3/30/2012 |
| K.K. (Wockhardt) | 4 | 10/5/2011 | 2/1/2012 |
| D.P. (Sandoz) | 3 | 7/9/2014 | 7/14/2014 |
| CW-5 (Glenmark) | 3 | 11/19/2013 | 11/19/2013 |
| Falkin, Marc (Actavis) | 2 | 6/6/2013 | 12/5/2013 |
| P.M. (Aurobindo) | 2 | 8/20/2014 | 5/2/2014 |
| B.M. (Amneal) | 1 | 10/3/2011 | 10/3/2011 |
| Brown, Jim (Glenmark) | 1 | 10/29/2014 | 10/29/2014 |
| L.P. (Taro) | 1 | 6/26/2015 | 6/26/2015 |
| D.N. (Breckenridge) | 1 | 4/4/2016 | 4/4/2016 |
| A.T. (Aurobindo) | 1 | 2/1/2013 | 2/1/2013 |
| S.G. (Glenmark) | 1 | 4/27/2011 | 4/27/2011 |

### xii.  Nisha Patel

1075.  Defendant Patel worked at Defendant Teva from April 2013 to December 2016,

first as a Director of Strategic Customer Marketing and then as a Director of National Accounts.

As discussed in great detail above, Defendant Patel was in frequent communication with her counterparts at the corporate Defendants to fix prices and allocate markets.  For example, during her time at Teva, Defendant Patel exchanged at least 1,240 phone calls and text messages with her contacts at Defendants Zydus, Sandoz, Actavis, Glenmark, Greenstone, Taro, Lupin, Dr. Reddy's, Lannett, Par, Apotex, Aurobindo, Mylan, Amneal, Upsher-Smith, and Breckenridge. As discussed in various sections of this Complaint, Defendant Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the encrypted messaging application WhatsApp.  The communications detailed in the table below include only telephone calls and text messages:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Green, Kevin (Zydus) | 184 | 11/8/2013 | 8/31/2016 |
| CW-1 (Sandoz) | 183 | 4/26/2013 | 8/9/2016 |
| Rogerson, Rick (Actavis) | 157 | 5/2/2013 | 11/9/2015 |
| CW-5 (Glenmark) | 121 | 5/2/2013 | 3/4/2014 |
| R.H. (Greenstone) | 105 | 5/7/2013 | 10/13/2016 |
| Aprahamian, Ara (Taro) | 100 | 5/22/2013 | 3/3/2016 |
| Berthold, David (Lupin) | 76 | 5/6/2013 | 4/8/2014 |
| J.C. (Glenmark) | 44 | 5/6/2013 | 7/28/2015 |
| Brown, Jim (Glenmark) | 36 | 8/6/2013 | 10/15/2014 |
| V.B. (Dr. Reddy's) | 28 | 6/10/2014 | 9/27/2016 |
| A.B. (Actavis) | 28 | 4/30/2013 | 10/16/2015 |
| A.S. (Actavis) | 28 | 9/16/2015 | 3/10/2016 |
| Nailor, Jill (Greenstone) | 18 | 1/21/2014 | 3/6/2014 |
| Sullivan, Tracy (Lannett) | 17 | 6/12/2014 | 4/6/2016 |
| T.P. (Par) | 16 | 6/26/2013 | 11/10/2014 |
| B.H. (Apotex) | 14 | 5/20/2013 | 6/12/2015 |
| Grauso, Jim (Aurobindo) | 12 | 5/14/2013 | 7/8/2013 |
| Falkin, Marc (Actavis) | 11 | 2/5/2013 | 6/16/2016 |
| Nesta, Jim (Mylan) | 10 | 5/10/2013 | 8/8/2013 |
| A.G. (Actavis) | 9 | 1/27/2015 | 6/9/2016 |
| S.R.(2) (Amneal) | 9 | 9/9/2014 | 5/29/2015 |
| B.L. (Upsher-Smith) | 8 | 4/29/2013 | 9/18/2014 |
| Grauso, Jim (Glenmark) | 6 | 2/28/2014 | 1/5/2015 |
| K.R. (Zydus) | 6 | 10/10/2013 | 9/18/2014 |
| S.G. (Zydus) | 4 | 2/29/2016 | 5/24/2016 |
| M.B. (Actavis) | 3 | 2/26/2014 | 6/6/2016 |
| M.B. (Glenmark) | 3 | 5/10/2013 | 5/23/2013 |
| S.C. (Breckenridge) | 2 | 2/7/2014 | 2/7/2014 |
| S.R.(1) (Amneal) | 2 | 9/9/2014 | 1/6/2015 |

### xiii.   David Rekenthaler

1076.   Defendant Rekenthaler was the Vice President of Sales, US Generics at Defendant Teva until April 2015.  Defendant Rekenthaler is now the Vice President of Sales at Defendant Apotex.  During his time at Teva, Rekenthaler knew that his colleagues, including Defendants Green and Patel, were colluding with competitors.  Indeed, Defendant Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the corporate Defendants.  For example, between January 2011 and March 2015, Defendant Rekenthaler exchanged at least 1,044 phone calls and text messages with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro, Lannett, and Wockhardt.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 433 | 8/7/2013 | 3/25/2015 |
| Nesta, Jim (Mylan) | 102 | 4/5/2012 | 3/17/2015 |
| G.B. (Par) | 89 | 1/11/2011 | 2/13/2015 |
| R.C. (Aurobindo) | 75 | 10/6/2011 | 3/24/2015 |
| J.H. (Apotex) | 65 | 5/6/2013 | 3/9/2015 |
| Green, Kevin (Zydus) | 42 | 11/8/2013 | 3/30/2015 |
| A.S. (Actavis) | 26 | 1/11/2012 | 4/1/2013 |
| CW-2 (Sandoz and Rising) | 24 | 11/14/2011 | 11/20/2014 |
| J.H. (Par) | 19 | 9/16/2013 | 3/7/2015 |
| S.G. (Zydus) | 18 | 12/2/2013 | 1/29/2015 |
| B.P. (Mylan) | 18 | 9/12/2011 | 12/23/2013 |
| A.B. (Actavis) | 16 | 4/1/2013 | 9/16/2014 |
| J.K. (Actavis) | 15 | 10/11/2013 | 3/29/2015 |
| S.R.(2) (Amneal) | 13 | 5/8/2013 | 3/12/2015 |
| D.N. (Breckenridge) | 10 | 6/14/2012 | 6/10/2014 |
| Ostaficiuk, Kon (Camber) | 10 | 9/22/2014 | 2/19/2015 |
| Berthold, David (Lupin) | 9 | 10/14/2013 | 1/16/2014 |
| J.K. (Mylan) | 8 | 1/11/2012 | 2/7/2012 |
| K.M. (Rising) | 8 | 4/14/2011 | 1/4/2012 |
| B.R. (Dr. Reddy's) | 7 | 8/11/2011 | 4/16/2012 |
| K.R. (Zydus) | 5 | 10/10/2013 | 12/17/2013 |
| CW-5 (Glenmark) | 4 | 9/27/2013 | 3/11/2014 |
| Nailor, Jill (Greenstone) | 4 | 12/12/2013 | 1/22/2014 |
| E.G. (Taro) | 3 | 5/10/2011 | 3/8/2012 |
| K.S. (Lannett) | 3 | 10/31/2011 | 9/4/2014 |
| C.V. (Greenstone) | 3 | 11/14/2013 | 11/18/2013 |
| T.W. (Dr. Reddy's) | 3 | 7/29/2013 | 5/1/2014 |
| J.J. (Taro) | 2 | 1/31/2011 | 7/2/2012 |
| J.M. (Lannett and Glenmark) | 2 | 4/30/2011 | 11/19/2012 |
| M.B. (Glenmark) | 2 | 2/26/2013 | 2/28/2013 |
| B.W. (Wockhardt) | 2 | 1/5/2012 | 3/10/2014 |
| Brown, Jim (Glenmark) | 1 | 3/24/2014 | 3/24/2014 |
| S.R.(1) (Amneal) | 1 | 8/6/2012 | 8/6/2012 |
| G.R. (Aurobindo) | 1 | 11/1/2011 | 11/1/2011 |
| Grauso, Jim (Aurobindo) | 1 | 12/8/2011 | 12/8/2011 |

### xiv.      Rick Rogerson

1077.   Defendant Rogerson was the Executive Director of Pricing and Business

Analytics at Defendant Actavis until Actavis was acquired by Teva in August 2016.  Defendant

Rogerson now works at Defendant Amneal as a Senior Director of Marketing and Business

Analytics.  During his time at Actavis, Defendant Rogerson communicated with his contacts at

several corporate Defendants.  For example, between February 2010 and July 2016, Defendant

Rogerson exchanged at least 635 phone calls and text messages with his contacts at Defendants

Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus.  These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.A. (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Patel, Nisha (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| N.M. (Dr. Reddy's and Sandoz | 43 | 10/15/2013 | 3/6/2018 |
| J.M. (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| K.G. (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Teva Pharmaceuticals | 27 | 9/24/2015 | 7/29/2016 |
| C.B. (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Aprahamian, Ara (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| S.G. (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Kellum, Armando (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Taro Pharmaceuticals | 2 | 6/14/2013 | 11/20/2013 |
| J.W. (Zydus) | 2 | 6/24/2014 | 6/25/2014 |

### xv.      Tracy Sullivan

1078.  Defendant Tracy Sullivan has been employed at Defendant Lannett since 2007

and is currently the Director of National Accounts.  Sullivan regularly communicated with

competitors and maintained relationships with executives at many of the corporate Defendants.

For example, between March 2011 and August 2016, Defendant Sullivan exchanged at least 495

phone calls and text messages with her contacts at Defendants Zydus, Wockhardt, Teva,

Greenstone, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge.  These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 124 | 6/5/2011 | 11/14/2014 |
| K.K. (Wockhardt) | 101 | 4/11/2012 | 1/16/2014 |
| J.P. (Teva) | 50 | 3/26/2014 | 3/3/2016 |
| R.H. (Greenstone) | 37 | 7/29/2011 | 3/14/2016 |
| B.R. (Dr. Reddy's) | 28 | 3/28/2011 | 8/7/2011 |
| J.A. (Dr. Reddy's) | 22 | 4/28/2011 | 5/13/2014 |
| Patel, Nisha (Teva) | 17 | 6/12/2014 | 4/6/2016 |
| L.S. (Zydus) | 16 | 7/30/2011 | 8/15/2013 |
| D.V. (Dr. Reddy's) | 14 | 9/22/2015 | 8/19/2016 |
| K.O. (Par) | 14 | 7/26/2013 | 5/9/2015 |
| J.W. (Zydus) | 11 | 6/3/2014 | 3/7/2016 |
| J.P. (Amneal) | 11 | 5/24/2011 | 5/9/2015 |
| P.M. (Aurobindo) | 10 | 6/5/2013 | 6/10/2013 |
| K.N. (Dr. Reddy's) | 7 | 2/23/2016 | 3/7/2016 |
| Nesta, Jim (Mylan) | 7 | 7/21/2014 | 7/22/2014 |
| Ostaficiuk, Kon (Camber) | 6 | 5/19/2011 | 8/28/2012 |
| D.N. (Breckenridge) | 4 | 9/25/2012 | 9/17/2014 |
| Green, Kevin (Teva) | 4 | 5/23/2011 | 11/14/2012 |
| Green, Kevin (Zydus) | 4 | 2/16/2014 | 2/16/2014 |
| C.M. (Aurobindo) | 3 | 5/9/2015 | 5/9/2015 |
| G.R. (Aurobindo) | 2 | 6/14/2011 | 6/14/2011 |
| P.G. (Breckenridge) | 1 | 9/7/2011 | 9/7/2011 |
| S.K. (Wockhardt) | 1 | 10/6/2011 | 10/6/2011 |
| P.H. (Zydus) | 1 | 7/20/2012 | 7/20/2012 |

### 5. A Commitment To The Overarching Conspiracy Was Instrumental To The Success Of The Price Fixing Agreements

1079.   As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market.  When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose.  These "fair share" principles were the foundation upon which the price increases were built.  So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price.  In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario.  Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would

326

bid high so as not to punish the party that took the price increase.  Often, the competitor would then follow with a comparable price increase of its own.

1080.   There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Defendant Teva was approached by a large retail customer in May 2013 to bid on a drug for which Defendant Greenstone had increased prices, Defendant Green expressed caution stating, ███████████████████ Teva later declined to bid on the business.

1081.   The concept of "fair share" and price increases went hand in hand.  For example, as discussed above the ongoing understanding between Defendants Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan.  As discussed above, Defendant Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers.  Similarly, Defendant Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies.[9] Almost invariably, he would conclude the conversations with phrases like ████████████████ ███████████████ or ████████ █████

1082.   Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway.  So long as the competitor knew before it was approached by customers

---

[9] Although there are some examples of communications between Defendant Aprahamian and CW-3 discussed in this Complaint, as they relate to Teva drugs, many other collusive communications over a period of time, and the drugs they relate to, will be the subject of a subsequent complaint.

that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business.  Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### 6. "Quality Competitor" Rankings Relate To Price Increases, But Even "Low Quality" Competitors Comply With The Overarching Conspiracy

1083As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Defendant Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox."

### a. Example:  Camber Pharmaceuticals, Inc. (and its President, Defendant Ostaficiuk).

1084.   When Defendant Patel first created the quality of competitor rankings in early May 2013, she gave Camber Pharmaceuticals a ranking of -2.  When Defendant Patel revised those rankings one year later in May 2014, Camber's ranking did not change.  It remained one of the lowest ranked of all of Teva's competitors.

1085.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1086.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1087.   One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista – a drug used in the treatment of osteoporosis in postmenopausal women.

1088.   Teva had begun marketing Raloxifene in March of that year.  Actavis had received approval to begin marketing Raloxifene in 2014 as well, but had not yet entered by September 2014.

1089.   The other drug was a generic form of Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir.  Generic Combivir is used in the treatment of human immunodeficiency virus (HIV).  Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market.  Already in the market were competitors Teva, Aurobindo and Lupin.  As discussed more fully above in Section IV.C.1.c.i., Defendants Teva, Lupin and Aurobindo agreed to divvy up the generic Combivir market in 2012 when Teva was losing exclusivity on that drug.

1090.   As the anticipated product launches for Raloxifene approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market.  On September 9, 2014, Defendant Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis.  A short time later, a Teva executive told colleagues that she had ████████████████████████████████████

1091.   Teva's discussions with Actavis escalated over the coming week.  On September 10, Defendant Rekenthaler exchanged two calls with Defendant Falkin of Actavis lasting fifteen (15) minutes and one (1) minute, respectively.  On September 11, the men talked for ten (10) more minutes.  On September 16, Defendant Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

1092.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene business, K.G. of Teva replied in the affirmative.  Defendant Rekenthaler then shared the information he had gathered through his

329

communications with competitors: ████████████████████████████████████ ████████████████████████████████████████████ That same day, on September 17, 2014, Camber sent an offer for Raloxifene to a large Teva customer, Econdisc.

1093.   Defendant Rekenthaler and Defendant Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

1094.   On September 21, 2014, Defendant Ostaficiuk called Defendant Rekenthaler and the two spoke for two (2) minutes.  The next day, Rekenthaler initiated a series of four (4) phone calls with Defendant Ostaficiuk.  The two spoke for a total of thirty (30) minutes that day. Notably, these are the first identified phone calls ever between the two competitors.  As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene.

1095.   On September 24, Defendant Patel discussed a Raloxifene allocation strategy with her Teva colleagues in light of Camber's offer to the large Teva customer, Econdisc.  She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Defendant Rekenthaler during his conversations with Ostaficiuk – stating: ████████████████████████████████ ████████████████████████████

1096. As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber, and seek to recover that market share with another customer.  At 9:07am

that morning, Patel informed her supervisor K.G. and numerous others at Teva, that Defendant

Rekenthaler planned to discuss the matter with Camber:



Indeed, at 9:28am that morning, Defendant Rekenthaler called Defendant Ostaficiuk and the two

spoke for two (2) minutes. They spoke two more times that day, including one call that lasted

eight (8) minutes.

1097.   Some of these calls also related to Camber's entry into the market for generic

Combivir. Teva and Lupin were already in the market for generic Combivir, and Defendant

Ostaficiuk was engaging in contemporaneous communications with Defendants Rekenthaler of

Teva and Berthold of Lupin to negotiate Camber's entry into that market. At least some of those

calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

On that same day, Defendant Berthold also spoke with P.M., a senior operations executive at

Aurobindo, for more than eighteen (18) minutes, to close the loop on the generic Combivir

communications.

1098.   On September 25, after discussing with his colleagues which customers Teva

should concede in order to give Camber its fair share of the Raloxifene market, and armed with

331

the information Defendant Rekenthaler had gathered from Camber's President, K.G. concluded:

█████████████████████████████████████████████████████████

████████████████████████████████   Defendants Rekenthaler and Ostaficiuk spoke again

twice that day.

1099.   That evening, a Camber executive instructed a colleague to gather market

intelligence on possible additional customers for Camber's new Raloxifene product, but stressed

that the company would not bid on any additional Teva accounts ████████████████████

████████████

1100.   On Friday September 26, 2014, Camber publicly announced that it was launching

Raloxifene, the generic version of Evista.  Defendant Rekenthaler called Defendant Ostaficiuk

that day, for a short one (1) minute call.

1101.   From those telephone calls, Defendant Rekenthaler expressed to Defendant

Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on

Raloxifene or generic Combivir.  As a result of this communication, on Monday September 29,

2014 Defendant Ostaficiuk sent the following e-mail to his colleagues at Camber:



1102.   A.R., a senior sales executive at Camber, replied: ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ A.R. also added that

████████████████████████████████████████████████

Defendant Ostaficiuk replied: ████████████████████████████████████

██████

1103.   About a week later, on October 7, 2014, a large Teva customer informed a Teva

sales representative that Camber had made an unsolicited bid for its Raloxifene business.  J.P., a

Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including

Defendant Rekenthaler, notifying them of her conversation with the customer, and expressing

surprise given the agreement Teva had previously reached with Camber: ████████████████

████████████████ Based on his prior conversations with Defendant Ostaficiuk,

Defendant Rekenthaler doubted that Camber made an offer to another Teva customer, stating:

████████████████████████

1104.   J.P. of Teva ████████████████ to the customer that ████████████████

████████████ and Teva would be surprised if Camber had intended to make an offer to the

customer.  After further discussion with the customer, Teva staff learned that it was a

misunderstanding.  Camber never actually made the offer, but had instead complied with its

agreement with Teva.

1105.   The fair share agreement continued to govern as usual until mid-December 2014,

when Camber learned of supply problems at Teva on Raloxifene.  A Camber employee described

the prospect of Teva being on backorder for this drug as a ████████████ Expressing her

understanding of the rules of the conspiracy, she pointed out: ████████████████████████

████████████████████████   Defendant Ostaficiuk responded optimistically, but

cautiously: ██████████████████████████████████████████████████

### 7.    Teva Profitability Increases Dramatically As A Result Of Price Increases.

1106.    As discussed more fully above, from July 3, 2013 through January 28, 2015, Teva

conspired with its competitors to raise prices on at least 85 different drugs.  The impact of these

price increases on Teva's profitability was dramatic.

1107.    After these price increases – on July 30, 2015 – Teva reported strong results and

raised its guidance for the full year 2015.  Among other things:  (1) net income was up 15%

compared to the prior year; (2) operating income was up 16% compared to the prior year; and (3)

cash flow from operations was up 41% compared to the prior year.  Teva reported a gross profit

margin of 62.8%, which was up from 58.1% the prior year.  Teva's stock prices also soared.  By

July 2015, Teva's stock price was trading at an all-time high.  These significant results were

obtained largely as a result of the anticompetitive conduct detailed herein.

### 8.    Teva and Its Executives Knowingly Violated The Antitrust Laws

1108.    Teva was aware of the antitrust laws, and paid them lip service in its Corporate

Code of Conduct.  For example, Teva's Code of Conduct from the summer of 2013 states

specifically:



1109.   But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

1110.   For example, when Defendant Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality."  "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place.  Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Defendant Ara Aprahamian at Taro.

1111.   As Defendant Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor

ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013.  That ranking included, within the category of ███████████████████ the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin.  The preliminary list of price increase candidates also included the formula that Defendant Patel would use to identify price increase candidates using the quality of competitor scores.

1112.   With K.G.'s approval of her methodology for identifying price increase candidates, Defendant Patel continued communicating with competitors and agreeing to price increases.  She also routinely provided K.G. with intelligence that she had received from her communications with competitors.  For example, when Patel sent her very first formal ██ ███████████ spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, ████████████████ ███████████  For the drug Adapalene Gel, Patel noted that there were ████████████████ ███████████ – even though Taro had not yet increased its prices for Adapalene Gel.  Patel had obtained this competitively sensitive information directly from her communications with competitors.

1113.   K.G. immediately forwarded that information to Defendant Maureen Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Defendant Patel provided for each drug.  As discussed more fully above, Teva raised prices on those drugs (and others) on July 3, 2013.

1114.   Defendant Cavanaugh was well aware that Patel was communicating with competitors about price increases, and making recommendations based on those communications, because Patel told her so directly.  For example, during a 2013 meeting of Teva sales and pricing personnel where Defendant Cavanaugh was present, Defendant Patel was

336

discussing her communications with certain competitors about price increases when Defendant Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said.  Not once, however, did Cavanaugh ever tell Defendant Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

1115.  Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G.  On August 7, 2013, Defendant Patel sent to K.G. a summary list of drugs slated for a price increase on August 9, 2013.  In the ███████████ column, Patel again included specific information that could only have come from her communications with competitors, including:



This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Defendant Patel to change those references above, to remove the offending language:



As discussed more fully above, Teva increased prices on those three drugs two days later.  Not once did K.G. ever tell Defendant Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

1116.  Defendant Patel also spoke regularly to both Defendant Rekenthaler and Defendant Green about each others' communications with competitors.  Patel was aware that

337

both Rekenthaler and Green were communicating with competitors, sometimes at her direction. Defendants Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

1117.   Defendant Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps to avoid any evidence of his wrongdoing.  For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Defendant Rekenthaler at Teva and left a message. Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

### 9.     Price Increases Slow Dramatically After Government Investigations Commence

1118.   As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014.  This was not a coincidence.  Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

1119.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015.  In its report, Sandoz found that ███████████████████████████████████████████████ Specifically, the report stated: ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

1120.   The report went on to state that ████████████████████████

████████████████████ The following graphic, which was included in the Sandoz report, actually demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the Plaintiff States commenced their investigation:



1121.   The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down.  To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

### D.   Consciousness Of Guilt

1122.   The Defendants were aware that their conduct was illegal.  They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by these individuals, as well as individuals at other corporate Defendants, to avoid putting incriminating information in writing, in order to evade detection.

1123.   For example, when Defendant Kevin Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only ███████  Again, this was done to avoid putting any potentially incriminating communications in writing. Defendant Patel learned this technique from Defendant Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

1124.   Defendant Armando Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal.  Kellum had received antitrust training, and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws.  Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability.  As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their

340

information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

1125.   Similarly, Defendant Jill Nailor of Greenstone instructed her subordinates to avoid putting any sensitive market intelligence in writing.

### 1.    Spoliation of Evidence

1126.   Many of the individual Defendants, and others employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

1127.   For example, Defendant Nisha Patel produced text messages – in response to the States' subpoena – going back as far as early 2014.  Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with individual Defendants Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and Sullivan; and many other text messages with employees of corporate Defendants Dr. Reddy's, Glenmark (including CW-5), Greenstone (including R.H.), Par, Sandoz, Upsher-Smith and Zydus.

1128.   Patel deleted these text messages after a conversation with Defendant Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors.  Rekenthaler was aware of the government investigations that had been commenced, and told Patel that the government was showing up on people's doorsteps. Sometime after that, Patel deleted her text messages with competitors.

1129.   Defendant Apotex also destroyed an entire custodial file for one of its key employees (B.H., a senior sales executive), after the States requested it through an investigatory subpoena in July 2017.  As discussed above, B.H. was involved in coordinating two significant

341

price increases with Defendant Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings. After the States' subpoena was issued, Defendant Apotex destroyed B.H.'s custodial file – and did not inform the States that it had done so for over a year.

### 2.    Obstruction of Justice

1130.   Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response. This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

1131.   For example, in early October 2014, Heritage received a letter from Representative Cummings and Senator Sanders as part of their inquiry into generic drug pricing. Heritage's outside counsel immediately set out to coordinate a response with counsel for Defendants Teva and Mylan, to provide what he referred to as ████████ letters to Congress:



1132.   The coordination did not stop there. When the federal government executed a search warrant against Defendant Patel at her home on June 21, 2017, she immediately called Defendant Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Defendant Apotex. Rekenthaler then immediately called Defendant Cavanaugh and C.B., another senior Teva executive. Rekenthaler spoke several times to Defendant Cavanaugh before

then calling his own attorney and speaking twice.  Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

1133.   Other Defendants took similar action in response to events in the States' investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the States were engaging in substantive discussions with their counsel.  As just one example, on July 17, 2018 the States sent a subpoena to Defendant Grauso, through his counsel. That same day, Grauso spoke to Defendant Aprahamian for more than twelve (12) minutes.  The States then set up a conference call with Defendant Grauso's counsel for July 25, 2018.  The day before that call – July 24, 2018 – Defendant Aprahamian spoke to his lawyer, and then shortly thereafter called Defendant Grauso.  The next day, shortly after a conversation between the States and counsel for Defendant Grauso, Defendants Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

## V.   **TRADE AND COMMERCE**

1134.   At all times relevant to this Complaint, the activities of the Defendants in manufacturing, selling and distributing generic pharmaceutical drugs, including but not limited to those identified herein, among others, were in the regular, continuous and substantial flow of interstate trade and commerce and have had and continue to have a substantial effect upon interstate commerce.  The Defendants' activities also had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States.

## VI.   **MARKET EFFECTS**

1135.   The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by

preventing competition for the numerous generic pharmaceutical drugs identified herein, and have directly resulted in an increase in consumer prices for those drugs.

1136.   By unreasonably and illegally restraining competition for the generic pharmaceutical drugs identified herein, Defendants have deprived the Plaintiff States and their consumers of the benefits of competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve and protect.

1137.   As a direct and proximate result of the unlawful conduct alleged above, Plaintiff States and consumers were not and are not able to purchase, or pay reimbursements for purchases of the various generic pharmaceutical drugs identified herein at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior.  Instead, they have been and continue to be forced to pay artificially high prices.  Consequently, they have suffered substantial injury in their business and property in that, *inter alia*, they have paid more and continue to pay more for the various generic pharmaceutical drugs identified herein than they would have paid in an otherwise competitive market.

1138.   As a direct and proximate cause of the unlawful conduct alleged above, the general economies of the Plaintiff States have sustained injury and the Plaintiff States are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct.

1139.   Plaintiff States do not have an adequate remedy at law.

1140.   All conditions precedent necessary to the filing of this action have been fulfilled, waived or excused.

## VII.    CAUSES OF ACTION

**COUNT ONE(BY ALL PLAINTIFF STATES AGAINST DEFENDANT TEVA, AND
AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL
LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX
PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT**

1141.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth

herein.

1142.   Defendant Teva entered into agreements with various competitors to allocate and

divide customers and markets for various generic drugs in accordance with the principles of fair

share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The

details regarding these anticompetitive agreements are discussed throughout this Complaint.  The

generic drugs subject to these market allocation and price-fixing agreements include at least the

following:

> Adapalene Gel
> Amiloride HCL/HCTZ Tablets
> Amoxicillin/Clavulanate Chewable Tablets
> Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
> Amphetamine/Dextroamphetamine IR
> Azithromycin Oral Suspension
> Azithromycin Suspension
> Baclofen Tablets
> Bethanechol Chloride Tablets
> Budesonide DR Capsules
> Budesonide Inhalation
> Bumetanide Tablets
> Buspirone Hydrochloride Tablets
> Cabergoline
> Capecitabine
> Carbamazepine Chewable Tablets
> Carbamazepine Tablets
> Cefdinir Capsules
> Cefdinir Oral Suspension
> Cefprozil Tablets
> Celecoxib
> Cephalexin Suspension
> Cimetidine Tablets
> Ciprofloxacin HCL Tablets

Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules

Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

1143.   These agreements are facially anticompetitive because they allocate customers for

the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendant Teva and its competitors, including each of the Defendants herein.  These agreements

347

have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1144.   The conspiracies substantially affected and still affect interstate commerce.

1145.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1146.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Teva has enjoyed ill-gotten gains from the sales of these generic drugs.

1147.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT TWO (BY ALL PLAINTIFF STATES AGAINST DEFENDANT MYLAN, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1148.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

348

1149.   Defendant Mylan entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amiloride HCL/HCTZ Tablets
> Benazepril HCTZ
> Budesonide DR Capsules
> Buspirone Hydrochloride Tablets
> Capecitabine
> Cimetidine Tablets
> Clomipramine HCL
> Clonidine TTS Patch
> Diclofenac Potassium Tablets
> Diltiazem HCL Tablets
> Doxazosin Mesylate Tablets
> Enalapril Maleate Tablets
> Estradiol Tablets
> Fenofibrate
> Fluoxetine HCL Tablets
> Flurbiprofen Tablets
> Fluvastatin Sodium Capsules
> Haloperidol
> Ketoconazole Tablets
> Ketoprofen Capsules
> Ketorolac Tromethamine Tablets
> Levothyroxine
> Loperamide HCL Capsules
> Methotrexate Tablets
> Nadolol Tablets
> Nitrofurantoin MAC Capsules
> Pentoxifylline Tablets
> Prazosin HCL Capsules
> Prochlorperazine Tablets
> Propranolol HCL Tablets
> Tamoxifen Citrate Tablets
> Tizanidine
> Tolmetin Sodium Capsules

Tolterodine ER
Trifluoperazine HCL
Valsartan HCTZ

1150.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Mylan and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1151.   The conspiracies substantially affected and still affect interstate commerce.

1152.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1153.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Mylan has enjoyed ill-gotten gains from the sales of these generic drugs.

1154.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT THREE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT SANDOZ, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND

**SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1155.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1156.   Defendant Sandoz entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Amoxicillin/Clavulanate Chewable Tablets
Benazepril HCTZ
Bumetanide Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Clemastine Fumarate Tablets
Clomipramine HCL
Dexmethylphenidate HCL ER Capsules
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Etodolac Tablets
Fluocinonide Emollient Cream
Fluocinonide Gel
Haloperidol
Isoniazid
Hydroxyzine Pamoate Capsules
Ketoconazole Cream
Labetalol HCL Tablets
Levothyroxine
Nabumetone Tablets
Nadolol Tablets
Penicillin VK Tablets
Prochlorperazine Tablets
Ranitidine HCL Tablets

Temozolomide
Tizanidine
Tobramycin
Trifluoperazine HCL
Valsartan HCTZ

1157.   These agreements are facially anticompetitive because they allocate customers for

the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendant Sandoz and its competitors, including many of the corporate Defendants herein.

These agreements have eliminated any meaningful form of price competition in the market for

numerous generic drugs, including those identified herein.

1158.   The conspiracies substantially affected and still affect interstate commerce.

1159.   The agreements constitute unreasonable restraints of trade that are *per se* illegal

under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to

demonstrate the anticompetitive character of these agreements.

1160.   As a direct and proximate result of these agreements, Plaintiff States,

governmental entities and/or consumers have been injured in their business or property because

they have had to purchase or reimburse for numerous generic drugs, including those identified

herein, at supra-competitive prices, and Defendant Sandoz has enjoyed ill-gotten gains from the

sales of these generic drugs.

1161.   These agreements were part of an overarching conspiracy among all of the

corporate Defendants named in this Complaint to unreasonably restrain trade in the generic

pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic

drugs, including those identified herein.  As participants in the overarching conspiracy, the

corporate Defendants are jointly and severally liable for any harm caused as a result of the

conspiracy.

352

**COUNT FOUR (BY ALL PLAINTIFF STATES AGAINST DEFENDANT ACTAVIS,
AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND
SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS
AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT**

1162.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1163.   Defendant Actavis entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
> Amphetamine/Dextroamphetamine IR
> Budesonide Inhalation
> Buspirone Hydrochloride Tablets
> Celecoxib
> Ciprofloxacin HCL Tablets
> Clarithromycin ER Tablets
> Clonidine TTS Patch
> Desmopressin Acetate Tablets
> Dextroamphetamine Sulfate ER
> Disopyramide Phosphate Capsules
> Drospirenone and ethinyl estradiol (Ocella)
> Estazolam Tablets
> Estradiol Tablets
> Flutamide Capsules
> Griseofulvin Suspension
> Hydroxyzine Pamoate Capsules
> Nabumetone Tablets
> Nortriptyline Hydrochloride Capsules
> Propranolol HCL Tablets
> Tamoxifen Citrate Tablets
> Topiramate Sprinkle Capsules

1164.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1165.   The conspiracies substantially affected and still affect interstate commerce.

1166.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1167.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Actavis has enjoyed ill-gotten gains from the sales of these generic drugs.

1168.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT FIVE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT TARO, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1169.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1170.   Defendant Taro entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

>Adapalene Gel
>Carbamazepine Chewable Tablets
>Carbamazepine Tablets
>Clomipramine HCL
>Clotrimazole Topical Solution
>Enalapril Maleate Tablets
>Epitol Tablets
>Etodolac ER Tablets
>Etodolac Tablets
>Fluocinonide Cream
>Fluocinonide Emollient Cream
>Fluocinonide Gel
>Fluocinonide Ointment
>Ketoconazole Cream
>Ketoconazole Tablets
>Nortriptyline Hydrochloride Capsules
>Warfarin Sodium Tablets

1171.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Taro and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1172.   The conspiracies substantially affected and still affect interstate commerce.

1173.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1174.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Taro has enjoyed ill-gotten gains from the sales of these generic drugs.

1175.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT SIX (BY ALL PLAINTIFF STATES AGAINST DEFENDANT GLENMARK, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1176.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1177.   Defendant Glenmark entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are

discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Adapalene Gel
> Desogestrel/Ethinyl Estradiol Tablets (Kariva)
> Fluconazole Tablets
> Gabapentin Tablets
> Moexipril HCL Tablets
> Moexipril HCL/HCTZ Tablets
> Nabumetone Tablets
> Norethindrone Acetate
> Pravastatin Sodium Tablets
> Ranitidine HCL Tablets

1178.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Glenmark and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1179.   The conspiracies substantially affected and still affect interstate commerce.

1180.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1181.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Glenmark has enjoyed ill-gotten gains from the sales of these generic drugs.

1182.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic

pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT SEVEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT LUPIN, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1183.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1184.   Defendant Lupin entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Cefdinir Capsules
> Cefdinir Oral Suspension
> Cefprozil Tablets
> Cephalexin Suspension
> Drospirenone and ethinyl estradiol (Ocella)
> Fenofibrate
> Irbesartan
> Lamivudine/Zidovudine (generic Combivir)
> Niacin ER Tablets
> Norethindrone/ethinyl estradiol (Balziva)
> Pravastatin Sodium Tablets

1185.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Lupin and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1186.   The conspiracies substantially affected and still affect interstate commerce.

359

1187.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1188.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Lupin has enjoyed ill-gotten gains from the sales of these generic drugs.

1189.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT EIGHT (BY ALL PLAINTIFF STATES AGAINST DEFENDANT AMNEAL, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1190.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1191.   Defendant Amneal entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are

discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Bethanechol Chloride Tablets
> Norethindrone Acetate
> Ranitidine HCL Tablets

1192.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Amneal and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1193.   The conspiracies substantially affected and still affect interstate commerce.

1194.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1195.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Amneal has enjoyed ill-gotten gains from the sales of these generic drugs.

1196.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the

corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT NINE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT APOTEX, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1197.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1198.   Defendant Apotex entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Carbamazepine Tablets
> Doxazosin Mesylate Tablets
> Epitol Tablets
> Pentoxifylline Tablets
> Pravastatin Sodium Tablets

1199.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Apotex and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1200.   The conspiracies substantially affected and still affect interstate commerce.

362

1201.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1202.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Apotex has enjoyed ill-gotten gains from the sales of these generic drugs.

1203.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT TEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT AUROBINDO, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1204.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1205.   Defendant Aurobindo entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are

discussed throughout this Complaint.  The generic drugs subject to these market allocation and

price-fixing agreements include at least the following:

> Amphetamine/Dextroamphetamine IR
> Lamivudine/Zidovudine (generic Combivir)
> Penicillin VK Tablets

1206.   These agreements are facially anticompetitive because they allocate customers for

the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendant Aurobindo and its competitors, including many of the corporate Defendants herein.

These agreements have eliminated any meaningful form of price competition in the market for

certain generic drugs, including those identified herein.

1207.   The conspiracies substantially affected and still affect interstate commerce.

1208.   The agreements constitute unreasonable restraints of trade that are *per se* illegal

under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to

demonstrate the anticompetitive character of these agreements.

1209.   As a direct and proximate result of these agreements, Plaintiff States,

governmental entities and/or consumers have been injured in their business or property because

they have had to purchase or reimburse for certain generic drugs, including those identified

herein, at supra-competitive prices, and Defendant Aurobindo has enjoyed ill-gotten gains from

the sales of these generic drugs.

1210.   These agreements were part of an overarching conspiracy among all of the

corporate Defendants named in this Complaint to unreasonably restrain trade in the generic

pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic

drugs, including those identified herein.  As participants in the overarching conspiracy, the

corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT ELEVEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT BRECKENRIDGE, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1211.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1212.   Defendant Breckenridge entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Cyproheptadine HCL Tablets
> Mimvey (Estradiol/Norethindrone Acetate) Tablets

1213.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Breckenridge and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1214.   The conspiracies substantially affected and still affect interstate commerce.

1215.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

365

1216.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Breckenridge has enjoyed ill-gotten gains from the sales of these generic drugs.

1217.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT TWELVE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT DR. REDDY'S, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1218.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1219.   Defendant Dr. Reddy's entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Ciprofloxacin HCL Tablets
Glimepiride Tablets

366

Oxaprozin Tablets
Paricalcitol
Tizanidine

1220.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Dr. Reddy's and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1221.   The conspiracies substantially affected and still affect interstate commerce.

1222.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1223.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Dr. Reddy's has enjoyed ill-gotten gains from the sales of these generic drugs.

1224.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT THIRTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANTS PFIZER AND GREENSTONE, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1225.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1226.   Defendant Pfizer, acting through its wholly-owned subsidiary and alter ego, Defendant Greenstone, entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Azithromycin Oral Suspension
> Azithromycin Suspension
> Cabergoline
> Fluconazole Tablets
> Medroxyprogesterone Tablets
> Oxaprozin Tablets
> Penicillin VK Tablets
> Piroxicam
> Tolterodine Tartrate

1227.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Pfizer and Greenstone and their competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1228.   The conspiracies substantially affected and still affect interstate commerce.

368

1229.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1230.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendants Pfizer and Greenstone have enjoyed ill-gotten gains from the sales of these generic drugs.

1231.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT FOURTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT LANNETT, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1232.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1233.   Defendant Lannett entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are

discussed throughout this Complaint.  The generic drugs subject to these market allocation and

price-fixing agreements include at least the following:

> Baclofen Tablets
> Levothyroxine

1234.   These agreements are facially anticompetitive because they allocate customers for

the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendant Lannett and its competitors, including many of the corporate Defendants herein.

These agreements have eliminated any meaningful form of price competition in the market for

certain generic drugs, including those identified herein.

1235.   The conspiracies substantially affected and still affect interstate commerce.

1236.   The agreements constitute unreasonable restraints of trade that are *per se* illegal

under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to

demonstrate the anticompetitive character of these agreements.

1237.   As a direct and proximate result of these agreements, Plaintiff States,

governmental entities and/or consumers have been injured in their business or property because

they have had to purchase or reimburse for certain generic drugs, including those identified

herein, at supra-competitive prices, and Defendant Lannett has enjoyed ill-gotten gains from the

sales of these generic drugs.

1238.   These agreements were part of an overarching conspiracy among all of the

corporate Defendants named in this Complaint to unreasonably restrain trade in the generic

pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic

drugs, including those identified herein.  As participants in the overarching conspiracy, the

corporate Defendants are jointly and severally liable for any harm caused as a result of the

conspiracy.

370

**COUNT FIFTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT PAR, AND
AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL
LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX
PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT**

1239.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1240.   Defendant Par entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Budesonide DR Capsules
> Entecavir
> Fluoxetine HCL Tablets
> Flutamide Capsules
> Hydroxyurea Capsules
> Labetalol HCL Tablets
> Omega-3-Acid Ethyl Esters

1241.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Par and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1242.   The conspiracies substantially affected and still affect interstate commerce.

371

1243.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1244.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Par has enjoyed ill-gotten gains from the sales of these generic drugs.

1245.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT SIXTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT UPSHER-SMITH, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1246.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1247.   Defendant Upsher-Smith entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are

discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Baclofen Tablets
Oxybutynin Chloride Tablets

1248.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Upsher-Smith and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1249.   The conspiracies substantially affected and still affect interstate commerce.

1250.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1251.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Upsher-Smith has enjoyed ill-gotten gains from the sales of these generic drugs.

1252.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT SEVENTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT WOCKHARDT, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR ENALAPRIL MALEATE TABLETS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1253.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1254.   Defendant Wockhardt entered into agreements with Teva and various other competitors to allocate and divide customers within the market for the generic drug Enalapril Maleate Tablets in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for that drug on multiple occasions.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.

1255.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Wockhardt and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for Enalapril Maleate Tablets.

1256.   The conspiracies substantially affected and still affect interstate commerce.

1257.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1258.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Enalapril Maleate Tablets at supra-competitive prices, and Defendant Wockhardt has enjoyed ill-gotten gains from the sales of that drug.

374

1259.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT EIGHTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT ZYDUS, AND AGAINST ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1260.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1261.   Defendant Zydus entered into agreements with Teva and various other competitors to allocate and divide customers and markets for various generic drugs in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Clarithromycin ER Tablets
> Etodolac ER Tablets
> Fenofibrate
> Niacin ER Tablets
> Paricalcitol
> Pravastatin Sodium Tablets
> Topiramate Sprinkle Capsules
> Warfarin Sodium Tablets

1262.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between

375

Defendant Zydus and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1263.   The conspiracies substantially affected and still affect interstate commerce.

1264.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1265.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Zydus has enjoyed ill-gotten gains from the sales of these generic drugs.

1266.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize and control the prices for generic drugs, including those identified herein. As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT NINETEEN (BY CERTAIN PLAINTIFF STATES[10] AGAINST DEFENDANT ARA APRAHAMIAN) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1267.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1268.   Beginning at least as early as 2013, Defendant Aprahamian took active steps to facilitate market allocation and price fixing agreements between Defendant Taro and its competitors involving numerous generic drugs, as discussed herein.

1269.   Defendant Aprahamian participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Taro and its competitors.

1270.   These communications resulted in agreements between Defendant Taro and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Adapalene Gel
> Carbamazepine Chewable Tablets
> Carbamazepine Tablets
> Clomipramine HCL
> Clotrimazole Topical Solution
> Enalapril Maleate Tablets
> Epitol Tablets
> Etodolac ER Tablets
> Etodolac Tablets
> Fluocinonide Cream
> Fluocinonide Emollient Cream
> Fluocinonide Gel

---

[10]   All Plaintiff States join in Counts Nineteen through Thirty-Four against the Individual Defendants except:  Florida, NewYork, Tennessee, and Wisconsin.

Fluocinonide Ointment
Ketoconazole Cream
Ketoconazole Tablets
Nortriptyline Hydrochloride Capsules
Warfarin Sodium Tablets

1271.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Taro and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1272.   The conspiracies substantially affected and still affect interstate commerce.

1273.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1274.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Aprahamian has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1275.   As a participant in the agreements identified above, Defendant Aprahamian is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT DAVID BERTHOLD) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1276.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

378

1277.  Beginning at least as early as 2012, Defendant Berthold took active steps to facilitate market allocation and price fixing agreements between Defendant Lupin and its competitors involving numerous generic drugs, as discussed herein.

1278.  Defendant Berthold participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Lupin and its competitors.

1279.  These communications resulted in agreements between Defendant Lupin and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Cefdinir Capsules
> Cefdinir Oral Suspension
> Cefprozil Tablets
> Cephalexin Suspension
> Drospirenone and ethinyl estradiol (Ocella)
> Fenofibrate
> Irbesartan
> Lamivudine/Zidovudine (generic Combivir)
> Niacin ER Tablets
> Norethindrone/ethinyl estradiol (Balziva)
> Pravastatin Sodium Tablets

1280.  These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Lupin and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1281.  The conspiracies substantially affected and still affect interstate commerce.

379

1282.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1283.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Berthold has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1284.   As a participant in the agreements identified above, Defendant Berthold is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-ONE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JAMES (JIM) BROWN) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1285.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1286.   Beginning at least as early as 2013, Defendant Brown took active steps to facilitate market allocation and price fixing agreements between Defendant Glenmark and its competitors involving numerous generic drugs, as discussed herein.

1287.   Defendant Brown participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Glenmark to communicate with competitors, or tacitly approving of those communications by other Glenmark employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Glenmark and its competitors.

1288.  These communications resulted in agreements between Defendant Glenmark and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Adapalene Gel
> Desogestrel/Ethinyl Estradiol Tablets (Kariva)
> Fluconazole Tablets
> Gabapentin Tablets
> Moexipril HCL Tablets
> Moexipril HCL/HCTZ Tablets
> Nabumetone Tablets
> Norethindrone Acetate
> Pravastatin Sodium Tablets
> Ranitidine HCL Tablets

1289.  These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Glenmark and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1290.  The conspiracies substantially affected and still affect interstate commerce.

1291.  The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1292.  As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified

381

herein, at supra-competitive prices, and Defendant Brown has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1293.   As a participant in the agreements identified above, Defendant Brown is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT TWENTY-TWO (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT MAUREEN CAVANAUGH) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1294.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1295.   Beginning at least as early as 2012, Defendant Cavanaugh took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

1296.   Defendant Cavanaugh participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

1297.   These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets

382

Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Buspirone Hydrochloride Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets

Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules

Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

1298.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1299.   The conspiracies substantially affected and still affect interstate commerce.

1300.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1301.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Cavanaugh has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1302.   As a participant in the agreements identified above, Defendant Cavanaugh is jointly and severally liable for any harm caused as a result of those conspiracies.

**COUNT TWENTY-THREE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT MARC FALKIN) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1303.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1304.   Beginning at least as early as 2013, Defendant Falkin took active steps to facilitate market allocation and price fixing agreements between Defendant Actavis and its competitors involving numerous generic drugs, as discussed herein.

1305.   Defendant Falkin participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis to communicate with competitors, or tacitly approving of those communications by other Actavis employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Actavis and its competitors.

1306.   These communications resulted in agreements between Defendant Actavis and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amphetamine/Dextroamphetamine IR
> Budesonide Inhalation
> Buspirone Hydrochloride Tablets
> Celecoxib
> Ciprofloxacin HCL Tablets
> Clarithromycin ER Tablets
> Clonidine TTS Patch
> Desmopressin Acetate Tablets
> Dextroamphetamine Sulfate ER
> Disopyramide Phosphate Capsules
> Drospirenone and ethinyl estradiol (Ocella)

386

Estazolam Tablets
Estradiol Tablets
Flutamide Capsules
Griseofulvin Suspension
Hydroxyzine Pamoate Capsules
Nortriptyline Hydrochloride Capsules
Propranolol HCL Tablets
Tamoxifen Citrate Tablets
Topiramate Sprinkle Capsules

1306.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1307.   The conspiracies substantially affected and still affect interstate commerce.

1308.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1309.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Falkin has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1310.   As a participant in the agreements identified above, Defendant Falkin is jointly and severally liable for any harm caused as a result of those conspiracies.

**COUNT TWENTY-FOUR (BY CERTAIN PLAINTIFF STATES AGAINST
DEFENDANT JAMES (JIM) GRAUSO) – HORIZONTAL CONSPIRACY TO
ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1311.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1312.   Beginning at least as early as 2012, Defendant Grauso took active steps to facilitate market allocation and price fixing agreements between Defendants Aurobindo and/or Glenmark, and their competitors, involving certain generic drugs, as discussed herein.

1313.   Defendant Grauso participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Aurobindo and/or Glenmark to communicate with competitors, or tacitly approving of those communications by other Aurobindo and/or Glenmark employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Aurobindo and/or Glenmark, and their competitors.

1314.   These communications resulted in agreements between Defendant Aurobindo and/or Glenmark and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Desogestrel/Ethinyl Estradiol Tablets (Kariva)
> Gabapentin Tablets
> Lamivudine/Zidovudine (generic Combivir)

1315.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Aurobindo and/or Glenmark and their competitors.  These agreements have

eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1316. The conspiracies substantially affected and still affect interstate commerce.

1317. The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1318. As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Grauso has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1319. As a participant in the agreements identified above, Defendant Grauso is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT TWENTY-FIVE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT KEVIN GREEN) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1320. Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1321. Beginning at least as early as 2012, Defendant Green took active steps to facilitate market allocation and price fixing agreements between Defendants Teva and/or Zydus and their competitors involving numerous generic drugs, as discussed herein.

1322. Defendant Green participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva and/or Zydus to communicate with competitors, or tacitly approving of those communications by other Teva and/or Zydus

employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Teva and/or Zydus and their competitors.

1323.   These communications resulted in agreements between Defendants Teva and/or Zydus and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amiloride HCL/HCTZ Tablets
> Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
> Buspirone Hydrochloride Tablets
> Cefdinir Capsules
> Cefdinir Oral Suspension
> Cefprozil Tablets
> Cimetidine Tablets
> Clarithromycin ER Tablets
> Clonidine TTS Patch
> Diclofenac Potassium Tablets
> Diltiazem HCL Tablets
> Doxazosin Mesylate Tablets
> Drospirenone and ethinyl estradiol (Ocella)
> Enalapril Maleate Tablets
> Estradiol Tablets
> Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
> Etodolac ER Tablets
> Fenofibrate
> Fluconazole Tablets
> Irbesartan
> Ketoprofen Capsules
> Ketorolac Tromethamine Tablets
> Labetalol HCL Tablets
> Lamivudine/Zidovudine (generic Combivir)
> Levothyroxine
> Loperamide HCL Capsules
> Methotrexate Tablets
> Nadolol Tablets
> Niacin ER Tablets
> Nitrofurantoin MAC Capsules
> Oxaprozin Tablets
> Paricalcitol

390

Pravastatin Sodium Tablets
Prazosin HCL Capsules
Tamoxifen Citrate Tablets
Temozolomide
Tolmetin Sodium Capsules
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

1324.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Teva and/or Zydus and their competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1325.   The conspiracies substantially affected and still affect interstate commerce.

1326.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1327.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Green has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1327.   As a participant in the agreements identified above, Defendant Green is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-SIX (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT ARMANDO KELLUM) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1328.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1329.   Beginning at least as early as 2012, Defendant Kellum took active steps to facilitate market allocation and price fixing agreements between Defendant Sandoz and its competitors involving numerous generic drugs, as discussed herein.

1330.   Defendant Kellum participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Sandoz to communicate with competitors, or tacitly approving of those communications by other Sandoz employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Sandoz and its competitors.

1331.   These communications resulted in agreements between Defendant Sandoz and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amoxicillin/Clavulanate Chewable Tablets
> Benazepril HCTZ
> Bumetanide Tablets
> Cefdinir Capsules
> Cefdinir Oral Suspension
> Cefprozil Tablets
> Clemastine Fumarate Tablets
> Clomipramine HCL
> Dexmethylphenidate HCL ER Capsules
> Diclofenac Potassium Tablets
> Dicloxacillin Sodium Capsules

392

Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Etodolac Tablets
Fluocinonide Emollient Cream
Fluocinonide Gel
Haloperidol
Hydroxyzine Pamoate Capsules
Ketoconazole Cream
Labetalol HCL Tablets
Levothyroxine
Nabumetone Tablets
Nadolol Tablets
Penicillin VK Tablets
Prochlorperazine Tablets
Temozolomide
Tizanidine
Tobramycin
Trifluoperazine HCL
Valsartan HCTZ

1332.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Sandoz and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1333.   The conspiracies substantially affected and still affect interstate commerce.

1334.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1335.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Kellum has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1336.   As a participant in the agreements identified above, Defendant Kellum is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-SEVEN (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JILL NAILOR) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1337.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1338.   Beginning at least as early as 2012, Defendant Nailor took active steps to facilitate market allocation and price fixing agreements between Defendants Greenstone and Pfizer and their competitors involving numerous generic drugs, as discussed herein.

1339.   Defendant Nailor participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Greenstone and/or Pfizer to communicate with competitors, or tacitly approving of those communications by other Greenstone and/or Pfizer employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Greenstone and Pfizer and their competitors.

1340.   These communications resulted in agreements between Defendants Greenstone and Pfizer and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Azithromycin Oral Suspension
> Azithromycin Suspension
> Cabergoline
> Fluconazole Tablets
> Medroxyprogesterone Tablets

Oxaprozin Tablets
Penicillin VK Tablets
Piroxicam
Tolterodine Tartrate

1341.   These agreements are facially anticompetitive because they allocate customers for

the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendants Greenstone and Pfizer and their competitors.  These agreements have eliminated any

meaningful form of price competition in the market for numerous generic drugs, including those

identified herein.

1342.   The conspiracies substantially affected and still affect interstate commerce.

1343.   The agreements constitute unreasonable restraints of trade that are *per se* illegal

under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to

demonstrate the anticompetitive character of these agreements.

1344.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States,

governmental entities and/or consumers have been injured in their business or property because

they have had to purchase or reimburse for numerous generic drugs, including those identified

herein, at supra-competitive prices, and Defendant Nailor has personally enjoyed ill-gotten gains

from the sales of these generic drugs.

1345.   As a participant in the agreements identified above, Defendant Nailor is jointly

and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-EIGHT (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JAMES NESTA) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1346.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth

herein.

395

1347.   Beginning at least as early as 2012, Defendant Nesta took active steps to facilitate market allocation and price fixing agreements between Defendant Mylan and its competitors involving numerous generic drugs, as discussed herein.

1348.   Defendant Nesta participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Mylan and its competitors.

1349.   These communications resulted in agreements between Defendant Mylan and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amiloride HCL/HCTZ Tablets
> Benazepril HCTZ
> Budesonide DR Capsules
> Buspirone Hydrochloride Tablets
> Capecitabine
> Cimetidine Tablets
> Clomipramine HCL
> Clonidine TTS Patch
> Diclofenac Potassium Tablets
> Diltiazem HCL Tablets
> Doxazosin Mesylate Tablets
> Enalapril Maleate Tablets
> Estradiol Tablets
> Fenofibrate
> Fluoxetine HCL Tablets
> Flurbiprofen Tablets
> Fluvastatin Sodium Capsules
> Haloperidol
> Ketoconazole Tablets
> Ketoprofen Capsules
> Ketorolac Tromethamine Tablets
> Levothyroxine
> Loperamide HCL Capsules

> Methotrexate Tablets
> Nadolol Tablets
> Nitrofurantoin MAC Capsules
> Pentoxifylline Tablets
> Prazosin HCL Capsules
> Prochlorperazine Tablets
> Propranolol HCL Tablets
> Tamoxifen Citrate Tablets
> Tizanidine
> Tolmetin Sodium Capsules
> Tolterodine ER
> Trifluoperazine HCL
> Valsartan HCTZ

1350.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Mylan and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1351.   The conspiracies substantially affected and still affect interstate commerce.

1352.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1353.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Nesta has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1354.   As a participant in the agreements identified above, Defendant Nesta is jointly and severally liable for any harm caused as a result of those conspiracies.

397

**COUNT TWENTY-NINE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT KONSTANTIN OSTAFICIUK) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1355.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1356.   Beginning at least as early as 2014, Defendant Ostaficiuk took active steps to facilitate market allocation and price fixing agreements between Camber Pharmaceuticals, Inc. and its competitors involving certain generic drugs, as discussed herein.

1357.   Defendant Ostaficiuk participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Mylan and its competitors.

1358.   These communications resulted in agreements between Camber Pharmaceuticals, Inc. and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Lamivudine/Zidovudine (generic Combivir)
> Raloxifene HCL Tablets

1359.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Camber Pharmaceuticals, Inc. and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1360.   The conspiracies substantially affected and still affect interstate commerce.

1361.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1362.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Ostaficiuk has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1363.   As a participant in the agreements identified above, Defendant Ostaficiuk is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT THIRTY (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT NISHA PATEL) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1364.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1365.   Beginning at least as early as 2013, Defendant Patel took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

1366.   Defendant Patel participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

1367.   These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets

Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets

Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

1368.  These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1369.  The conspiracies substantially affected and still affect interstate commerce.

1370.  The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1371.  As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Patel has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1372.   As a participant in the agreements identified above, Defendant Patel is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT THIRTY-ONE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT DAVID REKENTHALER) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1373.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1374.   Beginning at least as early as 2012, Defendant Rekenthaler took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

1375.   Defendant Rekenthaler participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

1376.   These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Adapalene Gel
> Amiloride HCL/HCTZ Tablets
> Amoxicillin/Clavulanate Chewable Tablets
> Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
> Amphetamine/Dextroamphetamine IR
> Azithromycin Oral Suspension
> Azithromycin Suspension

Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Buspirone Hydrochloride Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream

Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets

Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

1377.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1378.   The conspiracies substantially affected and still affect interstate commerce.

1379.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1380.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Rekenthaler has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1381.   As a participant in the agreements identified above, Defendant Rekenthaler is jointly and severally liable for any harm caused as a result of those conspiracies.

**COUNT THIRTY-TWO (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT
RICHARD (RICK) ROGERSON) – HORIZONTAL CONSPIRACY TO ALLOCATE
MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION
OF SECTION 1 OF THE SHERMAN ACT**

1382.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1383.   Beginning at least as early as 2013, Defendant Rogerson took active steps to facilitate market allocation and price fixing agreements between Defendant Actavis and its competitors involving numerous generic drugs, as discussed herein.

1384.   Defendant Rogerson participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis to communicate with competitors, or tacitly approving of those communications by other Actavis employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Actavis and its competitors.

1385.   These communications resulted in agreements between Defendant Actavis and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Amphetamine/Dextroamphetamine IR
> Budesonide Inhalation
> Buspirone Hydrochloride Tablets
> Celecoxib
> Ciprofloxacin HCL Tablets
> Clarithromycin ER Tablets
> Clonidine TTS Patch
> Desmopressin Acetate Tablets
> Dextroamphetamine Sulfate ER
> Disopyramide Phosphate Capsules
> Drospirenone and ethinyl estradiol (Ocella)

407

Estazolam Tablets
Estradiol Tablets
Flutamide Capsules
Griseofulvin Suspension
Hydroxyzine Pamoate Capsules
Nabumetone Tablets
Nortriptyline Hydrochloride Capsules
Propranolol HCL Tablets
Tamoxifen Citrate Tablets
Topiramate Sprinkle Capsules

1386.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1387.   The conspiracies substantially affected and still affect interstate commerce.

1388.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1389.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Rogerson has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1390.   As a participant in the agreements identified above, Defendant Rogerson is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT THIRTY-THREE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT TRACY SULLIVAN) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1391.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1392.   Beginning at least as early as 2013, Defendant Sullivan took active steps to facilitate market allocation and price fixing agreements between Defendant Lannett and its competitors involving certain generic drugs, as discussed herein.

1393.   Defendant Sullivan participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Lannett to communicate with competitors, or tacitly approving of those communications by other Lannett employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Lannett and its competitors.

1394.   These communications resulted in agreements between Defendant Lannett and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for certain generic drugs.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Baclofen Tablets
Levothyroxine

1395.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Lannett and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

409

1396.   The conspiracies substantially affected and still affect interstate commerce.

1397.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1398.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Sullivan has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1399.   As a participant in the agreements identified above, Defendant Sullivan is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT THIRTY-FOUR – SUPPLEMENTAL STATE LAW CLAIMS

### Connecticut

1400.   Plaintiff State of Connecticut repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1401.   Defendants' actions as alleged herein violate the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 35-28, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

1402.   Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.  Plaintiff State of Connecticut seeks recovery of such damages as parens

patriae on behalf of the State of Connecticut and the People of the State of Connecticut pursuant to Conn. Gen. Stat. § 35-32(c)(2).

1403.   Defendants' acts and practices as alleged herein constitute unfair methods of competition in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

1404.   Plaintiff State of Connecticut seeks injunctive relief pursuant to Conn. Gen. Stat. § 35-34, civil penalties pursuant to Conn. Gen. Stat. § 35-38 for each and every violation of the Connecticut Antitrust Act, civil penalties pursuant to Conn. Gen. Stat. § 42-110o of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act, an order pursuant to Conn. Gen. Stat. § 42-110m requiring Defendants to submit to an accounting to determine the amount of improper compensation paid to them as a result of the allegations in the Complaint, disgorgement of all revenues, profits and gains achieved in whole or in part through the unfair methods of competition complained of herein, pursuant to Conn. Gen. Stat. § 42-110m, reasonable attorney's fees pursuant to Conn. Gen. Stat. § 42-110m, and such other and further relief as this Court deems just and equitable.

## Alabama

1405.   Plaintiff State of Alabama repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1406.   The acts and practices by Defendants constitute unconscionable acts in violation of the Alabama Deceptive Trade Practices Act, Code of Alabama, 1975, § 8-19-5(27) for which the State of Alabama is entitled to relief.

411

## Alaska

1407.   Plaintiff State of Alaska repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1408.   The aforementioned practices by Defendants are in violation of the Alaska Restraint of Trade Act, AS 45.50.562 et seq., and these violations had impacts within the State of Alaska and have substantially affected the people of Alaska.  Specifically, the defendants conspired to allocate market share and to fix and raise prices of generic pharmaceuticals resulting in a restraint of trade or commerce. Plaintiff State of Alaska is entitled to relief for these violations under AS 45.50.576-.580.

1409.   The aforementioned practices by Defendants are in violation of the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471(b)(11) and (b)(12), and these violations had impacts within the State of Alaska and have substantially affected the people of Alaska. Specifically, the defendants' conduct in allocating market share and in fixing and raising prices, as described in the preceding paragraphs, deceived and damaged Alaskans by causing them to pay increased prices for generic pharmaceuticals.  Further, the defendants deceived and defrauded Alaskans and omitted a material fact, namely their anti-competitive conduct, when selling their product to wholesalers and pharmacies knowing this would increase the cost to consumers. Plaintiff State of Alaska is entitled to relief for these violations under AS 45.50.501, .537, and .551.

## Arizona

1410.   Plaintiff State of Arizona repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1411.   Defendants' actions as alleged herein violate the Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. § 44-1401, et seq.

1412.   Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1407 and 1408, and seeks relief, including but not limited to injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and such other relief as this Court deems just and equitable.

1413.   Defendants engaged in deception, deceptive or unfair acts or practices, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of generic drugs in violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521–44-1531, including but not limited to:

    a.   Defendants engaged in deceptive and unfair acts and practices by omitting from their customers and from end-users the fact that Defendants were engaged in an overarching conspiracy to improperly allocate the markets for generic drugs amongst competitors and maintain anti-competitively high prices for generic drugs.

    b.   Defendants engaged in deceptive and unfair acts and practices by misrepresenting to their customers and other market participants the reasons for their price increases and refusals to submit bids to supply generic drugs, by attributing these actions to supply issues, among other things, instead of to their unlawful agreements with competitors to maintain their "fair share" of the market or inflate prices.

1414.   The unfair acts and practices alleged in the preceding paragraphs caused or were likely to cause substantial injury to consumers that was not reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

1415.   Defendants' violations of the Arizona Consumer Fraud Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by A.R.S. §44-1522.

1416.   Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1528 and 1531, and seeks relief, including but not limited to injunctive relief, restitution, disgorgement and other equitable relief, civil penalties, fees and costs, and such other relief as this Court deems just and equitable.

### Colorado

1417.   Plaintiff State of Colorado repeats and realleges each and every preceding allegation as if fully set forth herein.

1418.   Defendants' actions violate, and Plaintiff State of Colorado is entitled to relief under, the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat.

1419.   Plaintiff State of Colorado seeks relief including, but not limited to, equitable relief, damages on behalf of the Colorado Department of Health Care Policy and Financing, and all other relief allowed by law, including attorneys' fees and costs.

### Delaware

1420.   Plaintiff State of Delaware repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1421.   The aforementioned practices by defendants constitute violations of Section 2103 of the Delaware Antitrust Act, 6 Del. C. § 2101, et seq.

414

1422.   Plaintiff State of Delaware through the Attorney General brings this action pursuant to Sections 2105 and 2107, and seeks civil penalties and equitable relief pursuant to Section 2107 of the Delaware Antitrust Act, 6 Del. C. § 2101, et seq.

## Florida

1423.   The State of Florida repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1424.   This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, and the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, et seq.  The State of Florida is entitled to relief, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, injunctive relief, attorneys' fees and costs resulting from the Defendants' conduct as stated above, for all purchases of pharmaceuticals by the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

1425.   Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") purchases pharmaceuticals directly from Defendants and/or has an assignment of antitrust claims from Cardinal Health, Inc. ("Cardinal").  The State of Florida purchases generic drugs from MMCAP and has a similar assignment from MMCAP for any claims MMCAP may have for violations of the antitrust laws.  As a result of these assignments, any claims for violations of federal and/or state antitrust laws that MMCAP and/or Cardinal may have had have been assigned to the State of Florida when the claims relate to purchases by the State of Florida.

1426.   Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or stabilize the prices charged for pharmaceuticals during the Relevant Period, continuing through the filing of this Complaint.

415

1427.   Defendants directly and indirectly sold pharmaceuticals to the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

1428.   The State of Florida and its government entities and municipalities, and Florida individual consumers have been injured and will continue to be injured by paying more for pharmaceuticals purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

1429.   As a direct and proximate result of the Defendants' conduct, the State of Florida and its government entities and municipalities, and Florida individual consumers have been harmed and will continue to be harmed by paying supra-competitive prices for pharmaceuticals that they would not had to pay in the absence of the Defendants' conduct as alleged herein.

1430.   The sale of pharmaceuticals in the State of Florida involves trade or commerce within the meaning of the Florida Antitrust Act and the Florida Deceptive and Unfair Trade Practices Act.

1431.   Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

1432.   The combination, conspiracy, acts, and practices alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, 501. 201, et seq, Florida Statutes.

1433.   Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to municipalities in the State of Florida, and to consumers in the State of Florida in violation of Section 501.204, Florida Statutes.

### Hawaii

1434.   Plaintiff State of Hawaii repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1435.   The aforementioned practices by Defendants negatively affected competition by unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets, in violation of Chapter 480, Hawaii Revised Statutes.

1436.   Section 480-2, Hawaii Revised Statutes, provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

1437.   The aforementioned practices by Defendants were and are deceptive acts or practices because they involve representations, omissions, and/or practices that were and are material, and likely to mislead entities acting reasonably under the circumstances.

1438.   The aforementioned practices by Defendants:  were and are unfair because they offend public policy as established by statutes, the common law, or otherwise; were and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumer and entities affected by Defendants' practices; and were and are unfair competitive conduct.

1439.   The aforementioned practices are unfair or deceptive acts or practices and unfair methods of competition in violation of section 480-2, Hawaii Revised Statutes.

1440.   Plaintiff State of Hawaii is entitled to:  injunctive relief pursuant to section 480-15, Hawaii Revised Statutes, and other equitable relief (including but not limited to restitution and disgorgement of Defendants' ill-gotten gains); civil penalties pursuant to section 480-3.1,

417

Hawaii Revised Statutes; threefold the actual damages sustained by government agencies; as parens patriae on behalf of natural persons residing in the State for threefold damages for injuries sustained by such natural persons to their property by reason of any violation of chapter 480; and reasonable attorney fees and costs.

### Idaho

1441.   Plaintiff State of Idaho repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1442.   Defendants' actions as alleged herein violate the Idaho Competition Act, Idaho Code § 48-104, in that they have the purpose and/or the effect of unreasonably restraining Idaho commerce, as that term is defined by Idaho Code § 48-103(1).

1443.   For each and every violation alleged herein, Plaintiff State of Idaho, on behalf of itself, its state agencies, and persons residing in Idaho, is entitled to all legal and equitable relief available under the Idaho Competition Act, Idaho Code §§ 48-108, 48-112, including, but not limited to, injunctive relief, actual damages or restitution, civil penalties, disgorgement, expenses, costs, attorneys' fees, and such other and further relief as this Court deems just and equitable.

1444.   Defendants' actions constitute per se violations of Idaho Code § 48-104.  Pursuant to Idaho Code § 48-108(2), Plaintiff State of Idaho, as parens patriae on behalf of persons residing in Idaho, is entitled to treble damages for the per se violations of Idaho Code § 48-104.

### Illinois

1445.   Plaintiff State of Illinois repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1446.   Defendants' actions as alleged herein violate sections 3(1), 3(2) and 3(3) of the

Illinois Antitrust Act, 740 ILCS 10/1 et seq.

1447.   Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS

10/7, seeks relief, including but not limited to damages, for Illinois consumers and Illinois state

entities that paid for one or more of the drugs identified in this Complaint during the relevant

period and thereby paid more than they would have paid but for Defendants' unlawful conduct.

Plaintiff State of Illinois also seeks, and is entitled to, injunctive relief, civil penalties, other

equitable relief (including but not limited to disgorgement), fees and costs, and any other remedy

available for these violations under sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act.

### Indiana

1448.   Plaintiff State of Indiana repeats and re-alleges each and every preceding

allegation as if fully set forth herein.

1449.   The aforementioned practices are a violation of Chapter Two of the Indiana

Antitrust Act, Ind. Code § 24-1-2-1, and the Plaintiff State of Indiana seeks recovery pursuant to

I.C. § 24-1-2-5.

1450.   The aforementioned practices are a violation of Chapter One of the Indiana

Antitrust Act, I.C. § 24-1-1-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. §

24-1-1-2 and IC § 24-1-1-5.1.

1451.   The aforementioned practices are unfair and/or deceptive acts by a supplier in the

context of a consumer transaction in violation of the Indiana Deceptive Consumer Sales Act, I.C.

§ 24-5-0.5-3 and the Plaintiff State of Indiana seeks recovery pursuant to IC § 24-5-0.5-4.

1452.   Plaintiff State of Indiana under its authority in I.C. § 24-1-2-5, I.C. § 24-1-1-2, IC

§ 24-1-1-5.1 and I.C. § 24-5-0.5-4 seeks relief, including but not limited to damages, for Indiana

419

consumers and Indiana state entities that paid for one or more of the drugs identified in this Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct. Plaintiff State of Indiana also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), fees and costs and any other remedy available for these violations under the Indiana Antitrust Act and the Indiana Deceptive Consumer Sales Act.

### Iowa

1453   Plaintiff State of Iowa repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1454.   The alleged practices by Defendants were in violation of the Iowa Competition Law, Iowa Code Chapter 553.

1455.   Iowa seeks an injunction and divestiture of profits resulting from these practices pursuant to Iowa Code § 553.12, and civil penalties pursuant to Iowa Code § 553.13.

1456.   Defendants' acts and practices as alleged herein also constitute deceptive and/or unfair practices in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16(2)(a).

1457.   Pursuant to Iowa Code § 714.16(7), the State of Iowa seeks disgorgement, restitution, and other equitable relief for these violations. In addition, pursuant to Iowa Code § 714.16(11), the Attorney General seeks reasonable fees and costs for the investigation and litigation.

### Kansas

1458.   Plaintiff State of Kansas repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1459.   The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101 et seq.

1460.   The State of Kansas seeks relief on behalf of itself and its agencies and as parens patriae on behalf of its residents, pursuant to Kan. Stat. Ann. §§ 50-103 and 50-162.

1461.   Kansas governmental entities and residents are entitled to money damages regardless of whether they purchased one or more of the drugs identified in this Complaint directly or indirectly from Defendants, pursuant to Kan. Stat. Ann. § 50-161(b).

1462.   The State of Kansas is entitled to injunctive relief, civil penalties, restitution, treble damages, reasonable expenses and investigative fees, reasonable attorney fees and costs, and any other appropriate relief the court so orders, pursuant to Kan. Stat. Ann. §§ 50-103, 50-160, and 50-161.

<u>**Kentucky**</u>

1463.   Plaintiff Commonwealth of Kentucky repeats and re-alleges each and every preceding allegation as if fully set forth herein.  The aforementioned acts or practices by Defendants violate the Consumer Protection Act, Ky. Rev.Stat.Ann.§ 367.110 et seq. ("KCPA")

1464.   Defendants, by distributing, marketing and selling generic pharmaceutical drugs to consumers through wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and otherwise engaging in the conduct described herein with respect to the generic pharmaceutical drugs identified herein, are engaging in trade or commerce that harmed the Commonwealth and consumers within the meaning of Ky.Stat.Ann. §367.170.

1465.   Defendants impaired consumer choice in each generic drug market identified herein in what should have been a freely competitive marketplace for the generic pharmaceutical

drugs identified herein. Defendants have deprived consumers of being able to meaningfully choose from the options a competitive market would have provided.

1466.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the generic pharmaceutical drugs identified herein were sold, distributed or obtained. Such conduct has been and is unfair under the KCPA.

1467.   Defendants have misrepresented the absence of competition in each generic drug market identified herein. By misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein, the Defendants misled the Commonwealth that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair. Defendants' conduct has been misleading and/or had a tendency to deceive.

1468.   The Defendants' misrepresentations and omission of material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels; (3) the Commonwealth was deprived of free and open markets; and (4) the Commonwealth and consumers paid supra-competitive, artificially inflated prices for the generic pharmaceutical drugs identified herein. The Defendants' misrepresentations and omissions of material facts have caused Commonwealth harm in paying more for generic pharmaceutical drugs identified herein.

1469.   Defendants violated the KCPA:

      a.     Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth above;

422

b.   Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth above;

c.   Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

d.   Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

e.   Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

f.   Each time a request for reimbursement was made to the Commonwealth for any of the numerous generic pharmaceutical drugs identified herein; and

g.   Each time the Commonwealth or its consumers paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein the Defendants' distributed, marketed or sold.

1470.   The above described conduct has been and is willful within the meaning of Ky.Stat.Ann. §367.990.

1471.   The Commonwealth states that the public interest is served by seeking a permanent injunction to restrain the acts and practices described herein. The Commonwealth and its citizens will continue to be harmed unless the acts and practices complained of herein are permanently enjoined pursuant to Ky.Stat.Ann. §367.190. Further, the Commonwealth seeks restitution to the Commonwealth and/or disgorgement pursuant to Ky.Stat.Ann.§§ 367.190 -.200.

The Commonwealth seeks a civil penalty of up to $2,000 for each such willful violation, or

$10,000 for each such violation directed at a person over 60 pursuant to Ky.Stat.Ann.§ 367.990.

### *Unjust Enrichment*

1472.   Defendants have been unjustly enriched as a result of the conduct set forth herein.

The Commonwealth and consumers were purchasers, reimbursers and/or end-payors of

Defendants' generic pharmaceutical drugs identified herein and have paid, at their expense,

amounts far in excess of the competitive prices for such drugs that would have prevailed in a

competitive and fair market.

1473.   For those customers that purchase directly or indirectly from Defendants at

artificially inflated and supra-competitive prices, Defendants have increased prices above what

would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in

the form of increased revenues.

1474.   Defendants knew of, and appreciated and retained the benefits of Commonwealth

and consumers' purchases of any of the Defendants' generic pharmaceutical drugs identified

herein at amounts far in excess of the competitive price.

1475.   Based on Defendants' conduct set for herein, it would be inequitable and unjust

for Defendants to retain such benefits without payment of value. Defendants will be unjustly

enriched if they are permitted to retain the direct or indirect benefits received resulting from the

purchase of any of the generic pharmaceutical drugs identified herein by the Commonwealth.

The Commonwealth therefore seeks to recover the amounts that unjustly enriched the

Defendants.  The Commonwealth is entitled to equitable relief in the form of an injunction and

disgorgement, and any other relief the Court deems appropriate.

## Louisiana

1476.   Plaintiff State of Louisiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1477.   The practices of Defendants described herein are in violation of the Louisiana Monopolies Act, LSA-R.S. 51:121 et seq., and the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 et. seq.

1478.   Plaintiff State of Louisiana is entitled to injunctive relief and civil penalties under LSA-R.S. 51:1407 as well as damages, disgorgement and any other equitable relief that the court deems proper under LSA-R.S. 51:1408.

## Maine

1479.   Plaintiff State of Maine repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1480.   The aforementioned practices by Defendants are in violation of the Maine Monopolies and Profiteering Law, 10 M.R.S.A §§ 1101 and 1102, and Plaintiff State of Maine is entitled to all available relief for these violations under 10 M.R.S.A. § 1104, including, without limitation, treble damages for Maine governmental and consumer purchasers, civil penalties, injunctive relief, attorney's fees, investigative and litigation costs, and any other appropriate injunctive and equitable relief.

## Maryland

1481.   Plaintiff State of Maryland repeats and re-alleges each and every preceding allegation as if fully set forth herein.

425

1482.   The aforementioned practices by Defendants were and are in violation of the Maryland Antitrust Act, Md. Com. Law Code Ann. §§ 11-201 et seq.  These violations substantially affect the people of Maryland and have impacts within the State of Maryland.

1483.   Plaintiff State of Maryland brings this action against Defendants in the following capacities:

    a.    Pursuant to Md. Com. Law Code Ann. § 11-209(a) in its sovereign capacity for injunctive relief, civil penalties, restitution, disgorgement and all other available equitable remedies;

    b.    Pursuant to Md. Com Law Code Ann. § 11-209(b)(5) as parens patriae on behalf of persons residing in Maryland.  These persons are entitled to three times the amount of money damages sustained regardless of whether they have purchased generic pharmaceuticals directly or indirectly from Defendants.  Md. Health Gen. Code Ann. § 21-1114.

1484.   Plaintiff State of Maryland also seeks, pursuant to Md. Com. Law Code Ann. § 11-209(b), reimbursement of reasonable attorney's fees, expert fees and costs.

### Massachusetts

1485.   Plaintiff Commonwealth of Massachusetts repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1486.   The aforementioned practices by Defendants, including but not limited to agreements in restraint of trade and/or attempted agreements in restraint of trade, constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 et seq.

426

1487.   Defendants knew or should have known that their conduct violated the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 et seq.

1488.   Plaintiff Commonwealth of Massachusetts is entitled to relief under M.G.L. c. 93A, § 4, including, without limitation, damages and restitution to Massachusetts consumers and Massachusetts governmental purchasers; civil penalties for each violation committed by the Defendants; injunctive relief and other equitable relief including, without limitation, disgorgement; fees and costs including, without limitation, costs of investigation, litigation, and attorneys' fees; and any other relief available under M.G.L. c. 93A, § 4.

1489.   Plaintiff Commonwealth of Massachusetts notified the Defendants of this intended action at least five days prior to the commencement of this action and gave the Defendants an opportunity to confer in accordance with M.G. L. c. 93A, § 4.

### Michigan

1490.   Plaintiff State of Michigan repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1491.   The State of Michigan brings this action both on behalf of itself, its State Agencies, and as parens patriae on behalf of natural persons, pursuant to Mich. Comp. Laws §14.28, and §14.101, to enforce public rights and to protect residents and its general economy against violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, et seq., and the common law of the State of Michigan.

1492.   The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, et seq., and the common law of the State of Michigan.  As a result of Defendant's unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade and Defendants' conspiracy to restrain trade for the

427

purpose of excluding or avoiding competition, all as more fully described above, the Plaintiff

State of Michigan, its agencies, and consumers have suffered and been injured in business and

property by reason of having to purchase or reimburse at supra-competitive prices as direct and

indirect purchasers and will continue to suffer ascertainable loss and damages in an amount to be

determined at trial.

1493.   Accordingly, Plaintiff State of Michigan on behalf of itself, its agencies, and as

parens patriae on behalf of its consumers affected by Defendants' illegal conduct, is entitled to

relief including but not limited to injunctive relief and other equitable relief (including but not

limited to disgorgement), civil penalties, damages, costs and attorney fees.

### Minnesota

1494.   Plaintiff State of Minnesota repeats and re-alleges each and every preceding

allegation as if fully set forth herein.

1495.   Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971,

Minn. Stat. §§ 325D.49-.66. Plaintiff State of Minnesota seeks relief, including but not limited

to:

a.   damages for itself, its state agencies that paid for the generic
pharmaceutical drugs identified herein, and as parens patriae on behalf of
its consumers.  Plaintiff State of Minnesota is entitled to damages under
Minn. Stat. § 8.31, subd. 3a and treble damages under Minn. Stat.
§ 325D.57;

b.   disgorgement under Minn. Stat. § 325D.59 and Minn. Stat. Ch. 8;

c.   injunctive relief under Minn. Stat. §§ 325D.58 and Minn. Stat. § 8.31,
subd. 3;

d.   costs and reasonable attorneys' fees under Minn. Stat. § 325D.57 and
Minn. Stat. § 8.31, subd. 3a; and

e.   civil penalties under Minn. Stat. § 325D.56 and Minn. Stat. § 8.31, subd.

1496.   The Defendants deceptively misrepresented to Plaintiff State of Minnesota, its state agencies and Minnesota consumers that Defendants' pricing at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Minnesota was competitive and fair.

1497.   The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects: (1) generic drug price competition was restrained, suppressed and eliminated throughout Minnesota; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Minnesota; (3) Plaintiff State of Minnesota, its state agencies and Minnesota consumers were deprived of free and open markets; and (4) Plaintiff State of Minnesota, its state agencies and Minnesota consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

1498.   The Defendants' deceptive misrepresentations and failure to disclose material facts have caused Plaintiff State of Minnesota, its state agencies, and Minnesota consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

1499.   Defendants violated the deceptive trade practices laws of Minnesota:

    a.     Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

    b.     Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

    c.     Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

    d.     Each time Plaintiff State of Minnesota, its state agencies and Minnesota consumers paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein; and

     e.     Each time a request for reimbursement was made to Minnesota for any of the numerous generic pharmaceutical drugs identified herein.

1500.  The Defendants' conduct is unlawful pursuant to the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48 and Minn. Stat. Ch. 8. The aforesaid methods, acts or practices constitute deceptive acts under this Act, including, but not limited to:

     a.     Representing "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" in violation of Minn. Stat. § 325D.44, subd. 1(5);

     b.     Representing "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" in violation of Minn. Stat. § 325D.44, subd. 1(7); and

     c.     Engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding" in violation of Minn. Stat. § 325D.44, subd. 1(13).

1501.  Some or all of these violations by Defendants were willful.

1502.  Plaintiff State of Minnesota seeks relief for violations of the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48 including but not limited to:

     a.     damages for itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers under Minn. Stat. § 325D.45, subd. 3 and Minn. Stat. § 8.31, subd. 3a;

     b.     disgorgement under Minn. Stat. § 325D.45, subd. 3, Minn. Stat. Ch. 8, and Minnesota common law;

     c.     injunctive relief under Minn. Stat. § 325D.45, subd. 1 and Minn. Stat. § 8.31, subd. 3;

     d.     costs and reasonable attorneys' fees under Minn. Stat. § 325D.44 and Minn. Stat. § 8.31, subd. 3a; and

     e.     civil penalties under Minn. Stat. § 8.31, subd. 3.

1503.   By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein with respect to Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers.

1504.   Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers were purchasers, reimbursers and/or end-payors of Defendants' generic pharmaceutical drugs identified herein and have paid amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

1505.   Defendants knew of and appreciated, retained, or used, the benefits of Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers' purchases of any of the Defendants' generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price.  Defendants engaged in the conduct described herein to allocate or preserve the market share of the numerous generic pharmaceutical drugs identified herein thereby increasing their sales and profits.

1506.   For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

1507.   Based on Defendants' conduct set forth herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

1508.   Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of any of the numerous generic pharmaceutical drugs identified herein by Plaintiff State of Minnesota, its state agencies that paid

431

for the generic pharmaceutical drugs identified herein, and its consumers. Plaintiff State of
Minnesota, on behalf of itself, its state agencies that paid for the generic pharmaceutical drugs
identified herein, and as parens patriae on behalf of its consumers, seeks to recover the amounts
that unjustly enriched the Defendants.

1509.   Plaintiff State of Minnesota seeks relief, on behalf of itself, its state agencies that
paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its
consumers, and is therefore entitled to equitable relief in the form of an injunction, restitution
and disgorgement and any other relief the Court deems appropriate under Minn. Stat. Ch. 8 and
Minnesota common law for unjust enrichment.

## Mississippi

1510.    Plaintiff State of Mississippi repeats and re-alleges each and every preceding
allegation as if fully set forth herein.

1511.   Defendants' acts violate Miss. Code Ann. § 75- 21-1 *et seq*., and Plaintiff State of
Mississippi is entitled to relief under Miss. Code Ann. § 75- 21-1 *et seq*.

1512.   The aforesaid conduct was not only anti-competitive but was also unfair and
deceptive to the consumers of the State of Mississippi, therefore Defendants' acts violate the
Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*, and Plaintiff State of
Mississippi is entitled to relief under the Mississippi Consumer Protection Act, Miss. Code Ann.
§ 75-24-1, *et seq.*

1513.   Pursuant to Miss. Code Ann. § 75-21-1 *et seq*., and the Mississippi Consumer
Protection Act, Miss. Code Ann. § 75-24-1, *et seq*., Plaintiff State of Mississippi seeks and is
entitled to relief, including but not limited to injunctive relief, damages, restitution,

432

disgorgement, civil penalties, costs, attorney fees, and any other just and equitable relief which this Court deems appropriate.

## Missouri

1514.   Plaintiff State of Missouri repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1515.   The aforementioned practices by Defendants violate the Missouri Antitrust Law, Missouri Rev. Stat. §§ 416.011 et seq., and Missouri's Merchandising Practices Act, Missouri Rev. Stat. §§ 407.010 et seq., as further interpreted by 15 CSR 60-8.010 et seq. and 15 CSR 60-9.01 et seq., and the State of Missouri is entitled to an injunction, disgorgement, civil penalties and any other relief available under the aforementioned Missouri statutes and regulations.

1516.   The State of Missouri also seeks its costs and attorney fees incurred in the prosecution of this action.

## Montana

1517.   Plaintiff State of Montana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1518.   Defendants' acts and practices described in this Complaint violate Montana's Unfair Trade Practices and Consumer Protection Act, Mont Code Ann. § 30-14-101 et seq., including § 30-14-103, and Unfair Trade Practices Generally, Mont. Code Ann. § 30-14-201 et seq., including § 30-14-205.

1519.   Mont. Code Ann § 30-14-103 prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Mont. Code Ann. § 30-14-102(8) defines the terms "trade" and "commerce" as meaning "the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or

mixed, or any other article, commodity, or thing of value, wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state."

1520.   Montana's standard for 'unfairness' as prohibited under Mont. Code Ann. § 30-14-103 is articulated in Rohrer v. Knudson, 203 P.3d 759 (Mont. 2009) as an act or practice which "offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

1521.   Mont Code Ann. § 30-14-205 states that it is unlawful for a person or group of persons, directly or indirectly:

> (1)     to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce;
>
> (2)     for the purpose of creating or carrying out any restriction in trade to:  (a) limit productions; (b) increase or reduce the price of merchandise or commodities; (c) prevent competition in the distribution or sale of merchandise or commodities; (d) fix a standard or figure whereby the price of an article of commerce intended for sale, use, or consumption will be in any way controlled.

1522.   Defendants' anticompetitive and unfair and/or deceptive acts and practices in the marketing and sale of pharmaceuticals as described in this Complaint occurred in the conduct of "trade" and "commerce" as defined by Montana law.

1523.   Defendants' anticompetitive and unfair and/or deceptive acts and practices in the marketing and sale of pharmaceuticals as described in this Complaint offend established public policy.  Those acts and practices are also unethical, oppressive, and unscrupulous and have substantially injured and continue to injure Montanans through supra-competitive prices.

1524.   Defendants' price-fixing and market allocating conduct as described in this Complaint violates the plain language of Mont. Code Ann. § 30-14-205(1) and (2).

1525.   Defendants' unlawful conduct was willful as defined in Mont. Code Ann. § 30-14-142(4).

1526.   Plaintiff State of Montana is entitled to injunctive and equitable relief, including disgorgement, and the maximum civil penalties available under Mont. Code Ann. § 30-14-101 et seq. and § 30-14-201 et seq., including but not limited to Mont. Code Ann. §§ 30-14-111(4), -131, -142(2), -144, and -222.  Plaintiff State of Montana also seeks reasonable attorneys' fees and costs.

## Nebraska

1527.   Plaintiff State of Nebraska repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1528.   Defendants' actions as alleged herein violate the Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 et seq. and the Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et seq. Specifically, Defendants' actions constitute unreasonable restraints of trade or commerce in violation of Neb. Rev. Stat. § 59-801 and Neb. Rev. Stat. § 59-1603, and Defendants' actions constitute unfair methods of competition in violation of Neb. Rev. Stat. § 59-1602. The sale of pharmaceuticals to the State of Nebraska and its citizens constitutes trade or commerce as defined in Neb. Rev. Stat. § 59-1601. These violations have had an impact, directly and indirectly, upon the public interest of the State of Nebraska, for the State of Nebraska, its state agencies, and its citizens have been injured and continue to be injured by paying supra-competitive prices for pharmaceuticals purchased directly and/or indirectly from the Defendants.

1529.   Accordingly, Plaintiff State of Nebraska, on behalf of itself, its state agencies, and as parens patriae for all citizens within the state, seeks all relief available under the Unlawful Restraint of Trade Act, the Consumer Protection Act, and Neb. Rev. Stat. § 84-212. Plaintiff State of Nebraska is entitled to relief including, but not limited to: damages, disgorgement, civil penalties, equitable relief, injunctive relief, and its costs and attorney's fees pursuant to Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212.

<u>**Nevada**</u>

1530.   Plaintiff State of Nevada repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1531.   As alleged in Sections IV and VI, *supra*, the Defendants' conduct was and is directed at consumers nationwide, including in Nevada, and was overtly deceptive; not merely anticompetitive.

1532.   As repeatedly alleged *supra*, in the course of carrying out their schemes, Defendants often (i) declined bid opportunities and misrepresented the reason for their failure to bid, (ii) provided false bids that they knew would not be successful, or (iii) withdrew offers and misrepresented the reasons why the offers were withdrawn.  In all such cases, the alleged acts and practices by Defendants were, and are, in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq., and specifically the following:

a.      NRS 598.0915(15), a person engages in a deceptive trade practice by knowingly making a false representation in a transaction;

b.      NRS 598.0923(2), a person engages in a deceptive trade practice by failing to disclose a material fact in connection with the sale or lease of goods or services; and

436

      c.      NRS 598.0923(3), a person engages in a deceptive trade practice by violating a state or federal statute or regulation relating to the sale or lease of goods or services.

1533.  As alleged in Sections IV, V and VI, *supra*, the Defendants' anticompetitive conduct produced, and continues to produce, harm across the Plaintiff States, including in Nevada.  Accordingly, the aforementioned acts and practices by Defendants were, and are, also in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, et seq., and specifically the following:

      a.      NRS 598A.060(a), competitors unlawfully restrain trade by engaging in price fixing;

      b.      NRS 598A.060(b), competitors unlawfully restrain trade by agreeing to division of markets; and

      c.      NRS 598A.060(c), competitors unlawfully restrain trade by agreeing to allocate customers.

1534.  Accordingly, Plaintiff State of Nevada seeks all relief available under the Nevada Deceptive Trade Practices Act, the Nevada Unfair Trade Practices Act, and common law. Plaintiff State of Nevada is entitled to relief including but not limited to:  disgorgement, injunctions, civil penalties, damages, and its costs and attorney's fees pursuant to Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250.

## New Jersey

1535.  Plaintiff State of New Jersey repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1536.   Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq., in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere.  N.J.S.A. 56:9-3.  Plaintiff State of New Jersey seeks relief including but not limited to, treble damages for New Jersey consumers and state agencies that paid for one or more of the drugs identified in this Complaint, injunctive relief, disgorgement, restitution, civil penalties and attorneys' fees and investigative costs.  N.J.S.A. 56:9-10, -12.

1537.   Defendants' actions as alleged herein violate the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., in that Defendants' made misleading statements, omitted material facts and engaged in unconscionable commercial practices in connection with the advertising, offering for sale and sale of one or more of the drugs identified in this Complaint.  N.J.S.A. 56:8-2.  Plaintiff State of New Jersey seeks relief including but not limited to, injunctive relief, disgorgement, restitution, civil penalties and attorneys' fees and investigative costs.  N.J.S.A. 56:8-8, -11, -13 and -19.

## New Mexico

1538.   Plaintiff State of New Mexico repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1539.   The State of New Mexico, through its Attorney General, brings this enforcement action as parens patriae in its sovereign and quasi-sovereign capacity and in its proprietary capacity on behalf of the State, including its agencies and entities, to recover damages to the State, its residents, its economy, and all such other relief as may be authorized by statute or common law.

1540.   The aforementioned actions and practices by Defendants were and are a contract, agreement, combination, or conspiracy in an unreasonable restraint of trade or commerce in New Mexico, thus violating the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1 et seq.

1541.   The aforementioned actions and practices by Defendants were unfair or deceptive trade practices as they were false or misleading oral or written statements or other representations made in connection with the sale of goods in the regular course of their trade or commerce, that may, tended to or did deceive or mislead consumers.  These practices included false or misleading statements of fact concerning the price of drugs and failures to state material facts about the costs of drugs, actions that deceived or tended to deceive consumers. Additionally, Defendants' actions constituted unconscionable trade practices, because they resulted in supra-competitive prices for the aforementioned drugs, resulting in a gross disparity between the prices paid by consumers and the valued received. These practices and actions violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 et. seq.

1542.   The aforementioned actions and practices by Defendants also constitute unfair competition and unjust enrichment under New Mexico's common law.

1543.   Accordingly, the State of New Mexico is entitled remedies available to it under the New Mexico Antitrust Act, the New Mexico Unfair Practices Act, and New Mexico common law, including injunctive relief, actual, treble, and statutory damages, restitution, disgorgement, civil penalties, costs, attorney's fees, and any other appropriate monetary and injunctive relief. See N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11.

### New York

1544.   Plaintiff State of New York repeats and re-alleges each and every preceding allegation as if fully set forth herein.

439

1545.   In addition to violating federal antitrust law, the aforementioned practices by the Defendants violate New York antitrust law, the Donnelly Act, New York Gen. Bus. Law §§ 340-342c, and constitute both "fraudulent" and "illegal" conduct in violation of New York Executive Law § 63(12).

1546.   Plaintiff State of New York seeks relief, including but not limited to damages, for New York consumers and New York state entities that paid for one or more of the drugs identified in this Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of New York also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), and fees and costs.

1547.   Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") contracts directly with Defendants and/or has an assignment of antitrust claims from Cardinal Health, Inc. ("Cardinal") or other intermediary.  New York entities purchase generic drugs through MMCAP contracts and have a similar assignment from MMCAP for any claims MMCAP may have for violations of the antitrust laws.

1548.   To the extent these assignment clauses support a direct purchase by those represented by New York, in addition to all other remedies sought herein, Plaintiff State of New York seeks damages under federal antitrust law, 15 U.S.C. § 15.

### North Carolina

1549.   Plaintiff State of North Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1550.   By distributing, marketing and selling generic pharmaceutical drugs to consumers through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers

of generic pharmaceutical drugs and in otherwise engaging in the conduct more fully described herein with respect to the numerous generic pharmaceutical drugs identified herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed North Carolina consumers pursuant to North Carolina's Unfair or Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*

1551.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes North Carolina, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in North Carolina and deprived North Carolina consumers from paying a price for the numerous generic pharmaceutical drugs identified herein which would have been competitive and fair absent the agreement to allocate customers and fix prices.

1552.   The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under the North Carolina Unfair or Deceptive Trade Practices Act, and are injurious to North Carolina consumers and the general economy of the State of North Carolina, including, but not limited to by:

> a.   Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a market allocation agreement as set forth in the preceding counts;
>
> b.   Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a price-fixing agreement as set forth in the preceding counts; and
>
> c.   Engaging in any conduct which causes substantial injury to consumers.

1553.   By deceptively misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein to the State of North

Carolina and North Carolina consumers, the Defendants misled the State of North Carolina and North Carolina consumers into believing that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair in violation of the North Carolina Unfair or Deceptive Trade Practices Act.

1554.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes North Carolina, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in North Carolina.

1555.   The Defendants' impairment of choice and the competitive process had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout North Carolina; (3) the State of North Carolina and North Carolina consumers were deprived of free and open markets; and (4) the State of North Carolina and North Carolina consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

1556.   The Defendants' impairment of choice and the competitive process have caused the State of North Carolina and North Carolina consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

1557.   The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic drug prices were raised, fixed, maintained

442

and stabilized at artificially-high levels throughout North Carolina; (3) the State of North

Carolina and North Carolina consumers were deprived of free and open markets; and (4) the

State of North Carolina and North Carolina consumers paid supra-competitive, artificially

inflated prices for the numerous generic pharmaceutical drugs identified herein.

1558.   The Defendants' deceptive misrepresentations and failure to disclose material

facts have caused the State of North Carolina and North Carolina consumers to suffer and to

continue to suffer loss of money or property, real or personal, by means of Defendants' use or

employment of deceptive commercial practices as set forth above.

1559.   Defendants violated the North Carolina Unfair or Deceptive Trade Practices Act:

a.   Each time Defendants agreed to participate in the overarching conspiracy
     within the generic pharmaceutical drug market as set forth herein;

b.   Each time Defendants agreed to allocate the market for specific drugs in
     the generic pharmaceutical drug market as set forth herein;

c.   Each time Defendants agreed to fix prices on the specified drugs in the
     specified drug markets as set forth herein;

d.   Each time the State of North Carolina or a North Carolina consumer paid
     an unfairly or unconscionably inflated price for any of the numerous
     generic pharmaceutical drugs identified herein;

e.   Each time a Defendant failed to disclose the existence of a market
     allocation agreement and/or a price-fixing agreement involving any of the
     numerous generic pharmaceutical drugs identified herein;

f.   Each time a Defendant submitted false or misleading cover bids and/or
     offers to their customers and wholesalers;

g. Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

h. Each time a request for reimbursement was made to the State of North Carolina for any of the numerous generic pharmaceutical drugs identified herein; and

i. Each time the State of North Carolina or a North Carolina consumer paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein.

1560. Plaintiff State of North Carolina is entitled to relief pursuant to N.C. Gen. Stat. § 75-1 *et seq.*, including recovery of its costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

### North Dakota

1561. Plaintiff State of North Dakota repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1562. The aforementioned practices by Defendants are in violation of North Dakota's Uniform State Antitrust Act North Dakota Century Code (N.D.C.C.) § 51-08.1-01 et seq., and Plaintiff State of North Dakota is entitled to relief for these violations under N.D.C.C. § 51-08.1-01 et seq.

1563. The aforementioned practices by Defendants constitute unconscionable or deceptive acts or practices in violation of the North Dakota Consumer Fraud Law, N.D.C.C. §51-15-01 et seq., and Plaintiff State of North Dakota is entitled to relief for those violations under N.D.C.C. §51-15-01 et seq.

**Ohio**

1564.   Plaintiff State of Ohio repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1565.   The aforementioned practices by Defendants were, and are, a per se illegal conspiracy against trade in violation of Ohio Revised Code Section 1331.01 et seq, the common law of Ohio, and void pursuant to Ohio Rev. Code § 1331.06.  The State of Ohio, the general economy of Ohio, Ohio entities and individuals in Ohio were harmed as a direct result of Defendants' per se illegal conduct.  Defendants received ill-gotten gains or proceeds as a direct result of their per se illegal conduct.

1566.   Plaintiff State of Ohio seeks and is entitled to an injunction, disgorgement and civil forfeiture pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq, including Section 1331.03, which requires a forfeiture of $500 per day that each violation was committed or continued, and any other remedy available at law or equity.

**Oklahoma**

1567.   Plaintiff State of Oklahoma repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1568.   The aforementioned practices by Defendants are in violation of the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201 *et seq.*, and Plaintiff State of Oklahoma is entitled to relief under 79 O.S. § 205.

**Oregon**

1569.   Plaintiff State of Oregon repeats and re-alleges each and every preceding allegation as if fully set forth herein.

445

1570.   The aforementioned practices by Defendants were, and are, in violation of the Oregon Antitrust Law, Oregon Revised Statutes ("ORS") 646.705, et seq. These violations had impacts within the State of Oregon and substantially affected the people of Oregon.

1571.   Plaintiff State of Oregon seeks all relief available under the Oregon Antitrust Act for Oregon consumers and the State of Oregon, including injunctive, civil penalties, other equitable relief including but not limited to disgorgement, the State of Oregon's costs incurred in bringing this action, plus reasonable attorney fees, expert witness fees, and costs of investigation, and any other remedy available at law for these violations under ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780.

## Pennsylvania

1572.   Plaintiff Commonwealth of Pennsylvania repeats and re-alleges each and every preceding allegation as if fully set forth herein.

### *Pennsylvania Unfair Trade Practices and Consumer Protection Law*

1573.   In distributing, marketing and selling generic pharmaceutical drugs to consumers through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and in otherwise engaging in the conduct more fully described herein with respect to the numerous generic pharmaceutical drugs identified herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed the Commonwealth of Pennsylvania and Pennsylvania consumers within the meaning of 73 P. S. § 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL").

### *Unfair Methods of Competition and Unfair Acts or Practices*

446

1574.   By reason of the foregoing, the Defendants have impaired Commonwealth of Pennsylvania and Pennsylvania consumer choice in each generic drug market identified herein.

1575.   By impairing choice in what should have been a freely competitive marketplace for the numerous generic pharmaceutical drugs identified herein, the Defendants have deprived the Commonwealth of Pennsylvania and Pennsylvania consumers from being able to meaningfully choose from among the options a competitive market would have provided.

1576.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes Pennsylvania, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania.

1577.   The Defendants impaired the competitive process which deprived the Commonwealth of Pennsylvania and Pennsylvania consumers from paying a price for the numerous generic pharmaceutical drugs identified herein which would have been competitive and fair absent the agreement to allocate customers and fix prices.

1578.   Regardless of the nature or quality of Defendants' aforementioned acts or practices on the competitive process or competition, Defendants' conduct has been otherwise unfair or unconscionable because they offend public policy as established by statutes, the common law, or otherwise, are immoral, unethical, oppressive, unscrupulous, or substantially injurious to the Commonwealth of Pennsylvania and Pennsylvania consumers.

1579.   Defendants' unscrupulous conduct has resulted in the Commonwealth and its consumers being substantially injured by paying more for or not being able to afford the numerous generic pharmaceutical drugs identified herein.

1580.   The Defendants' impairment of choice and the competitive process had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

1581.   The Defendants' impairment of choice and the competitive process have caused the Commonwealth of Pennsylvania and Pennsylvania consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

1582.   Defendants violated the PUTPCPL:

   a.   Each time Defendants agreed to participate in the overarching conspiracy within the generic pharmaceutical drug market as set forth herein;

   b.   Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth herein;

   c.   Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth herein;

   d.   Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth herein;

   e.   Each time Defendants agreed to allocate markets and fix prices on the specified drugs in the specified drug markets as set forth herein;

f.    Each time Defendants agreed to decline to bid or otherwise bid high so as to not take market share on the specified drugs in the specified drug markets as set forth herein;

g.    Each time Defendants knowingly breached a legal or equitably duty, justly reposed, within the generic pharmaceutical drug market as set forth herein; and

h.    Each time the Commonwealth of Pennsylvania or a Pennsylvania consumer paid an unfairly or unconscionably inflated price for any of the numerous generic pharmaceutical drugs identified herein.

1583.   The Defendants' conduct more fully described herein is unlawful pursuant to 73 P.S. § 201-3.

1584.   The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL, including, but not limited to:

a.    "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

1585.   The above described conduct created the likelihood of confusion and misunderstanding and exploited unfair advantage of the Commonwealth of Pennsylvania and Pennsylvania consumers seeking to exercise a meaningful choice in a market expected to be free of impairment to the competitive process and thus constitutes constructive fraud or, in the alternative, constructive fraud in its incipiency through one or more of the following breaches of legal or equitable duties:

449

a.   Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a market allocation agreement as set forth in the preceding counts;

b.   Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a price-fixing agreement as set forth in the preceding counts;

c.   Violating Pennsylvania antitrust common law through engaging in a market allocation agreement;

d.   Violating Pennsylvania antitrust common law through engaging in a price-fixing agreement; and/or

e.   Engaging in any conduct which causes substantial injury to consumers.

1586.   The above described conduct substantially injured Pennsylvania consumers and the Commonwealth of Pennsylvania.

1587.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the PUTPCPL.

1588.   Pursuant to 71 P.S. § 201-4, the Commonwealth of Pennsylvania believes that the public interest is served by seeking a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restoration, disgorgement and attorneys' fees and costs pursuant to 73 P.S. §§ 201-4 and 4.1 for the Commonwealth of Pennsylvania and Pennsylvania consumers and civil penalties of not exceeding $3,000 for each such willful violation pursuant to 73 P.S. § 201-8 (b).  The Commonwealth of Pennsylvania believes that the Commonwealth of Pennsylvania and its citizens are suffering and will continue to suffer harm unless the methods, acts and practices complained of herein are permanently enjoined.

### *Deceptive Acts or Practices*

1589.   By reason of the foregoing, the Defendants have deceptively misrepresented the absence of competition in each generic drug market identified herein to the Commonwealth of Pennsylvania and Pennsylvania consumers in violation of the PUTPCPL.

1590.   By deceptively misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein to the Commonwealth of Pennsylvania and Pennsylvania consumers, the Defendants misled the Commonwealth of Pennsylvania and Pennsylvania consumers into believing that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair.

1591.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in in each generic drug market identified herein that includes Pennsylvania, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania.

1592.   The Defendants deceptively misrepresented to the Commonwealth of Pennsylvania and Pennsylvania consumers that Defendants' pricing at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania was competitive and fair.

1593.   Regardless of the nature or quality of Defendants' aforementioned acts or practices on the competitive process or competition, Defendants' conduct has had the tendency or capacity to deceive.

1594.   Defendants expressed, implied or otherwise falsely claimed conformance with prescribed bidding practices to their customers and wholesalers in relation to the numerous generic pharmaceutical drugs identified herein.

1595.   Defendants expressed, implied or otherwise falsely claimed supply capacity or reasons to prospective customers for bidding or not bidding in relation to the numerous generic pharmaceutical drugs identified herein.

1596.   The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

1597.   The Defendants' deceptive misrepresentations and failure to disclose material facts have caused Commonwealth of Pennsylvania and Pennsylvania consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

1598.   Defendants violated the PUTPCPL:

a.   Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

b.   Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

452

    c.      Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

    d.      Each time a request for reimbursement was made to the Commonwealth of Pennsylvania for any of the numerous generic pharmaceutical drugs identified herein; and

    e.      Each time the Commonwealth of Pennsylvania or a Pennsylvania consumer paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein.

1599.   The Defendants' conduct more fully described herein is unlawful pursuant to 73 P. S. § 201-3.

1600.   The aforesaid methods, acts or practices constitute deceptive acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL, including, but not limited to:

    a.      "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

    b.      "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii);  and

    c.      "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

1601.   The above described conduct has been willful within the meaning of 73 P.S. §
201-8 and is unlawful under the PUTPCPL.

1602.   Pursuant to 71 P.S. § 201-4, the Commonwealth of Pennsylvania believes that the
public interest is served by seeking a permanent injunction to restrain the methods, acts and
practices described herein, as well as seeking restoration, disgorgement and attorneys' fees and
costs pursuant to 73 P.S. §§ 201-4 and 4.1 for the Commonwealth of Pennsylvania and
Pennsylvania consumers and civil penalties of not exceeding $3,000 for each such willful
violation pursuant to 73 P.S. § 201-8 (b).  The Commonwealth of Pennsylvania believes that the
Commonwealth of Pennsylvania and its citizens are suffering and will continue to suffer harm
unless the methods, acts and practices complained of herein are permanently enjoined.

### *Common Law Doctrine against Restraint of Trade*

1603.   By reason of the foregoing, the Defendants have entered into an agreement in
restraint of trade to allocate markets and fix prices in each generic drug market identified herein
within the Commonwealth of Pennsylvania.

1604.   The agreements to allocate customers and to fix pricing as set forth in the
preceding counts constitute an unreasonable restraint of trade in violation of Pennsylvania
antitrust common law.

1605.   Unless Defendants' overall anticompetitive scheme is enjoined, the Defendants
will continue to illegally restrain trade in the relevant market in concert with another in violation
of the Pennsylvania common law doctrine against unreasonable restraint of trade.

1606.   Defendants' conduct in engaging in a contract to unreasonably restrain trade
concerning the customers to whom and the prices at which the numerous generic pharmaceutical

454

drugs identified herein were sold, distributed or obtained in Pennsylvania threatens injury to the Commonwealth of Pennsylvania and Pennsylvania consumers.

1607.   Defendants' anticompetitive and unlawful conduct alleged herein has injured, is injuring and will continue to injure competition in the relevant market by denying consumer choice and otherwise thwarting competition in the relevant market.

1608.   The Defendants' contract in restraint of trade had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

1609.   The Defendants' illegal conduct has had a substantial effect on the Commonwealth of Pennsylvania and Pennsylvania consumers.

1610.   As a direct and proximate result of the Defendants' unlawful conduct, the Commonwealth of Pennsylvania and Pennsylvania consumers have been injured in their business and property.

1611.   On behalf of the Commonwealth of Pennsylvania and its citizens pursuant to 71 P.S. §732-204 (c), the Commonwealth of Pennsylvania seeks injunctive relief, disgorgement and any other relief the Court deems appropriate.

### *Common Law Doctrine against Unjust Enrichment*

1612.   By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein with respect to the Commonwealth of Pennsylvania and Pennsylvania consumers.

1613.   The Commonwealth of Pennsylvania and Pennsylvania consumers were purchasers, reimbursers and/or end-payors of Defendants' numerous generic pharmaceutical drugs identified herein and have paid amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

1614.   Defendants knew of, and appreciated and retained, or used, the benefits of Commonwealth of Pennsylvania and Pennsylvania consumers' purchases of any of the Defendants' numerous generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price.  Defendants engaged in the conduct described herein to increase the market share of the numerous generic pharmaceutical drugs identified herein thereby increasing their sales and profits.

1615.   For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

1616.   Based on Defendants' conduct set forth herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

1617.   Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of any of the numerous generic pharmaceutical drugs identified herein by the Commonwealth of Pennsylvania and Pennsylvania

456

consumers.  The Commonwealth of Pennsylvania, on behalf of itself and Pennsylvania consumers, seeks to recover the amounts that unjustly enriched the Defendants.

1618.   The Commonwealth of Pennsylvania and Pennsylvania consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement and any other relief the Court deems appropriate.

## Puerto Rico

1619.   Plaintiff Commonwealth of Puerto Rico repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1620.   The aforementioned practices by Defendants were in violation of Puerto Rico Law No. 77 of June 25, 1964, also known as "Puerto Rico`s Antitrust and Restrictions of Commerce Law", 10 P.R. Laws Ann. §§ 257 et seq., and 32 P.R. Laws Ann. § 3341.

1621.   The Commonwealth of Puerto Rico, through its Attorney General, brings this enforcement action as parens patriae in its proprietary capacity on behalf of the Commonwealth, including its agencies and entities, to recover damages to the Commonwealth and all such other relief as may be authorized by statute or common law.

1622.   Accordingly, the Commonwealth of Puerto Rico is entitled remedies available under the Puerto Rico`s Antitrust and Restrictions of Commerce Law and 32 P.R. Laws Ann. § 3341, including injunctive relief, civil penalties and damages for the Commonwealth agencies and entities and any other appropriate monetary and injunctive relief.

## Rhode Island

1623.   Plaintiff State of Rhode Island repeats and re-alleges every preceding allegations as if fully set forth herein.

1624.   Defendants' actions as alleged herein violate the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*

1625.   Plaintiff State of Rhode Island brings this action pursuant to R.I. General Laws §§ 6-36-10, 6-36-11 and 6-36-12 and seeks relief, including but not limited to injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees, costs, and such other relief as this court deems just and equitable.

1626.   Defendants' actions as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices as defined in the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.3-1, *et seq.*

1627.   Defendants engaged in unfair or deceptive acts or practices in connection with the sale or advertisement of merchandise by, among other things, making misrepresentations and taking steps to conceal their anticompetitive schemes.

1628.   Defendants' violations of the Rhode Island Deceptive Trade Practices Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by R.I. Gen. Laws § 6-13.1-2, as defined by the R.I. General Laws § 6-13.1-1(6).

1629.   Plaintiff State of Rhode Island brings this action pursuant to Rhode Island Gen. Laws § 6-13.1-5, and seeks relief, including but not limited to injunctive relief, restitution, disgorgement and other equitable relief, civil penalties, fees, costs, and such other relief as this court deems just and equitable.

### South Carolina

1630.   Plaintiff South Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1631.   The aforementioned practices by Defendants constitute "unfair methods of competition and unfair or deceptive acts or practices" under §39-5-20 of the South Carolina Code of Laws. The State of South Carolina asserts claims in a statutory parens patriae capacity under S.C. Code § 39-5-50 and a common law parens patriae capacity.  Pursuant to common law and S.C. Code § 39-5-50(b), South Carolina seeks that this Court restore any ascertainable loss incurred in purchasing the generic drugs at issue. Pursuant to S.C. Code § 39-5-50(a), South Carolina seeks injunctive relief to prohibit Defendants from engaging in the conduct described in this complaint.

1632.   Defendants knew or reasonably should have known that their conduct violated S.C. Code § 39-5-20.  Under S.C. Code § 39-5-110(c), Defendants' conduct therefore constitutes a willful violation of S.C. Code § 39-5-20.  Accordingly, South Carolina seeks an award of civil penalties under S.C. Code § 39-5-110(a) in an amount up to $5,000.00 per violation in South Carolina.

1633.   South Carolina seeks attorneys' fees and costs under S.C. Code § 39-5-50(a).

### Tennessee

1634.   Plaintiff State of Tennessee repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1635.   This is an action that alleges violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

1636.   Defendants directly and/or indirectly through nationwide distributors, wholesalers, and retailers, sold or marketed the generic drugs at issue to the State of Tennessee and its agencies, Tennessee businesses, and individual consumers.

1637.   Defendants made arrangements or agreements with a view to lessening, or which tend to lessen, full and free competition in the sale in Tennessee of, or which were designed to advance or control the prices charged for, the generic drugs at issue.

1638.   Defendants' conduct affected Tennessee commerce to a substantial degree and substantially affected the people of Tennessee by affecting the choice of generic drugs available to, and/or the prices paid by, the State of Tennessee and its agencies, Tennessee businesses, and individual consumers for such generic drugs.

1639.   The aforementioned conduct by Defendants was in violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

1640.   As a direct and proximate result of Defendants' illegal conduct, the State of Tennessee and its agencies, Tennessee businesses, and individual consumers have been harmed and will continue to be harmed, by, *inter alia*, paying more for generic drugs purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the illegal conduct.

1641.   The State of Tennessee is entitled to relief for purchases of affected generic drugs by the State of Tennessee and its agencies, Tennessee businesses, and individual consumers.

1642.   On behalf of the State and its agencies, Tennessee businesses, and individual consumers, the State of Tennessee seeks all legal and equitable relief available under the Tennessee Trade Practices Act and the common law, including, but not limited to: damages for purchases of the affected generic drugs; equitable relief including disgorgement and injunctive relief; attorneys' fees and costs; and such other and further relief as this Court deems just and equitable.

## Utah

1643.   Plaintiff State of Utah repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1644.   The aforementioned acts by Defendants violate the Utah Antitrust Act, Utah Code §§ 76-10-3101 through 76-10-3118 (the "Act"), and Utah common law.  Accordingly, Plaintiff State of Utah, by and through the Attorney General of Utah, on behalf of itself, Utah governmental entities, and as *parens patriae* for its natural persons, is entitled to all available relief under the Act and Utah common law, including, without limitation, damages (including treble damages, where permitted), injunctive relief, including disgorgement, restitution, unjust enrichment, and other equitable monetary relief, civil penalties, and its costs and reasonable attorneys' fees.

## Vermont

1645.   Plaintiff State of Vermont repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1646.   Defendants' actions alleged herein constitute unfair methods of competition in commerce and thereby violate the Vermont Consumer Protection Act, 9 V.S.A. § 2453.  Plaintiff State of Vermont seeks relief for Vermont consumers and state entities that paid for one or more of the drugs identified herein during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Vermont seeks and is entitled to injunctive relief, civil penalties, other equitable relief (including but not limited to restitution and disgorgement), and its costs and fees for these violations pursuant to 9 V.S.A. §§ 2458 and 2465.

461

### Virginia

1647.   Plaintiff Commonwealth of Virginia repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1648.   The aforementioned practices by Defendants are in violation of the Virginia Antitrust Act, Virginia Code Sections 59.1-9.1, et seq.  These violations substantially affect the people of Virginia and have impacts within the Commonwealth of Virginia.

1649.   Plaintiff Commonwealth of Virginia, through the Attorney General, brings this action pursuant to the Virginia Antitrust Act, Virginia Code Section 59.1-9.15.  Pursuant to Sections 59.1-9.15(a) and (d), Plaintiff Commonwealth of Virginia seeks disgorgement, restitution, and other equitable relief as well as civil penalties for these violations.  In addition, pursuant to Sections 59.1-9.15(b), the Plaintiff Commonwealth of Virginia seeks reasonable fees and costs for the investigation and litigation.

### Washington

1650.   Plaintiff State of Washington repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1651.   The aforementioned practices by Defendants were, and are, in violation of the Washington Consumer Protection Act, Wash. Rev. Code 19.86.020 and .030.  Defendants have also engaged in conduct in violation of RCW 19.86.020 that is not a reasonable business practice and constitutes incipient violations of antitrust law and/or unilateral attempts to fix prices or allocate markets.  These violations have impacts within the State of Washington and substantially affect the people of Washington.

1652.   Plaintiff State of Washington seeks relief, including but not limited to damages, for Washington consumers and Washington state agencies that paid more for the generic drugs at

462

issue than they would have paid but for the Defendants' unlawful conduct.  Plaintiff State of Washington also seeks, and is entitled to, injunctive relief, other equitable relief (including but not limited to disgorgement), civil penalties, and costs and fees under the Consumer Protection Act, Wash Rev. Code 19.86.080 and 19.86.140.

### West Virginia

1653.   Plaintiff State of West Virginia repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1654.   Defendants' acts violate the West Virginia Antitrust Act, see W. Va. Code § 47–18–1 et seq. These violations substantially affected the State of West Virginia and had impacts within the State of West Virginia.

1655.   West Virginia affirmatively expresses that the State is not seeking any relief in this action for the federal share of funding for West Virginia's Medicaid Program.

1656.   Claims for damages for any federal monies expended by the State of West Virginia are hereby expressly disavowed.

1657.   Plaintiff State of West Virginia is entitled to all remedies available at law or in equity (including injunctive relief, disgorgement, restitution, and reimbursement), as well as civil penalties under West Virginia Code § 47–18–1 et seq.

1658.   Plaintiff State of West Virginia also is entitled to recover its costs and attorneys' fees under West Virginia Code § 47–18–9.

### Wisconsin

1659.   Plaintiff State of Wisconsin repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1660.   The aforementioned practices by Defendants are in violation of Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.  These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

1661.   Plaintiff State of Wisconsin, under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available at law or in equity under Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18.

## PRAYER FOR RELIEF

Accordingly, the Plaintiff States request that the Court:

A.   Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.   Adjudge and decree that the foregoing activities violated each of the State statutes enumerated in this Complaint;

C.   Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

D.   Award to Plaintiff States disgorgement of the Defendants' ill-gotten gains and any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal law or state antitrust and consumer protection laws to restore competition;

E.   Award to the Plaintiff States damages, including treble damages, to the extent sought pursuant to applicable state laws as enumerated in Count Thirty-Four of this Complaint;

F.   Award to each Plaintiff State the maximum civil penalties allowed by law as enumerated in Count Thirty-Four of this Complaint;

G.   Award to each Plaintiff State its costs, including reasonable attorneys' fees; and

H.      Order any other relief that this Court deems proper.

## JURY DEMAND

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, on all issues triable as of right by jury.

PLAINTIFF

WILLIAM TONG
ATTORNEY GENERAL

BY:       *W. Joseph Nielsen*

Michael E. Cole
W. Joseph Nielsen
Federal Bar No. ct20415
Laura J. Martella
Federal Bar No. ct27380
Assistant Attorneys General
55 Elm Street, P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033
Joseph.Nielsen@ct.gov

467

FOR PLAINTIFF STATE OF ALABAMA
STEVEN T. MARSHALL
ATTORNEY GENERAL

Billington M. Garrett
Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Fax: (334) 242-2433
Email: bgarrett@ago.state.al.us

FOR PLAINTIFF STATE OF ALASKA
KEVIN G. CLARKSON
ATTORNEY GENERAL

Margaret Paton-Walsh
(Alaska Bar No. 0411074)
Jeff Pickett
(Alaska Bar No. 9906022)
Assistant Attorneys General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 269-5100
Fax: (907) 276-3697
margaret.paton-walsh@alaska.gov
jeff.pickett@alaska.gov

FOR PLAINTIFF STATE OF ARIZONA
MARK BRNOVICH
ATTORNEY GENERAL OF ARIZONA

DANA R. VOGEL
(Arizona Bar No. 030748)
Antitrust Unit Chief
Office of the Attorney General
Civil Litigation Division, Antitrust Unit
2005 North Central Avenue
Phoenix, AZ 85004-1592
Telephone:  (602) 542-7728
Fax:  (602) 542-9088
Dana.vogel@azag.gov

FOR PLAINTIFF STATE OF COLORADO
PHILIP J. WEISER
ATTORNEY GENERAL

Jennifer H. Hunt
First Assistant Attorney General
Devin M. Laiho
Senior Assistant Attorney General
Abigail Smith
Assistant Attorney General
Colorado Department of Law
Consumer Protection Section
1300 Broadway, Seventh Floor
Denver, Colorado 80203
Telephone: 720-508-6215
Email: Jennifer.hunt@coag.gov;
Devin.Laiho@coag.gov;
Abigail.smith@coag.gov

STATE OF DELAWARE
KATHLEEN JENNINGS
ATTORNEY GENERAL

Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 577-8924
Email: Michael.Undorf@delaware.gov

FOR PLAINTIFF STATE OF FLORIDA
ASHLEY MOODY
Attorney General

JOHN GUARD
(Florida Bar No. 374600)
Chief Deputy Attorney General
PATRICIA A. CONNERS
(Florida Bar No. 361275)
Chief Associate Deputy Attorney General
LIZABETH A. BRADY
(Florida Bar No. 457991)
Chief, Multistate Enforcement
TIMOTHY FRASER
(Florida Bar No. 957321)
Assistant Attorney General
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134

FOR THE STATE OF HAWAII
CLARE E. CONNORS
ATTORNEY GENERAL OF HAWAII

BRYAN C. YEE
RODNEY I. KIMURA
Deputy Attorneys General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii  96813
Tel:  808-586-1180
Fax:  808-586-1205
Bryan.c.yee@hawaii.gov
Rodney.i.kimura@hawaii.gov

FOR PLAINTIFF STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

Brett T. DeLange
John K. Olson
David Young
Deputy Attorneys General
Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho  83720-0010
Telephone: (208) 334-4114
Fax: (208) 334-4151
brett.delange@ag.idaho.gov
john.olson@ag.idaho.gov
david.young@ag.idaho.gov

FOR PLAINTIFF STATE OF ILLINOIS

LISA MADIGAN
Attorney General

Robert W. Pratt
Antitrust Bureau Chief
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Tel:  (312) 814-3722
Fax:  (312) 814-4902
rpratt@atg.state.il.us

Respectfully submitted,

CURTIS T. HILL
Attorney General of the State of Indiana

TAMARA WEAVER
Deputy Attorney General

PHILIP RIZZO
Deputy Attorney General

JUSTIN G. HAZLETT
Section Chief, Consumer Protection
Division

302 West Washington St., 5th Floor
IGCS -5th Floor
Indianapolis, IN  46204

Tel: (317) 234-7122
Fax: (317) 233-4393

ATTORNEYS FOR THE
STATE OF INDIANA

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel:  (515) 281-7054
Fax:  (515) 281-4902
Layne.Lindebak@iowa.com


ATTORNEYS FOR THE
STATE OF IOWA

FOR PLAINTIFF STATE OF KANSAS
DEREK SCHMIDT
ATTORNEY GENERAL

Lynette R. Bakker
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 368-8451
Fax: (785) 291-3699
Email: lynette.bakker@ag.ks.gov

ANDY BESHEAR
Attorney General of Kentucky

LeeAnne Applegate
Charles W. Rowland
Assistant Attorneys General
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: 502-696-5300
Fax: 502-573-8317
LeeAnne.Applegate@ky.gov
Charlie.Rowland@ky.gov

ATTORNEYS FOR THE STATE OF KENTUCKY

FOR PLAINTIFF
STATE OF LOUISIANA
JEFF LANDRY
Attorney General
State of Louisiana

STACIE L. DEBLIEUX
LA Bar # 29142
Assistant Attorney General
Public Protection Division
1885 North Third St.
Baton Rouge, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
Email: deblieuxs@ag.louisiana.gov

AARON M. FREY
Attorney General of Maine

Christina Moylan
Assistant Attorney General
Office of the Attorney General of Maine
6 State House Station
Augusta, ME  04333
Tel:  207-626-8838
Fax: 207-624-7730
christina.moylan@maine.gov

ATTORNEYS FOR THE
STATE OF MAINE

BRIAN E. FROSH
MARYLAND ATTORNEY GENERAL

John R. Tennis
Assistant Attorney General
Chief, Antitrust Division

Schonette J. Walker
Assistant Attorney General
Deputy Chief, Antitrust Division
Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202
Tel. # (410) 576-6470
Fax # (410) 576-7830
jtennis@oag.state.md.us
swalker@oag.state.md.us

Attorneys for the State of Maryland

FOR PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Michael B. MacKenzie (MA BBO No. 683305)
Daniel H. Leff (MA BBO No. 689302)
Assistant Attorneys General
Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184
William.Matlack@mass.gov
Michael.Mackenzie@mass.gov
Daniel.Leff@mass.gov

FOR PLAINTIFF
STATE OF MICHIGAN
DANA NESSEL
ATTORNEY GENERAL

Carl Hammaker
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
G. Mennen Williams Building, 6th Floor
525 W. Ottawa Street
Lansing, Michigan 48933
hammakerc@michigan.gov
Telephone:  (517) 335-7632
Fax:  (517) 335-6755

485

FOR PLAINTIFF
STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL

JAMES CANADAY
Deputy Attorney General

ERIN R. ELDRIDGE
Assistant Attorney General

JOSEPH C. MEYER
Assistant Attorney General
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1433
Fax: (651) 296-9663
Email: Joseph.meyer@ag.state.mn.us

FOR PLAINTIFF STATE OF MISSISSIPPI

JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: Crystal Utley Secoy, MSBN 102132
Special Assistant Attorney General

Consumer Protection Division
Office of the Attorney General
Post Office Box 22947
Jackson, Mississippi  39225
Telephone:  601-359-4213
Fax: 601-359-4231
Email:  cutle@ago.state.ms.us

FOR PLAINTIFF STATE OF MISSOURI

ERIC S. SCHMITT
Attorney General

Michael Schwalbert, E.D. MO Bar No. 63229MO
Assistant Attorney General
815 Olive Street, Suite 200
Saint Louis, Missouri 63101
Tel: (314) 340-7888
Fax: (314) 340-7957
Michael.Schwalbert@ago.mo.gov

ATTORNEY FOR PLAINTIFF
STATE OF MISSOURI

STATE OF MONTANA
TIMOTHY C. FOX
Attorney General


MARK MATTIOLI
Chief, Consumer Protection
CHUCK MUNSON
Assistant Attorney General

MONTANA DEPARTMENT OF JUSTICE
OFFICE OF CONSUMER PROTECTION
555 Fuller Avenue
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-4500
FAX:  (406) 442-1894
cmunson@mt.gov

FOR PLAINTIFF
STATE OF NEBRASKA,
ex rel. DOUGLAS J. PETERSON,
ATTORNEY GENERAL

Collin Kessner
Assistant Attorney General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE  68509
Tel: 402-471-3833
Fax: 402-471-4725
collin.kessner@nebraska.gov

FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Nevada Attorney General

ERNEST D. FIGUEROA
Consumer Advocate

Lucas J. Tucker
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
8945 West Russell Road., Suite 204
Las Vegas, Nevada 89148
Nevada Bar No. 10252
LTucker@ag.nv.gov

Marie W.L. Martin
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson Street
Carson City, NV 89701
Nevada Bar No. 07808
MMartin@ag.nv.gov

GURBIR S. GREWAL
Attorney General of New Jersey

Robert N. Holup
Christopher Kozik
Deputy Attorneys General
State of New Jersey
Office of the Attorney General
Division of Law

124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Tel: (973) 648-7819
Fax: (973) 648-4887
Robert.Holup@law.njoag.gov
Christopher.Kozik@law.njoag.gov

ATTORNEYS FOR THE
STATE OF NEW JERSEY

FOR PLAINTIFF STATE OF NEW MEXICO
HECTOR BALDERAS
ATTORNEY GENERAL

Nicholas M. Sydow
Cholla Khoury
Assistant Attorneys General
P.O. Drawer 1508
Santa Fe, NM  87504-1508
Telephone:  (505) 717-3571
Fax:  (505) 490-4881
Email:  nsydow@nmag.gov
Email:  ckhoury@nmag.gov

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

BEAU BUFFIER
Chief, Antitrust Bureau

ROBERT L. HUBBARD
EMILY GRANRUD
Assistant Attorneys General

28 Liberty, 20th Floor
New York, New York 10005
Tel: (212) 416-8267
Fax: (212) 416-6015

ATTORNEYS FOR THE
STATE OF NEW YORK

FOR PLAINTIFF
STATE OF NORTH CAROLINA

Respectfully submitted,

JOSHUA H. STEIN
Attorney General of North Carolina

Kimberley A. D'Arruda
Special Deputy Attorney General
kdarruda@ncdoj.gov

Jessica V. Sutton
Assistant Attorney General
jsutton2@ncdoj.gov

North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC  27603
Telephone: (919) 716-6000
Fax: (919) 716-6050

STATE OF NORTH DAKOTA
Wayne Stenehjem
Attorney General

Parrell D. Grossman, ND ID 04684
Assistant Attorney General
Director, Consumer Protection &
Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste 200
Bismarck, ND  58503--5574
Telephone (701) 328-5570
Facsimile (701) 328-5568
pgrossman@nd.gov

*Attorneys for the State of North Dakota*

496

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

Jennifer Pratt
Chief, Antitrust Section
Beth A. Finnerty
Assistant Section Chief, Antitrust Section
Edward J. Olszewski
Principal Assistant Attorney General
Office of the Ohio Attorney General
Antitrust Section
150 E. Gay St., 22nd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269
edward.olszewski@ohioattorneygeneral.gov

ATTORNEYS FOR THE
STATE OF OHIO

FOR PLAINTIFF STATE OF OKLAHOMA
MIKE HUNTER
ATTORNEY GENERAL

Caleb J. Smith, OBA No. 33613
Assistant Attorney General
Consumer Protection Unit
Oklahoma Office of the Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel. (405) 522-1014
Fax (405) 522-0085
Caleb.Smith@oag.ok.gov

498

STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

TIM D. NORD, OSB 882800
Special Counsel
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 373-7067
tim.d.nord@doj.state.or.us

CHERYL F. HIEMSTRA, OSB 133857
Assistant Attorney General
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 373-7067
cheryl.hiemstra@doj.state.or.us

COMMONWEALTH OF
PENNSYLVANIA
Office of the Attorney General

JOSH SHAPIRO
ATTORNEY GENERAL

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: 717-787-4530
Fax: 717-787-1190
twertz@attorneygeneral.gov
jbetsko@attorneygeneral.gov

ATTORNEYS FOR THE
COMMONWEALTH
OF PENNSYLVANIA

FOR PLAINTIFF COMMONWEALTH OF
PUERTO RICO

WANDA VÁZQUEZ GARCED
Attorney General


Denise Maldonado Rosa
Assistant Attorney General
USDC-PR 301108
PR Bar No. 15652
dmaldonado@justicia.pr.gov

Johan M. Rosa Rodríguez
Attorney
PR Bar No. 16819
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 2600, 2601
Fax: (787) 721-3223
jorosa@justicia.pr.gov

FOR PLAINTIFF STATE OF RHODE ISLAND

Julia C. Wyman (#9017)
Special Assistant Attorney General
R.I. Office of Attorney General
150 South Main Street
Providence, Rhode Island 02903
Tel. (401) 274-4400 Ext. 2380
Fax (401) 222-3016
jwyman@riag.ri.gov

ALAN WILSON
Attorney General for the
State of South Carolina
Federal ID No. 10457
Email: awilson@scag.gov

W. JEFFREY YOUNG
Chief Deputy Attorney General
Federal ID No. 6122
Email: jyoung@scag.gov

ROBERT D. COOK
Solicitor General
Federal ID No. 285
Email: bcook@scag.gov

C. HAVIRD JONES, JR.
Senior Assistant Deputy Attorney General
Federal ID No. 2227
Email: sjones@scag.gov

CLARK KIRKLAND, JR.
Assistant Attorney General
Federal ID No. 12410
Email: ckirklandjr@scag.gov

OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street
Rembert C. Dennis Building
Post Office Box 11549
Columbia, South Carolina 29211-1549
Phone: 803.734.3970

Attorneys for Alan Wilson, in his official
capacity as Attorney General of the
State of South Carolina.

FOR PLAINTIFF STATE OF TENNESSEE

HERBERT H. SLATERY III
Attorney General and Reporter of
Tennessee

DAVID MCDOWELL
Assistant Attorney General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-8722
David.McDowell@ag.tn.gov

ATTORNEYS FOR THE
STATE OF TENNESSEE

504

FOR PLAINTIFF STATE OF UTAH

SEAN D. REYES
UTAH ATTORNEY GENERAL


/s/
David Sonnenreich
Deputy Attorney General
Antitrust Section Director

Office of the Attorney General of Utah
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0874
Tel: 801-366-0375
Fax: 801-366-0378
dsonnenreich@agutah.gov

505

FOR PLAINTIFF STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

Jill S. Abrams
Assistant Attorney General
109 State Street
Montpelier, Vermont 05609
Telephone: (802) 828-1106
Fax: (802) 828-2154
Email: Jill.Abrams@vermont.gov

Respectfully submitted,

MARK R. HERRING
Attorney General of Virginia

Cynthia E. Hudson
Chief Deputy Attorney General

Samuel T. Towell
Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Chief, Consumer Protection Section

Sarah Oxenham Allen
Senior Assistant Attorney General

Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA  23219
Tel:  804-692-0485
Fax: 804-786-0122
thenry@oag.state.va.us


ATTORNEYS FOR THE
COMMONWEALTH OF VIRGINIA

ROBERT W. FERGUSON
Attorney General of Washington State

JONATHAN A. MARK
Senior Assistant Attorney General
Antitrust Division Chief

Erica Koscher
Travis Kennedy
Assistant Attorneys General
Office of the Attorney General of
Washington State
800 5th Ave, Ste. 2000
Seattle, WA 98104-3188
(206) 464-7744

Attorneys for Plaintiff State of Washington

FOR PLAINTIFF STATE OF WEST VIRGINIA
PATRICK MORRISEY
ATTORNEY GENERAL

Edward M. Wenger
General Counsel
Douglas L. Davis
Assistant Attorney General
Office of the West Virginia Attorney General
State Capitol
Bldg. 1, Room E-26
Charleston, WV  25305
Telephone:  (304) 558-2021
Fax:  (304) 558-0140
Email:  edward.m.wenger@wvago.gov
Email:  douglas.l.davis@wvago.gov

Respectfully submitted,

JOSH KAUL
Attorney General of Wisconsin

GWENDOLYN J. COOLEY
Assistant Attorney General
State Bar #1053856

Attorneys for the State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-5810
(608) 266-2250 (Fax)
cooleygj@doj.state.wi.us