**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:16-cv-02056-MPS |
| *Plaintiffs,* | |
| v. | |
| AUROBINDO PHARMA USA, INC., et al., | |
| *Defendants.* | |

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:19-cv-00710-MPS |
| *Plaintiffs*, | |
| v. | |
| TEVA PHARMACEUTICALS USA, INC. et al., | |
| *Defendants.* | |

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:20-cv-00802-MPS |
| *Plaintiffs*, | |
| v. | |
| SANDOZ, INC., et al., | |
| *Defendants*. | |
| | March 26, 2025 |

**MEMORANDUM OF LAW IN SUPPORT OF THE STATES' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH  APOTEX CORP.**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  PROCEDURAL BACKGROUND ...................................................................... 4

III.  SETTLEMENT TERMS ...................................................................................... 5

  A.  Injunctive Relief ............................................................................................. 5

  B.  Monetary Payment .......................................................................................... 6

  C.  Preliminary and Final Court Approval ............................................................ 7

  D.  Exclusions ...................................................................................................... 8

  E.  Cooperation by Apotex ................................................................................... 9

  F.  Release and Covenant Not To Sue ................................................................ 10

IV.  THE STATES' AUTHORITY ........................................................................... 10

  A.  The States' *Parens Patriae* Authority to Represent Consumers in their States ................ 12

  B.  Fundamental Differences Between *Parens Patriae* Claims and Rule 23 Claims .............. 14

V.  ARGUMENT ..................................................................................................... 14

  A.  Standard for Preliminary Approval of *Parens Patriae* Settlement ................... 15

  B.  The Settlement Meets the Standard for Preliminary Approval ......................... 16

    1.  Procedural Analysis Factors Support Preliminary Approval .................... 17

      i.  The States Have Adequately – and Zealously – Represented Consumers ................. 17

      ii.  The Settlement Was Negotiated at Arm's Length by Experienced Counsel. ............. 18

      iii.  The States Have Obtained a Sufficient Understanding of the Case ........................... 19

    2.  Substantive Analysis Factors Support Preliminary Approval ................... 20

      i.  The Settlement Provides Adequate Relief ................................................. 21

      ii.  The Cooperation from Apotex Adds Value to the Settlement ................... 22

      iii.  The Settlement Is Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal. ................................................................................ 23

      iv.  The Proposed Method of Distribution treats Consumers Equitably Relative to Each other and Based on Claims Asserted and Releases Provided ................... 26

      v.  The Monetary Payment to the States is Fair and Reasonable and the Settlement Does Not Contain Any Additional Agreement ................................................. 27

  C.  The Proposed Notice Plan is Reasonable and Meets the Requirements of Due Process ... 27

2

D.  The Proposed Framework for Distribution is Fair and Reasonable ................................... 31

    1.    Allocation of the State Settlement Amount ................................................................. 32

    2.    The Proposed Consumer Claims and Distribution Process ........................................ 33

    3.    Proposed Framework for Allocation Among Consumers ......................................... 35

    4.    Final Distribution Plan is Deferred to a Future Date ................................................. 39

E.  The Court Should Appoint Huntington Bank as the Escrow Agent ................................. 39

VI.    CONCLUSION ........................................................................................................................ 40

# I.  INTRODUCTION

Plaintiff States[1] (the "States") have reached a settlement agreement ("Settlement") with Apotex Corp. ("Apotex") resolving the States' claims against Apotex for their participation in an unlawful conspiracy to fix prices and allocate markets for generic pharmaceuticals. *Exhibit 1* (*Settlement Agreement*). The Settlement resolves and releases all the States' claims against Apotex for conduct alleged in the actions in which Apotex is defendant, *Connecticut et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, 3:16-cv-02056 (the "Action") and *Connecticut et al. v. Teva Pharmaceuticals USA, Inc.*, *et al.*, 3:19-cv-00710, and the related action pending in *Connecticut et al. v. Sandoz, Inc.*, *et al.*, 3:20-cv-00802 (collectively all three actions are referred to as the "States' Actions"), in exchange for Apotex's payment of $39.1 million (the "Settlement Payment") and injunctive relief.  Of the $39.1 million, $27.37 million (70%) shall constitute restitution ("Restitution Account") and shall be held in escrow until, pursuant to an allocation plan approved by the Court, it can be distributed to Consumers[2] and State Entities[3] that are State Releasors, to compensate them for any alleged harm resulting from the alleged Conduct. The remaining $11.73 million (30%) shall be held in an escrow account for use in paying for the

---

[1] Plaintiff States means Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. In addition to the States that are Plaintiffs in this Action, Plaintiff States also include Georgia, Northern Mariana Islands, Puerto Rico, Rhode Island, South Dakota, U.S. Virgin Islands, and Wyoming, who are Plaintiffs in the related States' action, and who are releasing their claims against Apotex they could have brought in any of the States' Actions, and, therefore, include every remaining plaintiff in the States' Actions.

[2] "Consumers" are defined as natural persons for whom an Attorney General has the power to act, whether pursuant to the Attorney General's parens patriae authority or otherwise; as well as natural persons for whom the EPPs are asserting claims (*i.e.*, all natural persons who are potential members of the EPP Settlement Class). For purposes of clarity, the term "Consumers" does not include any State Entity, any county, city, town, or other local entity, or any Corporate Entity. *Settlement ¶ I.F.*

[3] Capitalized terms are defined terms in the Settlement and is used here with the same meaning.

expenses, and upon final approval of the Settlement, for costs of litigating the States' claims both collectively and individually, including attorney fees incurred by the States ("Cost Account"). [4]

The Settlement is a joint settlement with the End-Payer Plaintiffs (the "EPPs") in the related action *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.) (the "MDL"). The States seek preliminary approval of the States' portion of the Settlement as it relates to the States' claims in the States' Actions and for the Notice Plan to Consumers, and the EPPs will seek preliminary approval of the Settlement as it relates to the EPPs' claims in the MDL ("EPP Settlement") and the Notice Plan to Corporate Entities.

As chief legal officers, the attorneys general of the States enforce both state and federal antitrust and consumer protection law. Additionally, they represent their states in their sovereign, proprietary, and *parens patriae* capacities. The States' Actions are enforcement actions brought to advance the public interest and address anticompetitive activity in the generic drug industry that has led to higher prices for Consumers, State Entities, and Corporate Entities. [5] The States plan to gather settlement proceeds for later distribution to Consumers and State Entities, on whose behalf the States assert claims, and are exercising authority to settle and release claims under their *parens patriae* and other state law authority.

As a matter of law[6] and policy, the States seek the Court's preliminary approval of the Settlement as it resolves the State claims in the States' Actions and a notice plan, for providing

---

[4] To the extent that monies in this cost account are not used to offset costs of States litigating in the State Actions, any remaining funds may be used for other use permitted by state law. *Settlement ¶ I.DD.3.*

[5] "Corporate Entities" are defined as corporate (and other business) entities for whom an Attorney General has asserted a claim in the MDL (or any court to which the State Actions have been or may be remanded), whether pursuant to the Attorneys General's parens patriae authority or otherwise, as well as corporate (and other business) entities for which the EPPs are asserting claims (i.e., all corporate and other business entities that are potential members of the EPP Settlement Class).

[6] *See, e.g.,* Idaho Code § 48-108(3); Nev. Rev. Stat. 598.0975(3)(b); ORS 646.775(2), (3), (4), and (5). For citations of the authority pursuant to which each State is acting, see footnote 14 below.

notice to Consumers, as described in this motion. A minority of the state laws obligate the attorney general to provide Consumers with notice of settlements, including an opportunity to opt out of and to object to or comment on the settlement.[7] All States are providing those opportunities to Consumers. Similarly, only a few state laws require court approval of a settlement of consumer claims after a notice plan is implemented. Nonetheless, all States will seek the Court's final approval after notice is provided. The States' proposed Notice Plan builds on the notice plan set forth in the States' Motion for Preliminary Approval of the Heritage Settlement, which was previously granted by this Court, ECF No. 675 (3:16-cv-02056-MPS), No. 465 (3:20-cv-00802-MPS), and No. 502 (3:20-cv-00802-MPS). States Declaration in Support of The States' Motion for Preliminary Approval of Settlement with Apotex Corp. ("*State Decl.*") ¶ 15.

The States are also seeking preliminary approval of the division and allocation of the State Settlement Amount between the States (30%), Consumers (45.08%), and State Entities that are State Releasors (24.92%). Further, the States seek approval to use the remaining balance of the 30% allocated to the Cost Account, after financing the administration of this settlement and potential future settlements, to fund continued litigation against the remaining defendants or such purposes as are set forth in paragraph I.DD.3 of the Settlement, including attorney fees.

A final allocation and distribution plan for the Restitution Account has not yet been developed. The States are asking the Court to approve and authorize the States to allocate 24.92% of the State Settlement Amount to State Entities that are State Releasors and divide and distribute these funds between the settling states based on relative harm and claims asserted in the litigation. Further, the States seek the Court's preliminary approval of a general framework for an allocation and distribution plan for the consumer restitution portion of the State Settlement Amount to be

---

[7] *See, e.g.,* Cal. Bus. & Prof. Code § 16760(c); Idaho Code § 48-108(3); ORS 646.775(2), (3), (4), and (5). For citations of the authority pursuant to which each State is acting, see footnotes 14 and 16 below.

allocated among Consumers. Consumers will then be able to opt out of, object to, or comment on this proposed framework as part of the Notice Plan. *See* Exhibit C.

The States (in consultation with the EPPs) are working to develop an efficient and effective consumer distribution plan. Rust established a website – www.AGGenericDrugs.com – that provides specifics about the litigation and settlements in the States Actions and contains a mechanism for Consumers to register and receive future related notices via email. Declaration of Tiffaney Janowicz ("Janowicz Decl.") ¶ 11. Also, Rust will staff a contact center with a toll-free informational number, a settlement email address, and a U.S. Mail Post Office Box to allow consumers to ask questions, register for future notices, update their address, request exclusion, and eventually file claims. *Id.* at ¶ 11. The consumer registrations will assist the States in identifying Consumers eligible for restitution under a future distribution plan. Approval of a final distribution plan for consumer restitution should, however, be deferred until a later date, after the States' motion, when there are sufficient settlement funds to warrant distribution to Consumers.

## II.     PROCEDURAL BACKGROUND

A large coalition of States brought three actions against generic drug manufacturers alleging that they conspired to fix prices and allocate markets for many generic drugs in violation of federal antitrust laws and state antitrust and consumer protection laws. The actions, collectively referred to as the States' Actions, include: (1) a complaint focused on agreements involving Heritage, filed in December 2016, *Connecticut et al. v. Aurobindo Pharma USA, Inc., et al.*, 3:16-cv-02056 (the "Heritage Action"), which after amendments and consolidation of separate complaints now encompasses 15 drugs; (2) a complaint focused on over 100 different drugs centered on agreements involving Teva Pharmaceuticals, filed in 2019, *Connecticut et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 3:19-cv-00710 ("Teva Action"); and (3) a complaint focused

primarily on dermatology products concerning over 80 different drugs, filed in 2020 (the "Dermatology Action"), *Connecticut et al. v. Sandoz, Inc., et al.*, 3:20-cv-00802. In each of the complaints, the States allege an overarching conspiracy for the drugs and anticompetitive acts in that action. Although the States have only brought claims against Apotex in the Heritage Action and Teva Action, this Settlement, if approved, will resolve and release all claims that the States brought or could have brought against Apotex in all three States' Actions.[8]

### III.    SETTLEMENT TERMS

The Settlement contains several different categories of terms and relief, namely: (1) Injunctive Relief, (2) Monetary Payment, (3) Preliminary and Final Court Approval, (4) Exclusions, (5) Cooperation by Apotex, and (6) Release and Covenant Not To Sue. *Exhibit 1.*

### A.  **Injunctive Relief**

The Settlement provides a covenant by Apotex not to engage in any price-fixing, bid-rigging, or market allocation as to any Generic Pharmaceutical Product in violation of Section 1 of the Sherman Act, for seven years after executing the Settlement. *Settlement VII.A.* The States may, upon good cause shown, petition the court for a three-year extension of this covenant. *Id.*

Apotex entered a separate civil settlement agreement with the United States on September 30, 2021, which includes a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services. For the duration of the CIA,

---

[8] The EPPs have litigated claims against Apotex since 2016. The EPPs have filed 18 individual drug complaints and two multi-drug complaints in the MDL and Apotex is a Defendant in three of the EPPs' pending cases. Following the Court's denial of motions to dismiss, the parties engaged in substantial discovery and engaged in numerous discovery motions before the Court and the three Special Masters, including one discovery motion that was briefed before the Third Circuit and the United States Supreme Court. EPPs and Defendants have also briefed class certification, twelve *Daubert* motions, and motions for summary judgment in both of the EPP bellwether cases. While the motions in the bellwether cases did not involve Apotex, they involved issues that will apply broadly across the MDL.

Apotex covenants to the States that it will substantially maintain its existing compliance program, as set out in the documents shared with the Attorneys General prior to the date of entry of this Agreement. Apotex will provide an annual report to the States as to its compliance program *Settlement ¶ VII.B.* The report shall also confirm that it is in substantial compliance with the terms of the CIA and confirm that no potential antitrust violations have been identified or provide a brief description of any potential antitrust violations disclosed pursuant to Apotex's obligations under the CIA. *Settlement ¶ VII.C.* Apotex agreed to submit to the jurisdiction of this Court for purposes of enforcing the provisions in Section VII of the Settlement.

### B. **Monetary Payment**

The Settlement requires Apotex to make a total cash payment of $39.1 million to the States ("State Settlement Amount") within the later of: (1) thirty (30) calendar days after the date of the Court grants preliminary approval of the Settlement or (2) thirty (30) calendar days after receiving written payment instructions from the States. *Settlement ¶ I.DD, II.A.* At least 70% of the State Settlement Amount ("Restitution Account") shall be paid directly into an escrow account ("State Escrow"), pending Final Court Approval of the Settlement and the distribution of settlement funds from the State Escrow pursuant to the States' allocation plan as approved by the Court, including to State Entities that are State Releasors and Consumers, to compensate them for any alleged harm resulting from the alleged Conduct. *Settlement ¶ II.A.*

The Restitution Account shall be allocated among Consumer and the State Entities that are State Releasors as determined by the States, with the EPP Settlement Class Counsel consulting, and as approved by the Court. *Settlement ¶ I.DD.*2. The amount allocated to the State Entities that are State Releasors shall be received by the respective Attorneys General Offices to be allocated for any use permitted under state law at the sole discretion of the States. *Id.*

The remaining 30% of the State Settlement Amount ("Cost Account") shall also be held in escrow and used to pay for the cost of providing notice and the costs of administration of the Settlement Funds (limited to $500,000), and, upon final approval of the Settlement, for costs of litigating the States' Actions both collectively or individually, subject to approval of the court. *Settlement ¶¶ II.A-D., I.DD.3, X.A.* To the extent that the Cost Account funds are not used to offset costs of litigating the States' Actions, any remaining funds may be used for any of the following: (1) deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account) for use in accordance with governing laws; (2) deposit into a fund exclusively dedicated to assisting any state to defray the costs of experts, economists and consultants in multistate antitrust investigations and litigations, including healthcare related investigations and litigation; (3) antitrust or consumer protection enforcement, including healthcare-related enforcement, by an individual State or multiple States; or (4) for any other use permitted by state law at the sole discretion of that State's Attorney General. *Settlement ¶¶ II.A., I.DD.3.* Apotex has no obligation to make any other payments of any kind in connection with the Settlement. *Settlement ¶ II.C.*

### C. <u>Preliminary and Final Court Approval</u>

The Settlement provides that the States will submit a proposed notice and notice plan to the Court with a request for preliminary approval of the Settlement. *Settlement ¶ III.*A. EPPs will submit that same or similar proposed notice and notice plan, as well as a separate proposed notice and notice plan for the Third-Party-Payer members of their class, to the court presiding over the MDL in the Eastern District of Pennsylvania. The proposed notices are intended to inform those Consumers and Corporate Entities[9] on whose behalf the States have asserted claims, as well as

---

[9] In order to minimize cost and duplication, Corporate Entities on whose behalf the Attorneys General have asserted claims will be covered in the Notice Plan developed and implemented by the EPPs, which plan will be submitted for approval in the MDL. *See* Settlement ¶ III.A. The States' Notice Plan will

natural persons for whom the EPPs are asserting claims (*i.e.*, all natural persons who are potential members of the EPP Settlement Class), and anyone else for whom notice is required, of their right: (1) to object to the settlement or (2) to file a timely and valid request for exclusion. The States will coordinate with the EPPs in providing notice in order to minimize cost and avoid duplication. *Id.* The notice plan must be implemented within sixty (60) calendar days of preliminary approval of the Settlement and the court's approval of the allocation plan, or such other time as directed by the court. *Id. at ¶ III.*C. The notice will provide that, to the extent permitted by law, Consumers and Corporate Entities on whose behalf the States have asserted claims, as well as members of the EPP Class, who opt out of either the States' or the EPP's settlement will also be required to opt out of the other settlement. *Id.*

### D.  Exclusions

Subject to court approval, any Consumer or Corporate Entity may seek to be excluded from the Settlement by submitting a valid and timely request for exclusion. *Settlement ¶ IV.A.*  The States, State Entities identified on the Settlement's Appendix B, and other State Entities that accept a distribution of settlement proceeds from the Settlement, have no right to seek exclusion. *Id.* Any Consumer or Corporate Entity that submits a valid and timely request for exclusion[10] will not be eligible to receive a distribution of any portion of the settlement amounts and will have no rights with respect to the Settlement. *Id.* Further, subject to court approval, in any written request for exclusion from the Settlement, the Consumer or Corporate Entity seeking exclusion must state his, her, or its full name, address, telephone number and e-mail address and include a statement that

---

provide notice to all consumers, including consumers on whose behalf the Attorneys General have asserted claims and consumers who are members of the EPP Settlement Class.

[10] A Consumer or Corporate Entity can submit a valid and timely request for exclusion from either the States' Settlement or the EPP Settlement, and if so, will be deemed to have requested exclusion from both. *See* Settlement IV.E

they wish to be excluded from the AG Settlement. *Settlement ¶ IV.B.* To the extent legally permissible, any Consumer or Corporate Entity that submits a valid and timely request for exclusion from either settlement shall be deemed to have requested exclusion from both the Settlement and the EPP Settlement. *Settlement ¶IV.E.* Unless otherwise ordered by the Court, a request for exclusion that does not comply with all of the provisions set forth in the applicable notice will be invalid, and any Consumer or Corporate Entity serving such an invalid request shall be bound by this Settlement upon Final Court Approval. *Settlement ¶IV.F.*

The States and EPPs shall, within ten (10) calendar days of the deadline for submitting a request for exclusion (the "Opt-Out Deadline"), provide Apotex with a list of, and copies of, all requests for exclusion, and shall file with their motions for final approval a list of all persons and entities that timely and validly requested exclusion. *Settlement ¶ IV.G.* Any of the Parties may dispute an exclusion request, in which case they shall, if possible, seek to resolve the disputed exclusion request by agreement within thirty (30) calendar days of the Opt-Out Deadline, and, if necessary, the Parties will seek court approval of any such resolutions. *Settlement ¶IV.H.* If the Parties are unable to resolve any such disputes, the Parties will submit such unresolved disputes to the court for decision. *Id.* A dispute relating to an exclusion request involving a Consumer or a State Entity should be addressed to this Court, while exclusion requests involving a Corporate Entity or other non-Consumer member of the EPP class will be addressed to the MDL Court.

### E. Cooperation by Apotex

As a condition of the Settlement, Apotex is required to continue providing cooperation to the States, EPPs and their respective counsel, as set forth in Appendix C of the Settlement. *Settlement ¶VIII.D; Appendix C.* Further, Apotex will use reasonable efforts to provide information necessary to authenticate and admit documents produced by Apotex and will in good

faith consider reasonable requests from the States and EPPs for additional assistance that does not impose an undue burden on Apotex.  *Settlement ¶¶ VIII.B and VIII.E.*

### F.  <u>Release and Covenant Not To Sue</u>

If this Court enters a final approval order and all appeals have been resolved or all appeal periods have expired, the State Releasors[11] will release, acquit, and forever discharge all Apotex Releasees from all Released Claims,[12] in consideration of Apotex's obligations under the Settlement. *Settlement ¶VI.A.* The State Releasors expressly waive and fully, finally, and forever settle and resolve, any known or unknown, suspected or unsuspected, contingent or non-contingent claims arising out of the Conduct[13] that they have released or for which they have covenanted not to sue, without regard to the subsequent discovery or existence of such different or additional facts. *Id.* at *¶¶VI.B* - VI.D. The State Releasors covenant not to sue or otherwise pursue any Apotex Releasees for any Released Claims, whether on their own behalf or, to the fullest extent permitted by law, on behalf of any other natural person or entity, including any State, State Entity, political subdivision, Consumer, or Corporate Entity. *Id.* at *¶VI.E.*

## IV. THE STATES' AUTHORITY

This Settlement is presented to the Court for preliminary approval by the attorneys general of the States in their sovereign and proprietary capacities and in their capacity as *parens patriae* or similar authority under federal and state laws[14] to bring claims and to obtain important redress

---

[11]*See* Settlement ¶ I.CC.

[12] *See* Settlement ¶ I.X.

[13] *See* Settlement ¶ I.E

[14] *E.g.*, Conn. Gen. Stat. § 35-32(c); Alaska Stat. §§ 45.50.580; 45.50.577(b); Ariz. Rev. Stat. §§ 44-1407, 44-1408(A), 44-1528(A); Cal. Bus. & Prof. Code § 16760; Col. Rev. Stat. § 6-4-111: D.C. Code §§ 28-4507, 28–3909; Del. Code Ann. tit. 6, § 2101, *et seq*.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. § 542.22(22); Ga. Code Ann. § 10-1-397(b)**;** Idaho Code Ann. § 48-108; 740 Ill. Comp. Stat. 10/7(2); Ind. Code § 24-1-2-5; *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 295 (1975); *Bd. of Comm'rs of Union City v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017); Ind. Code § 24-5-0.5-4(c);

for harm caused by Apotex's conduct. State attorneys general are politically accountable representatives of their states and have authority under state law to recover (1) for Consumers and Corporate Entities to the extent permitted by state laws; (2) for public purchasers, including state agencies to the extent permitted by state laws; and (3) for the state, in the form of disgorgement, civil penalties, costs, and fees.[15] The States, based on their authority to bring actions and seek relief for violations of federal law and state antitrust and consumer protection laws as to the facts in their complaints,[16] are authorized by state law to enter into this Settlement with Apotex to obtain

---

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); Iowa Code § 553.12; Kan. Stat. Ann. § 50-103(a)(8); Ky. Rev. Stat. Ann § 15.020, 367.110 through 367.990, and 518.020; *Com. ex. rel. Conway v. Thompson,* 300 S.W.3d 152 (Ky. 2010); *Com. ex rel. Beshear v. ABAC Pest Control Inc.,* 621 S.W.2d 705 (Ky. 1981); *State v. Bordens, Inc.*, 684 So.2d 1024, 1026 (La.Ct.App.1996); *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554 (Me.1973); Md. Com. Law Code Ann., § 11-209; MGL c. 93A § 4; *State v. Detroit Lumberman's Association*, 1979-2 Trade Cas. (CCH) ¶ 62,990, 1979 WL 18703 (Mich. Cir. Ct. 1979); *Minnesota v. Standard Oil Co*., 568 F. Supp. 556, 563 (D. Minn. 1983); Miss. Code Ann. §§ 7-5-1; *Clark Oil & Ref Corp. v. Ashcroft*, 639 S.W.2d 594, 596 (Mo. 1982); S*tate ex rel. Olsen v. Public Service Comm'n*, 283 P.2d 594 (Mont. 1955); Neb. Rev. Stat. § 84-212; Nev. Rev. Stat. § 598A.160(1) (1999); Nev. Rev. Stat. 598.0963 (2023); N.H. Rev. Stat. Ann. § 356:4-a; State v. City of Dover, 153 N.H. 181 (N.H. 2006); N.J. Stat. Ann. § 56:9-12.b; N.M. Stat. Ann. § 57-1-3(A), (B) (1979); *New Mexico v. Scott & Fetzer Co.*, 1981-2 Trade Cas. ¶ 64,439, 1981 WL 2167 (D.N.M. 1981); N.Y. Exec. Law § 63(12) and N.Y. Gen. Bus. Law §§ 340-342-a; N.C. Gen. Stat. §§ 75-15, 75-16; *Hyde v. Abbott Labs, Inc.*, 473 S.E.2d 680 (N.C. Ct. App. 1996); *FTC v. Mylan Labs*, 99 F. Supp. 2d 1 (D.D.C. 1999); N. D. Cent. Code §§ 51-08.1-07, -08(2); N. D. Cent. Code § 51-15-07; 4 CMC §§ 5107, 5121(b), 5206(b); Ohio Rev. Code § 109.81; *Ohio v. United Transp. Inc.,* 506 F. Supp. 1278, 1280-81 (S.D. Ohio 1981); 79 O.S. § 205 (A)(1); Or. Rev. Stat. § 646.775(1); 71 Pa. Stat. Ann. § 732-204(c); P.R. Laws Ann. tit. 32, §§ 3341–3344; R.I. Gen. Laws § 6-36-12; S.C. Code Ann. § 39-5-50(b); *State ex rel. Condon v. Hodges*, 349 S.C. 232, 562 S.E. 2d 623 (2002); S.D. Codified Laws § 37-1-23; *State v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990); Tenn. Code Ann. § 8-6-109; *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812 (6th Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *Connecticut v. Mylan Labs, Inc.*, No. 1:98cv2114, 2001 WL 765466 (D.D.C. Apr. 27, 2001); *Government of Virgin Islands by and through Encarnacion v. Health Quest, LLC,* 2023 WL 7214673, at *4 (Superior Ct. V.I. Oct. 31, 2023) (*citing Mathes v. Century Alumina Co*., 2008 U.S. Dist. LEXIS 90087, at *29 (D.V.I. 2008)); Utah Code Ann. §§ 76-10-3106(3), 76-10-3108(1), 13-11-17; *Utah Division of Consumer Protection v. Stevens,* 398 F.Supp.3d 1139, 1150 (D. Utah Aug. 19, 2019); Vermont Stat. Ann. 9 V.S.A. § 2458; Va. Code Ann. §§ 59.1-9.15; Rev. Code Wash. § 19.86.080; *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011); W. Va. Code § 47-18-17; Wis. Stat. Ann. §§ 133.16 – 133.17(1); Wy. Stat. §§ 40–12–105, 40–12–106, 40–12–107, 40-12-112 and 40-12-113; *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982).

[15] *See* footnote 14, *supra*.

[16] *E.g.,* Conn. Gen. Stat. §§ 35-34, 35-38, 42-110o, and 42-110m; Alaska Stat. §§ 45.50.576 - .578, 45.50.501, .531, and .537; Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. §§ 44-1407, 44-1408, 44-1528, and 44-1531; Cal. Bus. & Prof. Code §§ 16750, et seq., 17200, et seq., 17500, et seq., 17206, 17536,

injective relief and to recover for the States' Consumers, State Entities, and Corporate Entities, on whose behalf the States assert claims.

### A. **The States' *Parens Patriae* Authority to Represent Consumers in their States.**

The States bring claims for monetary relief for Consumers pursuant to state antitrust and consumer protection laws, which build on the common law doctrine of *parens patriae*. States have long-standing authority to bring *parens patriae* actions. The term *parens patriae* means "parent of the country." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600, n.8 (1982) (quoting BLACK'S LAW DICTIONARY 1003 (5th ed. 1979)). The doctrine originated under the English common law, which recognized the King as the guardian of "'all charitable uses in the kingdom.'" *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 257 (1972) (quoting 3 William Blackstone, Commentaries, 47-48 (1794)). In *Hawaii v. Standard Oil Co*., the court affirmed "the right of a State to sue as parens patriae to prevent or repair harm to its 'quasi-sovereign' interests."

---

17206.1, 16750, 16754, and 16754.5; Cal. Civil Code § 3345; Colo. Rev. Stat. § 6-4-101, et seq.; D.C. Code §§ 28-4507, 28-4509, and 28–3909; Del. Code Ann. tit. 6 § 2101, et seq.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. §§ 501.201, et seq, and 501.204; Idaho Code §§ 48-104, 48-108, and 48-112; 740 ILCS 10/1 et seq.; 10/7(1), 7(2), and 7(4); Ind. Code. §§ 24-1-2-5, 24-1-1-2, and § 24-5-0.5-4; Iowa Code §§ 553.12, 553.13, 714.16; Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, 50-161, and 50-162; Ky. Rev. Stat. Ann. 367.110 et seq.; LSA-R.S. 51:1407, and 51:1408; 10 M.R.S. § 1104, 5 M.R.S. § 209; Md. Com. Law Code Ann. § 11-209; MGL c. 93A, § 4; Mich. Comp. Laws § 445.771, et seq. and § 445.901 et. seq.; Minn. Stat. §§ 325D.43, 325D.45, 325D.49, 325D.56, 325D.57, 325D.58, and 325D.66; Minn. Stat. Ch. 8; Miss. Code Ann. §§ 75-24-1, et seq., and 75-21-1 et seq.; Missouri Rev. Stat. §§ 416.011 et seq., 407.010 et seq., 15 CSR 60-8.010 et seq., 15 CSR 60-9.01 et seq.; Mont. Code Ann. §30-14-111(4), §30-14-131, §30-14-142(2), and § 30-14-222; Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212; Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250; N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.; N.J.S.A. 56:9-1 et seq.; N.J.S.A. 56:8-1 et seq.; N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11; N.Y. Gen. Bus. Law §§ 340-342c; N.Y. Executive Law § 63(12); N.C. Gen. Stat. § 75-1 et seq.; N.D.C.C. §§ 51-08.1-01 et seq. and 51-15-01 et seq.; 4 CMC §§ 5101 et. seq.; 4 CMC §§ 5201 et. seq.; Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq.; 79 O.S. § 201 et seq.; 79 O.S. § 205; ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780; 73 P.S. §§ 201-4, 201-4.1, and 201-8 (b); 10 P.R. Laws Ann. §§ 257 et seq.; 32 P.R. Laws Ann. § 3341; R.I. Gen. L. §§ 6-36-1, et. seq.; South Carolina Code of Laws §§ 39-5-50, 39-5-110, 39-5-140, and 1-7-85; S.D. Codified Laws Chapters 37-1 and 37-24; Tenn. Code Ann. §§ 47-25-101 et seq.; 11 V.I.C. § 1507; 12A V.I.C. § 328; Utah Code §§ 76-10-3101 through 76-10-3118; 9 V.S.A. §§ 2458, 2461 and 2465; Virginia Code Section 59.1-9.15; Wash Rev. Code 19.86.080 and 19.86.140; West Virginia Code § 47–18–1 et seq.; Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18; Wyoming Statutes § 40-12-101 et seq.

405 U.S. at 258. The *parens patriae* doctrine has evolved to encompass a wide range of actions to protect the health and safety of a state's citizens. *See, e.g., Georgia v. Tennessee Copper Co.,* 206 U.S. 230 (1907) (interstate air pollution); *Kansas v. Colorado,* 185 U.S. 125 (1902) (water diversion); *Louisiana v. Texas,* 176 U.S. 1 (1899) (communicable disease).

State authority to bring a *parens patriae* action for federal antitrust law violations was first recognized by the U.S. Supreme Court in *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439 (1945), where the Court recognized a state's right to seek to enjoin price fixing, declaring that antitrust violations could erect trade barriers harmful to the state's "prosperity and welfare," and that the state had a sovereign interest in such "matter[s] of grave public concern." 324 U.S. at 449. Since *Georgia,* federal courts have routinely recognized the right of state attorneys general to bring *parens patriae* actions to redress consumer deception and antitrust violations.[17] States have, and have used, *parens patriae* authority to recover monetary damages for consumers for antitrust violations. *E.g.,* 15 U.S.C. § 15c; *In re Electronic Book Antitrust Litig.,* 14 F. Supp. 3d 525, 531 (S.D.N.Y. 2014); *In re Insurance Antitrust Litigation*, 938 F.2d 919, 927 (9th Cir. 1991), *aff'd in part, rev'd in part sub. nom. Hartford Fire Ins. Co. v. California,* 509 U.S. 764 (1993).

States have built on federal *parens patriae* authority with state law, including the provisions exercised here. Those state laws are sometimes constitutional, statutory, including both competition specific statutes and general statutes that apply to competition issues, common law,

---

[17] *See e.g. In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014) (conspiracy to raise eBook prices); *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd,* 96 F.3d 44 (2d Cir. 1996) (conspiracy to fix, raise, maintain, or stabilize retail prices of shoes); *Louisiana v. Borden, Inc.,* No. 94-3540, 1995 WL 59548 (E.D. La. February 10, 1995) (milk price-fixing claim); *Pennsylvania v. Milk Indus. Mgmt. Corp.,* 812 F. Supp. 500 (E.D. Pa. 1992) (milk contract bid-rigging claims on behalf of schools); *In re Mid-Atl. Toyota Antitrust Litig.*, 541 F. Supp. 62 (D. Md. 1981) (alleged conspiracy to fix artificially high price for "polyglycoat" finish applied to certain automobiles); *California v. Infineon Technologies AG,* 531 F.Supp.2d 1124 (N.D. Cal 2007) (alleged horizontal price-fixing conspiracy in market for dynamic random access memory (DRAM)).

and case law.[18] States are enforcing those laws here to fill gaps in federal law and otherwise strive to further the public interest.[19]

**B.** **Fundamental Differences Between *Parens Patriae* Claims and Rule 23 Claims**

*Parens patriae* claims differ from Rule 23 class action claims substantively and procedurally, and *parens patriae* actions are not directly governed by Rule 23 of the Federal Rules of Civil Procedure. *Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 217 (2nd Cir. 2013). While *parens patriae* authority derives from the states' interest as sovereigns, *Georgia*, 324 U.S. at 449, class action representation is developed to more efficiently and effectively manage litigation asserting claims for many businesses or consumers. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). Because of its sovereign nature and political accountability, *parens patriae* authority is exercised as soon as a state attorney general files an action. In contrast, representation by class counsel under Rule 23 requires court appointment and class certification, even in the settlement context. Fed. R. Civ. P. 23. Additionally, a class action requires the ascertainability of class members. Fed. R. Civ. P 23(b)(3).

Both the *parens patriae* claims by the States and the class action claims by the EPPs are released in the Settlement. According to its terms, the Settlement, including the notice plans and the consumer distribution plan, as set by the States in consultation with the EPPs, must be approved by this Court and the MDL court.

## V. ARGUMENT

Preliminary approval of the Settlement is warranted and appropriate based on the substantive terms of the Settlement and the process by which this Settlement was negotiated.

---

[18] *See* footnotes 14 and 16, *supra.*
[19] *See* footnotes 14 and 16, *supra.*

## A. <u>Standard for Preliminary Approval of *Parens Patriae* Settlement</u>

A parens patriae settlement will be approved if it is fair, reasonable, and adequate. *State of N.Y. by Vacco v. Rebook Intern. Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995). Although States' *parens patriae* actions are distinct from class actions, courts in this circuit and elsewhere generally look to the standards used in approving class action settlements when evaluating what a *parens patriae* settlement delivers. *See Id.; In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003); *New York. v. Nintendo of America, Inc.*, 775 F. Supp. 676, 680 (S.D.N.Y. 1991). The *parens patriae* settlement approval process generally applies a two-step approach: (1) preliminary approval, which occurs prior to notice to consumers and requires the court to make a preliminary evaluation of fairness, and (2) final approval, after notice of the settlement is provided and a hearing with opportunity to be heard, where the court makes a final determination whether the settlement is fair, reasonable, and adequate. *See In re GSE Bonds Antitrust Litigation*, 414 F. Supp. 3d 686, 691-92 (S.D.N.Y 2019); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

A motion for preliminary approval is distinct from a motion for final approval. The preliminary approval process is governed by a "likelihood standard"—requiring the Court to assess whether the parties have shown that "the court *will likely* be able to grant final approval…." *In re Payment Card*, 330 F.R.D. at 28 n.21 (emphasis in original). Preliminary approval of a settlement, in contrast to final approval, "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to … [consumers] and hold a full-scale hearing as to its fairness." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (citing *In re Traffic Executive Association–Eastern Railroads*, 627 F.2d 631, 634 (2d Cir.1980)).

"Because Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval, it follows that courts must assess at the preliminary approval stage whether the parties have shown that the court will *likely* find that the factors weigh in favor of final settlement approval." *In re Payment Card,* 330 F.R.D. at 28.

### B.  The Settlement Meets the Standard for Preliminary Approval

The Settlement satisfies the standard for preliminary approval because the court w*ill likely* be able to grant final approval of the Settlement.  Looking to the standard used for approval of class action settlements, *See supra, See e.g.*, *In re Toys 'R' Us Antitrust Litig*., 191 F.R.D. at 351; *New York v. Salton, Inc.*, 265 F. Supp. 2d at 313; *State of New York v. Rebook Intern. Ltd*., 903 F. Supp at 535; *New York. v. Nintendo of America, Inc.*, 775 F. Supp. at 680. Final approval of a class action settlement requires courts to consider whether:

A.  the class representatives and class counsel have adequately represented the class;
B.   the proposal was negotiated at arm's length;
C.  the relief provided for the class is adequate, taking into account:
   i.  the costs, risks, and delay of trial and appeal;
   ii.  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
   iii.  the terms of any proposed award of attorney's fees, including timing of payment; and
   iv.  any agreement required to be identified under Rule 23(e)(3); and
D.  the proposal treats class members equitably relative to each other.

F. R. Civ. P Rule 23(e)(2). "Paragraphs (A) and (B) constitute the 'procedural' analysis factors and examine 'the conduct of the litigation and of the negotiations leading up to the proposed settlement.'" *In re Payment Card,* 330 F.R.D. at 29 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). "Paragraphs (C) and (D) constitute the 'substantive' analysis factors and examine '[t]he relief that the settlement is expected to provide ….'" *Id.* In the Second Circuit, the Rule 23(e)(2) factors are supplemented by the factors set forth in *City of*

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), when determining whether the Court will likely find that a settlement is fair, reasonable, and adequate, thus warranting preliminary approval. *Id.*; *In re GSE Bonds*, 414 F. Supp. 3d at 692. *Grinnell* set forth nine factors that are referred to as the *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation,
> (2) the reaction of the class to the settlement,
> (3) the stage of the proceedings and the amount of discovery completed,
> (4) the risks of establishing liability,
> (5) the risks of establishing damages,
> (6) the risks of maintaining the class action through the trial,
> (7) the ability of the defendants to withstand a greater judgment,
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (citations omitted). The States will address both sets of factors.

### 1. Procedural Analysis Factors Support Preliminary Approval

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself. *See e.g. In re GSE Bonds*, 414 F. Supp. 3d at 693; *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *7 (E.D.N.Y. Dec. 22, 2011); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 238-39 (E.D.N.Y. 2010). The court must consider two procedural factors under Rule 23; whether (A) the class representatives and class counsel have adequately represented the class, and (B) the proposal was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2). Because the Settlement was negotiated at arm's length by experienced litigators and is the result of a good-faith and procedurally fair process, the procedural factors support preliminary approval of the Settlement.

### i. The States Have Adequately – and Zealously – Represented Consumers

This first procedural factor requiring adequate representation of the class is not directly

applicable to a settlement in a *parens* action brought by the States in the public interest. *See e.g.* *State of New York v. Reebok International, Ltd.,* 96 F.3d 44,48 (2d Cir. 1996) (noting Attorneys General in *parens* actions are motivated by concern for the public interest). Nonetheless, the States have vigorously represented the interests of their citizens in this action for more than eight years.[20] States Decl. ¶11. The States have engaged in extensive discovery and motion practice, zealous prosecution of this Action, and settlement negotiations to obtain a favorable settlement.[21] *Id.* The States represent fifty U.S jurisdictions whose interests are aligned in enforcing federal and state laws and vigorously pursuing remedies for their states, their Consumers, State Entities, and Corporate Entities.[22] *Id.* at ¶8.

## ii. The Settlement Was Negotiated at Arm's Length by Experienced Counsel.

The Settlement was "reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex … litigation'" and enjoys a presumption of fairness. *In re GSE Bonds*, 414 F.Supp.3d at 693 (*quoting In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)); State of *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. at 535. Attorneys representing the parties to the Settlement are experienced and well-informed. Apotex's and EPP's respective counsel have significant expertise in complex antitrust litigation. The Assistant Attorneys General in the offices of the Attorneys General for Connecticut, New York, and Massachusetts who negotiated the Settlement, individually and collectively, also have extensive experience with antitrust investigations and litigation. States Decl. ¶13. "The Attorney Generals

---

[20]Similarly, the EPPs have vigorously represented the interests of their putative class members, including consumers represented by the EPPs.

[21] Similarly, the EPPs have zealously litigated in the MDL and engaged in settlement negotiations with Apotex to obtain a favorable settlement for putative members of the EPP Settlement Class, including Consumers who are not residents of the States.

[22] EPPs represent a putative class covering purchasers in 48 states, D.C. and two territories.

have extensive experience in complex antitrust cases brought under their *parens patriae* powers." *New York v. Nintendo of Am. Inc.*, 775 F. Supp. at 680. Indeed, this action is part of a long and successful tradition of multistate litigation by State Attorneys General.[23]

Courts can place special weight on a settlement being negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd,* 682 F.2d 355 (2d Cir. 1982). The participation of State Attorneys General furnishes extra assurance that Consumers' interests are protected. *In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. at 351. The motivating factor in this Action is the enforcement of antitrust laws by the States acting as *parens patriae* for their citizens. *See New York v. Reebok,* 96 F.3d at 48. The States negotiated at arms-length with Defendants for years while actively litigating, and fifty Attorneys General have approved the settlements on behalf of their state, their Consumers, State Entities, and Corporate Entities, for whom they assert claims. States Decl. ¶8; Exhibit 1.

### iii. The States Have Obtained a Sufficient Understanding of the Case

The States were well informed about the issues in this matter and the strengths and weaknesses of the States' Action when they negotiated the Settlement with Apotex. States Decl. ¶¶11-13. The third *Grinnell* factor requires the court to consider the stage of the proceedings and amount of discovery completed. *In re GSE Bonds*, 414 F. Supp. 3d at 699. "The relevant inquiry 'is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the

---

[23] *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993); *In re Panasonic Consumer Elect. Prod.*, 1989-1 Trade Cas. (CCH) ¶ 68, 613 (CCH), 1989 WL 63240, (S.D.N.Y. June 5, 1989); *Colorado v. Airline Tariff Publ's Co.*, 1995-2 Trade Cas. (CCH) ¶ 71,231, 1995 WL 792070 (D.D.C. May 10, 1995); *In re Mid-Atl. Toyota Antitrust Litig.*, 605 F. Supp. 440 (D.Md.1984); State of *New York v. Reebok International, Ltd.*, 96 F.3d 44 (2d Cir. 1996); *In re Electronic Book Antitrust Litig.*, 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp 706 (D. Minn.1975); *U.S. v. Apple Inc.*, 952 F.Supp.2d 638 (S.D.N.Y 2013); *In re Compact Disk Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003); *State of New York, et al. v. Cephalon, Inc.*, No. 16-4234 (E.D. Pa. 2016); *State of Wisconsin, et al. v. Indivior Inc., et al.*, 16-cv-5073 (E.D. Pa. 2016).

strengths and weaknesses of their claims and the adequacy of the settlement.'" *Id.* (*quoting In re*

*AOL Time Warner, Inc.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6,

2006)). The State of Connecticut has been investigating some claims since July 2014, and most

States have been litigating some of the claims in the States' Actions since December 2016. The

lengthy and extensive litigation has provided an excellent foundation to understand the facts and

legal issues, as did this Court's and the MDL Court's opinions and orders. The States understand

what Consumers, State Entities, Corporate Entities, and members of the EPP Settlement Class

have overpaid for generic pharmaceuticals manufactured by Apotex and the other Defendants,

and the challenged conduct's price effects on generic pharmaceuticals, based on data provided by

state Medicaid agencies, third parties, and Defendants in the MDL and expert analysis and reports.

The States' investigation and litigation work over the past eight years, including expert discovery,

has allowed them to obtain an excellent understanding of the case. States Decl. ¶11.

In summary, because the settlement was the product of arm's-length negotiations between

informed and experienced counsel and was reached after a lengthy investigation and litigation,

the procedural factors weigh in favor of preliminary approval.

## 2. Substantive Analysis Factors Support Preliminary Approval

The second set of factors focuses on the substantive terms of the Settlement and the relief

that the settlement is expected to provide. *In re Payment Card,* 330 F.R.D. at 29. When evaluating

preliminary approval of a settlement, the court must consider whether: (C) the relief provided is

adequate, and (D) the proposal treats eligible consumers equitably relative to each other. Fed. R.

Civ. P. 23(e)(2). This inquiry overlaps significantly with several *Grinnell* factors, which help guide

the Court's application of Rule 23(e)(2)(C)(i). *In re GSE Bonds,* 414 F. Supp. 3d at 693 (*citing In*

*re Payment Card*, 330 F.R.D. at 36). The substantive factors weigh in favor of preliminary

approval because the Settlement provides substantial and guaranteed recovery for Consumers, State Entities, and Corporate Entities, which recovery is fair, reasonable, and adequate given the litigation risks. States Decl. ¶23.

Rule 23(e)(2)(C) requires the court to examine whether the "relief … is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Further, *Grinnell* factor eight, "the range of reasonableness of the settlement in light of the best possible recovery," and factor nine, "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," are often considered together, *In re GSE Bonds*, 414 F. Supp. 3d at 696 (*quoting In re Payment Card*, 330 F.R.D. at 47-48).

### i. The Settlement Provides Adequate Relief

When assessing the adequacy of a settlement, courts may need to forecast the likely range of possible recoveries and the likelihood of success in obtaining such results. *In re GSE Bonds*, 414 F. Supp. 3d at 693 (citing *In re Payment Card,* 330 F.R.D. at 36). The court's task is to weigh the settlement figure against the amount of likely recovery. *New York v. Reebok,* 96 F.3d at 49. Courts have held that "[t]he proper measure of damages in a suit concerning a price-fixing conspiracy is 'the difference between the prices actually paid and the prices that would have been paid absent the conspiracy.'" *In re Electronic Books Antitrust Litigation*, 2014 WL 1282293 at *16 (S.D.N.Y., March 28, 2014) (quoting *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988)). Further, monetary relief in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565, 101 S. Ct. 1923, 68 L.Ed.2d 442 (1981)

(quoting *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264 (1946)).

Based on information and data the States have obtained through investigation and discovery, and analysis provided by the States' experts, the States estimate that the total amount of overcharge associated with sales by Apotex during the period at issue in the litigation is approximately $202 million. The amounts of overcharges passed through to Consumers and State Entities is disputed, but the States' expert in the Dermatology Action has indicated the cumulative passthrough is 50% of that number, or $101 million. States Decl. ¶9. Given that, the $39.1 million settlement amount to the States is a significant percentage considering the case complexity and litigation risk and, therefore, reasonable, adequate, and within the range of possible approval for purposes of the preliminary approval analysis. *See e.g., In re GSE Bonds*, 414 F. Supp. 3d at 697 (13-17% of the best possible recovery considered reasonable); *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006) (settlement "representing roughly 10-15% of the credit transaction fees collected by Defendants").

In addition to the monetary relief, the Settlement also provides valuable relief through Apotex's commitment to maintain its existing compliance program and provide an annual report to the States as to its compliance program. *See* Settlement ¶¶VII.B, VII.C

ii. The Cooperation from Apotex Adds Value to the Settlement

Further value is added to this Settlement through Apotex's agreement to provide cooperation to the States in the ongoing litigation against other Defendants. *See In re GSE Bonds*, 414 F. Supp. 3d at 697. Successful litigation against Apotex's co-defendants will increase the likelihood of further recovery and additional value to the States, the Consumers, State Entities, and Corporate Entities on whose behalf the States assert claims, and for EPP Settlement Class members. Related to this is the seventh *Grinnell* factor, defendants' ability to withstand a greater

judgment. Even if it is determined that Apotex could withstand a greater judgment, "courts have noted that a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)).

Apotex's covenant of continued cooperation in this litigation provides considerable value, which supports preliminary approval. *See e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396 at *9 (E.D.N.Y. Sept. 25, 2009) ("the agreement to cooperate with the plaintiffs … adds significant value"); *In re GSE Bonds*, 2019 WL 6842332 at *4 (S.D.N.Y Dec. 16, 2019) ("this cooperation … nonetheless provides some additional value to the GS settlement"); *In re Packaged Ice Antitrust Litig.*, 2010 WL 3070161 at *6 (E.D. Mich. Aug 2, 2010) (where "there is the potential for a significant benefit … in the form of cooperation on the part of the settling Defendant, this Court is reluctant to refuse to consider the very preliminary approval that will trigger that cooperation").

### iii. The Settlement Is Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal.

When evaluating the adequacy of the Settlement, the Court should analyze the comparison between the settlement amount and the full estimated damages in light of all the risks of litigation, which determine the likelihood of recovery. As the risks of litigation increase, the range of reasonableness correspondingly decreases. *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002). This analysis overlaps significantly with *Grinnell* factors 1, 4, 5, and 6, which include: the complexity, expense, and likely duration of the litigation (factor 1); the risks of establishing liability (factor 4); the risks of establishing damages (factor 5); and the risks of maintaining the class action through the trial (factor 6). *Grinnell*, 495 F.2d at 463.

A settlement is a compromise, a yielding of the highest hopes in exchange for certainty and

resolution. *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). The Settlement's substantial and guaranteed recovery for Consumers is fair, reasonable, and adequate given the litigation risks inherent in any litigation and more particularly in a complex antitrust case such as this matter. In addition to analyzing purchases of Apotex's generic pharmaceuticals at issue and the damage analysis contained in expert reports submitted in the Dermatology Action, the States have gathered information necessary to adequately assess their risks of litigation in this matter.

The States have done significant investigation and litigation work to support their belief in their claims, but litigation always include risks. Antitrust cases "'are complicated, lengthy, and bitterly fought,'… as well as costly." *In re GSE Bonds,* 414 F.Supp.3d at 697 (quoting *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc*., 396 F.3d 96, 118 (2d Cir. 2005)); *See also In re Vitamin C Antitrust Litig*, No. 06-MD-1738 (BMC), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012). This litigation, which, in addition to federal law claims, also includes state law claims for forty-three different states,[24] is no exception, particularly given the number of parties, drugs, and alleged conspiracies and the fact that the litigation against Apotex has been ongoing for more than eight years. *See In re GSE Bonds*, 414 F.Supp.3d at 693. This Action will involve multiple trials, which will be lengthy and complex because of the nationwide scope of the alleged activities, and it has already required lengthy and expensive discovery, which is still ongoing. *See New York v. Reebok,* 903 F. Supp. at 536. "Courts favor settlement when litigation is likely to be complex,

---

[24] The States bring claims under the laws of Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin. *See* Consolidated Amended Complaint. The EPPs bring claims under the laws of every state except Indiana and Ohio.

expensive, or drawn out." *In re GSE Bonds*, 414 F.Supp.3d at 693.

Litigating the claims and defenses in this case would necessarily entail some risk with respect to establishing liability and proving damages or other relief sought. "[A]s to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially more difficult issues at the proof stage." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 327 F.R.D. 483, 494 (S.D.N.Y. 2018) ("*LIBOR*")*.* Further, litigation also includes risk that the fact finder would find that the injury caused by the anticompetitive conduct is less than alleged. Proving violations of antitrust laws is no mean feat, and even if that feat is accomplished, proving remedies and damages is just as difficult. *See LIBOR*, 327 F.R.D. at 494 (plaintiffs' damages models would "unquestionably be challenged and perhaps subject to further *Daubert* motions"); *In re GSE Bonds*, 414 F. Supp. 3d at 697 (even if they prove liability, plaintiffs will still face the difficulties inherent in proving damages).

At trial, proof of damages, disgorgement, restitution, and civil penalties would likely be a complex task involving a "battle of the experts." *In re Nasdaq Mkt.-Makers Antitrust Litig*., 187 F.R.D. 465, 476 (S.D.N.Y. 1998); *See Chatelain* v. *Prudential–Bache Secs., Inc.,* 805 F. Supp. 209, 213 (S.D.N.Y. 1992) (complex issue of establishing damages would require battle of the experts). "As the Second Circuit has noted, 'the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting Wal-Mart Stores,* 396 F.3d at 118 (citation omitted)); *See also ZF Meritor et al. v Eaton Corporation*, 800 F.Supp.2d 633 (D. Del. August 4, 2011) (exclusion of expert report made plaintiffs unable to prove monetary damages despite jury verdict finding antitrust violations).

This litigation has been ongoing for more than eight years, and considering the risks, costs, and delay involved in an antitrust case of this magnitude, the opportunity for guaranteed relief weighs heavily in favor of approving the Settlement. *See In re GSE Bonds*, 414 F. Supp. 3d at 694 (court should balance immediacy and certainty of recovery against the continued risk of litigation). Recognizing the cooperation that Apotex has agreed to provide, an early settlement discount, the risks of litigation, and the time value of money, the States believe that the $39.1 million Settlement is fair, reasonable and adequate.

    iv.   <u>The Proposed Method of Distribution treats Consumers Equitably Relative to Each other and Based on Claims Asserted and Releases Provided.</u>

The States propose to hold funds in the State Escrow designated for later distribution and to submit a complete allocation and distribution plan to the Court for approval at a future date. *See Settlement ¶ XI.B.* A plan of allocation is not required for the Court to grant preliminary approval of the Settlement. *E.g., In re Foreign Exchange Benchmark Rates Antitrust Litig*., 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015) (order granting preliminary approval and stating that counsel shall submit for the Court's approval a proposed Plan of Distribution of the Settlement Funds at a later date). However, the States are proposing a framework and general principles for the plan for distribution to Consumers as further described in Paragraph V.D, *infra*. This proposed distribution plan structure includes a plan for allocation that treats Consumers equitably relatively to each other and based on the strength of claims asserted and released on their behalf. *See* Paragraph V.D, *infra*. The States' proposed plan regarding distribution to Consumers, *infra,* is fair to Consumers as a whole, taking into consideration the strength of releases and claims based on available evidence, and meets the desired goal that a distribution plan must be fair and adequate. *See In re GSE Bonds*, 414 F. Supp.3d 686, 694 (S.D.N.Y. 2019).

The Court must also consider the terms of any proposed award of attorney's fees, including timing of payment, and any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C). The States have not entered into any related agreements requiring disclosure. The Settlement provides that 30% of the State Settlement Amount be placed in escrow for use in paying for the expenses of the Notice Plan and administration, and upon final approval of this Settlement, for costs of litigating the States' claims both collectively or individually, including to reimburse the States for attorney's fees. *Settlement ¶I.DD.3.* Further, to the extent that the funds in the Cost Account is not needed to offset costs of States litigating in the State Actions, any remaining funds may be used by the States as set forth in the Settlement's paragraph I.DD.3. *See III.B, supra.* The Cost Account represents statutorily authorized recovery and enforcement remedies, including the costs and expenses of settlement administration, the costs, expenses and attorneys' fees incurred by the States in investigating and litigating the States' Actions, and such other monetary recovery or remedies the States may be entitled to pursuant to state law.[25] This payment to the state is fair and reasonable under the circumstances.

In summary, the factors set forth in Rule 23(e)(2), together with the *Grinnell* factors, demonstrate that the Settlement is fair, reasonable, and adequate, under the circumstances of this case, and that preliminary approval of the Settlement is warranted.

**C. The Proposed Notice Plan is Reasonable and Meets the Requirements of Due Process.**

The States seek the Court's approval of a proposed Notice Plan for providing notice to Consumers on whose behalf the States have asserted claims, as well as Consumers who are

---

[25] See footnote 16, supra.

included in the EPP Settlement Class. The details of the States' proposed Notice Plan are set forth in the declaration of Tiffaney Janowicz.[26] There are no rigid rules for determining whether a settlement notice satisfies constitutional requirements. *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F.Supp.2d 179, 191 (S.D.N.Y. 2012), *aff'd sub nom* 731 F.3d 241 (2d Cir. 2013). "The standard for the adequacy of a settlement notice … under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023) (*citing Wal-Mart Stores*, 396 F.3d at 113–14). Notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings. *Wal-Mart Stores*, 396 F.3d at 114.

To ensure compliance with notice requirements under the Settlement, as well as state and federal laws, the States have retained Rust Consulting, Inc ("Rust"), a nationally recognized notice and administration company specializing in the design and implementation of notice and administration programs of all sizes and types in class action settlements and similar matters. *See* Janowicz Decl. at ¶¶2-3 and Exhibit A; States Decl. ¶ 16. Rust has extensive experience in state and federal class and *parens patriae* actions. *Id.*[27]

To ensure that the Notice Plan is successful, the States propose to take various actions to effectuate broad, clear, and concise notice to Consumers – as well as prepare for a fair and thorough claims process. *First*, Rust established a website at [www.AGGenericDrugs.com](http://www.AGGenericDrugs.com) that informs

---

[26] The EPPs will request approval of this same proposed Notice Plan, as well as a separate notice plan for the Third-Party-Payer members of their class, including Corporate Entities on whose behalf the Attorneys General assert claims, from the MDL court.

[27] *See e.g. In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *In re Metropolitan life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871 (W.D. Pa. Dec. 28, 1999); *In re Electronic Book Antitrust Litig.*, 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014). Rust was also approved by this Court as the Notice and Claims Administrator for the Heritage Settlement. ECF No. 675 (3:16-cv-02056-MPS), No. 465 (3:20-cv-00802-MPS), and No. 502 (3:20-cv-00802-MPS).

Consumers about the litigation and Settlement, including basic information about Consumers' rights and options concerning the Settlement, shares several helpful documents and lists "FAQs" to several expected questions Consumers are likely to have. Janowicz Decl. ¶11. The website also has a form allowing Consumers to register to obtain future information about how to file a claim seeking payment (if eligible) as well as a form for Consumers seeking to opt-out of the Settlement. *Id.; Exhibit E.* The States have drafted a Short Form Notice (Summary Notice) and a Long Form Notice, *see* Exhibits C and D, that will be available on the website and otherwise used to provide Notice to Consumers. *Second,* Rust will provide some direct notice to Consumers who have registered to receive updates. Rust has been collecting and will continue to collect registrations through the website and by telephone, and when possible, Rust will send the Short Form Notice via email to consumers who registered to receive updates concerning the case status, and for those consumers who did not provide an email address with their registration, Rust will mail the Long Form Notice. Janowicz Decl. ¶14. *Third,* Rust has created an email address and a toll-free telephone number, where Consumers can seek additional information, and U.S. Mail Post Office Box, identified on the website, to allow Consumers to ask questions, register for future notices, update their address, request exclusion, and eventually file claims. Janowicz Decl. at ¶30-34.

Fourth, Rust will implement a paid media program. This program is designed to ensure that the Notice is placed in media outlets whose audiences are likely to include our target audience and includes digital (website banner ads) and social media, as well as print media through AARP's *The Magazine.* Janowicz Decl. at ¶¶ 15-24. *Fifth,* States and Rust will implement an earned media program, in the form of press releases issued by the States and a national press release distributed through PR Newswire's Multicultural and US1 Newslines in English, Spanish and Chinese, thereby reaching approximately 14,500 websites, media outlets, and journalists. Janowicz Decl. at

¶¶25-28. *Sixth,* Rust will also send the Summary Notice to 17,500 independent pharmacies across the country via mail and email. A letter from the States accompanying the notice will ask pharmacies to post, email or otherwise share the Summary Notice with customers who may have purchased one or more of the drugs at issue. Janowicz Decl. at ¶29.

The States propose that notice begin within 7 days of preliminary approval, continue until 63 days after the date of the preliminary approval and provide an Opt-Out Deadline of 73 days from the date of preliminary approval, by which Consumers must opt out of, comment on, or object to the Settlement. Implementation of the Notice Plan will be coordinate with the EPP notices and Notice Plan. The States are not now asking the Court to impose a deadline for Consumers to opt out of the litigation generally or comment on or object to a final distribution plan.

 The objective of the proposed Notice Plan is to provide the best notice practicable under the circumstances to eligible consumers who purchased one of the identified  generic drugs at issue in the above-referenced litigations for personal, family, or household use (and not for resale) between January 1, 2010 and December 31, 2018, provide them with opportunities to learn about the settlement and act upon their rights; and ensure that they will be exposed to, see, review, and understand the Notices. Janowicz Decl. at ¶¶6-7. The Notice Plan is designed to reach at least 78% of the target audience using a methodology that is consistent with the standards employed by Rust in designing effective notice programs and administering these types of settlements.   Janowicz Decl. at ¶36. The Notice will "fairly, accurately, and neutrally describe the claims and parties in the litigation, the terms of the proposed settlement and the identity of persons entitled to participate in it," as well as apprising Consumers of their options with regard to the proposed Settlement.  *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (citing *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988), *aff'd,* 892 F.2d 196 (2d Cir. 1989)); *Wal-Mart Stores*, 396 F.3d at 114.

The States developed the proposed Notice Plan to provide the best notice to Consumers as practicable under the circumstances. Janowicz Decl. at ¶6; *See In re GSE Bonds*, 414 F. Supp. 3d at 702. Providing notice is no easy task in the States' Actions, considering the large number of Defendants and drugs involved and the fact that the identity of Consumers who purchased the drugs at issue are not easily determined. There is no readily available Consumer list to be used for direct notice. Janowicz Decl. at ¶9. The proposed Notice Plan has been designed to reach as many potentially Consumers as practicable, while remaining cost-effective. Therefore, the Notice Plan was designed to include paid advertising in digital and social media communications and print, and earned media from press releases, supplemented by outreach to pharmacies asking for their assistance in providing notice to their customers. Janowicz Decl. at ¶9.

Further, by encouraging potentially eligible Consumers, who choose to remain in the Settlement, to register on the website, the Notice Plan is designed to make distribution of settlement funds to those injured by Defendants' conduct more attainable. The Notice Plan fully comports with the requirements of due process, both in terms of form and substance, and is reasonable, as well as the best notice practicable under the circumstances. Janowicz Decl. at ¶¶ 6, 8, 36. Therefore, the States request that this Court approve the Notice Plan, and order that Notice commence within 7 days after the entry of the Preliminary Approval order.

### D.   The Proposed Framework for Distribution is Fair and Reasonable

The States are submitting an outline of the basic framework or structure of a proposed distribution plan to the Court for preliminary approval. This framework is also outlined in the Long Form Notice filed herewith as Exhibit C. The States are asking the Court to grant preliminary approval of (1) the proposed framework for allocation of the settlement funds between Consumers and State Entities that are State Releasors, and (2) the proposed framework of a consumer

distribution plan.

The States maintain that the proposed framework of the distribution plan and the allocation of the restitution funds between Consumers and State Entities that are State Releasors is fair and reasonable under the circumstances. The standard for judicial approval of a settlement agreement, that requires a finding that the settlement is fair, adequate and reasonable "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants." *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir. 1982); *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp, 2d 1152, 1154 (N.D.Cal.2001) (Approving a plan for the allocation of a class settlement fund is governed by the same legal standards that apply to approving the settlement terms: the distribution plan must be "fair, reasonable and adequate"). Approval of a plan of distribution is within the discretion of the Court. *In re Chicken,* 669 F.2d at 238*; West Virginia v. Chas. Pfizer & Co., Inc.,* 440 F.2d 1079, 1085 (2d Cir. 1971); *White v. National Football League,* 822 F. Supp. 1389, 1417 (D. Minn. 1993). A plan of allocation may be approved so long as it has a "reasonable, rational basis." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-3400 (CM) (PED), 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010); *In re Initial Pub. Offering Sec. Litig*., 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009). However, "a plan of allocation need not be perfect." *In re GSE Bonds, 414 F. Supp.3d at 694 (quoting In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05-CV-10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007)).

### 1. Allocation of the State Settlement Amount

The Settlement provides that 70% of the $39.1 million State Settlement Amount is allocated to restitution to Consumers and State Entities that are State Releasors, to compensate them for any alleged harm resulting from the alleged Conduct. *Settlement I.DD, II.A.* The States

propose that 45.08% of the State Settlement Amount (or 64.4% of the restitution amount) equaling $17,624,403.04 be allocated and distributed to Consumers and 24.92% of the State Settlement Amount (or 35.6% of the restitution amount) equaling $9,745,596.96 be allocated as restitution to State Entities, to be divided between the settling states based on relative harm and claims asserted in the litigation, and distributed to each State for such use permitted under state law at the sole discretion of each State Attorney General. *See Settlement* DD(2) ("The State Settlement Amount shall be allocated among the State Entities that are State Releasors as determined by the Attorneys General"). States Decl. ¶18. The States propose that the distribution to States of funds allocated as restitution to State Entities that are State Releasors will be made promptly upon the Court's Final Approval of the Settlement.

### 2. The Proposed Consumer Claims and Distribution Process

To receive a portion of the Settlement, a Consumer will be required to submit a claim and release form. States Decl. ¶19. The States do not intend to require proof of purchase beyond a verified statement of purchase from a Consumer. *Id.* However, the States reserve the option of requiring proof or auditing any large claims submitted. *Id.* The States do not intend to block any claims as being too small to be paid, but rather, propose to determine and set a minimum payment amount to be paid to a Consumer filing a valid claim ("Minimum Payment") so that all valid claims would receive at least a minimum amount. *Id.; See In re Nasdaq Mkt.-Makers Antitrust Litig., No. 94 CIV. 3996 RWS, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000)* (approving $25 minimum payment as a reasonable means of compensating class members with relatively small claims); *In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 497-98 (S.D.N.Y. 2009)* (approving $10 minimum payment no matter how small the claim). The States believe that the use of a Minimum Payment is important to encourage Consumers to participate in the claims process.

The States propose that the Minimum Payment amount be determined after additional settlements have been reached and it is appropriate and efficient to do a distribution to Consumers, to ensure that a reasonable portion of the Settlement funds are allocated towards claimants receiving the Minimum Payment, while still preserving enough funds for Consumers with larger documented claims. States Decl. ¶20. The use of a Minimum Payment allows Consumers to meaningfully participate in the Settlement by submitting valid claims and is designed to avoid a situation in which the cost of issuing a payment exceeds the amount of the payment. *Id.* A Minimum Payment amount also allows smaller claims to be processed more efficiently and with less inquiries and challenges on claims. Efficiency, ease of administration and conservation of public and private resources are highly relevant to the reasonableness of a settlement. *In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. 104, 135, (S.D.N.Y. 1997). The "goal of any distribution method is to get as much of the available damages remedy to [Consumers] … as possible and in as simple and expedient a manner as possible." *LIBOR,* 327 F.R.D. at 496 (quoting 4 William B. Rubenstein, *Newberg on Class Actions* § 12:15 (5th ed.)(Westlaw 2018). In the event that a minimum payment is impracticable, the States reserve the possibility of pro rata reductions or other options, in which event the States will first seek and obtain approval from the Court.

The States believe this plan for distribution represents a reasonable method of ensuring equitable and timely distribution of the restitution funds, and to as many affected Consumers as possible, without burdening the process in a way that will unduly waste funds. States Decl. ¶20; *See In re GSE Bonds,* 414 F. Supp.3d at 694; *See also LIBOR,* 327 F.R.D. at 496 (quoting *In re Credit Default Swaps Antitrust Litig.*, 13-md-2476 (DLC), 2016 WL 2731524 *9 (S.D.N.Y. April 26, 2016) ("A principal goal of a plan of distribution must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund").

### 3.  Proposed Framework for Allocation Among Consumers

The State propose the following framework for allocation among Consumers. The Settlement provides that the "State Settlement Amount shall be allocated … among Consumers ***as determined by*** the Attorneys General with the EPP Settlement Class Counsel consulting … and approved by the court." *Settlement* ¶ DD(2)(emphasis added). The States propose to treat Consumers equitably relative to each other and based on representation in the litigation, strength of claims asserted, and releases provided for consumer claims. States Decl. ¶21. A Consumer shall be entitled to receive payments in proportion to their spend on generic pharmaceuticals at issue (i.e. "pro-rata")[28] with one exception; Consumers residing in a non-settling state on whose behalf only EPPs are settling claims, namely Alabama, Arkansas, Hawaii, and Texas, shall receive less, likely only the minimum payment, because they are giving less by providing a release only for class action claims and not *parens patriae* claims brought by the state. *Id.*

A plan of distribution "'must be fair and adequate,'" but "it 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent … counsel." *In re GSE Bonds*, 414 F. Supp.3d at 694 (*citing In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)). There is no rule that a settlement must benefit all Consumers equally if the allocation is rationally based on legitimate considerations. *In re MetLife Demutualization Litig., 689 F.Supp.2d 297, 344 (E.D.N.Y 2010; In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. at 129; *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1411 (E.D.N.Y. 1985); *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983); s*ee also In re Blue Cross Blue Shield*

---

[28] A pro rata plan for allocation has been used in many antitrust cases. *See e.g. In re Vitamins Antitrust Litig.,* 2000 WL 1737867, at *6 (D.D.C.Mar.31, 2000); *In re Lloyds' Am. Trust Fund Litig.,* 2002 WL 31663577, at *19 (S.D.N.Y.Nov.26, 2002); *In re Paine Webber Inc. Ltd. Partnerships Litig.,* 117 F.3d 721 (2d Cir.1997).

*Antitrust Litig.*, MDL 2406, 85 F.4th 1070, 1094 (11th Cir. 2023)("Although the settlement agreement's allocation is facially unequal, it is not facially unfair"); In re Payment Card Interchange Fee and Merc. Disc. Antitrust Litig., 2024 WL 3236614 *36 (E.D.N.Y. June 28, 2024)("Inequitable treatment can arise where differently situated class members are treated equally by a settlement").

The States' proposal to treat Consumers in non-settling states differently than Consumers residing in the States, is fair and reasonable for several reasons. First, the States' *parens patriae* and other claims on behalf of their citizens are different than class action claims. The claims brought on behalf of Consumers in non-settling states consist of the EPPs' private cause of action class action claims for Consumers residing in those states. Compared to the States' *parens patriae* claims and other state claims, the EPP claims carry more uncertainty and litigation risk. For example, the class action claims are reliant on the ability to certify a class, *see* F. R. Civ. P. 23. Treating Consumers differently because of the strength of claims asserted on their behalf and risk of non-recovery is not uncommon nor unfair. *See e.g. In re Remicade Antitrust Litig.*, No. CV 17-4326-KSM, 2023 WL 1850502 (E.D. Pa. Feb. 8, 2023) (Members of Selected States treated differently from members in other states because of those states' laws); *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) (varied relief among class members with differing claims in class settlements is not unusual); *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1146 (8th Cir.1999) ("[A]lmost every settlement will involve different awards for various class members.").

Numerous courts have approved distribution plans that allocate the settlement proceeds according to the relative strengths and weaknesses of the various claims. See *e.g. In re Warner Communications Sec. Lit.* 618 F. Supp. 735, 745 (S.D.N.Y. 1985), affd., 198 F.2d 35 (2d Cir. 1986)(the proposed method of allocation recognizes the potential for recovery varies among class

members); *In re MetLife Demutualization Litig.,* 689 F.Supp.2d 297, 344 (E.D.N.Y 2010) ("Relative strength and value of different categories of claims may be considered"); *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982)(not unfair for settlement's distribution formula to reflect value of claim). "[W]hen real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh 'distribution of the settlement ... in favor of plaintiffs whose claims comprise the set' that was more likely to succeed." *In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. at 133 (quoting *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1411 (E.D.N.Y. 1985); *see Becher v. Long Island Lighting Co*, 64 F. Supp 174, 181-182 (E.D.N.Y 1999) (approving allocating settlement funds among three different groups of class members based on the strengths of their claims and relative risk of non-recovery). For clarification, the States' allocation plan does not take into account the existence of *Illinois Brick* repealers[29] because "[i]t is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than claimants from other states; all claimants sought damages through consumer protection statutes, some of which also provide for punitive or treble damages." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004).

Second, the scope of the release is less for Consumers residing in non-settling states. States Decl. ¶21. Settling defendants pay for releases. The release of claims provided for Consumers residing in non-settling states is less than for Consumers residing in the States, as *parens patriae* and other state claims are not being released for Consumers in non-settling states to the same extent that they are by the States' Consumers. An important part of a global settlement is "that Defendants

---

[29] Since the U.S. Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746-47 (1977)), holding that "indirect" purchasers do not have antitrust standing to sue for damages under federal antitrust law, most states have enacted so-called *Illinois Brick* repealer statutes, or developed case law, that expressly allow downstream purchasers to bring claims under the respective state antitrust laws.

achieve 'total peace.'" *In re Remeron End-Payor Antitrust Litig.*, No. CIV. 02-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) (quoting *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir.1982). It is reasonable and fair that the States' Consumers be compensated differently because of the total peace provided to Defendants from the States.

Third, the States are carrying the labor and cost of the claims process and distribution to Consumers, from which the EPP proposed consumer class benefits. States Decl. ¶21. Therefore, it is fair and reasonable that the States be entitled to compensate Consumers residing within the States differently than Consumers residing in other states that have not participated in or contributed to the States Actions.

"As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *In re PaineWebber Ltd. Partnership Litig.,* 171 F.R.D. at 133. The States' proposed plan of consumer allocation and distribution has a reasonable and rational basis and is recommended by fifty state attorneys general, making it both fair and adequate under the circumstances of the States' Action. *See In re GSE Bonds,* 414 F. Supp.3d at 694.

The Settlement provides a significant recovery that can reimburse a large number of Consumers for a share of their damages. The proposed framework for allocation and distribution is calculated to bring relief to as many Consumers as possible by employing a method that will equitably distribute the benefits to affected Consumers. The States maintain the proposed framework for a distribution plan is fair and reasonable under the circumstances and, therefore, asks the Court to preliminary approve the proposed outlines of a distribution and allocation plan.[30]

---

[30] EPPs will request that the MDL court find that this proposed framework is fair, reasonable and adequate.

4. <u>Final Distribution Plan is Deferred to a Future Date.</u>

According to the terms of the Settlement, any distribution to Consumers will be made pursuant to a future Court-approved distribution plan, after this Settlement Final Court Approval, and at a time to be determined by the States. *Settlement ¶ XI.B.* Approval of a settlement does not depend on approval of a distribution plan. *See e.g. In re Chicken Antitrust Litigation,* 560 F.Supp. 957, 959 (N.D.Ga.1980), *aff'd,* 669 F.2d 228 (5th Cir.1982); *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871 (1971). The States ask that a complete distribution plan, and any deadlines related thereto, be deferred and presented to the Court for approval at a future date when there are enough consumer funds accumulated to make a distribution practicable and sensible.  States Decl. ¶22.

E. **The Court Should Appoint Huntington Bank as the Escrow Agent**

Pursuant to the Settlement, Apotex will pay $39.1 million (the "State Settlement Amount") to the States. *Settlement ¶I.DD.* Apotex's payment will be deposited directly into escrow with Huntington Bank, and which will accrue interest. States Decl. ¶15. The States shall hold the State Settlement Amount in escrow pending Final Court Approval and the distribution of settlement funds from the State Escrow pursuant to a court-approved allocation plan. *Settlement ¶II.A.* A State Escrow (a "Settlement Fund") shall be established by order of the court at Huntington Bank with such bank serving as escrow agent ("Escrow Agent"). *Settlement ¶IX.A.* Huntington Bank is well qualified to serve as the escrow agent, having regularly served in that role in many other *parens patriae* or class action settlements. States Decl. ¶15. Therefore, the States request that the Court appoint Huntington Bank to serve as Escrow Agent for the purpose of administering the State Escrow holding the Settlement Fund.

## VI.  CONCLUSION

For the foregoing reasons, the States respectfully request that the Court (1) grant preliminary approval of the Settlement; (2) approve Huntington Bank as the Escrow Agent, (3) stay litigation against Apotex until the Court decides whether to grant final approval of the Settlement; (4) approve Rust Consulting as the Notice and Claims Administrator, (5) approve the Notice Plan for providing notice to Consumers, (6) approve a 70/30 percentage split and allocation of the State Settlement Amount between restitution and cost escrow, (7) approve a 45.08/24.94 percentage split and allocation of the State Settlement Amount between Consumers and  State Entities who are State Releasors, (8) approve the proposed framework for a plan of distribution and allocation to Consumers and defer the approval of a final distribution plan until a later appropriate date, and (9) set a date and time for a final approval hearing.

Respectfully submitted this 26th day of March, 2025.

STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL

/s/ *Robert L. Hubbard*
Robert L. Hubbard
Saami Zain (phv 208329)
Assistant Attorneys General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY 10005
Tel: (212) 416-8267
Robert.Hubbard@ag.ny.gov
Saami.Zain@ag.ny.gov

*Attorneys for the State of New York*

STATE OF NORTH DAKOTA
DREW H. WRIGLEY
ATTORNEY GENERAL

/s/ *Elin S. Alm*
Elin S. Alm
Bar number phv207896
Assistant Attorney General
Director, Consumer Protection & Antitrust Div.
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
Facsimile (701) 328-5568
ealm@nd.gov

*Attorneys for the State of North Dakota*

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

<u>*/s/ W. Joseph Nielsen*[31]</u>
W. Joseph Nielsen
Federal Bar No. ct20415
Allison C. Frisbee
Federal Bar No. ct30779
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5030
Fax: (860) 808-5391
Joseph.Nielsen@ct.gov
Allison.Frisbee@ct.gov
*Attorneys for the State of Connecticut*

---

[31] Counsel for Plaintiff State of Connecticut represents the consent of all Plaintiffs in the above captioned case pursuant to Section XI.D. of the Electronic Filing Policies and Procedures.